# *EXHIBIT C*

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION
CIVIL ACTION NO. 2:13-cv-4178

KATHERINE JEAN HARTUNG,                    :
                                           :
            Plaintiff,                     :
                                           :
    vs.                                    :
                                           :
REGINALD KENNETH YELVERTON and             :
ADVANTAGE TANK LINES, LLC d/b/a ATL        :
LEASING, INC., an Ohio Corporation,        :
                                           :
            Defendants.                    :


                    ---------
              MAY 20, 2014
                    ---------


        Oral deposition of SCOTT L. TURNER, taken
pursuant to notice, was held at BEST WESTERN PLUS
MORRISTOWN INN, 270 South Street, Morristown, New
Jersey, commencing at 10:13 a.m. on the above date,
before GINA A. FAROLDI, a Certified Court Reporter
of the State of New Jersey.

              Magna Legal Services
                866-624-6221
                www.MagnaLS.com



```
 1   A P P E A R A N C E S:
 2        WARNER LAW OFFICES, PLLC
          BY:  TAMMY BOWLES RAINES, ESQUIRE
 3        227 Capitol Street
          Post Office Box 3327
 4        Charleston, West Virginia  25333
          Representing the Plaintiff
 5
          PION, NERONE, GIRMAN, WINSLOW & SMITH, P.C.
 6        BY:  TIMOTHY A. MONTGOMERY, ESQUIRE
          1500 One Gateway Center
 7        Pittsburgh, Pennsylvania  12034
          (412) 281-2288
 8        Representing the Defendants
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Case 2:13-cv-04118-T Document 79-2 Filed 03/05/14 Page 6 of 94 PageID 1519

```
                                                                 Page 3

 1                          ------
                           I N D E X
 2                          ------
 3   Testimony of:  SCOTT L. TURNER
 4     By:  Mr. Montgomery        5
       By:  Ms. Raines          244
 5
 6                         --------
                     E X H I B I T S
 7                         --------
 8   NO.   DESCRIPTION                          PAGE
 9   A     Curriculum vitae                       7
10   B     Case list                             26
11   C     3/25/14 expert report                 48
12   D     Transcript excerpts                   86
13   E     1/14/14 expert report                 94
14
     Original exhibits B through E attached
15
16
17
18
19
20
21
22
23
24
25
```



Case 2:13-cv-04173  Document 79-2  Filed 07/09/14  Page 4 of 05/09  PageID age 1520

```
                                                                     Page 4

   1                        -------------

                      DEPOSITION SUPPORT INDEX

   2                        -------------

   3

        Direction to Witness Not to Answer

   4

        Page Line       Page Line     Page Line

   5

   6

   7   Request for Production of Documents

   8   Page Line       Page Line     Page Line

   9

  10

        Stipulations

  11

        Page Line       Page Line     Page Line

  12

  13

  14   Question Marked

  15   Page Line       Page Line     Page Line

  16

  17

  18

  19

  20

  21

  22

  23

  24

  25
```



1   S C O T T   L.   T U R N E R,

2   63 Wishing Well Road, Columbia, New Jersey  07832,

3   sworn, testifies as follows:

4   BY MR. MONTGOMERY:

5       Q.       Good morning, Mr. Turner.  My name is

6   Tim Montgomery.  We were introduced previously.

7   We're here today to take your deposition as a result

8   of an expert report that you have filed in the case

9   of Katherine Hartung versus Advantage Tank Lines,

10  Inc., Reginald Kenneth Yelverton, which has been

11  filed in the United States District Court for the

12  Southern District of West Virginia.

13              I am assuming you have probably had

14  your deposition taken prior to today.

15      A.       I have.

16      Q.       How many times, roughly, if you could

17  estimate?

18      A.       Maybe a dozen?

19      Q.       There are a couple of ground rules

20  that I would like to go over before we start taking

21  the deposition.  I am sure you probably heard these

22  before.  I think that we need to be consciously

23  aware of them so that the court reporter can take

24  down everything we are saying with accuracy and

25  clarity.



Page 6

1                    First, I am going to ask that you let

2     me finish asking my questions before you start to

3     answer.  We tend to probably get conversational.  It

4     is human nature to do so.  At the same time, I will

5     try and extend that same courtesy to you and let you

6     finish answering before I start asking.  If we start

7     talking over each other, the court reporter is not

8     going to be able to take down what we say.

9                    The second thing, I am going to ask

10    that you please keep all of your responses verbal.

11    You cannot nod your head, um-hum, things of that

12    nature.  "Yes" and "No" is the appropriate method of

13    answering questions when there is someone

14    transcribing what we are saying.

15                   Third, if you need to take a break at

16    any point in time, just please let me know.  This is

17    not a test of your endurance or mind, although from

18    what you were telling me earlier, you shouldn't have

19    an issue with sitting here for an extended period of

20    time.  Like I said, if you do need a break, please

21    let me know.  I can certainly afford that to you.

22                   Mr. Turner, you authored a report in

23    this matter on March 25, 2014.  Correct?

24         A.        Yes, sir.

25         Q.        Did you, at some point in time, also



Case 2:15-cv-04178  Document 79-2  Filed 07/21/14  Page 7 of 35  PageID #:920

Page 7

 1   provide your CV to plaintiff's counsel?

 2        A.      I did.

 3                MR. MONTGOMERY:   I am going to go

 4   ahead and mark, as Exhibit A, Mr. Turner's CV.

 5                (Exhibit A, Curriculum vitae, marked

 6   for identification.)

 7        Q.      Mr. Turner, I am handing you what has

 8   been marked as Exhibit A.  Is that a copy of your

 9   CV?

10        A.      It is.  It's not the most current.

11   But, it is -- it is, nonetheless, a copy of my CV.

12        Q.      Is it possible to get an updated

13   version of that?

14        A.      You bet.

15        Q.      If you can give that to counsel, she

16   can give it to me.  That would be great.

17        A.      Yes, sir.

18        Q.      With respect to your background,

19   could you give me the highest level of education

20   that you have achieved?

21        A.      Yes, sir.

22                It was -- I graduated high school.

23   No college education.

24        Q.      No college or any graduate school or

25   anything of that matter?



Case 2:15-cv-04178 Document 79-2 Filed 07/03/14 Page 8 of 33 PageID #: 924

Page 8

1       A.      No, sir.

2               My -- all my training is relative to

3    commercial motor vehicles predominantly.  Commercial

4    motor vehicles in one respect or another, whether

5    safety or, you know, things of that nature.

6       Q.      Let's focus in on that.  What

7    training have you had with respect to commercial

8    motor vehicles?

9       A.      Well, one of the things that's not on

10   the current -- it's not on this version of the CV

11   here is NATMI, which is North American

12   Transportation Management Institute.  I completed

13   their course on supervisors and also transportation

14   director for -- under NATMI.  Again, North American

15   Transportation Management Institute.

16               I've also attended a week long

17   program by the Institute of Technology & Management,

18   which is out of Jacksonville, Florida on commercial

19   motor vehicle crash investigation.  They get into

20   reconstruction aspects and so forth and that.

21               A plethora of courses through New

22   Jersey State Police, where actually I've been an

23   FMCSA trained individual for roadside inspections.

24   So, I'm trained essentially to the level of when

25   you're driving down a highway and you see a trooper



Case 2:14-cv-11473-AJT-RSW ECF No. 50-3, PageID.1476 Filed 05/09/17 Page 10 of 246
Case 2:13-cv-04178 Document 79-2 Filed 07/15/14 Page 9 of 343 PageID #: 1329

Page 9

1    underneath a truck with a creeper inspecting the

2    brakes and so forth, I'm trained to that level.

3    Also, that involves post crash, as well on

4    commercial manufactures.

5            I'm trained as a -- that's level one

6    FMCSA, by the way, which is the highest level with

7    respect to roadside inspections.

8            Also trained under -- as a hazmat

9    inspector. Roadside hazmat inspector. So, checking

10    cargo on trucks for compliance with the PHMSA,

11    Pipeline and Hazardous Materials Safety

12    Administration.

13            Also weights and measures. I've been

14    trained under the weights and measures master, which

15    involves with dealing with truck weights, as well as

16    widths of vehicles -- legal widths and so forth.

17    Lengths of vehicles.

18            Been also trained as a cargo tank

19    truck specialist. Also, I was a 11 year instructor

20    -- lead instructor with the New Jersey State Police

21    for cargo tank truck emergency disasters and

22    response and incidents. So, dealing with any type

23    of -- with respect to MC 306/DOT 406 cargo tank

24    trucks, which is petroleum carriers. I also trained

25    a lot of the aspects of -- which would be similar to



Case 2:14-cv-11473-AJT-RSW Document 79-2 Filed 04/29/21 Page 11 of 34 PageID 1526

Page 10

1    this type tank truck here.  MC 307/DOT 407, which

2    are chemical carriers.  Although this tank truck

3    that was involved in this incident here, to the best

4    of my knowledge, was a nonspec cargo tank, which

5    would not meet any of those requirements.  But, you

6    still, nonetheless, would have slosh and surge

7    factors and things of that nature that applied to

8    it.  And rollover factors.

9                   University of Findlay advanced

10   emergency response of cargo tank truck.  I've been

11   trained on that, as well out of Ohio.

12                   University of Medicine & Dentistry

13   hazardous waste site investigation, which I'm not

14   gonna talk about the nonrelevant courses.

15         Q.      Let me ask you that.

16         A.      Well, there's one last one, which I

17   think is important.

18         Q.      Please.

19         A.      Smith System.  Smith System driver

20   training.  I'm an instructor in that, as well.

21   We're training individuals on the Smith System on

22   proper and safe methodologies of operating

23   commercial and/or fleet type vehicles.

24         Q.      Out of the training that you just

25   talked about on the record, can you identify which



1   areas that you just discussed were applied in your

2   investigation of this matter?

3       A.      I think it really is kind of a

4   combination of all of them for the most part.  At

5   one point in time or another, in the training and/or

6   being an instructor --

7       Q.      For instance, you talked about

8   rollover prevention.  I don't know that that

9   necessarily would be applicable to this crash.

10      A.      No.  It wouldn't -- it would not be

11  -- no.  It wouldn't be applicable to the crash.

12              Not only that, you're dealing with a

13  material for slosh and surge factors.  You're

14  dealing a material that's very viscus.  So, you're

15  not going to have the slosh or surge factors that

16  you would have with say like gasoline or something

17  to that effect.  Because it's an elevated

18  temperature material.  Meaning that it's rather

19  thick, if you will.

20              Probably, the course that would stand

21  out most would be Institute of Police Technology &

22  Management, IPTM.  That has a lot to do with it.

23  Commercial motor vehicle crash inspection

24  investigation.  That has a lot to do with it.  So,

25  FMCSA level one would have a lot to do with it.



Case 2:15-cv-04176   Document 79-2   Filed 07/18/11   Page 12 of 359 PageID: 1320

Page 12

1              Also, one other one would be, not

2    listed on the CV, NATMI training, getting into

3    investigation of crashes -- post crash incidents.

4         Q.        You mentioned the IPTM training as

5    being applicable and specific to the opinions you

6    formed in this crash.  Correct?

7         A.        It would be relative.  Yes.

8         Q.        When did you go to the IPTM school?

9    Do you remember?

10        A.        I would say probably -- I'm gonna

11   take a guess and say maybe three, four years ago.

12              This is all, obviously, in addition

13   to the excessive experience -- the considerable

14   experience that I have in dealing with crashes over

15   the 20 plus years.

16        Q.        Sure.  I think you mentioned earlier

17   that the IPTM school has actually taught you how to

18   do a post crash analysis.

19        A.        It was more -- not necessarily -- I'm

20   not going to say not teaching me.  But, it's more or

21   less affirming a lot of the things I already knew

22   based on the experience of 20 plus years.  A lot of

23   it is just commonsense that now is more or less

24   defined in words in a book, if you will.

25        Q.        Did you receive any sort of



Case 2:13-cv-04178   Document 79-2   Filed 07/15/14   Page 13 of 349 PageID#: 1329

Page 13

1   certification for attending the IPTM class?

2        A.        I did.

3        Q.        Do you currently have that

4   certification?

5        A.        I do.

6        Q.        Do you remember who your instructors

7   were at the IPTM?

8        A.        They were two fellas from down in

9   Georgia.  Georgia and I think Jacksonville.  I can't

10  place their names.  Actually, I went out -- I took

11  them out to dinner on the last day.  We got to know

12  each other pretty well.  But, I don't recall their

13  names offhand.  It's been three or four years now I

14  guess it's been.

15       Q.        Do you remember who the author of the

16  materials that were used for the IPTM course were?

17       A.        One of the instructors is one in the

18  same.  He was also the author of the book that we

19  utilized.

20       Q.        Do you remember what his name was?

21       A.        No.  Again, I don't remember the

22  instructors' names.

23       Q.        Did you ever, at any point in time --

24  was the name Steve Rickard mentioned?  Does that

25  name ring a bell at all?



Case 2:14-cv-11473-AJT-RSW  Document No. 9  Filed 04/04/14  Page 15 of 246

Page 14

1         A.         I'm -- not offhand.  I don't -- I

2    don't believe so.

3         Q.         The reason why I ask, I will relay

4    this to you, he is our -- we are using him as an

5    expert in this case.  I know that he teaches at IPTM

6    quite extensively and frequently.  I know that he

7    has authored a lot of the materials.  I was just

8    wondering if there was any sort of connection there.

9         A.         Well, IPTM has a lot of instructors.

10   There's a lot of adjunct instructors that are

11   involved over there.  I just don't -- I don't

12   recall.  I don't believe he was.  I don't believe

13   that he was.  You know, I could be mistaken.  But,

14   I'm pretty sure he wasn't.

15        Q.         Maybe not on that particular day.  I

16   can relate to you that he is involved extensively --

17   University of North Florida IPTM course.  Is that

18   what we are talking about?

19        A.         Yeah.  It's a big program.  It's

20   actually considered to be one of the lead programs

21   in the country.

22                    So, they've got a lot of adjunct

23   instructors similar to what I have done as an

24   instructor with the New Jersey State Police.  There

25   was probably about 24 of us that were, you know,



Case 2:13-cv-04178   Document 79-2   Filed 07/10/14   Page 15 of 349   PageID: 1931

Page 15

1    teaching.

2                 I've trained folks from New York City

3    fire and hazmat, New York emergency -- ECU -- ECS.

4    You know.  Boston and, you know, Philadelphia and so

5    forth.  So, it's somewhat similar in that regard I

6    guess.

7         Q.      When you were at IPTM, did they teach

8    you the principals of say accident reconstruction?

9         A.      Yes.  There were -- there was

10   training issues on that.

11        Q.      At IPTM, were you trained on

12   perception-reaction time?

13        A.      There was -- it was part of it.  I'm

14   not going to say -- it certainly was not the entire

15   course.  But, to the best of my recollection, that

16   was part of it.

17        Q.      They taught you about how to apply

18   perception-reaction to an automobile accident such

19   as this one?

20        A.      Yes.  But, I don't do cars.  I don't

21   get involved with reaction times of cars and stuff.

22   I get involved with the react -- I shouldn't say

23   reaction time of cars.  But, I don't get involved

24   with accident reconstruction with car on car.

25   Strictly it's -- it has to have a commercial motor



Page 16

1    vehicle involved for me to get involved.

2         Q.        Did you actually do a reconstruction

3    of this accident?  A formal reconstruction.

4         A.        I wouldn't call it necessarily a

5    formal reconstruction.  I did a -- I did a

6    reconstruction as looking at it and breaking it down

7    into 15 second increments coming in to the -- I

8    believe it was 15 second increments coming in to the

9    crash.  I don't recall exactly -- well, I -- if you

10   look at the electronic tachograph, the electronic

11   tachograph actually breaks it down into intervals

12   that I utilized in order to be able make

13   determinations of where the trucks were at what

14   point in times and so forth.

15        Q.        When you say "where the trucks were,"

16   you mean where the truck and the car were or just

17   the truck?

18        A.        Where the truck was.

19        Q.        Did you take into consideration the

20   actions of the driver of the motor vehicle at any

21   point?

22        A.        I did.

23                  MS. RAINES:  Objection to form.

24        A.        I did.  But, more on a rudimentary

25   level.  I didn't get into the break it down into



Case 2:13-cv-04178 Document 79-2 Filed 07/15/14 Page 17 of 349 PageID#: 1535

Page 17

1    what she was doing.  I don't, quite frankly, as

2    every other expert in this matter, doesn't know if

3    she had a vehicle to her left-hand side.  So, I

4    couldn't make a determination if she was able to

5    safely make that left hand -- lane change.  So, I

6    just didn't -- there was no witnesses that came

7    forward to say that she looked like she was

8    attempting to make that left-hand lane change.  So,

9    I didn't get into details on that.

10        Q.      Did you read Ms. Hartung's deposition

11   transcript?

12        A.      I did.  It was quite some time ago,

13   though.

14        Q.      Did you read the section where she

15   was asked whether there were vehicles to her

16   left-hand side?

17        A.      Honestly, I don't recall that part.

18        Q.      I am just wondering if -- because you

19   said that you didn't take that into consideration.

20   Her testimony was that there weren't any vehicles to

21   her left-hand side.  Is that something that you

22   would have considered in your report?

23            MS. RAINES:  Object to form.  Maybe a

24   little bit of mischaracterization.

25        A.      Again, I don't -- I don't get



Case 2:13-cv-04173   Document 79-2   Filed 07/16/21   Page 18 of 345   PageID: 1834

Page 18

1    involved with the car -- the activities of the car.

2    I more or less look at it from an FMCSR standpoint,

3    what the truck did and did not do.  So, I did not

4    break down the car issues, if you will.

5         Q.     We are getting into this well ahead

6    of where I initially planned to in the deposition.

7    But now that we are talking about it, is it your

8    testimony that really your analysis was with respect

9    to what the truck driver did or didn't do and you

10   really didn't take into consideration what the

11   driver of the motor vehicle did or did not do when

12   formulating your opinion?

13             MS. RAINES:  Objection to form.

14        A.     I think that's pretty well reflected

15   in my report.  I did not get into what Ms. Hartung

16   did or did not do.  My focus was what Mr. Yelverton,

17   from a commercial motor vehicle operator, did or did

18   not do.

19             I did, from a lesser standpoint, make

20   some degree of consideration about Ms. Hartung.

21   But, not in depth.

22        Q.     But that consideration that you just

23   testified about, is that -- where in your report can

24   you point to where you made that consideration?

25        A.     No.  No.  In my mind.  I'm not saying



Page 19

```
 1   in the report.
 2        Q.       So you made that consideration in
 3   your mind.  But, you didn't include any
 4   consideration of what Ms. Hartung did or did not do
 5   wrong in your report?
 6        A.       That's correct.
 7        Q.       Have you been trained in human
 8   factors at all?
 9        A.       Human factors, just to the extent
10   that if they were brought up in training programs.
11   Were there specific training courses that I took on
12   human factors?  No, sir.  I'm not a human factors
13   expert.
14        Q.       You personally couldn't make any sort
15   of commentary on Mr. Edwards' report then?
16                 MS. RAINES:  Object to the form.
17        A.       Well, there is a -- bringing up Mr.
18   Edwards' report, I mean, I really couldn't --
19   there's two issues that I would bring up on Mr.
20   Edwards' report, one of which is --
21        Q.       I'm asking if you could comment on it
22   or not.
23        A.       On the human factors aspects, no.
24   But, I do have some comments with respect to Mr.
25   Edwards' report.
```



```
 1          Q.         Have you also had an opportunity to
 2    review Mr. Richter's report?
 3          A.         I did.
 4          Q.         I am assuming you also feel that you
 5    have specialized knowledge that would allow you to
 6    comment on that report?
 7          A.         Yes, sir.
 8          Q.         Have you had any engineering
 9    training?
10          A.         No, sir.
11          Q.         Are you a certified accident
12    reconstructionist?
13          A.         I don't belong to ACTAR or anything
14    like that.  No, sir.
15                     THE WITNESS:  A-C-T-A-R.
16          Q.         Do you ever act as an instructor in
17    any capacity in the field of accident
18    reconstruction?
19          A.         No, sir.
20          Q.         Obviously, not in human factors
21    either?
22          A.         No, sir.
23          Q.         How about truck -- tractor trailer
24    inspections?
25          A.         I have trained on that.  Yes.  But,
```


MAGNA ▶

Page 21

1    am I a -- is -- am I an active instructor in it?

2    No, sir.

3         Q.        Do you hold any state licenses in

4    accident reconstruction or -- I will quit asking

5    that.

6                   Do you have any state licenses in

7    tractor trailer inspections?

8         A.        There is no -- that I'm aware of,

9    there is no such thing as a state license.  You go

10   through -- it's MCSAP, M-C-S-A-P, which is -- it's

11   funding that -- funds for instructors -- excuse me.

12   Not instructors.  But, personnel to investigate

13   and/or inspect commercial motor vehicles roadside.

14   That gets in to the FMCSA.  So, it's a federal level

15   rather than a state level.

16        Q.        So you are a trained MCSAP

17   instructor?

18        A.        I'm trained in the FMCSA level one.

19   Yes, sir.

20        Q.        Level one.

21                  Is that -- a MCSAP inspection, FMCSA

22   level one inspection, that's -- tell me if I am

23   mischaracterizing it.  That is more or less a

24   mechanical inspection to make sure that the motor

25   vehicle -- the tractor trailer is compliant with the

MAGNA ▶
LEGAL SERVICES

Page 22

1    Federal Motor Carrier Safety regulations.

2              MS. RAINES:  Object to form.

3        A.        Yeah.  Essentially what it does, it

4    takes apart 393 and 396 out of the FMCSR and applies

5    mechanical aspects.  But, at the same time, it

6    teaches you out of service issues.  You learn about

7    out of service.  What conditions would make a

8    commercial motor vehicle considered to be out of

9    service by the regulations.

10             So, taking all that into

11   consideration, you're -- you take that information

12   and do post crash inspections and be able to make

13   determinations.

14             For example, if it was a truck crash

15   involved with a braking matter and the truck ran in

16   to the rear end of another truck and there were skid

17   marks showing that the driver was awake or, you

18   know, he did try some evasive maneuvers or what have

19   you, you can then take that commercial motor vehicle

20   and check the brakes on it to make sure that the

21   brakes were in compliance and that 20 percent or

22   greater of these brakes were not out of service.

23   Out of spec I should say.

24        Q.        You look for things like conspicuity

25   tape being proper?



Case 2:14-cv-11473-AJT-RSW Document 79-2 Filed 04/25/14 Page 23 of 49 PageID 4535

Page 23

1        A.        Correct.

2                  If it was a rear end on the truck in

3   front, was there conspicuity markings --tape on the

4   vehicle, itself?  Were the lights working on the

5   vehicle?  Was he on the shoulder?  Did he have his

6   four way flashers on, things of that nature.  Did he

7   have his triangles out?

8                  So, it's kind of a combination of a

9   bunch of different things that bring me to that

10  conclusion when I'm investigating a crash.

11                 So, it's in part, the FMCSA training,

12  in part of over a thousand crashes in my career, and

13  in part, the IPTM training in addition to other

14  training throughout my years.

15       Q.        As an FMCSA level one MCSAP

16  inspector, after a crash happens, your role in that

17  particular investigation is more or less looking at

18  the truck in terms of the physical or mechanical

19  characteristics of what was happening with the truck

20  at the time of the accident.  Is that accurate?

21                 MS. RAINES:  Object to form.

22       A.        Yeah.  What was happening with the

23  truck -- also, looking at reaction times of a driver

24  -- of a commercial motor vehicle driver and looking

25  at the 1.5 second reaction time and so forth, you



1    know, looking at evidence such as brake -- skid

2    marks.  Skid marks are going to tell me that the

3    driver wasn't necessarily on his -- dialing his cell

4    phone, or looking down at a cup of coffee, or

5    changing his CD player, or something to that effect,

6    or even fatigue related matters where the driver

7    fell asleep behind the wheel.  If you see no skid

8    marks, that's going to tell you that the driver, in

9    all probability -- especially if you look at the

10   circadian rhythm.  That the driver may have fallen

11   asleep at the wheel at 3:30 in the morning.  So,

12   it's taking a whole combination of these variables

13   and, you know, kind of coming up with an opinion.

14        Q.      Let's say reaction time that you

15   mentioned before, that's more from your training at

16   IPTM in accident reconstruction rather than your

17   FMCSA level one MCSAP inspector's hat so to speak?

18        A.      It is.  But, not to say that in the

19   FMCSA training, that it wasn't covered.  Because it

20   certainly was covered.  It was discussed.  Was it

21   discussed to the extent that it was trained in the

22   IPTM?  No.

23              In addition -- I mean, not

24   necessarily is all of my education on certifications

25   and on my CV.  I spent a lot of time, you know,



Page 25

1    studying this stuff and reading this stuff, as well,

2    through the years.  So, self-taught I guess you

3    might say to a large extent, as well.

4         Q.        Have you ever given testimony in any

5    case where you have done a full accident

6    reconstruction with perception-reaction and done the

7    mathematical calculations that go along with that?

8         A.        When it gets into things like the

9    mathematical calculations and the crush factors and

10   so forth, that's not really my area of expertise as

11   far as reconstruction is concerned.  Reaction times

12   and so forth, yeah.  I mean, drag factors, things of

13   that nature, crash factors I don't get involved

14   with.  But, taking and breaking down the reaction

15   time, looking at the half second, that lag time for

16   a commercial motor vehicle air brake system, you

17   know, incorporating all of that into what occurred

18   with that commercial motor vehicle before that crash

19   occurred, yes.  I do get involved with that.

20              But do I get involved to the extent

21   of the mathematical applications that -- no, I

22   don't.

23        Q.        In what cases have you testified

24   where you have given that kind of analysis?

25        A.        Oh.  I -- I --



Page 26

1      Q.      If you want, I have a list of cases

2   where you have given testimony in the past.  Maybe

3   that -- if you look at that, it would help --

4      A.      Yeah.  It depends on how current that

5   is, too.

6      Q.      We will mark this as Exhibit B.  To

7   the extent that it is not current, I would

8   appreciate if you could give a current version to

9   counsel.

10      A.      Sure.

11              (Exhibit B, Case list, marked for

12   identification.)

13      A.      Actually, I have some current cases

14   that I'm, working -- as a matter of fact, one is in

15   West Virginia right now that I'm dealing with that.

16   I have some current cases, unfortunately, right now

17   that I can't disclose.  Let me continue looking at

18   this list and I'll try to give you a more firm

19   answer as to what --

20      Q.      Not to be confrontational, but why

21   wouldn't you be able to disclose any current cases

22   that you have given testimony in?

23      A.      Without counsel's approval on the

24   other side, I'm not gonna sit here in deposition and

25   talk about opinions and --

MAGNA ▶

LEGAL SERVICES

Page 27

1      Q.      An ongoing matter?

2      A.      Right.  Exactly.

3              I'm gonna put a checkmark next to the

4  ones that I think may be involved with what the

5  subject matter is.  Not a hundred percent certain.

6  Just going back on my recollection.

7      Q.      Okay.

8      A.      Or I'll maybe highlight it.

9  Highlight or check?  What would you like?

10      Q.      Highlight works just fine.

11      A.      And again, this is going back on

12  recollection.  I'm not a hundred percent certain,

13  though.  I'll send you off on a wild goose chase

14  now.

15              Well, here's one here, this Arkady

16  Frekhtman, F-r-e-k-h-t-m-a-n.  There was never a

17  report generated and it was never actually filed in

18  the suit because I walked away based on the

19  findings.  I explained to the attorney that you

20  don't have a case or it's a nonstarter.  So, never

21  filed a case.  He walked away from it, as well.

22      Q.      What was the name?

23      A.      Sure.  Arkady Frekhtman.  That's the

24  attorney.  F-r-e-k-h-t-m-a-n.  There was nothing

25  in-depth.  But, I did some analysis on it, to make a



Page 28

1    determination what happened, what the driver did and

2    so forth.  It was a crash and burn on a CMV.

3              Here's one down in Texas.  Terry

4    McCartney.  It was a crash and burn, as well.

5    Again, there was some degree of -- some degree of

6    reconstruction that was applied on these, as well.

7        Q.      Just so I am clear, you don't do

8    reconstructions in cases involving motor vehicles.

9    You only do them when there is a commercial motor

10   vehicle involved.

11       A.      Right.  That's correct.

12              Chris Karounos, there was some

13   reconstruction that was done on that one.  That's

14   K-a-r-o-u-n-o-s.  Again, I highlighted that one, as

15   well.

16       Q.      I want to follow up on that while we

17   are still on the topic.

18              Is there a particular reason why you

19   don't get involved doing reconstructions in cases

20   involving motor vehicles?  Is it because you haven't

21   been trained in that --

22       A.      No.  It's just something that I

23   prefer not to do.  If I'm not real good at

24   something, I don't do it.  I consider myself to be

25   really good at commercial motor vehicle crashes, and



1    investigating the truck, and investigating the

2    circumstances around the crash, why it happened and

3    so forth.  But, I don't get involved with the

4    aspects that necessarily are something that I -- if

5    I don't feel that I'm 110 percent on it, right, if

6    I'm 99.9 percent on it, I'm not going to do it.  I

7    get asked to do cases quite often in truck related

8    work that I just won't do because I just don't -- I

9    don't want to spend my time dealing with something

10   like that.

11        Q.        But you -- my question is then, you

12   do know how to apply perception-reaction time to a

13   motor vehicle crash such as this one?

14        A.        I do.

15        Q.        Is there any reason why you didn't do

16   that in your analysis in this matter?

17        A.        Again, I was -- my focus was on the

18   commercial motor vehicle.  You know.  All my

19   information shows I'm a commercial motor vehicle

20   expert.  So, I'm looking at more from a regulatory

21   standpoint, what the truck did or did not do.  And

22   now if I felt that Ms. Hartung was -- was the lead

23   cause on the crash, then I certainly would have

24   added it into there.  I would have at least put some

25   kind of footnote in there, if you will.  But, you



Case 2:14-cv-11473-AJT Document 79-2 Filed 07/05/14 Page 00079549 PageID: 1540

Page 30

1    know, I didn't feel as though she was.  My focus was

2    on the truck and Mr. Yelverton's actions.

3            Q.        I understand that.  But, there were

4    two vehicles involved in the crash.

5            A.        I understand.

6            Q.        Ms. Hartung rear-ended Mr.

7    Yelverton's vehicle.  Is that not how this crash

8    happened?

9            A.        Mr. --

10           Q.        Answer my question.

11           A.        Well, I deserve the right to go --

12    other than just a yes or no.

13                     MS. RAINES:  Objection.

14           Q.        Did Ms. Hartung's vehicle strike the

15    rear of Mr. Yelverton's tractor trailer?

16           A.        Well, of course she did.

17           Q.        But you didn't take any consideration

18    -- you didn't take into consideration whether she

19    could have avoided the accident by looking ahead?

20           A.        I'm not saying that there may have

21    been opportunity for her to cut left to get around

22    that crash.  All right?  I don't know that for a

23    fact.  I was not in the vehicle.  I don't know her

24    actual speed.  You know.  I know she testified I

25    believe to 65 miles per hour.  So, I -- I just



Page 31

1    didn't opine on that.  I based my information on

2    facts that I have and the facts that I have is she

3    slammed into essentially a parked -- for all intents

4    and purposes, a parked tractor trailer on the

5    interstate highway.  You know?  And there were no --

6    there was no attempt to get to the shoulder.  There

7    was -- you know, as far as four-ways are concerned,

8    four-way hazard lights, I don't believe that Mr.

9    Yelverton put the four-ways on.  You know.

10                   As far as his distraction that he had

11   on his cell phone --

12        Q.       We read your report.  We'll talk

13   about the report.

14        A.       Right.  Okay.

15                   Let me keep going through these

16   here -- these list of past cases here.

17                   I believe I did on this one, Paul

18   Zerola too.  I did or I'm -- I'm putting a question

19   mark next to that one.

20                   I also put a question mark next to

21   Karounos and Laskin.

22                   And again, you'll notice under

23   Frekhtman, that the case was never filed.  I just --

24   I did that in an attempt to understand exactly what

25   had occurred on that crash.



Case 2:13-cv-04178 Document 79-2 Filed 07/15/14 Page 32 of 349 PageID #: 1848

Page 32

1    Q.        What happened on that crash that you

2  were talking about that you walked away from?

3        A.        Oh.  I probably turned down --

4  there's -- that's just an example.  I probably

5  turned down 25 percent of work that calls in to my

6  office that I just don't -- 'cause I just don't feel

7  like dealing with it.  It's a case that I don't want

8  to deal with.  I get called on railroad incidents

9  just choose not to do it.  I'm very well experienced

10  in railroad crashes.  I've handled some of the most

11  notorious crashes in current history around the

12  country.  Handled from a management standpoint

13  on-site.  You know.  I can do jet crashes.  But, do

14  I choose to do jet crashes?  It would have to depend

15  on the circumstances of the crash, itself.

16    Q.        Do you ever choose not to handle a

17  case because someone's come to you and said hey,

18  give me your opinion on this and say they represent

19  a particular party and you say, I can't find fault

20  with the other party?

21        A.        Oh.  Absolutely.  Matter-of-fact,

22  that was the one that I gave you earlier, is Arkady

23  Frekhtman.  I refused to handle that case because of

24  the simple fact that it was a case that I just felt

25  that it was a loser.  I only sign on to the side



Page 33

1   that I think is right.

2       Q.      Has an attorney ever come to you in a

3   rear-end collision and you said that I can't handle

4   this case because I can't find fault with the --

5   with your driver?

6       A.      Repeat that again, please?

7       Q.      Has an attorney ever come to you in a

8   rear-end accident where you have turned down the

9   case because you couldn't find fault with the other

10  party?

11      A.      I really don't -- I don't recall, to

12  be honest with you.  I mean, I don't make notes in

13  the cases that I turn down.  I mean, you know, if

14  I'm handling 40 cases a year, that means I'm turning

15  down 10 to 12, maybe 15 -- well, more than that.

16  Yeah.  10 to 12 cases a year.  So, I don't remember

17  back -- you know, in recollection looking back three

18  years ago that I had a conversation with, you know,

19  a specific attorney and, you know, he wanted me to

20  handle a rear-end crash.  I just don't -- I don't

21  recall.

22              Let me finish on this real quick here

23  so I can get my thoughts out.

24      Q.      Sure.  I am making you multitask

25  right now.



Case 2:13-cv-04173 Document 79-2 Filed 07/18/14 Page 34 of 349 PageID: 1550

Page 34

1        A.        I know where that's going.

2                  I think that might be about it.

3    There may be some others in here.  Again, it's just

4    not coming to my recollection.

5                  There -- yeah.  That's about it.  I

6    highlighted them and I put some question marks next

7    to the ones that may or may not have been.  But,

8    there was, I believe, perception and reaction issues

9    in those particular highlighted cases.

10       Q.        Let me ask you this.

11                 As far as this list is concerned,

12   have you ever -- are any of these cases rear-end

13   accidents where you found fault with the striking

14   vehicle?  Have you ever given testimony or written a

15   report in a case like that?

16       A.        I don't -- I just don't recall.  I

17   mean, I don't, offhand, recall.  I mean, I certainly

18   could get back to you on that.  But, I just don't

19   recall.  Not back to you.  But, back to Ms. Raines.

20       Q.        Let me look through some of these

21   brief case descriptions here.  Not that I am saying

22   you are being evasive or anything like that.  It

23   might refresh your memory.  I remember looking

24   through here, I saw some.  For instance, "Rizzuto

25   versus Coastal.  Car driver rear-ended into 306."



Page 35

1    It's 2/28/12.

2          A.        Can I see that one?

3          Q.        Sure.

4          A.        Okay.  Yeah.  This matter here may

5    still be open.  I haven't heard anything from the --

6    actually, I believe it's still open.  It was a car

7    that ran into a truck on the roadside.  It was --

8    there was ice on the road.  It was coming down a

9    hill.  And the driver panicked on the hill because

10   there was ice -- there was snow -- it was a slippery

11   condition.

12         Q.        Which driver?

13         A.        The truck driver.  He panicked on the

14   road and he stopped his truck in the middle of the

15   road.

16                   And I was on the plaintiff's side,

17   the side with the car that came up and rear-ended.

18                   Now, I do not -- no.  There was a

19   report on that one actually.  Again, that's Soltis.

20   S-o-l-t-i-s.  I don't know if there was

21   perception-reaction put into there.  But, that was a

22   rear-end on a -- it was an MC 306 gasoline cargo

23   tank truck in Upstate, New York.

24         Q.        "PAK-AM Transit, Inc. and Akinwole

25   Foster.  Car into tractor trailer on I-87."  Do you



1    remember the details of that accident?

2          A.      Can you show me that one, please?

3          Q.      Yes.  That is Michelle Laskin, the

4    attorney.

5          A.      Yeah.  That's why I highlighted that

6    one.

7                  Yeah.  If I remember correctly, this

8    was a -- again, it was a snowy condition.  The

9    driver should have taken his vehicle off the

10   roadway.  And I believe he -- he jackknifed going

11   down a mountain.  I believe he applied his Jake

12   brake, which is a no-no with commercial motor

13   vehicles on icy roads or wet conditions.  And I

14   believe that the car came in to the side of his

15   commercial motor vehicle.

16                 And I was also plaintiff on that

17   case, too.

18         Q.      How about "Nancy Nolan Rosado, et al.

19   Four time fatal New Jersey Turnpike"?  You testified

20   for the defense in that matter.  Do you remember how

21   that accident occurred?

22         A.      Yeah.  My opinions on that matter

23   were strictly with respect to the load securement,

24   part 393.100.  Under the FMCSR.  And dealing with

25   load securement of the truck.  The truck had rolled

1   over and the freight came off the truck and there

2   was five people killed on that one.  So, I -- that

3   was a -- that was a -- that was more of a load

4   securement matter than anything else.

5        Q.        "Tractor trailer wheels off truck,

6   struck car."  Those are always interesting.

7        A.        Oh.  They're fun.  Nine times out of

8   ten, the same things over and over again.

9                  I'm not gonna say what it is because

10  that will come up in a later point.

11       Q.        How about this 12/6/2012?  "Crizaldo,

12  plaintiff Larry Wilson.  Burdick versus Lambland."

13  It says you testified for the defense in that case.

14  Do you remember the details of that accident?

15       A.        You know, that one is completely

16  drawing a blank.

17       Q.        "Teeter, Michael" --

18       A.        Oh.  Crizaldo.  I'm sorry.

19                 That one there is drawing a complete

20  blank.  I don't -- I just don't -- honestly do not

21  remember what that was.  I don't recall.

22                 My guess is that it probably may not

23  have gone forward because I just don't remember

24  authoring a report on this.  A report, I would like

25  -- very likely remember.  And I just do not recall



Page 38

1  authoring a report.  Oh.  You know what?  That's
2  right.  I didn't.  I want to say that this was in
3  Arizona.  I'm not a hundred percent certain.  But, I
4  -- this one here, it was what I call a nonstarter.
5  Nonstarter meaning, you know, I'm not gonna work
6  this matter because I can't help you.
7       Q.      What were the details of that crash?
8       A.      I just -- it --
9       Q.      Was it a rear-end accident?
10      A.      I don't believe so.  I -- I just
11  don't recall.  I just don't -- I really just don't
12  recall.
13      Q.      I am going to mark that one with a
14  star just for my edification.
15      A.      Sure.
16      Q.      How about this November 22, 2012 case
17  for "Roger Turk, Rodriguez versus Coca-Cola"?  It
18  says "Coca-Cola into car at intersection."
19      A.      Yeah.  He was -- if I remember
20  correctly, the truck was making a left-hand turn.
21  He was -- I believe the truck was -- the truck was
22  making a left-hand turn and the car had -- I believe
23  the car collided in to it.  I just don't remember
24  the details on it, though.  I try to keep all my
25  memory bank space that's available for current cases



Page 39

1    and get rid of the junk.

2         Q.        What I am really trying to get at

3    here -- it's relevant.

4         A.        I understand.

5         Q.        -- if you've handled a case where you

6    have given an opinion for a plaintiff that was rear-

7    ended.

8         A.        Sure.

9         Q.        Because obviously, that's very

10   similar to the case we have here.

11        A.        Sure.

12        Q.        I am thinking that there is a good

13   likelihood that at some point in time, you may have.

14   I am just trying to go through what I have in front

15   of me just to potentially explore all of --

16        A.        I completely understand.

17        Q.        -- the potential cases that at least

18   I know about.

19             How about 1/31/2013?  Robert Mixson

20   was the attorney.  You have "Tractor crash defense."

21   Do you remember the details of that case?

22        A.        Yeah.  It was a tractor trailer -- it

23   was a tractor trailer involved with a car or a

24   U-Haul if I remember correctly.  You know.  It was a

25   tractor trailer involved with a U-Haul.  The details



Page 40

1   on it, I never -- I don't recall the specific

2   breakdown of that case, though.

3        Q.        How about the next one here,

4   "4/15/2013, Mark L. Levinson"?  You have "Carrington

5   versus Truck-Rite."  That is a "Truck versus bus."

6   You testified for the defense in that case.  Do you

7   remember the details of that accident?

8        A.        No.  Unfortunately, I don't.

9        Q.        Looking at this list of cases in

10  which you have listed for us as far as your

11  testimony or issued a report, you do testify for the

12  defense sometimes.  Would it be safe to say that the

13  majority of your work is plaintiffs' oriented?

14            MS. RAINES:  Object to the form.

15       A.        No.  Actually, it used to be.  As

16  you're looking at the -- my list there.  It used to

17  be predominantly plaintiff.  I would say about a

18  65/35 mix, if you will.  The weight being to the

19  plaintiffs' side.  But, over the last -- the last

20  year, I have been getting a plethora of calls from

21  defense attorneys and reason being is a lot of it is

22  repeat work.

23       Q.        Okay.

24            How about this 4/28/2013?  You

25  testified for Kevin Connolly in the matter of



Page 41

1    Hussain versus Five Star Carting.  "Car versus

2    garbage truck" is what you have as the description.

3    You testified for the defense there.  Do you

4    remember the details of that accident?

5            A.      If I remember correctly, that was a

6    truck in a scrap facility and -- if I remember that

7    one correctly.  And I don't believe a report was

8    rendered on that case.  There was -- there was

9    something to do with a scrap facility.  Again, if

10   I'm recollecting correct.  A scrap facility that --

11   there was an accident or something to that effect.

12   I don't remember the details, though.

13           Q.      We are almost through this list.  We

14   will be moving on.

15           A.      Okay.

16           Q.      I don't mean to belabor the point.

17           A.      No.  It's quite all right.

18           Q.      How about "Craig Prosmushkin, Candice

19   Rienzo, Hazan Ayaz versus Roma Granite"?  Do you

20   remember the details of that case?

21           A.      Oh.  You know what that was?  Yeah.

22   This was -- yeah.  This was a load securement issue.

23   Yeah.  That was load securement.  I'm pretty sure it

24   was load securement.

25           Q.      I wanted to talk about the next one



Case 2:13-cv-04178   Document 79-2   Filed 07/15/14   Page 42 of 345   PageID#: 1358

Page 42

1    then, which would've been the "Carrasco versus

2    Reliable Wood."  Do you know the details of that

3    case?

4         A.     Can I see it?

5         Q.     It is the next one there.

6         A.     My -- oh.  You know what?  Okay.  No.

7    This was a pedestrian crossing the roadway and he

8    got run over by a truck.  It was a fatal.  And as

9    far as -- I don't believe that I rendered a report

10   on this.  And the reason is that I told the

11   attorneys that there -- they better sharpen their

12   pencil.  Defense.  Yeah.  I'm 99.9 percent certain I

13   did not render a report on that one.

14              That would be one of those examples

15   that -- you know, where I reviewed the documents and

16   got back to counsel and -- for -- what happens

17   sometimes is, I'll get a phone call on a case.  The

18   attorney tells me about it over the phone and I say

19   I'm sorry.  I can't help you.  In this particular

20   case here, you know, maybe everything was not --

21   they were not a hundred percent forthright of what

22   had happened.  I looked at the documents on this and

23   I got back to them and said I cannot render an

24   opinion on this for you.  I can't help you.

25        Q.     Did you, at any point, do a



Case 2:14-cv-11473-AJT-RSW   ECF No. 50-3, PageID.1510   Filed 05/09/17   Page 44 of 246
Case 2:13-cv-04178   Document 79-2   Filed 07/18/14   Page 48 of 549 PageID: 1559

Page 43

1   perception-reaction analysis in the Carrasco case?

2          A.      Is that the one we were just talking

3   about?

4          Q.      That was the one.  I believe so.

5          A.      Yeah.  I believe it was.  Yeah.  It

6   was a Peruvian woman.

7                  It would have been just from a -- the

8   standpoint of a blind turn.  So, is it -- I just

9   don't recall if I broke it down.  I know that I

10  didn't put it down on the record.  So, anything that

11  might exist from that is gone.  So, I just don't --

12  you know.  Nothing would've been written.

13         Q.      I am just trying to get a general

14  sense.  Was that a case where you didn't render an

15  opinion because the driver of the motor vehicle

16  failed to perceive and react to stimulus or a

17  situation in front of them and failed to stop in

18  time?

19         A.      It would've been that in combination

20  with the blind turn.  So, all of these things

21  combined together to try to come up with that

22  opinion.  So, yeah.  I would have, to a rudimentary

23  level.  I would not have gotten into, you know,

24  extreme depth with it.  But, there was too many

25  factors that were against the trucking company on



Page 44

1    this and it was not worth the fight.

2        Q.      When you say that in combination with

3    a blind turn, you mean the failure to perceive and

4    react in combination with the fact that the truck

5    driver was making a blind turn made him more liable?

6        A.      No.  It was at nighttime.  Woman was

7    wearing a dark clothing.  There was a lot of

8    variables involved with it.  But, at the same time,

9    you know, I just felt, in my opinion, at that point,

10   there was enough lighting -- artificial lighting in

11   the area.  It was well lit up.  There was a gas

12   station right there at the corner.  There was street

13   lights.  And she came out from behind a sign,

14   started crossing the highway, and the truck driver

15   made a right-hand turn on to the roadway from a stop

16   -- a full stop -- presumably full stop.  There was

17   no ECM data downloaded.  So, I don't -- I can't say

18   for certain.  I'm just going on testimony.  So, you

19   know, I utilized whatever information that I had to

20   come up with an opinion that I couldn't defend that

21   case for them.

22              And I believe it was shortly

23   thereafter that they settled the case, too, based on

24   my -- my preliminary findings.

25       Q.      How about this "Andrew Christman,



Page 45

1    Clinton and Stephanie Montgomery versus E&M Oil

2    Company, Inc."?  You testified for the defense.

3    There's no description.

4         A.      Yeah.  That was a tanker explosion.

5    That's down in Oklahoma.  I'm actually involved in

6    that one right now.

7         Q.      The next one, attorney "Matt Rosek,

8    Billy E. Williams, Junior and C&W Fuels."

9         A.      Right.

10        Q.      You testified for the defense in that

11   matter?

12        A.      That was a fire in the loading rack.

13   A driver got severely burned.

14        Q.      The last one is 10/18/2013.  You

15   testified for a "David A. Yavil.  Matyi versus

16   Transport Intermodal, Balit Singh, et al."  Do you

17   remember the details of that case?

18        A.      Yes, sir.  Now we're getting to more

19   current days.  So, I can remember these things.

20   Three years ago, I'm kind of lost.

21               Yeah.  That one there was a

22   suspension related matter, where -- a Posi-Lock,

23   P-o-s-i hypen L-o-c-k.  An alleged failure of the

24   Posi-Lock of the truck.  So, it had -- there was no

25   crash related issues here.



Case 2:13-cv-04178 Document 79-2 Filed 07/15/14 Page 46 of 343 PageID #: 1562

Page 46

1     Q.        If you could -- if you have an

2   updated version of case testimony, we would

3   appreciate that.

4             Having gone through that document, I

5   think it's probably a good time to stop real quickly

6   if that is okay with everybody.

7             (Recess.)

8     Q.        Mr. Turner, have you published any

9   articles on tractor trailer inspections or accident

10  reconstruction in your career?

11    A.        There's been some.  But, there --

12  they're more blogs, if you will.  You know.  There's

13  not a dealing with -- not necessarily in-depth

14  reconstruction.  But, dealing with brake

15  applications and so forth of commercial motor

16  vehicles and things of that nature.  Transportation

17  cargo tank trucks, bus crashes, you know, motor

18  coach crashes and things to that effect.  Nothing

19  from -- I've done some from magazines, too.  But,

20  they're not -- they're more dealing with the

21  regulations, themselves, rather than reconstruction.

22    Q.        What magazines have you been

23  published in?

24    A.        Over the years?  Bulk Transport.  I

25  think it's called Bulk Transport or Bulk Carrier.



Page 47

1    Many years ago.  That was dealing with cargo tank
2    truck crashes.  That was probably I'm gonna say 15,
3    maybe 18 years ago.
4                 I just recently did an article
5    dealing with bus crashes.  It's an electronic
6    magazine, if you will.  I can't remember what the
7    name -- it's called Bus something or other.  Bus
8    Industry Magazine or something to that effect.
9         Q.       What was the nature of that --
10        A.       It was about bus crashes and it was
11   not perception-reaction.  It was with regulatory
12   issues.
13        Q.       You said something about blogs?  Do
14   you have a blog?
15        A.       Yeah.  But, the blog -- it doesn't
16   get involved with accident reconstruction.
17        Q.       What is the name of the blog?
18        A.       truckcrashblotter.com.
19        Q.       You just got a new reader.
20        A.       I kind of figured that.  There's
21   nothing there really.
22        Q.       Can you identify specifically what
23   scientific literature treatises that you depended on
24   when formulating your opinions that you have
25   rendered in this matter?



Page 48

1           MS. RAINES:  Object to the form.

2      A.      Essentially, I mean, I -- the Federal

3  Motor Carrier Safety regulations, the Motor Fleet

4  Safety Supervisors of NATMI.  They're listed on my

5  report.  On the back of my report here.  Whatever

6  else I utilized.

7      Q.      We will go through that line by line

8  in a minute.

9      A.      Okay.

10          MR. MONTGOMERY:  I am going to go

11  ahead and mark, as Exhibit C, a copy of Mr. Turner's

12  report that he has authored in the matter.

13          (Exhibit C, 3/25/14 expert report,

14  marked for identification.)

15          I will note, for purposes of the

16  record, that this report does not have the CV

17  attached, which was I think the form I got it in.

18  For the purposes of deposition today --

19      Q.      I will have you look at it and state

20  that this is a full, complete, and accurate version

21  of the report that you authored in this matter.

22      A.      Yeah.  And there is one thing that I

23  -- when you asked me about Ms. Hartung.  It just

24  jogged my memory.

25          About my opinions as to her actions.



Page 49

1    I just -- I did put something in the report and I

2    just -- at the time we were talking about it, I

3    didn't recall.

4          Q.        What was that?

5          A.        It was essentially talking about her

6    -- the short time span that she had the ability to

7    react to essentially a parked 80,000 pound or there

8    -- close to 80,000 pound commercial motor vehicle on

9    an interstate highway.  So, that really was an

10   opinion.  But, it wasn't a breaking down of the acts

11   from an accident reconstruction standpoint.  So, I

12   did offer an opinion.  But, it was not necessarily a

13   breakdown of, you know, timeliness and so forth.

14         Q.        If you could point to me, in that

15   report, where you did do that, that would be

16   helpful.  I don't remember any commentary,

17   whatsoever, on her driving actions or inactions.

18         A.        Sure.  Yeah.  I'm almost positive I

19   did.  Let me verify that this is an original here

20   first and then I will go ahead and go over my copy

21   and find that for you.

22                   Yeah.  This appears to be a copy of

23   my original.

24         Q.        And you have a copy of it right in

25   front of you.  It is the same as my copy.  Correct?



Page 50

1          A.          Yes, sir.

2          Q.          Just while we are on the topic.  If

3    you could, please, point to me in the report where

4    you have done some analysis with regard to Ms.

5    Hartung's inactions or actions.

6          A.          Again, it was not a, you know,

7    scientific analysis.  It was just a -- it was a

8    statement that I had.  And this is just a

9    recollection.  I don't remember specifically where

10   it is.  But, give me a minute and I'll find it for

11   you.

12         Q.          Just so I am clear, your testimony

13   before was that you didn't consider Ms. Hartung's

14   actions when you formulated your opinion.  Now are

15   you changing that --

16         A.          No.  No.  No.  I -- I made a -- what

17   I'm saying is that it is my opinion that Ms.

18   Hartung -- in the closing speech, she would've

19   recognized the vehicle somewhere around 500 feet or

20   400 feet, somewhere in that area.  Did that give her

21   enough time to react in an evasive manner?  I don't

22   know for certain.  But, I know that it was -- it was

23   -- she did make an attempt to get around the

24   commercial motor vehicle or the tanker.  The tank

25   truck.



Case 2:13-cv-04178   Document 79-2   Filed 07/15/14   Page 53 of 349 PageID: 1507

Page 51

1       Q.      But you have been trained in

2    perception-reaction time.  Correct?

3       A.      Yes.

4       Q.      Why wouldn't you have applied

5    perception-reaction time to this accident?

6       A.      Again, my main focus was dealing with

7    the commercial motor vehicle.

8       Q.      But you have made the conclusion that

9    the sole contributing factor of the crash was the

10   actions of Reginald Yelverton.  Is that accurate?

11      A.      We'd have to go through my opinions.

12      Q.      I am not trying to be difficult, but

13   you gave them.

14      A.      I understand.  But I want to reflect

15   on my opinions that I wrote -- you know.  I wrote

16   these opinions back on March of 2014.  So, I just

17   want to make sure that I have the language correct.

18   I think that's pretty important.

19      Q.      I think so, too.

20              Did you review your report before you

21   testified today?

22      A.      I did.  I reviewed it last night,

23   amongst some other documents I've got here.  You can

24   see I've got literally a couple thousand pages here

25   that I've reviewed.  I took a look at not everything



Page 52

1    last night, but things that I felt were of

2    importance today.

3              But, if you will give me a minute, I

4    will review this real quick.

5         Q.        Sure.

6         A.        And by the way, the instructor that

7    was from IPTM, I believe the one guy's last name

8    began with an H.  Hol something or other.  H-o-l

9    something or other, if I'm not mistaken.  Again, I

10   don't recall Rickard.  I'm not a hundred percent

11   certain, though.  But, the main instructor was the

12   same guy who wrote the book, itself.  You know.

13   But, then again, you know, you go to training

14   courses, I can't tell you how many times I've had

15   instructors from other training courses in my --

16   sitting as students in courses that I've taught,

17   too, for the State Police.  So --

18              You know, I can't locate it right

19   now.  But, during a break, I could take a look at it

20   for the benefit of time.  But, I'm almost positive

21   that I said something to the effect of timeliness

22   with Ms. Hartung.  I'd have to double check on that.

23        Q.        I think it's real important -- I

24   prefer if you take the time right now.  I have read

25   the report.  I am going to relate to you that there



Page 53

1    is no such commentary in the report.

2         A.      Okay.

3              MS. RAINES:  If I may, can we look at

4    opinion number one?

5              MR. MONTGOMERY:  Sure.

6         A.      Yeah.  I -- it -- where she has a

7    reasonable expectation to be able to travel down

8    Interstate 77 and not have to be faced with a

9    commercial motor vehicle essentially parked.  I

10   mean, that's not exactly what it says.  But, the

11   interpretation of it.

12        Q.      Right.  But there is no perception-

13   reaction analysis?

14        A.      No.  No.  Well, I prefaced this whole

15   conversation with saying that there's no perception-

16   reaction time analysis.  But, there is a point where

17   I put -- it did put into the report that, you know,

18   she has that expectation to be able to drive safely

19   down the highway and not have a parked commercial

20   motor vehicle sitting on the -- in the right-hand

21   lane.

22        Q.      But in that analysis, you don't talk

23   about her obligations or duties as a driver of a

24   private motor vehicle --

25        A.      No.



Page 54

```
 1        Q.        -- at all.  Correct?

 2        A.        No.  That's correct.

 3        Q.        So basically, there's no

 4   consideration of the inaction or actions of Ms.

 5   Hartung as it relates to your opinions that have

 6   been rendered in this accident?

 7                  MS. RAINES:  Objection to form.

 8        A.        Repeat that again, please?

 9        Q.        Essentially, there has been no

10   consideration of the actions or inactions of Ms.

11   Hartung as they contributed to this crash with

12   respect to the opinions that you formulated in this

13   case?

14                  MS. RAINES:  Object to the form.

15        A.        I didn't take a -- an extensive look

16   at what she had done in -- as to involvement with

17   the crash.

18        Q.        I think now I am going to go ahead

19   and go through the stuff that you have laid out here

20   on the table as being the contents of your file.  I

21   will identify, for the record, the documents.  If

22   you could copy them and send them along to us, I

23   would appreciate it.

24        A.        Sure.

25        Q.        What I have here is the "Kenan
```



Page 55

1    Transport Company driver accident report form."  Did

2    you review and analyze this in the formulation of

3    your opinions rendered in this matter?

4            A.        Yes.

5                      If there's anything that has either

6    tabs on it or highlights in it would indicate that I

7    reviewed it.

8                      The only things that I typically

9    don't review, typically, is going to be medical

10   related and/or insurance related.  Sometimes I do,

11   sometimes I don't.  But, on a typical basis, I don't

12   get involved with those two aspects.

13                     So, anything else you see here on the

14   table with exception to -- I don't believe there's

15   any medical here.  There is some insurance here that

16   I did not review.  But, with respect to everything

17   else, it's all been reviewed.  So, it would be a

18   combination of these things that helped me to

19   formulate my opinions.

20           Q.        I have here the "State of West

21   Virginia uniform traffic crash report."  Did you

22   review and analyze this in the formulations of your

23   opinions rendered in this matter?

24           A.        I did.

25           Q.        While we are on the topic, did you



Page 56

1  note in this report where Ms. Hartung was issued

2  with a citation for failure to remain in control of

3  her vehicle in violation of 17C-6-1 of the West

4  Virginia code?

5       A.     I believe that I did.  I believe I

6  did put that in my report.  Yes.  And --

7       Q.     Well, that is not in your report.

8       A.     I thought that I had mentioned it in

9  my report.

10      Q.     If you could show me, in your report,

11  where you mentioned that Ms. Hartung was cited as a

12  result of this accident, I would appreciate that.

13      A.     Okay.  What I had said in here was

14  about the -- with the West Virginia State Police

15  report was about the fact that it was not a hazmat.

16  All right?

17      Q.     Is the police report something you

18  typically consider in the formulations of your

19  opinions --

20      A.     Yes.

21      Q.     -- when asked to do so?

22           And you did consider this State

23  Police report.  Correct?

24      A.     Yes, I did.

25      Q.     But you didn't mention that Ms.



Case 2:14-cv-11473-AJT-RSW ECF No. 50-3, PageID.1524 Filed 05/09/17 Page 58 of 246
Case 2:13-cv-04178 Document 79-2 Filed 07/15/14 Page 57 of 343 PageID #: 1579

Page 57

1    Hartung was issued a citation for failure to remain

2    in control anywhere in your report?

3           A.      You know.  I --

4           Q.      Yes or no?

5           A.      Well, it's not a yes or no answer.

6           Q.      Well, I am asking if it's in your

7    report or not.

8                   MS. RAINES:  Let me object.  Please

9    let him finish his answer to your request.

10                  MR. MONTGOMERY:  It was a yes or no

11   question.

12          Q.      I am not trying to be difficult.  Did

13   you mention in your report that Ms. Hartung was

14   cited for failure to remain in control?  Yes or no?

15          A.      Again, there's no such thing as a yes

16   or no answer.  When I give depositions, I prefer to

17   make sure that I have yes, with explanation or no,

18   with explanation.

19          Q.      Then answer no and explain.

20          A.      Okay.

21                  No, it was not written in here.

22                  And the -- but, when I do deal with

23   situations like this often -- and I should have --

24   matter-of-fact, I would probably supplement the

25   report based on my past experience.  Normally, what



Page 58

1   I do is, I look into whether the West -- in this

2   case here, West Virginia State Trooper was actually

3   an FMCSA trained individual.  Because often, they're

4   just standard troopers, if you will.  No insult to

5   them.  They're standard troopers that are not FMCSA

6   trained.  They have no accident reconstruction

7   training to an extent of a commercial motor vehicle.

8   So, they often will not address issues that are in

9   the FMCSR when they write the citation.

10             So, does that trooper necessarily

11   know that the vehicle has certain requirements under

12   part 383.111 under the FMCSR, which is required

13   knowledge of the driver?  You know.  Does the

14   trooper necessarily know that under 390.3, general

15   requirements, that the driver has to understand the

16   Federal Motor Carrier Safety regulations, therefore

17   a CDL is not just enough to drive a truck?

18             So, that I would amend or I would

19   supplement my report based on that.  Because it's

20   something that I feel that should've been put in to

21   the report but for whatever reason, it was

22   overlooked.

23        Q.        It should have been put in your

24   report --

25        A.        Yes.



Page 59

1          Q.          -- that Ms. Hartung was cited?

2          A.          It should have been put in my report

3    that Ms. Hartung was cited and that Ms. Hartung or

4    the trooper that cited her cited her with the basis

5    of not understanding the obligations of a commercial

6    motor vehicle operator.

7          Q.          Okay.

8                       And you said that this is an ordinary

9    statement --

10          A.          Let me just make a note real quick on

11    supplementing that.

12          Q.          You said this is not a -- this is

13    just an ordinary State Trooper.  Do you know the

14    State Troopers that investigated this accident?

15          A.          Again, that's what I said.  I would

16    look into that.  For some reason, that escaped my --

17          Q.          I thought your statement was that

18    they were not FMCSR trained?

19          A.          No.  I said they're often not.

20    There's a lot of troopers that I know that are MCSAP

21    trained.  There's -- the majority of them are not

22    MCSAP trained.  The large majority of them.  So, I

23    would look into that to find out if this trooper, in

24    fact, was or was not MCSAP trained and if he was,

25    then he would have -- it would be a little bit more



Case 2:14-cv-11473-AJT-RSW ECF No. 50-3, PageID.1527 Filed 05/09/17 Page 61 of 246
Case 2:13-cv-04178 Document 79-2 Filed 07/15/14 Page 60 of 343 PageID#: 1576

Page 60

```
 1    believable to me that -- you know, the violation
 2    that he wrote up.  Because if he's not a MCSAP
 3    trained officer, he cannot write federal violations.
 4    He cannot write violations out of the FMCSR.  He can
 5    only write state violations under West Virginia.
 6         Q.       But we are talking about Ms.
 7    Hartung's ticket, which isn't a federal violation?
 8         A.       Right.
 9                  But, here the issue is that -- what
10    your issue is that Ms. Hartung was the only one to
11    receive a violation.
12         Q.       That's not what my question was.  I
13    asked if she was cited or not.
14         A.       But, that's where you are going with
15    this.
16         Q.       I don't know that you know where I'm
17    going with anything, to be quite frank with you.
18                  I'm asking you whether or not Ms.
19    Hartung was cited and whether it's mentioned in your
20    report.  I apologize I gave you the platform to
21    discuss the federal regulations and things of that
22    nature, which in my opinion, is not responsive to my
23    questions.
24                  My question was simple.  What was she
25    cited, did you consider it, and did you put it in
```



Case 2:14-cv-11473-AJT-RSW ECF No. 50-3, PageID.1528 Filed 05/09/17 Page 62 of 246
Case 2:13-cv-04178 Document 79-2 Filed 07/15/14 Page 61 of 343 PageID #: 1577

Page 61

1   your report?

2              MS. RAINES:  Objection.  Asked and

3   answered, argumentative, as well.  I believe we have

4   covered that.

5       Q.      You mentioned before if officers are

6   MCSAP trained, that that would provide more weight

7   in your opinion to the conclusions reached in that

8   report?

9       A.      It would provide a little bit more

10  weight.  Sure.  I mean, I would look at that and say

11  okay, he gave her a violation.

12             If he is an enforcement officer under

13  MCSAP, then did he -- he would be able to write

14  violations under Title 49.

15      Q.      So if one of the officers that

16  investigated this crash is an enforcement officer or

17  a MCSAP officer, then you would take more -- there

18  would be more credence to the fact that Ms. Hartung

19  was cited?

20             MS. RAINES:  Object to the form as

21  hypothetical and also to the relevancy considering

22  that the citation was dismissed.

23             You can answer.

24             MR. MONTGOMERY:  Thanks for the

25  speaking objection.



Page 62

1          Q.          Go ahead.

2          A.          Again, repeat the question, please.

3          Q.          If there was an FMCSA inspector or a

4    MCSAP inspector that was involved in this

5    investigation, you would give more weight to the

6    fact that Ms. Hartung was cited?

7                    MS. RAINES:  Same objection.

8          A.          Well, if the violation stood, you

9    know, then I would look at it and say there may be a

10   little more weight.  However, it still doesn't

11   change my opinions of what Mr. Yelverton did or did

12   not do to cause this crash.

13                    MR. MONTGOMERY:  Counsel, I am going

14   to ask that you keep your objections to form.

15                    MS. RAINES:  Because that is an

16   admissibility issue, it had to be rendered.

17         Q.          This is the training hazardous

18   materials HM-126 and security HM-232.  This is a

19   Kenan Advantage Group, Inc. document.  Did you

20   review these documents --

21         A.          I did.

22         Q.          I believe actually appended to this

23   is Mr. Yelverton's driver's qualification file.  Did

24   you review his driver's qualification file in

25   rendering your opinions in this matter?



Page 63

1         A.        I did.

2         Q.        Do you remember when Mr. Yelverton's

3    driver's qualification file dates back to as far as

4    his driving history?

5         A.        No.  I don't specifically recall his

6    driving history, as far as how long he's been

7    driving a commercial motor vehicle.  I just don't

8    recall.

9         Q.        You make mention of it in your

10   report.  I believe that you state that it goes back

11   to 2005.  Does that refresh your memory?

12        A.        Yeah.  That's what I'm reviewing

13   right now.

14                  Well, he began his driving stint with

15   ATL/KTC March of 2010.

16        Q.        When did he begin his driving career?

17   Under "5.1, Driver's qualification," you note "His

18   employment application filed with ATL/KTC dated back

19   to November 2005, whereas most of his driving career

20   was operating CMVs with semivan trailers."  That is

21   the first paragraph under 5.1.

22        A.        Right.  All right.  I got you.  Yep.

23        Q.        So you reviewed Mr. Yelverton's

24   driver's qualifications?

25        A.        That the's -- I didn't have my



Page 64

1    glasses on.  I'm sitting here squinting at it.  I'm

2    not -- I see it now very clearly.

3                  All right.  Go ahead.

4         Q.      Did you review -- the question was,

5    did you review Mr. Yelverton's driving history from

6    2005 until at least the point of the accident?

7         A.      Whatever was provided to me in

8    discovery.

9         Q.      I notice in here that you didn't note

10   any other motor vehicle accidents or citations.

11   Correct?

12        A.      Not that I'm aware of.  Not to say

13   that they didn't exist.  But, not that I'm aware of.

14        Q.      I have here a copy of plaintiff's

15   complaint with civil cover sheet.  You reviewed and

16   analyzed that in the formulation of your opinions in

17   this matter?

18        A.      I did.

19        Q.      Then I have here an FOIA request for

20   records for Advantage Tank Lines, LLC d/b/a ATL

21   Leasing, Inc.  Did you review these in the

22   formulation of your opinions rendered in this

23   matter?

24        A.      Yes.  It's on my -- it's on my

25   document -- documents reviewed section 9.0, "FOIA



Page 65

1    request for records PSCWV, January 28, 2013."

2        Q.      Did you make any commentary on these

3    records in your report?

4        A.      I would say likely not because of the

5    fact that there's no flags at pages there.  So, it's

6    possible that I did not use -- although not to say

7    that it didn't -- it didn't go into the total sum of

8    my thought process.

9        Q.      How did it go into the total sum of

10   your thought process?

11       A.      I could not give you a specific

12   answer.  I mean, it may have given me some guidance

13   as --

14       Q.      How so?  It is your report.  You

15   reviewed the documents.  How did it give you

16   guidance?

17       A.      There's nothing that's highlighted in

18   there.  There's no pages that are flagged.  So, I

19   can't specifically point to one thing.

20               Can I see the document, please?

21       Q.      Sure.

22       A.      Here's -- yeah.  There is actually

23   some highlighted sections in here.  There was

24   violations -- looking at violations of the motor

25   carrier, FMCSA, the driver vehicle examination



Page 66

1    reports.  So, just looking at some of the violations

2    that were inoperable.  Required one of five cab

3    lights inoperable, things of that nature.  It

4    essentially tells me about a motor carrier and what

5    their habits are and how they conduct themselves

6    from a driving standpoint from roadside inspections.

7    Here you have ABS malfunction circuit.  Are these

8    things contributory to the crash?  No.  Are they

9    things that tell me about the motor carrier that I

10   can kind of put in my thought process?  Sure.

11         Q.       Did you mention the review of those

12   reports anywhere --

13         A.       No.

14         Q.       -- in your report?

15         A.       No, sir.

16         Q.       If I am correct, those reports are

17   concerning Advantage Tank Lines.  Right?

18         A.       That's correct.  It's not specific to

19   the driver.

20         Q.       Do you know who Mr. Yelverton's

21   employer was and under whose authority he was

22   operating on the day of the accident?

23         A.       That -- I just -- that's why I

24   referred to ATL/KTC as the motor carrier.  Because

25   -- excuse me.  Advantage Tank Lines, I believe was



Page 67

1    the primary player here.  Then it was Kenan

2    Transport.  Excuse me.  Kenan Transport was primary

3    and Atlantic tank -- Advantage Tank Lines is the

4    owner of the tank line being transported by

5    Yelverton.  And Kenan Transport Company is a motor

6    carrier and employer of Yelverton.

7         Q.       Who would be responsible for the

8    maintenance of this tractor trailer?

9                  MS. RAINES:  Object to the form.

10        A.       Who would be responsible for the

11   tractor trailer, or the tractor or trailer?  They're

12   two specific distinctly different units.

13        Q.       Well, the tractor.

14        A.       Okay.

15                 Well, the owner of the cargo tank is

16   Advantage Tank Lines.  It depends on --

17        Q.       We are talking about the tractor

18   trailer.

19        A.       Well, that is part of the tractor

20   trailer.  You're saying tractor trailer.  So, I'm

21   giving you the trailer.  All right?

22                 The tractor presumably is owned by

23   Kenan Transport.  I didn't see evidence one way or

24   the other.

25        Q.       Then I guess you can answer you don't



Page 68

1   know.

2       A.      Again, that's the reason I put in

3   ATL/KTC, in order to cover both aspects of it.

4       Q.      Let me ask you this.

5           You haven't made any commentary in

6   this case concerning Advantage Tank Lines' program

7   of maintaining their vehicles.  Correct?

8       A.      No, sir.

9       Q.      You haven't made any commentary in

10  this case with respect to Kenan Transport's program

11  for maintaining their vehicles.  Correct?

12      A.      No, sir.

13      Q.      I have here "Driver vehicle

14  examination report" --

15      A.      I believe that might be the same as

16  this here.

17      Q.      These very well could be duplicative,

18  just not having the cover letter on it so we will

19  move along.

20      A.      Right.

21      Q.      Then the "Business auto

22  declarations."  Did this formulate in to your

23  opinions in this matter at all?

24      A.      No, sir.

25      Q.      It is essentially the insurance



1   sheet.

2                    These would be your documents that

3   you have provided -- is this your bill?

4           A.       It is.

5           Q.       That wouldn't have gone in to your

6   consideration?

7           A.       No.  No, sir.

8           Q.       Then I see here a letter from myself

9   to Mrs. Raines labeled -- dated September 13, 2013.

10  "Responses to plaintiff's requests for admission of

11  defendant, Reginald Kenneth Yelverton."

12                   Did you incorporate this in to your

13  opinion?

14          A.       Let's take a look at the document if

15  I could.

16          Q.       Sure.

17          A.       I would say no.

18                   For simplicity purpose, maybe we can

19  just stack everything up we've gone through already.

20          Q.       I didn't know if you had that

21  organized for your own ability to look through it.

22          A.       No.  All the things that I don't need

23  to go over later, I can stack up here.

24          Q.       Then I have here the driver training

25  manual for Kenan Advantage Group.  You reviewed this



Page 70

1  driving manual?

2       A.      Well, there's a lot of red flags on

3  there.  So, I would say that I certainly did review

4  it.  What was applicable -- there's a lot of red

5  flags on there.  So, there may be some issues on

6  there.

7       Q.      You would have reviewed that and

8  incorporated the information in there in to your

9  opinions --

10      A.      Yes.

11      Q.      -- that you rendered in this matter?

12      A.      Yes, sir.

13              I mean, I did mention in the report

14  that Yelverton was Smith System trained.  Okay?

15      Q.      Here, we have the "Repair order

16  detail, Kenan Advantage Group."  I guess you didn't

17  really render an opinion with regard to the

18  maintenance on this tractor trailer.  Would you have

19  incorporated these documents in to your opinion?

20      A.      Anything outside of the -- anything

21  outside of the turbo issue, the direct related issue

22  here, I didn't -- I did not go in to detail of --

23      Q.      A program or anything like that?

24      A.      Yeah.  Maintenance issues.  Correct.

25      Q.      When you say "the turbo issue," what



1    did you review as far as information related to the

2    -- as you described it, "the turbo issue" in this

3    matter?

4          A.      Just the fact that it was taken to a

5    different facility and that different facility, from

6    the original record -- they transported it off to a

7    different facility.  And that facility had effected

8    the repairs on turbo, which apparently, they were --

9    yeah.  I'm not quite sure -- there was a record

10   invoice and that record invoice reflected the fact

11   that it was taken to a different facility, where it

12   was repaired -- the turbo, itself, was repaired.

13         Q.      From those records that you are

14   talking about, you can continue to look for them as

15   we ask these questions, did it say what was wrong

16   with the turbo?  Do you know?

17         A.      No.  Based on -- based on what

18   Yelverton said, it was a pop sound.  Essentially,

19   the turbo blew up.  And here you have the various

20   parts and so forth that were replaced on it.  It was

21   "Turbo seals and turbine are bad."  This is -- I'm

22   quoting from the repair order detail from Kenan

23   Advantage Group.  And it's "Replace turbo and MTG

24   kit."  I'm not sure what that is.  "Calibrated the

25   turbo."  So, essentially, my interpretation of this



Case 2:14-cv-11473-AJT-RSW   ECF No. 50-3, PageID.1539   Filed 05/09/17   Page 73 of 246
Case 2:13-cv-04178   Document 79-2   Filed 07/15/14   Page 72 of 343 PageID #: 1588

Page 72

1    is the turbo failed.  It blew up.

2         Q.        Have you ever done any work in your

3    career as an auto mechanic?

4         A.        Other than working on my own trucks.

5    I had -- I owned a fleet of tractor trailers back

6    some years ago.  I also was a driver for many -- not

7    many years.  But, for a few years.  Driving 18

8    wheelers.  So, I did all of my own mechanical work.

9         Q.        Now that we are on the subject, you

10   owned a hazmat response team for a while there.

11        A.        I did.

12        Q.        Do you ever remember being called

13   upon by Kenan Advantage Group to respond to spills?

14        A.        I'm pretty sure we have.  Yeah.  I'm

15   pretty sure we have.

16        Q.        Does that at all affect your ability

17   -- did you gain any information from that prior

18   relationship with Kenan Advantage Group that

19   affected your -- the opinions that you have rendered

20   in this case?

21        A.        Oh.  No, sir.  I vaguely even

22   remember doing work for them.  But, I know that --

23   I'm pretty sure that we had done some work with them

24   over the years.

25        Q.        This is repair order 9601-0018789



Page 73

1    that you had previously talked about.  You reviewed

2    this --

3         A.    I did.

4         Q.         -- and it factored in to your

5    opinions that you rendered in this matter.

6              Then I have here the June 15, 2011

7    tractor preventative maintenance.  Did you review

8    this document and consider this document --

9         A.    Yes, sir.

10        Q.         -- in the formulation of your

11   opinions?

12        A.    Yes.

13        Q.    We have some photographs here.  Who

14   provided these photographs to you?

15             Do you know who took those

16   photographs?  Let me ask you this photograph first.

17        A.    I got these from Mrs. Raines.  And I

18   believe that these were taken by Mr. Yelverton.

19        Q.         Again, we have the State Police crash

20   report.

21             Then there are some additional

22   photographs -- I believe --

23             MR. MONTGOMERY:  Are those the State

24   Police photos?

25             MS. RAINES:  Yes.



Page 74

1          A.          Yes.  State Police photographs.

2          Q.          For the record, the photos that we

3     just discussed were the color copies of the State

4     Police photographs?

5          A.          Correct.  These are from the State

6     Police.

7          Q.          I am going to hand you a copy of

8     black-and-white photos.  Did you review those in the

9     formulation of your opinions in this matter?

10         A.          I did.

11         Q.          Do you know who took those

12    photographs?

13         A.          These appear just to be the same.

14    Just a different -- just black-and-white versus

15    color.

16                     Yeah.  These are the same pictures.

17    Just black-and-white versions evidently.

18         Q.          They are?

19         A.          Yeah.  Appear to be.

20         Q.          The next set of documents we have

21    here are "Defendants' supplemental and rebuttal Rule

22    26(a)(2)(B) disclosures.  Did you review these

23    documents in the formulations of your opinions in

24    this matter?

25         A.          I did.



Page 75

1          Well, actually, I received these --

2     these were received after my report.

3          Q.     Correct.

4          A.     So, I -- you know, I -- in my mind, I

5     have some opinions on it.  But, these are received

6     post report.

7          Q.     What we have right here is the ETOG

8     data from the Kenan Transport tractor trailer.  Did

9     you review this data in the formulation of your

10    opinions?

11         A.     I sure did.

12         Q.     I believe attached to this are some

13    calculations that appear to be your calculations.

14    Is that accurate?

15         A.     Yes, sir.

16         Q.     What are these numbers based off of?

17         A.     They're based off of 15 second

18    increments on the -- on the graph, itself.  On the

19    ETOG.  So, it's breaking down approximate 15 second

20    increments of activities of the commercial motor

21    vehicle of Yelverton's truck leading up to the

22    crash.

23         Q.     Why was that important to do in your

24    analysis?

25         A.     To demonstrate that Yelverton



Page 76

1    essentially, for all intents and purposes, parked --

2    you know, parked his commercial motor vehicle on the

3    highway.  Broke down on the highway.  But,

4    essentially, was parked on the highway.

5         Q.        I think in your report, you note that

6    he was still moving.

7         A.        There's no absolute conclusive

8    evidence that says that he was definitely moving.

9    There's also -- I believe that he may have come to a

10   complete stop.  I gave him some latitude in saying

11   that it may have been five miles per hour.  But,

12   I've also looked at it and said that looking at the

13   ETOG, there is at one point here where he comes to a

14   complete stop.

15        Q.        His speed is obviously important to

16   your -- to the opinion that you have rendered.

17   Correct?

18        A.        Sure.  Because it was an indicator to

19   him that there's something wrong with my truck and I

20   better get it off the highway.

21        Q.        Did you take into consideration, when

22   formulating your opinions in this matter, the speed

23   of the Hartung vehicle at all?

24        A.        I think we've already covered that

25   and that's -- I didn't get into the breakdown


MAGNA
LEGAL SERVICES

Page 77

1    Hartung's vehicle.

2         Q.        Did you take into consideration

3    closing distance with respect to the Hartung vehicle

4    based on her speed and Mr. Yelverton's speed?

5         A.        Well, say asked and answered.  Right?

6         Q.        Is that a no?

7         A.        That's a no.

8         Q.        What we have here is just an

9    additional ETOG data with some handwritten notes on

10   it.  Did you take into consideration this data in

11   the formulation of your opinions that you have

12   rendered in this matter?

13        A.        I did.

14        Q.        Again, additional ETOG data.

15        A.        Yeah.  That's multiple copies in

16   there.  The same.

17        Q.        I have here some handwritten notes --

18        A.        They're field notes when I was at a

19   crash -- at the crash site.

20        Q.        When did you visit the crash site?

21        A.        January 24, 2014.

22        Q.        Do you remember what approximate time

23   you visited the crash site?

24        A.        It was later in the afternoon.  It

25   was around 4 -- about 4 o'clock.

Page 78

```
 1        Q.        While we are on the topic, did one of

 2   the things that you observed at the crash site --

 3   would one of the things you observed at the crash

 4   site have been Ms. Hartung's line of sight as she

 5   approached the accident scene?

 6        A.        Did I observe that?

 7        Q.        Yes.

 8        A.        Well, I ran the stretch of the

 9   highway a couple times.

10        Q.        Were there any obstructions --

11        A.        No, sir.

12        Q.        Let me ask.

13                  Were there any obstructions in Ms.

14   Hartung's line of sight as she approached the

15   accident site?

16                  MS. RAINES:  Objection to

17   hypothetical, form.

18        A.        Other than the potential of a vehicle

19   being in front of her, to the best of my knowledge,

20   no.

21        Q.        Again, you reviewed Ms. Hartung's

22   deposition testimony.

23        A.        Yes.

24        Q.        Do you recall her mentioning any sort

25   of vehicle in between her and the tractor trailer?
```



Page 79

1      A.      I don't recall her saying one way or

2   the other.

3      Q.      Would that be something that would be

4   important to your analysis in this matter?

5      A.      Oh.  Sure it would.  If you have a

6   box truck in front of you and he makes that quick

7   adjustment and evasive maneuver and leaves a parked

8   tractor trailer sitting right in front of you at 65

9   miles an hour, sure.  That would make -- that would

10   be a significant event.

11      Q.      But you don't know whether that

12   happened or not?

13      A.      There is no testimony either way.  As

14   far as -- to the best of my recollection, there's no

15   testimony either way.  And again, I reviewed that

16   deposition, you know, quite some time ago.  But, I

17   just don't recall there being any -- any testimony

18   to that effect.

19      Q.      Now that we are on the topic, I am

20   going to go ahead and take that out.

21              MR. MONTGOMERY:  Let's take a quick

22   break.

23              (Recess.)

24              MR. MONTGOMERY:

25      Q.      We went off the record.  I had asked



MAGNA

LEGAL SERVICES

Page 80

1    you a question about whether you had taken into

2    consideration Ms. Hartung's line of sight inability

3    to perceive the tractor in to your consideration

4    formulating your opinion.  You said you didn't know

5    if there was any information on that.  Is that

6    correct?

7              MS. RAINES:  Object to the form.

8         A.      There is no -- as far as if there was

9    no vehicle in front of her, then there would be

10   nothing affecting her line of sight.  If there were

11   a vehicle in front of her, then there would be an

12   effect of her line of sight and reaction time.

13        Q.      I think you testified earlier, too,

14   that you didn't consider Ms. Hartung's actions or

15   inactions because you didn't know whether there was

16   a vehicle to her left that would have affected her

17   ability to turn and things of that nature.  Is that

18   correct?

19        A.      That's correct.

20              I just don't recall, in her

21   testimony, whether she had stated that there was a

22   vehicle to her left -- or she didn't know.  I don't

23   recall.

24        Q.      If there were not vehicles to her

25   left, would that have factored in to your analysis



Page 81

1    with regard to her ability to changing lanes and

2    avoid striking the --

3        A.    Let's put it this way.  If there were

4    a vehicle that was just trailing her but in the left

5    lane, it may have affected her judgment time, her

6    time of reaction.  So, in other words, as she's

7    driving along doing 65 miles an hour, she closes

8    into about 500 feet of that vehicle -- of the

9    commercial motor vehicle parked in the left -- in

10   the right lane and if there was a vehicle just

11   trailing her and she looked in her mirror, saw that

12   vehicle, that would account for a few seconds of her

13   making that quick reaction decision to cut left.

14   Now, she makes that left-hand -- that left lane

15   change cut.  In the process of that, she strikes the

16   commercial motor vehicle.  Is that a possibility?

17   It is.  Was there any mention of a trailing vehicle

18   behind her?  I don't believe that there was.

19       Q.    If there were no vehicles, does that

20   affect your analysis?

21       A.    Her reaction may have be more swift.

22   May have been.

23       Q.    In your professional opinion, what

24   should her reaction have been to perceive and react

25   to the tractor trailer in front of her?  How much



Page 82

1    time before -- from when she perceived the potential

2    danger to when she should have changed lanes should

3    have elapsed?

4              MS. RAINES:  Object to the form.

5         A.       Perception and reaction -- reaction

6    is gonna be approximately 1.5 to 1.6 seconds.  All

7    right?  Looking at an average.  So, if you have a

8    1.5 to 1.6 seconds, 65 miles an hour, at 95 feet per

9    second, so you immediately lose 150 feet

10   approximately.  150 to 160 feet.

11             So now if she has that vehicle --

12   like I said, if there was a trailing vehicle but in

13   the left lane right behind her, that could consume

14   another two seconds on that decision making process

15   and we have no idea whether there was or there

16   wasn't.  We don't have -- and I believe that there

17   was no testimony as to a vehicle being in front of

18   her.

19        Q.       Let's do the analysis without a

20   vehicle.

21        A.       Okay.

22        Q.       How many seconds would it take for

23   her to perceive the tractor trailer in front of her

24   -- how much time would elapse between when she

25   perceived the tractor trailer in front of her



Page 83

1   slowing down to when she could have changed lanes?

2   How much time would elapse?

3                MS. RAINES:  Object to form.

4        A.       Perception to reaction?

5        Q.       Yes?

6        A.       1.5 to 1.6 seconds roughly.  Barring

7   no other vehicles were in the area, as you said.

8        Q.       Do you know what the -- a looming

9   threshold is?

10       A.       Sure.  That's that closing point as

11  to which she has that decision to make.

12       Q.       How many feet would have been between

13  her and the Kenan Advantage tractor trailer when she

14  realized that she needed to move?

15               MS. RAINES:  Object to the form.

16       A.       About --

17       Q.       Or hit her brakes?

18       A.       About 500 feet.  From the point of

19  reaction.  It would be between 400 and 500 feet

20  roughly.

21       Q.       Do you know -- you didn't do this

22  analysis in your report.  I understand.  Do you know

23  what the closing speed was at that point in time?

24       A.       Well, she was traveling at

25  approximately 65 miles per hour.  I believe she



Page 84

1    testified at about 65 miles per hour.  So, 65 miles

2    per her, again, is 95 feet per second.

3        Q.        Not if the tractor trailer is moving

4    at 5 or 10 miles an hour.  Correct?

5        A.        Yeah.  But, I don't believe that the

6    tractor trailer is moving.

7                  Based on the evidence of the ETOG,

8    the tractor trailer, to me, because -- because there

9    is a point as to which the tractor trailer comes to

10   a complete stop at zero miles per hour.  Then he is

11   struck.  And that's just before 6/29/11.  Then he is

12   struck.  And then he takes another 15 seconds to get

13   -- to limp his commercial motor vehicle off the

14   roadway on to the shoulder.

15       Q.        So your opinion that you are giving

16   me here today was that he was stopped when he was

17   hit?

18       A.        I believe that he was stopped.  But,

19   I've given him some degree of latitude on my report

20   in saying that possibly up to five miles per hour.

21   Something in terms of that language.

22       Q.        Whether he was moving at 5 miles an

23   hour, 10 miles an hour, or stopped, that would have

24   an affect on the amount of distance that she was

25   closing on him.  Correct?



Page 85

1           MS. RAINES:  Object to the form.

2      A.      It would be nominal.  Your five miles

3  an hour to 65 miles an hour.  So, your closing speed

4  is now 60 miles an hour.  If it were, in fact, 5

5  miles per hour.

6      Q.      Your testimony, sitting here today,

7  500 feet from the tractor trailer she should have

8  perceived that there was a danger and began an

9  evasive maneuver?

10          MS. RAINES:  Object to the form.

11     A.      I believe I said 4, 500 feet.

12  Barring no vehicles in the immediate area.

13     Q.      Did you take into consideration the

14  duration of time that Ms. Hartung first perceived

15  the tractor trailer to when the accident happened in

16  your analysis?

17     A.      Well, I don't know how many feet back

18  that she actually did perceive it.  But, assuming 4,

19  500 feet.  That's all we can go off of.

20     Q.      Well, as something that you learned

21  at the University of North Florida, did they talk

22  about when a closing vehicle would perceive that

23  there was a potential danger in a situation like

24  this?

25     A.      Well, she could see the -- you know,



Page 86

1    a vehicle possibly out a thousand feet.  Or even

2    greater.

3         Q.       I am talking about the point that she

4    would have realized that there was an imminent

5    collision or the potential for a collision.

6         A.       Again, that would be that 4 or 500

7    feet.

8         Q.       I am going to introduce here Exhibit

9    D.

10               (Exhibit D, Transcript excerpts,

11   marked for identification.)

12        Q.       This is the deposition testimony of

13   Ms. Hartung which you have reviewed in this matter.

14   If you could, read into the record the parts that I

15   highlighted there or underlined rather.

16        A.       Okay.  It's -- starts out a question

17   on page 108-11.

18               "Question:  Now in the 40 seconds,

19   you know, the 40 second time period from which when

20   you first observed the tractor trailer to the point

21   of impact, were you paying attention to what you

22   were doing?  Were you paying attention to the

23   traffic around you and the tractor trailer?"

24               She replies:  "Yes."

25               "Question:  And was there any other



Page 87

1    traffic in the area at the time?

2                     Answer:  No.

3                     Question:  So basically it was just

4    your vehicle and the tractor trailer on the road?

5                     Answer:  Correct."

6        Q.          The next page, it continues on.

7        A.          Page 109, line 1.

8                     "Question:  So there would have been

9    nothing there to distract you?

10                    Answer:  No.

11                    Question:  Since there were no other

12   vehicles on the road, then there was nothing to your

13   left that would have prevented you from switching

14   lanes and avoiding the tractor trailer?

15                    Answer:  Had I had noticed that there

16   was a tractor --

17                    Question:  My question was, there was

18   no vehicles to your left that would have stopped you

19   from switching lanes and hitting the tractor

20   trailer?"

21                    And Ms. Bowles' objection to form.

22                    "Answer:  There were no vehicles to

23   my left."

24       Q.          Does that change or alter your

25   analysis with respect to Ms. Hartung's perception-



Page 88

1    reaction as it relates to this collision?

2              MS. RAINES:  Object to the form.

3         A.        Slightly.  But, not necessarily

4    incomplete.  The reason I say that is because she

5    said you're speaking to her about a vehicle

6    immediately to her left.  Again, if there was a

7    vehicle trailing her to the left-hand lane, that may

8    have given her a split-second decision to make that

9    decision to make that cut to the left lane.

10        Q.        So you are taking the answer -- the

11   question "So basically it was just your vehicle and

12   the tractor trailer on the road?  Answer:  Correct"

13   to mean that there's still potentially another

14   vehicle behind her that would've distracted her?

15        A.        At 10 o'clock in the morning heading

16   towards Charleston, West Virginia, I find it highly

17   improbable that there were no other vehicles within

18   sight distance.  I just find that highly improbable.

19        Q.        So you are saying that Ms. Hartung's

20   testimony is incorrect?

21        A.        No.  No.

22             MS. RAINES:  Object to the form.

23        A.        I'm not saying her testimony is

24   incorrect.  I'm saying that once she crashed, maybe

25   at that point in time, the shock of the situation



Case 2:13-cv-04178 Document 79-2 Filed 07/13/14 Page 89 of 343 PageID #: 1805

Page 89

1    and so forth, she's medivac'd out, all right, that

2    that possibly could've skewed her mindset and her

3    thinking.  All right?  There was -- I'm just saying

4    if there was -- if there was a vehicle that was left

5    of her, behind her, that's not a vehicle next to

6    her, as she testified.

7         Q.      As an expert, you have to look at the

8    information that is available to you.

9         A.      Facts.

10        Q.      The facts.

11        A.      Correct.

12        Q.      Her testimony is factual testimony in

13   this matter.

14        A.      That's correct.  But, it does not say

15   the vehicle -- it says vehicle next to her.

16        Q.      But you just said to me "if there was

17   another vehicle" in the area.  Now aren't you making

18   assumptions that aren't necessarily supported by the

19   evidence?

20              MS. RAINES:  Object to the form.

21        A.      Again, I'm saying -- I'm saying if.

22   And it's a big if.

23        Q.      If what?  If there was another

24   vehicle, it might have affected her perception-

25   reaction.  But, is there any information that there



Page 90

1  was another vehicle in the area?  Yes or no?

2              MS. RAINES:  Object to the form.

3      A.      No.  Based on her testimony, no.

4      Q.      It is your opinion that going to

5  Charleston at 10 o'clock in the morning, you don't

6  believe that her testimony is accurate?

7              MS. RAINES:  Object to the form.

8      A.      I'm not saying that her testimony is

9  inaccurate.  I'm saying that there is a possibility

10  that she was not -- at that point in time, after the

11  crash, as a result of the traumatic experience that

12  she suffered, that there could've been a vehicle

13  that was not next to her, as I said, a vehicle

14  that's further back.

15              If the question was asked was there a

16  vehicle at your 5 o'clock position, 12 o'clock being

17  straight ahead -- excuse me.  Your 8 o'clock

18  position.  That question wasn't asked.  All right?

19  Is there any other vehicles on the highway?  I find

20  it improbable that there were no other vehicles

21  within sight distance.  Is it possible?  Yeah.  Sure

22  it's possible.

23      Q.      Again, the question was "So basically

24  it was just your vehicle and the tractor trailer on

25  the road?"  She says "Correct.



Page 91

1          Question:  There were no vehicles to
2    the left that would've stopped you from switching
3    lanes to avoid you from hitting the tractor trailer?
4          Answer:  There were no vehicles to my
5    left?"
6          I'm just reading the testimony.
7    A.        I understand.
8          I'm certainly not entitled to my own
9    facts.  The facts are the facts.
10         What she testifies to, I have to -- I
11   have to believe what she's saying.  But, also, there
12   is a traumatic crash that occurred here.  This woman
13   is severely injured.  You know.  Is it possible that
14   that affected her decision making process just
15   before she was making that cut to that left lane?
16   It's possible.  But, again, that's just something
17   that I'm saying.  Was there a vehicle directly in
18   front of her that cut out in front of her?  I don't
19   know the answer to that either.
20   Q.        But you are not here to talk about
21   what's possible.
22   A.        Right.
23   Q.        You are here to render opinions
24   within a reasonable degree of accident
25   reconstruction certainty.  Correct?



Page 92

```
 1          A.        Correct.

 2          Q.        If you were doing a perception-

 3   reaction analysis with respect to the Hartung,

 4   vehicle based on this testimony, you wouldn't

 5   consider any distraction behind her.  Is that

 6   accurate?

 7                    MS. RAINES:  Object to the form.

 8          A.        That's correct.

 9          Q.        Right here, that's another bill.  I

10   am not concerned with that.

11          A.        Well, I am.

12                    MS. RAINES:  That one is for you.

13          Q.        You have here a "Capability of heavy

14   truck electronic control module ECM data."  Describe

15   to me what these documents are.

16          A.        Sure.  This is in relation to

17   Edwards' testimony -- excuse me.  Edwards' report.

18   Where he didn't visit the site.  But, he renders

19   opinions as to what happened on this crash scene.

20   And one of the things here in this component

21   document here, "Capability of heavy truck electronic

22   control module, ECM data," there's a statement that

23   says "ECM data can be quite valuable in analysis and

24   reconstruction of heavy truck accident.  However,

25   the physical evidence is also important and relying
```



Page 93

1   exclusively on ECM data can lead to incorrect or

2   unreliable conclusions."

3                   So my point is and the reason this

4   was brought forth was that Mr. Edwards never visited

5   the site to the best of my knowledge.  All right?

6   And he used photographs to make determinations of

7   what occurred.  In addition, a couple other issues

8   if you'd like, since this is the next document, we

9   can kind of tie them in together.

10      Q.      Let's stick with that.  Then we'll

11  move on to that.

12      A.      Sure.

13      Q.      Had Mr. Edwards visited the site,

14  would that have changed any opinion that you have

15  with regard to his conclusions?

16      A.      I -- if he was at the site, the

17  opinions may hold a little bit more water.

18      Q.      What is it that you -- what

19  information are you relying on to believe that he

20  didn't visit the site?

21      A.      It wasn't in his report, to the best

22  of my knowledge.  The best of my recollection I

23  should say.

24                  MR. MONTGOMERY:  I am going to mark

25  this as Exhibit E.  This is the report of Mark Lee



Page 94

1   Edwards.

2                (Exhibit E, 1/14/14 expert report,

3   marked for identification.)

4        Q.       If he did visit the site, how would

5   that have changed your opinions regarding his

6   conclusions?

7        A.       Well, very -- variables of the site.

8   I mean, the lane widths.  I don't believe he made

9   mention of there being 11 foot lanes, whereas also

10  Rickard said 12 foot lanes.  The consideration of

11  slopes of the roadway.  Inclines of the roadway and

12  so forth.  Line of vision.  You know.  Taking it off

13  my information rather than -- rather than actually

14  having facts of his own.

15       Q.       Did you form an opinion with regard

16  to Mr. -- Dr. Edwards' opinions?

17       A.       No.  I got his -- again, I got his

18  report after.

19       Q.       I know you haven't authored a report

20  on it.  As you sit here today and I ask you the

21  question do you have an opinion with respect to the

22  conclusions reached by Mr. Edwards, could you tell

23  me what those opinions are?

24       A.       Well, there's a couple of them.

25  Number one is that he's critical of my terminology



Page 95

1    of inattention blindness.  And he comes out and

2    calls it a -- oh, boy.  In intentional blindness.

3    Correct.  Where my phraseology is inattention

4    blindness.  He would have to argue that point with

5    National Safety Council 'cause National Safety

6    Council calls it inattention blindness, not an in

7    intentional blindness.  That's one.

8                    And two would be that on his report,

9    he has calculations as to closing speed and so forth

10   and what Ms. Hartung should have done as far as

11   being evasive of this crash.  He refers to the ECM

12   data.  I never received any ECM data to even

13   consider his comments.  There's no ECM data

14   available.

15        Q.       I think he is making reference to the

16   ETOG data.

17        A.       Well, I can't make that assumption at

18   this point.

19                    He put down ECM.  ECM is a component

20   on the truck, which is essentially the brain of the

21   truck.

22                    ETOG is something by CADEC,

23   C-A-D-E-C, which is managed outside of the -- at the

24   corporate office by a desktop.  They can look at a

25   driver and see what that driver is doing.



Page 96

1              So, he took either the wrong

2    information or information that was not available to

3    me to come up with his conclusions.

4         Q.      Other than that and the fact that he

5    didn't visit the site, is there any other issues you

6    take with his report?

7         A.      No, sir.

8         Q.      Did he use the correct looming

9    threshold in his report?

10              MS. RAINES:  Objection to form.

11        A.      I would say approximately 65 miles

12   per hour roughly.  Yes.

13        Q.      I believe his was 506 feet.

14        A.      Well, I said between 4 and 500 feet I

15   think it was.

16        Q.      When you say between 4 and 500 feet

17   is the looming threshold, what scientific

18   literature, treatise, or authority are you using to

19   come up with 4 to 500 feet?

20        A.      It was 65 miles per hour.  He was

21   traveling 65 miles per hour -- she was traveling 65

22   miles per hour, 95 feet per second.

23        Q.      What treatise says it's 400 to 500

24   feet if it's 65 miles an hour?

25        A.      I don't have reference to that.



Page 97

1           He puts 506 feet looming threshold.

2      Q.      Is that right?

3      A.      Yeah.  It sounds about right.  Yes.

4  That's where I said earlier 4 to 500 feet.

5      Q.      I am wondering where the four is

6  coming from.  Is there something you are relying on

7  that I need to look at that says that 400 feet at 65

8  miles an hour is the looming threshold?

9      A.      It's gonna be on an individual basis.

10  I mean, you can't nail down exactly 506 feet and say

11  that you, Counselor, at 506 feet are going to see

12  something that I may see at 400 feet.  Ms. Raines

13  may see at 450 feet.

14      Q.      When you are doing an accident

15  reconstruction, you have to use numbers that -- and

16  data that are generally accepted by the scientific

17  community.  The accident reconstruction community.

18  Correct?

19      A.      Right.  But, it is a variable number.

20  It's not a concrete number.  At 65 miles per hour on

21  a roadway with no visual impairments and anything

22  blocking the view or blind turns or what have you at

23  65 miles per hour, that speed is going to be -- you

24  can't nail down say it's going to be five -- all

25  professional -- excuse me.  All expert opinions and



Case 2:14-cv-11473-AJT-RSW   ECF No. 50-3, PageID.1565   Filed 05/09/17   Page 99 of 246
Case 2:13-cv-04178   Document 79-2   Filed 07/16/14   Page 98 of 349   PageID#: 1814

Page 98

1    all treatises and so forth would say that it is an

2    approximate.  Just like, for example -- stopping

3    distance.  It's going to depend on certain

4    variables.  All right?  Reaction time.  They say an

5    average reaction time is gonna be 1.5 seconds, 1.6

6    seconds.  They don't say that reaction time is

7    concrete for everybody at 1.5 seconds.  It's an

8    average.  Some older folks' reaction time may not be

9    but 3.3 seconds.

10         Q.        But we are doing a reconstruction.

11   We have to use a number.  What we use are the

12   generally accepted numbers like the ones that you

13   learned at IPTM.  Correct?

14         A.        Yes.

15         Q.        Would 506 feet at 65 miles per hour

16   be an accepted number?

17         A.        Certainly.  I'm not arguing with 506

18   feet.

19         Q.        My question to you is, what analysis

20   did you use or what authority or treatise did you

21   use to come up with 4 to 500 feet?

22         A.        I don't -- I don't recall.  I mean, I

23   don't have it listed on my report as documents

24   reviewed or documents reviewed -- references.

25         Q.        Prior to sitting here today, did you



Page 99

1    say 4 to 500 feet or did you not even consider that

2    when doing your report?

3                MS. RAINES:  Object to the form.

4         A.       Well, no.  I didn't consider it

5    because I didn't have Mr. Edwards' report at that

6    time.  So, it's not included in my report.  It's

7    nothing that I -- that I had added into my report

8    because I didn't have -- was not available to his

9    report at this given time.  I received it after the

10   fact.

11        Q.       Just for the sake of clarification, I

12   am going to introduce Dr. Edwards' report as Exhibit

13   E.  I am going to point you to the "Materials

14   reviewed" page.  If you look at the third bullet

15   point down, did Dr. Edwards, in fact, inspect the

16   scene of the accident?

17        A.       Apparently.  Yes.  "Materials

18   reviewed, inspection of collision site."

19                Okay.  I missed that.  Again, I just

20   reviewed this report recently.  I did not see what

21   he actually reviewed.

22        Q.       You said before if he had inspected

23   the report, that you would give more weight to his

24   opinions?

25        A.       Well, the 500 feet does not change.



Page 100

```
 1    All right?  There's the 506 feet.  No.  I'm not
 2    changing that opinion at all.
 3                What I am -- what I am concerned
 4    about is the fact that he is using ECM data that I
 5    was not privy to at the time of authoring my report.
 6    And I'm not going to comment on something that I
 7    have not reviewed.  All right?
 8         Q.        There is no ECM data.  I am telling
 9    you it is the ETOG data.  It may be a difference in
10    terminology.  Certainly, today at some point in
11    time, I am going to call something something that
12    you don't call it.  But I am telling you right now,
13    there is no ECM data.
14         A.        Well, it's all that I have to base it
15    on, is that he wrote his report.  He authored his
16    report on ECM data.  So, I really can't -- I can't
17    oh point on that because of the fact that I don't
18    have access to ECM data.  I cannot make an
19    assumption.  As you well know, I can't make an
20    assumption that he went off of ETOG.
21         Q.        Sure.  Okay.
22                The next item we have here that you
23    looked at, reviewed, and considered in formulating
24    your opinions would be the deposition of Ms.
25    Hartung.  Correct?
```



Page 101

```
 1          A.      That's correct.
 2          Q.      And then the videotaped deposition of
 3   Reginald Yelverton.
 4          A.      Yes, sir.
 5          Q.      Did you actually look at the
 6   videotape or did you just review the transcript?
 7          A.      Just the transcript.
 8          Q.      The next item would be the videotaped
 9   deposition of Mark Follett.
10          A.      Yes, sir.
11          Q.      What is your understanding as to what
12   Mr. Follett's role in this matter is?
13          A.      Corporate representative of KTC-ATL.
14          Q.      Then you considered the deposition of
15   Roger Yelverton.
16          A.      His father.  That's correct.
17          Q.      We have here the depositions of Dr.
18   Biundo Hubbard.  I am assuming you didn't pay too
19   much attention to those.
20          A.      No, sir.  I didn't.
21          Q.      Then we have "Answers to plaintiff's
22   first set of interrogatories, requests for
23   production of documents, and requests for admission
24   to defendant, Advantage Tank Lines, d/b/a ATL
25   Leasing, Inc."  Did you review and consider this
```



Page 102

1    document in formulating your opinions?

2        A.    Yeah.  Essentially just for motor

3    carriers' name.  There was nothing of significant

4    relevance that I had taken out of here.

5        Q.    How about answer to "Plaintiff's

6    first set of interrogatories, request for admissions

7    to Reginald Yelverton"?  Did you consider this

8    document -- these documents in formulating your

9    opinion?

10       A.    I did.  And what it was -- and I go

11   back on an answer that I had responded to prior

12   about Yelverton's driving history as it pertains to

13   crashes.  In October of 2011, and I took

14   consideration -- it says under number nine, on this

15   document, "Defendant was involved in a motor vehicle

16   accident where his vehicle was struck by pulling out

17   of a parking lot by at fault vehicle in October

18   2011."

19           Not that it has any significant

20   weight or anything.  But, it was just something I

21   did take into consideration.

22       Q.    Other than that accident, you don't

23   recall any accidents while he was driving a

24   commercial motor vehicle?

25       A.    No, sir.  To the best of my



Page 103

1   knowledge.  No.

2       Q.      Here we have some documents State

3   Farm Insurance Company issue tod Susan B.

4   Rawlinitis, ETOG data, cell phone records.  Did you

5   take this into consideration?

6       A.      I did.

7           It just demonstrated to me that Ms.

8   Hartung was not on her cell phone at the time of the

9   crash.

10       Q.      Did you take into consideration the

11   responses to plaintiff's request for admissions to

12   defendant, Reginald Yelverton or did we already

13   cover this?

14       A.      Hold on a second.  I have something

15   here highlighted.  I did.  'Cause there's two -- it

16   says "It is admitted that Mr. Yelverton began

17   experiencing engine problems before the accident.

18   It is further admitted that his speed decreased

19   before his trailer was struck by plaintiff."

20           So, that tells me that he had plenty

21   of advanced warning, up to five minutes, that he was

22   having --

23       Q.      How does that sentence right there

24   tell you that he had five minutes?

25       A.      Well, I'm taking that information and



Page 104

1    combining that along with the ETOG data.  That

2    demonstrates to me that his commercial motor vehicle

3    began experiencing some kind of mechanical issue

4    about five minutes before there.  'Cause I drove

5    that stretch of the highway and it was a stretch of

6    highway that did not have any aggressive mountains

7    that would have called for such low drops in speed.

8         Q.        Did you take into consideration Mr.

9    Yelverton's testimony about the engine issue?

10        A.        Well, yeah.  But, I didn't take --

11   you know.  I think -- I believe he's a -- he lacks

12   credibility.  His credibility issues really -- once

13   I start seeing things from a credibility standpoint,

14   I take that information and I kind of put that in my

15   mind when I'm developing a report and wonder if this

16   person is being truthful with further questions or

17   answers.

18        Q.        Do you have a degree in psychology,

19   or psychiatry, or other scientific background?

20                  MS. RAINES:  Object to form.

21        A.        No.

22                  I have 52 years of being able to

23   determine if somebody -- I have 52 years of common

24   logic of being able to determine if somebody is not

25   being truthful.  I have employed literally hundreds



Page 105

1    and hundreds of people, and interviewed, and so

2    forth.

3              So, no.  Certainly I have no degree

4    in psychology.  But, you know, I think it's -- I

5    think my years of experience in being able to

6    determine if somebody is lying to me and whether

7    it's being untruthful in a deposition or, you know,

8    one-on-one basis, I don't think I need a psychology

9    degree to understand that.

10        Q.      Have you ever rendered an opinion

11   with respect to somebody's credibility in a court of

12   law?

13              MS. RAINES:  Object to form.

14        A.      No, sir.

15              MR. MONTGOMERY:  What is the

16   objection to that?

17              MS. RAINES:  Because it was just a

18   hypothetical question.

19              MR. MONTGOMERY:  He is talking about

20   the credibility of Mr. Yelverton.  I am asking if he

21   has ever rendered an opinion in a court of law with

22   respect to credibility.  That's a very plain and

23   simple question.

24        A.      Right.  My response is no.

25              If you look at the few things that



Page 106

1  concern me as to Yelverton's credibility, it is he's

2  on his cell phone and he says -- he testifies he

3  doesn't drive and talk on his phone.  He says that

4  he doesn't drive and talk on his phone.  When you

5  look at his cell phone records, he's engaged in a

6  plethora of conversations prior to this point in

7  time of the crash.

8           In addition, he says that he did not

9  -- now here's a man who is a truck driver that

10  drives the interstate system on a daily basis and I

11  don't know any interstate system that doesn't have

12  an improved shoulder.  And he says that he didn't

13  take his commercial motor vehicle off of the travel

14  lane portion of the highway because he didn't want

15  to drive off the mountain.  So, is it realistic that

16  he doesn't believe that there is a shoulder

17  available for him to escape to as at least a safe

18  refuge or even the interchange just prior to the

19  crash at 106?

20      Q.      My issue really is, you were retained

21  to give an opinion with respect to who was at fault

22  for the accident.  Not necessarily to make a

23  commentary on someone's credibility, which is up to

24  the jury to do.  You understand that?

25      A.      Sure.



Case 2:13-cv-04178   Document 79-2   Filed 07/08/14   Page 107 of 345   PageID #: 3629

Page 107

1              But, I don't believe that the jury's

2     gonna be taking depositions in the back and making a

3     determination.

4          Q.      I don't think you are going to be

5     able to comment on his credibility at least as it

6     relates to the what your opinion of it is at trial.

7          A.      But, if there are things that affect

8     my opinions, all right, such as is in my report,

9     cell phone usage, I believe that's a relevant issue.

10    All right?  Yeah.  Certainly.  Am I gonna be the one

11    testifying on it?  Maybe not.  All right?  But, I

12    believe that I have a right to make that

13    determination about truthfulness based on his -- his

14    statement saying he doesn't talk on his cell phone

15    while driving and then to turn around and look at

16    his cell phone records and see that he's had a

17    plethora of conversations before the crash.

18         Q.      He testified that he talked on his

19    cell phone at his deposition, though.  Did he not?

20              MS. RAINES:  Object to the form.

21         A.      While he is driving?

22         Q.      Yes.

23         A.      I -- I thought that he said in

24    deposition that he didn't -- he does not talk on his

25    cell phone while driving.



Page 108

1    Q.        He testified that he made a phone

2    call to his father prior to the accident.

3        A.        Right.  But, in general, he says --

4    that's a different scenario because of the simple

5    fact of the crash.

6        Q.        We're distinguishing between in

7    general and the accident now?

8        A.        And I said a plethora of phone calls

9    prior to the crash.

10   Q.        Okay.

11       A.        Not the one that's relative to the

12   crash, itself.

13       Q.        But you made a credibility

14   determination based on the fact that he said he

15   doesn't talk while he is driving.  But he did say he

16   talks while he is driving at his deposition.  Yes or

17   no?

18                MS. RAINES:  Object to the form.

19   It's argumentative.

20       A.        To call his father and say I've got a

21   problem with my truck.

22       Q.        So yes?

23       A.        To call his father and say I've got a

24   problem with my truck.

25       Q.        So yes?



Page 109

1       A.      Well, in addition, there's also the

2   fact of him stating that he could not pull his truck

3   off the site of the road, which clearly --

4       Q.      With all due respect, please keep

5   your answers responsive.  This isn't a platform for

6   you to stay whatever it is you want to say.  I'm

7   asking the questions, you are giving me the answers.

8   I've given you a ton of latitude so far with respect

9   to sort of veering off the path of what's being

10  asked of you.  If there is no question, I would

11  appreciate it if you wouldn't just go into some sort

12  of diatribe about something that we are not even

13  talking about yet.  We will get there.  You will

14  have your opportunity to render an opinion.  I'm

15  asking you to, please, answer the questions that

16  have been asked of you.

17          MS. RAINES:  That's fine.  But I

18  would ask that you allow him to answer the question

19  that you pose instead of a yes or no and trying to

20  cut short.

21          MR. MONTGOMERY:  Fair enough.  I

22  think yes or no questions are totally appropriate in

23  every deposition I've been involved in.  The witness

24  is refusing to give a yes or no answer.

25          MS. RAINES:  Don't refuse to give a



Page 110

1    yes or no answer.  Please answer the questions with

2    a yes or no and then give the remainder.

3                    THE WITNESS:  With explanation.

4         A.        The other thins is, too is that --

5                    MS. RAINES:  There's no question

6    pending.

7         Q.        Here we have the "Operating carrier,

8    Kenan Transport Company, certificate of equipment

9    lease."  Did you review this and consider it in your

10   opinion?

11        A.        I did.

12        Q.        Then we have "Plaintiff's responses

13   to defendant's first set of interrogatories and

14   request for production of documents."  Did you

15   review these and consider them in your opinion?

16        A.        I did.

17        Q.        Here we have the "Defendant's Rule

18   26(a)(2)(B) disclosures I believe that we have

19   already discussed that you have looked at these, and

20   reviewed them, and considered them in your opinion.

21        A.        Yes, sir.

22        Q.        We are almost through the documents.

23                   This is "Advantage Tank Lines'

24   responses to plaintiff's request for admissions."

25   You reviewed and considered these in your opinion.



Page 111

1        A.        Yes, sir.

2        Q.        Then here we have the bill of lading

3   and documents related to the load.  Did you review

4   and consider these documents in the formulation of

5   your opinion?

6        A.        I did.

7        Q.        There is a customer service history

8   on the vehicle owned by Susan Rawlinitis.  Did you

9   review and consider these documents in the

10  formulation of your opinions?

11       A.        It was just a real cursory -- a

12  cursory review.

13       Q.        Daily log reports from Kenan

14  Transport, did you review and consider these?

15       A.        I did.

16       Q.        We have some documents here dated

17  August 4, 2011, Charleston Auto Towing, to repair

18  the rear-end damage.  Did you review and consider

19  these documents in formulating your opinion?

20       A.        Yes.  This is the one that I was

21  looking for before in this plethora of documents

22  laying around here.  It says --

23       Q.        I just asked if you reviewed and

24  considered it.

25       A.        Okay.  I sure did.



Page 112

1                    I'll hold on to this if you don't

2    mind.

3         Q.        Certainly.

4         A.        Okay.

5         Q.        This is the driver's qualification

6    file, which I believe was contained in some other

7    documents.  You said you did review and look at

8    this?

9         A.        Yes, I did.

10        Q.        These are the cell phone records that

11   were provided to Tammy for Reginald and Roger.  Did

12   you review and consider these?

13        A.        Yes.  But, there is some concerns on

14   that.

15        Q.        We are going to get this "Yes" or

16   "No" thing down.  I know it.

17                   Finally, we have "Supplemental Rule

18   26(a)(2)(B) disclosures and supplemental rebuttal

19   Rule 26(a)(2)(B) disclosures."  Did you review and

20   consider these in the formulation of your opinion?

21        A.        Yes, sir.

22        Q.        That takes us through the entirety of

23   your file.  Are there any documents that you

24   reviewed and considered that are outside of the

25   documents that we have just looked over today?



Page 113

```
1          A.         At the best of my knowledge at this

2    time, no.

3          Q.         Well if there were any other

4    documents, what documents would those be that you

5    looked at, and reviewed, and considered in the

6    formulation of your opinions?

7          A.         That's why I said to the best of my

8    knowledge.  I don't believe there's anything else.

9          Q.         If you think of anything else that

10   you have looked at or reviewed that was helpful to

11   you or that you utilized, please let counsel know.

12   She can let me know.

13         A.         Sure.

14         Q.         When were you retained by plaintiff

15   to do your analysis of this accident?

16         A.         October 21, 2013.

17                    There is one document you did miss,

18   which is the retainer agreement.

19         Q.         I don't need to see that.

20                    MS. RAINES:  You didn't rely on that,

21   did you, in formulating your opinions?

22                    THE WITNESS:  No.  No.

23         Q.         What was the scope of what you were

24   retained to do with respect to this accident?

25         A.         Make a determination as to Mr.
```



Page 114

1    Yelverton's involvement in the crash, what he could

2    have or could not have done in order to avoid the

3    crash.

4         Q.       Were you asked, at that time, to do

5    any analysis with respect to the actions or

6    inactions of Ms. Hartung?

7         A.       Not necessarily.  No.  It was here's

8    a crash, here's what happened, we'd like to retain

9    you as a commercial motor vehicle expert to make a

10   determination what Mr. Yelverton did or did not do.

11        Q.       Would you agree with me, when there

12   is a two vehicle crash, it's often times protocol to

13   consider the actions or inactions of both drivers

14   when coming to an opinion with respect to who was at

15   fault?

16                 MS. RAINES:  Objection to form.

17        Q.       I'm talking in general.

18        A.       I do agree.  That's the reason that I

19   put it down in my first opinion in my report, as to

20   Ms. Hartung's -- considering Ms. Hartung, where it

21   says, again, the first opinion, "Katherine Hartung

22   has a reasonable expectation to be able to travel

23   Interstate 77 in normal driving conditions and there

24   not being a CMV stopped in the travel lane without

25   any degree of warning.  Failure to warn and the mere



Page 115

1    fact of the CMV's stopped presence were contributing

2    factors to the crash that occurred causing injury to

3    Katherine Hartung."

4        Q.      When you say "failure to warn," what

5    do you specifically mean there?  Emergency flashers?

6        A.      I -- failure to warn would've been --

7    first off, it's hard to really explain failure to

8    warn when you stop your commercial motor vehicle in

9    the middle of a highway.  If it were as a result of

10   an initial collision, that's a totally different

11   scenario.  But, had he pulled his commercial motor

12   vehicle off to the side of the roadway on to the

13   improved shoulder, put out -- put his four-way

14   flashers on immediately and put out his triangles,

15   there's three triangles as required by the

16   regulation, then that would've been appropriate

17   warning of his vehicle being on the shoulder as a

18   potential hazard.

19       Q.      Understanding how this crash

20   happened, do you think Mr. Yelverton would have had

21   time to pull off to the side of the road, put his

22   flashers on, and put his triangles out before Ms.

23   Hartung got to the scene of the accident?

24       A.      No.

25               But, if you look at -- if you look at



Page 116

1   the ETOG data going at the point of what I have, and

2   you will receive a copy of this, at 9.55.15, I

3   believe that's where he started experiencing

4   problems.  That's likely where the seals blew out on

5   his turbo.  That's not necessarily gonna be --

6   necessarily, I emphasize, the pop sound that he

7   heard.  I believe that's where the turbo began to

8   fail.

9               Then you can see where he decreases

10  in rpms and also speed, miles per hour.  And it

11  continues then.  It fluctuates up and down up until

12  the point of 9.59.45.  Then it just deteriorates

13  from that point on out.

14              So, that 45 seconds there, from

15  9.59.45 to almost 10.00.45, he should have had --

16  it's about 45 seconds -- actually, excuse me.

17  10.00.30, he should have taken his commercial motor

18  vehicle off the highway.  He had 45 seconds to do

19  that.  So, from traveling at a speed of 50 miles an

20  hour -- nearly 50 miles an hour, he certainly

21  could've gotten his truck off to the side of the

22  roadway and on to the shoulder.

23      Q.      At what point did you say that the

24  seals on his turbo probably blew out?

25      A.      They probably actually blew out at



Page 117

1    about the mark of 9.59.45.

2        Q.        Which would've been how many seconds?

3        A.        45 seconds.

4                  But a turbo is not going to go from

5    full working mode to blowing out mode in a matter of

6    seconds.  There is going to be a degree of failure

7    in between there.  So --

8        Q.        What knowledge are you basing that

9    opinion on?

10       A.        Experience of trucks.  Dealing with

11   trucks for 20 plus years.  25 years.

12       Q.        Are you a mechanical expert?

13                 MS. RAINES:  Objection.  Asked and

14   answered.

15       A.        No.  FMCSA.  In dealing with turbos,

16   I've dealt with turbos on my own.  You know.  I've

17   dealt with blown up turbos.

18       Q.        Did you inspect this truck?

19       A.        No, sir.

20                 This is all based on information that

21   was provided to me.  'Cause the truck -- it really

22   would've been -- it would've been a pointless

23   inspection because you're talking a couple years

24   later.  The truck had been in service after this

25   crash.  So, any evidence that I would've ascertained



Page 118

1    from inspecting that truck would've been useless.

2        Q.        So it is your belief that the turbo

3    -- the pop was 45 seconds prior to the accident and

4    at that point in time, the tractor trailer

5    precipitously lost speed?

6        A.        Possibly.  Very possibly 45 seconds

7    prior to that.

8        Q.        Possibly?

9        A.        Very possibly.

10              But, somewhere definitely within the

11    five minutes.  But, likely at that 45 second mark

12    prior to the crash is when he actually blew the

13    turbo out.  Complete failure.

14        Q.        In your opinion, does that comport

15    with Ms. Hartung's testimony as to how the accident

16    occurred?

17        A.        Well, Ms. Hartung knew nothing about

18    the pop sound or about the turbo --

19        Q.        I am talking about the speed of the

20    tractor trailer.

21        A.        Well, I'm basing this on -- not Ms.

22    Hartung's testimony.  I'm not basing that on Ms.

23    Hartung's testimony.  I'm basing it on the ETOG,

24    which is factual information, rather than what Ms.

25    Hartung, who is trailing behind the vehicle at 65



Page 119

1    miles an hour, a distance back -- what her testimony

2    is.  'Cause it's perception rather than fact here.

3        Q.       Are you saying Ms. Hartung's

4    testimony isn't factual information?

5               MS. RAINES:  Object to the form of

6    the question.

7        A.       No.

8               Ms. Hartung -- as I said, Ms.

9    Hartung's testimony, I'm going to take Ms. -- Mrs.

10   Hartung is back a thousand feet or whatever that

11   distance is prior to her, you know, seeing vehicles

12   that are up ahead of her.  So, if that's a thousand

13   feet, 500 feet, 1500 feet, I don't have an exact

14   answer for you at this point in time.

15              But, this information here, the ETOG,

16   is factual.  This is information that's sent to the

17   desktop at the corporate office of Kenan.  And

18   they're able to monitor this.  They're able to look

19   at this.  This information is factual to me as far

20   as speeds are concerned.

21              Whatever Ms. Hartung says that the

22   truck was doing, 55 miles an hour, I'm gonna take

23   this fact here over her opinion any day.

24       Q.       At 45 seconds, how far -- the 45

25   seconds when you are saying that it is possible that



Case 2:14-cv-11473-AJT-RSW ECF No. 50-3, PageID.1587 Filed 05/09/17 Page 121 of 246
Case 2:13-cv-04178 Document 79-2 Filed 07/15/14 Page 120 of 545 PageID #: 1036

Page 120

 1    the turbo failed, how far away from the back of the

 2    tanker would Ms. Hartung's vehicle have been?

 3                    MS. RAINES:  Object to the form.

 4         A.       At 45 seconds?

 5         Q.       Yes.

 6         A.       I -- let's see.  You know, I don't

 7    have an exact -- I don't have calculations for that.

 8         Q.       Why don't we back it up?

 9                    She is going 65 miles an hour.

10         A.       Right.

11         Q.       How many feet per second is she

12    traveling?

13         A.       95.

14         Q.       It is your testimony that the turbo

15    failed at 45 seconds prior to the crash?

16         A.       Again, I said -- what I said is that

17    at --

18         Q.       We are doing math.

19         A.       Excuse me.

20                    It's somewhere in 45 seconds.  It

21    could've been -- it could've been all the way as far

22    back as five minutes.  But, likely, it started to

23    come apart.  In other words, it started to fail five

24    minutes prior and then you have -- you have -- the

25    total failure was about 45 seconds prior.  It



Page 121

1    could've been earlier than that.  There's nothing --

2    it -- the failure is not going to happen -- it's not

3    going to be an absolute failure all of a sudden.

4    It's going to be over a period of minutes.  And it

5    could even be up to a period of hours before this

6    actually fails.  Total failure that is.

7           Q.       You have testified that at 45

8    seconds, the speed of the tractor trailer

9    precipitously dropped.  Yes or no?

10          A.       It did.  Down to zero miles per hour.

11          Q.       Would it not be important to your

12   analysis to know where Ms. Hartung was in relation

13   to the tractor trailer at that point, 45 seconds

14   prior to the accident?

15          A.       Again, my analysis was dealing with

16   the commercial motor vehicle.  That was my primary

17   analysis.

18          Q.       At 65 miles an hour, Ms. Hartung

19   would be traveling 95 feet per second?

20          A.       At 65 miles per hour.  That's

21   correct.

22          Q.       So at 45 seconds prior to the

23   accident, that puts her 256,500 feet behind to the

24   accident, according to my math.  Does that sound

25   correct?



Page 122

1           MS. RAINES:  Object to form.

2      A.      I don't have a calculator with me

3   today.

4      Q.      Did you bring one with you?

5      A.      I have a cell phone calculator.

6      Q.      Okay.  Get it out.

7      A.      Okay.  What was your input?

8      Q.      You said at 95 feet per second -- at

9   65 miles an hour, she is traveling 95 feet per

10  second.  So when the tractor trailer's speed

11  precipitously dropped at 45 seconds, how many feet

12  was Ms. Hartung behind --

13     A.      4,275.

14     Q.      Walk me through that equation.

15     A.      95 feet per second, all right, at 45

16  seconds is 4,275 feet.

17     Q.      She would've been 4,275 feet from the

18  point of the accident when the tractor trailer's

19  speed precipitously dropped 45 seconds prior to the

20  accident as you testified.  Yes or no?

21          MS. RAINES:  Object to the form.

22     A.      Repeat that again?  I'm sorry.  I was

23  looking for something.

24     Q.      She would've been 4,275 feet from the

25  point of the accident -- when the tractor trailer's



Page 123

1    speed precipitously dropped 45 seconds prior to the

2    accident, according to your testimony?

3              MS. RAINES:  Objection.

4         A.        Yes.

5              But, she would've been also been at

6    that point there, too, she would've been out of

7    sight -- that truck would've been out of sight based

8    on my inspection of the site.  She would not have

9    seen the truck at that distance.  Because you do

10   have -- you do have some minor blinds up there, as

11   well as you do have some small -- slight -- as a

12   matter of fact, just after Exit 106, I believe it's

13   106, which is the exit just prior to the crash

14   point.  Just prior to that crash point, there is a

15   -- there's an elevation, and then it levels out, and

16   then it starts to rise again and that's where the

17   crash occurred.  So, she would've had no more than a

18   quarter mile, maybe -- maybe a half a mile of visual

19   on that commercial motor vehicle -- on that truck.

20        Q.        I think there was some testimony

21   earlier, you said 400 to 500 feet would be the

22   looming threshold?

23        A.        Yes.

24        Q.        So you were retained on October 21st

25   of 2013?



Page 124

```
 1        A.        That's correct.

 2        Q.        When did you go and do an actual

 3   scene inspection?

 4        A.        January 24th of 2014.  On a nice,

 5   snowy afternoon.

 6        Q.        I saw that from your photographs.

 7                  Did you take into consideration --

 8   what time did you do your inspection?

 9        A.        It was around 4 p.m.

10        Q.        Were the conditions that were present

11   at that time the same as they would have been on

12   June 29, 2011?

13        A.        No.  Because of the fact that you

14   have southbound traffic going into Charleston, which

15   would be likely much more considerable than what I

16   was seeing in all likelihood.  There was still a

17   relatively significant amount of traffic.  A lot of

18   tractor trailer traffic.

19        Q.        Did you ever look into whether this

20   particular roadway had been altered in any way,

21   shape, or form from June 29, 2011 to the point that

22   you did your inspection and then ultimately rendered

23   your opinions in this accident?

24        A.        No.  I didn't look in to it.  But, it

25   appeared that it would've been -- it's -- I come
```



Case 2:14-cv-11473-AJT-RSW Document 59-2 Filed 07/06/15 Page 125 of 348 Page ID #: 1641

Page 125

1  from a background of highway construction many years

2  ago.  And this looks like it has not been overlaid

3  or anything to that effect in some time.

4       Q.       How about the shoulder?

5       A.       The shoulder does not look improved

6  either.  And also comparing that with the

7  photographs you have, exterior rumble strips, you

8  know, things of that nature, that tell me that it's

9  the original condition that it was at the time of

10  the crash, less the snow.

11       Q.       Did anyone participate in the

12  inspection with you, other than yourself?

13       A.       No.  Just me.

14       Q.       You said that there was snow on the

15  road that day?

16       A.       It was -- it was plowed off.  It was

17  not affecting my judgment in any way, shape, or

18  form.  I mean, there was -- it was on the shoulder

19  -- beyond the improved shoulder on the soft

20  shoulder, if you will.

21       Q.       What is "the soft shoulder"?  Just

22  explain that to me.

23       A.       That's dirt.  It's also called turf

24  repair area, turf repair strip.

25                That had some snow on it.  But, it's



Case 2:13-cv-04178  Document 79-2  Filed 07/15/14  Page 126 of 343 PageID #: 1642

Page 126

1    -- it wasn't significant.

2         Q.        Did you take any notes at the

3    inspection?

4         A.        I did.

5         Q.        Those are the notes that you brought

6    with you today?

7         A.        Yes, sir.  These two sheets here.

8         Q.        Two take any measurements while you

9    were on scene?

10        A.        I did.

11        Q.        Are those measurements depicted in

12   those pages of notes that we have here?

13        A.        They are.

14                  They're typical of an interstate

15   system of the Eisenhower interstate system.  The

16   shoulders -- the improved shoulders, 11 foot wide,

17   the two travel lanes southbound are both 11 foot

18   wide with skid marks and a yellow fog line to the

19   left and a white fog line to the right, and outside

20   the white fog line on the right was rumble strips.

21   Mr. Rickard had said that they're 12 feet lanes.

22   They're not.  They're 11 foot lanes travel space.

23   And there was guardrail at a certain point where the

24   depression is where the tractor trailer came to

25   rest.  No guardrail, earth and berm, where the



Page 127

1    crashed occurred.

2         Q.       Did you take any photographs while

3    you were doing your inspection?

4         A.       I did.

5         Q.       Did you bring those with you today?

6         A.       I sure did.

7                  MR. MONTGOMERY:  Do we have these?

8                  MS. RAINES:  I don't have those, for

9    the record.

10                 Is that a CD?

11                 THE WITNESS:  It's a ThumbDrive.

12                 MR. MONTGOMERY:  You can give those

13   to me.

14                 MS. RAINES:  Is this your original?

15                 THE WITNESS:  No.  I've got them on

16   the computer.

17        Q.       What did you photograph in

18   particular?

19        A.       Essentially, I took pictures of where

20   the crash site would approximately have been.  I

21   took photographs of the encroachment on to the crash

22   site.  Looking back at the crash site, behind -- in

23   other words, where the crash site is, took 180

24   degrees photographs of -- again, the approximate

25   crash site.  I don't have the exact location.  But,



Page 128

1    it's within 10, 15 feet either way.

2         Q.       When you say you have the exact

3    location, why were you unable to determine the exact

4    location of the crash?

5         A.       Well, with any degree of certainty, I

6    mean, being able to make an absolute declaration

7    that this is the location where the crash occurred,

8    it's kind of difficult because you have a rolling

9    crash.  You don't know specifically.  I cannot say

10   this is where the impact occurred.  Now if it had

11   occurred and I was able to look at the scrape marks

12   and so forth that you see in the photographs from

13   the State Police, yeah.  Sure you could get

14   accurate.  But as far as any evidence that really

15   tells me exactly where -- I mean, I saw some gouge

16   marks and so forth.  But, I don't know if they were

17   exactly from this crash.  They were minor gouge

18   marks.

19        Q.       So you did see gouge marks at the

20   scene but you didn't use them as the location of

21   this crash?

22        A.       No.  Because I couldn't determine,

23   with any degree of certainty, that that was from

24   this crash.

25        Q.       Have you ever rendered any testimony



Case 2:13-cv-04178   Document 79-2   Filed 07/15/14   Page 129 of 343 PageID #: 1645

Page 129

1    in any matter where there was a tractor trailer that

2    was parked on the side of the road that was struck

3    by another vehicle?

4         A.      You know what?  I -- I'm sure I have.

5    I'm just not -- I'd have to look into that for you.

6    I'm sure that I have.  I just don't remember

7    specifics.  But, I would have to look into that.

8         Q.      Did you find fault with the tractor

9    trailer driver in those cases?

10        A.      Again, if I don't recall the

11   specifics, you know, I don't recall the specifics.

12               I -- I want to say that I have

13   rendered opinions on trucks on shoulders.

14   Specifics, I don't -- I don't recall.  I don't

15   recall the specific cases, I don't recall the

16   specifics of any event.

17        Q.      Would any of those cases be listed --

18        A.      Let me see the year when it started

19   actually.

20        Q.      I think it goes back three years.

21        A.      I think that's what Rule 26 requires

22   me to demonstrate.

23               No.  This actually goes back from day

24   one.  Yeah.  2009.  So -- yeah.

25               But, I couldn't tell you, offhand, if



Case 2:13-cv-04176   Document 79-2   Filed 07/15/14   Page 130 of 345   PageID #: 1646

Page 130

1    any of them were shoulder related.  Because

2    sometimes I get a phone call and somebody says would

3    you -- you know, from a defense standpoint, as I was

4    telling you earlier on, somebody calls and also said

5    that they would like -- you know, an attorney calls

6    and they would like me to represent them from a

7    defense standpoint -- oh actually, yes.  I do.  I do

8    have -- I just recalled one.  It is up in Boston.

9    Paul Zerola.  Z-e-r-o-l-a.

10                    I'm writing on here "Shoulder crash."

11         Q.         Who do you represent in that case for

12   Paul Zerola?  The plaintiff or the defendant?

13         A.         Plaintiff.

14         Q.         This was involving an improved

15   shoulder?

16         A.         Yes.

17         Q.         That is similar to the shoulder we

18   have in this case?

19         A.         It was an interstate.  So, I have not

20   yet gotten a chance to get up there and inspect that

21   shoulder and I do anticipate doing that.  So, it is

22   -- it is an improved shoulder and there was a car

23   that ran in to the back of the -- in to the -- I'm

24   representing the passenger of the car.

25         Q.         You are representing a plaintiff in a



Page 131

1    case where a tractor trailer had pulled off the road

2    and you are finding fault with the tractor trailer

3    driver that pulled off the road?

4           A.       It was a straight job.  It was a

5    straight job truck.  Yeah.

6           Q.       Yes?

7           A.       Yes.

8                    That's the first time you had to

9    correct me on that, too.

10          Q.       In that case, if you don't mind, what

11   is the basis of your opinion?

12          A.       Well, I -- it's an open case, it's an

13   open matter.  So, I don't know how much I'm at

14   liberty to discuss without speaking to counsel.  So,

15   I'd rather not, without speaking to counsel.

16          Q.       It is probably better we talk about

17   it now than on the stand.  That is your call.

18                   MR. MONTGOMERY:  Off the record.

19                   (Discussion held off the record.)

20          Q.       Prior to going off the record, we

21   were talking about the case where you rendered an

22   opinion in favor of the plaintiff that resulted from

23   a tractor trailer accident where I believe a motor

24   vehicle collided with a truck that was parked on the

25   improved shoulder.  Correct?



Case 2:13-cv-04178   Document 79-2   Filed 07/15/14   Page 132 of 343 PageID #: 1648

Page 132

1          A.        That's correct.

2          Q.        I don't want to know the specific

3    details of the case.  There was some question as to

4    whether you have actually authored a report or not

5    in that matter.  What exactly did the tractor

6    trailer driver do wrong in that situation?

7                    First of all, was this a mechanical

8    breakdown situation?

9          A.        No.  It was a mechanical maintenance

10   situation.

11         Q.        What is the difference?

12         A.        He had the reburn on his -- for the

13   diesel fuel particulate filter reburn.  It kicks on

14   at a certain point and tells you you have to --

15   you've got to do certain things with the truck.

16   But, you have a period of I can't remember how many

17   miles it is before you have to do this quick

18   service.  And the service essentially is pulling

19   over to the side of the road -- not the side of the

20   road.  In a safe harbor, safe refuge, and allowing

21   the vehicle to regen itself.  Okay?  This guy, who

22   wasn't trained properly, the light went off and he

23   immediately pulled his truck off the side of the

24   road at 2 o'clock in the morning and didn't put out

25   any of his required warning devices.  And low and


MAGNA
LEGAL SERVICES

Case 2:13-cv-04178  Document 79-2  Filed 07/15/14  Page 133 of 343 PageID #: 1649

Page 133

1    behold -- and it was a straight job truck.  Another

2    vehicle crashed in to the back end.

3         Q.        So you found fault with the driver of

4    that truck for pulling his vehicle on the side of

5    the road in the situation you just described?  Yes

6    or no?

7         A.        I find fault that he did not have to

8    pull that vehicle over to the side of the road.  He

9    had up to 50 miles and a multitude of exits that he

10   could have taken that vehicle off the side of the

11   road and allowed that service -- that regen service

12   to take place.

13        Q.        I'll ask the question again.

14                  In the situation that you just

15   described, you found fault with that driver for

16   pulling his vehicle on to the side of the road?  Yes

17   or no?

18                  MS. RAINES:  Objection.  Asked and

19   answered.

20                  MR. MONTGOMERY:  He didn't answer.

21        A.        The answer is yes.  But, there's also

22   a follow up with that, too.

23        Q.        I appreciate that.

24        A.        Is that the driver pulled his vehicle

25   over to the side of the road when he shouldn't have.



Page 134

1    He should have taken it to an exit up the road where

2    he could've safely gone to an area and allowed his

3    particulate filter to regen itself.

4         Q.        Is that because this truck was still

5    moving?  Still operational?

6         A.        No.  It was primarily lack of

7    training.  That he should have been trained

8    accordingly.  And he was not.

9         Q.        In that situation, he should not have

10   pulled off the road and in this situation, Mr.

11   Yelverton should have?

12              MS. RAINES:  Objection to form.

13        A.        That's not a yes or no.

14        Q.        Yes or no?  That's the opinion?

15        A.        This -- the particular case in

16   Boston, the driver should not have pulled his truck

17   on to the shoulder because the truck was still

18   operational for up to I believe it was either 45 or

19   95 miles.  He had another -- a considerable amount

20   of mileage to go before his vehicle would shutdown

21   on him.  And it's just a maintenance part.  So,

22   instead of finding a spot like a truck stop or

23   something to that effect and doing the regen

24   process, what he did is as soon as the light went

25   off on the truck, he immediately pulled his truck



Page 135

1    over to the roadside.  All right?  Which is not

2    correct.  Because it's a breakdown lane.  All right?

3    It's considered by some to be a breakdown lane.

4    It's not a place to go and set up your truck and do

5    maintenance on your vehicle.  I mean, who's gonna

6    pull over and do an oil change on your truck because

7    your mileage hits another 5,000 miles on a roadside?

8    You take it to a place where it's gonna be

9    appropriate.  He had time to do that and he didn't

10   do that.

11                In Mr. Yelverton's case, Mr.

12   Yelverton had at least 45 seconds, actually up to

13   five minutes, to make a determination that my truck

14   is malfunctioning, there's something wrong with my

15   vehicle, I'm an experienced commercial motor vehicle

16   so I better get my truck off the road -- off the

17   highway.  And he had opportunity to do that at Exit

18   106 and he didn't.  Then after Exit 106, he had

19   opportunity to take it to the shoulder and he didn't

20   because he said he was concerned about driving off a

21   mountain.

22        Q.      In the future, I'll be more careful

23   about giving you yes or no questions that allow a

24   platform on which to pontificate concerning that

25   case, this case.  I was to get a more simple out of



Page 136

1    you.  I'll try a different method.

2         A.      It's understood.  But, it's not that

3    simple.

4              MR. MONTGOMERY:  Off the record.

5              (Discussion held off the record.)

6         Q.      Did you make any determinations in

7    this matter with respect to the point of impact on

8    the Hartung vehicle?

9         A.      Looking at it, I could -- I can -- I

10   certainly can discern that it appeared that you

11   can't just take Hartung's vehicle.  You have to take

12   both vehicles in this situation.

13        Q.      I'm asking about the Hartung vehicle.

14   Work with me here.

15              THE WITNESS:  I hope you're recording

16   down the laughing part.

17        A.      You could see that the -- on the

18   Hartung vehicle, it appears that the primary impact

19   was on the right-hand side, the passenger's side, of

20   her vehicle.

21        Q.      Would that indicate that at some

22   point, she did perceive that a collision was

23   imminent?

24        A.      In my mind, yes.

25        Q.      Did you determine where the point of



Page 137

1    impact was on the Kenan Transport tanker?

2         A.       On driver's side bumper.  On the --

3    on his DOT bumper on the back.

4         Q.       Again, that is consistent with Ms.

5    Hartung, at some point, realizing that she was going

6    to crash in to the back and trying to steer left?

7         A.       It is.  It is.

8              Or I'll just say yes.

9         Q.       Do you recall if the West Virginia

10   police report had any information with respect to

11   the point of impact?

12        A.       I believe it did.  And it shows the

13   vehicles, where they -- with the -- Yelverton's

14   vehicle on the shoulder post crash and it shows Ms.

15   Hartung's vehicle straddled over the skip lines on

16   the southbound lanes.

17        Q.       Let me ask you this.  In your

18   inspection, did you see any tire marks or any

19   markings on the roadway that would be indicative of

20   an evasive maneuver on the part of Ms. Hartung?

21        A.       I don't think -- I don't think

22   photographs allowed for that analysis.

23        Q.       Was there any mention of that in the

24   police report?

25        A.       No, sir.  I don't believe so.


MAGNA

Page 138

1      Q.      So you have no evidence that there

2    were any road markings or anything like that that

3    showed an evasive maneuver on the part of Ms.

4    Hartung?

5      A.      Well, I can only base it on the

6    photographs because of the fact that obviously all

7    that evidence would've been gone by the time I got

8    out there to do my inspection this past January.

9    But, based on the photographs, I mean, there's some

10   degree of tire marks where you could see where her

11   car -- upon impact where you could see the front

12   right tire kind of took a dive down and it made an

13   impression on the roadway.  But, other than that,

14   there is no other pictures that are available that I

15   can confidently say that there was or there wasn't.

16   I just don't have that information.

17     Q.      If you had seen any evidence in a

18   photograph or during your visit, you would have --

19   your scene visit, you would have noted that in your

20   report.  And that is any evidence of an evasive

21   maneuver.

22            MS. RAINES:  I am going to object to

23   the form.  Are we still talking at the Hartung

24   vehicle?  Just to be clear.

25            MR. MONTGOMERY:  We're talking about



Page 139

1    the roadway now.

2          A.     Well, you could see in the

3    photographs, there's one photograph that shows

4    probably the most clear point of impact where you

5    could see leading -- where it was actually the tire

6    marks from -- the tire marks from Yelverton's

7    commercial motor vehicle after the crash.  It was

8    post crash.  Prior to that, there was nothing that I

9    can point to to specifically say that it was -- that

10   shows Ms. Hartung's skid marks or something to that

11   effect.

12         Q.     Have you personally ever spoken to

13   Ms. Hartung?

14         A.     No, sir.

15         Q.     The only information with respect to

16   how the crash happened is her deposition testimony

17   and perhaps some of her answers to the written

18   discovery in this matter?

19         A.     Well, it's a plethora of things that

20   you put together.  You put together, you know, the

21   ETOG data, her testimony, Yelverton's testimony,

22   State Police reports, and so forth to come up with a

23   conclusion.  It's -- you know.  It's not just one

24   document.

25         Q.     Did you measure the improved shoulder



Case 2:13-cv-04178   Document 79-2   Filed 07/15/14   Page 140 of 343 PageID #: 1656

Page 140

1   -- how did you determine what part of the improved

2   shoulder to measure whenever you came up with the

3   measurement for the improved shoulder?

4        A.        It would come from the turf strip,

5   which is the soft shoulder.  So, the dirt, if you

6   will.  Out to the -- real technical term.  Out to

7   the right-hand fog line.  The outside part of the

8   right-hand fog line just beyond the rumble strips.

9        Q.        Is that uniform on I77 South?

10        A.        It's -- it's, pretty much, uniform as

11   far as I know throughout the interstate system.

12        Q.        Did you take any photographs of other

13   areas as you approached the scene of the accident

14   showing that it's uniform?

15        A.        No.  But, I've done enough work on

16   the interstate system over the years to know that

17   it's relatively close to uniform.  11 foot wide

18   lanes.  But, that's just travel portion.  Did I

19   answer your question?  I apologize.

20        Q.        I am talking about the improved

21   portion.  You give an opinion at some point --

22        A.        The improved shoulder?

23        Q.        -- the improved shoulder is 11 feet

24   wide.

25        A.        Right.



Page 141

1          Q.          Is that uniform on I77 heading

2    southbound?

3          A.          Well, I didn't get out and measure

4    every, you know, quarter mile or what have you.

5    But, observation would say that yes, it's relatively

6    standard.

7          Q.          When you say "relatively standard" --

8          A.          11 foot.  It could be 11 foot, 4

9    inches or 10 foot, 9 inches.

10                     And I know that under -- under

11   construction -- heavy highway construction

12   regulations, that the placement of this -- the state

13   and the federal government are gonna get their

14   money's worth.  So, if it's an 11 foot section

15   highway, they want an 11 foot section improved

16   shoulder, they want 11 foot of asphalt.  If it's 10

17   foot, they're gonna want 10 foot.

18         Q.          Did you look at the specifications

19   for the dimensions as far as the design and

20   construction of this highway?

21         A.          No.  But, I'm very familiar with

22   that.  Because I come from a highway building

23   background many years ago, as you see on my CV.

24         Q.          Can that vary from state to state,

25   place to place?



Page 142

```
 1        A.       It's somewhat typical.  If you

 2   measure the improved shoulder in Jacksonville, you

 3   might wind up with 11 foot.  If you're in Jersey,

 4   you're gonna wind up with 11 foot.  Of course on the

 5   New Jersey Turnpike, it's wider.  You know.  Getting

 6   down on Interstate 40 in Tennessee, I believe it's

 7   11 foot.  So, it really depends.

 8                 Also, there's variables, too.  You

 9   have some areas that are wider than others.  But,

10   the relative norm is 11 foot.

11        Q.       I guess my question is, do you have

12   any evidence that the improved shoulder was 11 foot

13   in width in the five miles or six miles leading up

14   to the scene of this crash?

15        A.       It appeared to be.  Again, I did not

16   get out and measure, you know, five miles' worth of

17   shoulder by quarter mile increments or what have

18   you.  But, it appeared that the majority of it was

19   11 foot.

20        Q.       You are basing that on your

21   perception --

22        A.       That's correct.

23        Q.       -- as you drove down the highway?

24        A.       That's correct.

25                 And most important I think is the
```



Page 143

1    shoulder -- the improved shoulder coming up to 106

2    and just beyond 106.  And I believe that I'm getting

3    that exit correct.  Bear with me one second here.

4    I'm pretty sure it is.  Yeah.  106, which is Edens

5    Fork exit.  So, Edens Fork exit.

6            So, most specifically right after

7    106, you have the 11 foot shoulders.  And that was

8    the opportunity.  Since he didn't take the exit,

9    knowing that he had a problem with his commercial

10   motor vehicle -- since he didn't take 106 as a place

11   of safe refuge, he still had a shoulder -- 11 foot

12   shoulder going after Edens Fork.  But, there was

13   also --

14       Q.      Based on your interpretation of the

15   five minutes of him having trouble, et cetera, et

16   cetera, I understand.

17           Did you take a measurement of the

18   grade at or near the point of the accident?

19       A.      Approximate.  Yes.

20       Q.      Did you use a tool to measure the

21   grade or --

22       A.      I did.

23       Q.      What kind of tool was that?

24       A.      A protractor.

25       Q.      How would you go about doing that?  I



Page 144

1    wasn't the greatest in math.  How would you measure

2    the grade of a road?

3         A.      It just gives -- it gives you grades

4    and percentages of -- you know, percentages of

5    grade.

6         Q.      Is it an electronic one?

7         A.      No.  It's manual.

8                 And then I also have a level, too,

9    that you set down on an angle just to confirm it and

10   that level that sits on an angle tells you -- that's

11   electronic.  It tells you exactly what the

12   percentage of grade is.

13        Q.      Did you just measure the grade in the

14   area of the accident or -- let's say for instance

15   what the grade of the road is a mile back?

16        A.      No.  I -- I did it starting at mile

17   marker 110, which is a half percent.

18                And then at 109 was a one and a half

19   percent upgrade.

20                108.5 was a half percent downgrade.

21                108 was one and a half percent

22   downgrade.

23                107, one and a half percent upgrade.

24                Edens Fork, no.  I didn't have Edens

25   Fork.



Page 145

1        And then crash location was

2   approximately 2 percent.

3        And these are all rough dependent

4   upon where you take the actual measurement.  It's

5   just so much as a simple stone getting underneath

6   that's sticking up out of the bituminous asphalt.

7   Surface can affect that slightly.

8      Q.      I am confused.  In your report, you

9   say that the area at or near the crash was 4

10  percent.  You just said 2 percent.

11     A.      No.  I didn't say 4 percent.

12     Q.      Page three, paragraph three.  If you

13  could take a quick look at that.  Would you read the

14  second sentence there in paragraph three?

15     A.      Yeah.  Yeah.  I did say 4 percent.  I

16  don't know -- crash location -- I had it down on my

17  field notes here as 2 percent.  Is it a typo?  I

18  don't know.  My field notes say right here, "Crash

19  location, 2 percent."

20        So, I don't know how that -- I don't

21  know how -- that is a typographical error.  Had to

22  be.  Because I would've taken it right -- I don't

23  know where I picked this up from.  But, here on my

24  field notes, you could see, right here, "Crash

25  location, 2 percent."  I don't know how I made that



Page 146

1  error.

2      Q.      Does the difference between 2 or 4

3  percent affect the conclusions that you have reached

4  in this matter?

5      A.      No.  No.  It wouldn't affect it at

6  all.  Especially because of the fact that he's

7  coming off a relative stepped up flat surface right

8  by Edens Fork there.  Watching other tractor

9  trailers, too, they were consistently at, you know,

10  50 mile an hour, 40 mile an hour coming up that

11  grade?

12      Q.      If you want to get your report out,

13  we are getting to the meat-and-potatoes here.  We

14  are moving along nicely.

15              On page three, you make the statement

16  "Unable to avoid the CMV's cargo tank located in the

17  right lane of travel.  Hartung crashed into the rear

18  bumper of same causing severe injury to Hartung."

19              Why was Hartung unable to avoid the

20  rear of the commercial motor vehicle?

21      A.      I think that it just -- the closing

22  -- closing.  It just closed in on her so quickly.

23      Q.      You didn't do any perception-reaction

24  analysis?

25      A.      No.  We covered that.  No.



Page 147

1        Q.        Would that be something that you

2   learned at the IPTM that you would need to do before

3   rendering an opinion with respect to whether

4   somebody had time to perceive and react and avoid

5   something?

6                  MS. RAINES:  Object to the form.

7        A.        Again, my opinions are based on the

8   commercial motor vehicle.  Predominantly the

9   commercial motor vehicle operator's actions of what

10  he did or did not do in compliance with the FMCSR.

11       Q.        You made your statement in your

12  report "Unable to avoid the CMV cargo tank located

13  in right lane of travel.  Hartung crashed into rear

14  bumper of same causing severe injury to Hartung."

15                 You are saying she was "Unable to

16  avoid."  I am saying what are you basing that on,

17  scientific or otherwise?  The fact that the crashed

18  happened?

19       A.        That's it.  The fact that the crash

20  occurred tells me in my mind that she was unable to

21  avoid it.  From the point at which she perceived it,

22  reacted to it, she was unable to avoid the crash

23  based on the simple fact of the crash.

24       Q.        But you didn't do a

25  perception-reaction analysis.  So essentially what



Page 148

1    you are saying is because an accident happened, it

2    was the truck driver's fault?

3                MS. RAINES:  Objection to form.

4    Mischaracterization.

5          A.      I think that parking a commercial

6    motor vehicle on a highway and somebody striking it,

7    would in my mind make it the fault of the commercial

8    motor vehicle operator.

9          Q.      You have also given the opinion that

10   parking a motor vehicle on the side of the road also

11   is the fault of the truck driver, as well.

12         A.      Again, that is a totally different

13   scenario.  You can't -- it is a completely different

14   scenario.  We are talking about a breakdown versus a

15   maintenance issue.  So, it is totally irrelevant.

16   This guy drove the straight job truck.  He had a

17   maintenance issue of up to -- and I don't recall

18   whether it was 95 miles or something like that, that

19   he could've maintained that issue very easily at a

20   truck stop or a safe refuge off an off ramp.  He had

21   that opportunity.  His commercial motor vehicle was

22   mobile.  This commercial motor vehicle here, after

23   it passed 106, was definitely immobile after the

24   turbo blew up and 45 seconds prior had a total loss

25   of power.



Page 149

1          Q.          And you were retained by Paul Zerola

2     in that case?

3          A.          Yes, sir.

4          Q.          Do you know who the defense attorney

5     is?

6          A.          No, I don't.

7          Q.          Do you know where that case is filed?

8     Is that information in there?

9          A.          It's -- it should be in there I would

10    think.  I'm not sure of the venue.

11         Q.          I will look at it later.  I don't

12    want to belabor it right this second.  Obviously, we

13    are going to look at that later.  I think it's

14    pretty pertinent to the situation that we are

15    talking about today.

16                      In the second -- on page three,

17    second paragraph from the bottom, you say "While

18    traveling on I77 in the right lane of travel,

19    Hartung came upon the cargo tank CMV essentially

20    stopped or near stopped in the right lane of travel

21    on a moderate incline."

22                      It doesn't make any difference to

23    your analysis whether it was stopped or still

24    moving?

25         A.          Very little.  I think that it's more



Page 150

1    detrimental if he was stopped in my opinion.  Based

2    on the ETOG data, it appears to me that he was

3    stopped.  Five miles per hour, from an impact

4    standpoint, is -- you're running into -- if you're

5    running in to the back of a wall at 65 -- 55 or 50

6    miles per hour versus five miles per hour -- excuse

7    me zero miles per hour versus five miles per hour, I

8    think the end result is gonna be relatively the same

9    or very close to it.

10        Q.        Specifically, do you have the ETOG

11   data that you relied on in formulating the opinion

12   that he was stopped?

13        A.        Sure.  Here you go right here.  Right

14   at the bottom right there.  Zero miles per hour.

15   This is five miles per hour here.  The first

16   increment up above that is five miles per hour.

17        Q.        You have that happening after 10

18   o'clock and 30 seconds.  Correct?

19        A.        Shortly thereafter.

20        Q.        Do you know what time this accident

21   occurred?

22        A.        Exactly?

23        Q.        Yes.

24        A.        No.  Nobody knows exactly what time

25   it occurred.  I'm looking at this here and seeing



Page 151

1    what's happening with his rpms and with his miles

2    per hour speed rate.  Very clearly, it appears to me

3    that he's going to total failure.

4         Q.      Did you testify earlier that after

5    the accident, he pulled his truck off the road?

6         A.      He did.

7         Q.      How was he able to do that if it was

8    a total failure?

9         A.      He was on his way to total failure.

10        Q.      Why would he take it down to five

11   miles an hour?

12        A.      Because he was able to limp off the

13   roadway at five miles per hour.  Just enough to get

14   it off the roadway.

15        Q.      So your testimony is that he was on

16   his way to total failure but was stopped on the

17   roadway, but wasn't at total failure?

18        A.      Was not completely at total failure

19   but well on his way.

20        Q.      So he would have been moving?

21        A.      He was able to move enough to limp

22   his truck off the roadway at five miles an hour

23   which took him about 15 seconds.

24        Q.      You testified that you believe at the

25   point of the accident that he may've been completely



Page 152

1   stopped.  Why would he have been completely stopped

2   at the point of the accident if he was able to drive

3   his truck off the road?

4        A.      The same reason that he probably

5   didn't realize that he should have taken his truck

6   off the road.  Because he's not thinking clearly

7   because he's on his cell phone, engaged in a

8   conversation rather than thinking what he should be

9   doing of getting his truck off the roadway.

10       Q.      How do you know he was on his cell

11  phone at the time of the accident?

12       A.      It seems logical to me that he was --

13  at the time of the actual collision, I don't know if

14  he was, but sometime in this 45 seconds prior to it,

15  I believe very well that he was, which took his

16  attention away from the task at hand, which is

17  getting his vehicle to a place of safe refuge.

18       Q.      But you don't know exactly what time

19  the accident happened?

20       A.      No.  I -- nobody knows exactly what

21  time.  It's estimated.

22       Q.      What time is noted in the police

23  report?

24       A.      10 o'clock.

25       Q.      Was the truck, based on the ETOG data



Page 153

1    that you are looking at right now, moving at 10

2    o'clock?

3            A.        It was physically moving at 10

4    o'clock.  At exactly 10 o'clock, it was at 20 miles

5    per hour.

6            Q.        At what point now did it go actually

7    to zero?

8            A.        Went down to zero at -- it would be

9    about 10.00.47 I would say?  No.  Excuse me.  Take

10   that back.  10.00.40 maybe?

11           Q.        Don't you think that that's more

12   consistent with him stopping the truck after she

13   rear-ended him?

14           A.        No.  Because he took his -- he

15   immediately -- I believe that what happened is on

16   that impact, all right, that impact, obviously you

17   can see where it -- on that impact, you could see

18   the truck moving forward.  He comes forward, he

19   pulls it up 15 -- at five miles an hour for 15

20   seconds to limp it off the shoulder.  So even -- but

21   I guess the main point is -- that's why I left some

22   latitude in the report.  Whether he was doing a

23   total of five miles per hour or zero miles per hour,

24   five miles per hour is a speed that he should have

25   removed his vehicle from the roadway.  He should



Page 154

1   have started coming off the roadway at 45 seconds --

2   actually prior to that.  Within that five minutes,

3   he should've been looking for an exit.

4        Q.        At that point, he would've been past

5   any exits?

6        A.        Not within the five minutes.  At the

7   45 seconds, he possibly would've been past Edens

8   Fork.  But, if he was thinking clearly, rather than

9   being engaged in cell phone conversations, he

10  would've been thinking at getting off at Exit 106

11  rather than talking on his phone.

12       Q.        Let's talk about that.

13                 In the 45 seconds when the speed

14  precipitously drops, that's the term we coined

15  today, where the speed drops, you think that's when

16  he heard the pop.

17       A.        I believe that it may have been.

18       Q.        How far would he have traveled in

19  those 45 seconds?

20       A.        I have that broken down.  Page six I

21  think it is.  Or seven.  Here we go.

22                 Page eight.  Calculating the average

23  speed for approximate 15 second increment is the

24  following:  The first 15 second increment is 42.5

25  because you could see that slide is consistent.



Page 155

1      Q.        My question was about the 45 seconds.

2      A.        Right.  That's what I'm talking about

3  here.

4                You could see, in that 45 seconds on

5  the ETOG, that his speed slide is consistent.

6  There's no fluctuations in that last 45 seconds.

7  So, it's fair enough to be able to come up with an

8  average for each 45 seconds in 15 second increments

9  as to what that speed was.  So, the average speed

10  for the first 15 seconds of that 45 seconds is 62

11  feet per second.  All right?  The second increment

12  is 40 feet per second.  Third increment is 7.5 feet

13  per second.  Okay?

14     Q.        How many feet is that?

15     A.        540 yards.

16     Q.        How many feet is that?

17     A.        Which you take in five and a half

18  football fields or convert it to 1,620 feet.

19     Q.        He traveled 1,620 feet in that 45

20  seconds?

21     A.        Yes.

22     Q.        How far away was the Edens Fork exit?

23     A.        Edens Fork is sitting at 106.  Exit

24  106.  Crash occurred at 105. -- 105.2.

25     Q.        Four-fifths of a mile?



Page 156

1          A.        Hold on one second.

2                    Okay.  What was that?

3          Q.        How far away was the Edens Fork exit

4     from the -- how far away was Edens Fork exit from

5     when he started experiencing the 45 seconds?

6          A.        Well, it's -- an exact, you're not

7     gonna have because the mile markers don't give

8     exact.  And I couldn't shut the highway down to

9     measure all this.

10         Q.        How far away was the Edens Fork exit

11    as you have stated in your report?

12         A.        I would say probably a quarter mile.

13    Approximately.

14         Q.        I have to go back to your report.

15    You do say it was four-fifths of a mile away.

16         A.        Four-fifths.  All right.  5.5

17    football fields was -- yeah.  Four-fifths of a mile

18    if we're looking at the -- and that's based on mile

19    stickers -- mile markers.

20         Q.        It is four-fifths of a mile from the

21    accident scene.  We did the calculation he traveled

22    1,620 feet after he heard the pop in that 45

23    seconds.  Yes?

24         A.        Right.

25         Q.        So he would've been past the Edens



Case 2:15-cv-04178 Document 79-2 Filed 07/15/24 Page 157 of 348 PageID #: 1673

Page 157

1    Fork exit, based on the math that you just gave me--

2          A.       That's correct.

3          Q.       -- when he heard the pop?

4          A.       I'm not saying that he would not have

5    been past it.  The pop occurred after -- if the pop

6    occurred at that 45 second mark, it would've been

7    past Edens Fork.

8          Q.       You render opinions in your report

9    about pulling off at Edens Fork?

10         A.       But, that's within that five minute

11   period.  It's not within that 45 second period.

12   Within that five minutes, he knew that he had a

13   problem.  And he did not act on that problem.

14         Q.       But he testified that he didn't know

15   that he had a problem?

16         A.       I'm an experienced truck driver.

17   When you're driving that truck and you live in that

18   truck every single day and you're driving over the

19   road, you know when you have a problem.  You know

20   when the turbo's failing.  You know when you have a

21   flat tire.  If you're driving along, you know you

22   have the flat tire on the trailer.

23         Q.       You weren't in this particular truck

24   obviously.

25         A.       No.



Page 158

1      Q.      Do you know whether this is the truck
2   that Mr. Yelverton drove on a consistent basis?
3      A.      I believe that was his first day in
4   it, if I'm not mistaken.
5              But, the point is that you understand
6   trucks.  When you're driving a truck and you have
7   been driving that truck for a day or what have you,
8   you understand that vehicle.  You get the feel of
9   the vehicle.
10     Q.      Once you drive a particular truck for
11  a while, you start to get a feel for it?
12     A.      Yeah.  But, even still, if you're
13  driving a truck for an eight hour shift --
14     Q.      I just want to understand how it is
15  that you are able to just conclude that he knew that
16  there was a problem for five minutes based on --
17  what are you basing that on?
18     A.      Power.  I mean, it's a power failure.
19  You know if your truck is not responding.  When
20  you're stepping down on your throttle, you know your
21  truck's not responding, there's something wrong.
22  Whether it's water in the fuel or -- you know, or
23  air filter situation.  Whether it's -- it could be a
24  whole host of different things.  But, you get your
25  truck off the road.



Page 159

1    Q.        This particular area in the five

2    minutes, would he have been going up and down hills

3    in West Virginia?

4        A.        Sure.  But, they -- the distance that

5    I traveled, they were not real aggressive hills.

6    They were moderate.

7        Q.        Would those hills be of a significant

8    enough incline to affect the speed of a tractor

9    trailer?

10       A.        Oh, sure.  But, again, you would feel

11   -- you would still feel your truck.

12       Q.        What basis are you rendering the

13   opinion that five minutes and 15 seconds before the

14   accident, he should have known that he was having

15   trouble with his tractor trailer?  You said power.

16   What is it that you are looking to that says this is

17   definitive, this is how I can make this opinion?

18       A.        Experience.  Experience.  And plenty

19   of it.  Experience of driving trucks, experience of

20   owning trucks.  You know when you're having a power

21   failure in your vehicle.

22       Q.        But that is your experience.  You

23   weren't driving this truck.

24       A.        But, I have been retained as an

25   expert -- as a commercial motor vehicle expert.  So,



Page 160

1    I think that I should be permitted to express my

2    experience.  I think that's what I'm retained for,

3    in part.

4         Q.      I am asking you, out of the

5    information that you reviewed, that you were able to

6    apply your experience as a truck driver to in order

7    to formulate that opinion.

8         A.      Right here.  ETOG.  The ETOG

9    demonstrates to me that he -- he was feeling some

10   degree of loss of power.  And he should have felt

11   it.

12        Q.      The ETOG, does it not have

13   fluctuations in speed from 45 miles an hour to 60

14   miles an hour in this time period that you're

15   talking about he should have known there is a

16   problem?

17        A.      Yeah.

18        Q.      It does?

19        A.      It does.

20        Q.      You testified earlier that going up

21   and down hills would affect the speed of this

22   tractor trailer.  How could you say there has to be

23   a power problem?

24        A.      Look at the time period before he

25   started experiencing these problems.  He maintained



Page 161

1    the speed at 65 miles an hour in these hills.  Okay?

2    Then he gets to the point at 9.54.45 and starts

3    seeing a decline in his power.  So, in my mind, he

4    was to have known.

5         Q.      Are you equating a decline in speed

6    with a decline in power?

7         A.      Yeah.

8                 If you also look at rpms, too.

9         Q.      What is it about the rpms that

10   indicates that there is a decline in power?

11        A.      Right in here.  You can see the

12   fluctuation of the rpms.  If you look here, on rpms

13   -- where are the time frames here?  Roughly 9.56.00,

14   he has spikes in his rpms.  I mean, it just shoots

15   straight up.  It goes from 1300 rpms, up to 1800

16   rpms for no rhyme or reason, while at the same time,

17   his power is declining going down.  In other words,

18   he's losing power.

19        Q.      Would his rpms go up as he was

20   climbing the hill or would they go down?

21        A.      It depends.  It all depends on what

22   he was doing with his throttle.  And it all depends

23   on his load.

24                If you look at -- his rpm s are all

25   the over the place.  That is not normal.  His rpms



Page 162

1    are all over the chart.  If you look at it -- look

2    at his rpms prior to 9.54.45, his rpms are

3    consistent all the way through.  He's running at

4    1500 rpms.

5               Now where I would say he hit a little

6    bit of a hill or mountain is if you look at the time

7    distance here of 9.50.00.  He has a little dip

8    there.  That would say yeah.  He was probably

9    climbing a hill at that point -- a small hill and

10   lost some rpms.  Then he gets back on a consistency

11   with 1500 rpms.  And then here, at 9.55.30 roughly,

12   he has all kinds of spikes, which is telling me that

13   there is a significant power failure.  And he

14   would've felt that, too.  All of a sudden, he feels

15   his rpms go right through the roof on his truck

16   which tells me that somewhere in there is where he

17   was beginning to get failure on his turbo.

18        Q.      What is the likely period of time

19   that we are looking at here?

20        A.      It would be about -- it would be

21   about maybe 11 minutes.  Half of that time in that

22   11 minutes, he's running along all clean, no

23   problems at all.  And then all of a sudden, he has

24   these spikes in rpms and he has the decline in power

25   or fluctuation in power.  And that's when his turbo



Page 163

1    began to fail.  I don't know exactly where the pop

2    began or occurred.  But, I would believe it would

3    probably have happened just before total failure,

4    which is at that 45.  45 seconds prior.

5         Q.        If you look at page four of your

6    report, down into the section here involving

7    italics --

8         A.        Page four where?

9         Q.        Just in the section where you have

10   started to write in italics.

11        A.        Okay.  Yep.

12        Q.        You rendered some opinions under the

13   Federal Motor Carrier Safety regulations.

14   Specifically subsection "383.11 required knowledge."

15             I think my first question is, if a

16   commercial motor vehicle has a CDL, have they passed

17   an exam that basically states that they have the

18   required knowledge of the regulations to operate a

19   commercial motor vehicle?

20             Yes?

21        A.        Yes.

22        Q.        You are saying that he doesn't have

23   this knowledge but he is a CDL driver?

24        A.        There is a part under the Federal

25   Motor Carrier Safety regulations which is 390.3,



Page 164

1    which is general requirements.  Under general

2    requirements, it requires both the motor carrier and

3    the driver -- I think it's one -- two and three

4    under 393.3 -- excuse me.  390.3 that requires both

5    the motor carrier to have knowledge of the Federal

6    Motor Carrier Safety regulations and also that the

7    motor carrier will cause the driver to have

8    knowledge of the Federal Motor Carrier Safety

9    regulations.  That's what points me back on to

10   393.111, where he is required, as driver required

11   knowledge.  So, yes.  He is entitled to drive a

12   commercial motor vehicle with a CDL A.  With a CDL A

13   for an 80,000 pound articulating vehicle.  But, he

14   also needs to have the knowledge of the FMCSR.

15   That's why you have -- motor carriers will issue a

16   driver a small version copy of this Federal Motor

17   Carrier Safety regulation that I have right here,

18   the green one.  They'll give him a small copy of it

19   and say here, read this.  Some of them will train on

20   it.  But, he's required to understand what pertains

21   to him as a commercial motor vehicle operator in

22   here.

23       Q.       Do you know whether he had a copy of

24   the FMCSA regulations?

25       A.       FMCSR.



Page 165

1              I have no idea.

2       Q.        Did you read his deposition?

3       A.        I did.

4              Perhaps it was issued to him.  But, I

5   just don't -- I don't recall.

6       Q.        Would it make a difference, in your

7   opinion, whether he had one or not?

8       A.        Well, it would if he had taken the

9   time to read it.  It doesn't make a difference if he

10  just put it in his glove compartment and got on the

11  job and started driving.

12      Q.        Subparagraph nine, you said that

13  these were parts that were not applied by Yelverton

14  at the time of the crash.  You say "Speed

15  management.  The importance of understanding the

16  affects of speed including speed and traffic flow."

17             There was some testimony earlier that

18  you really didn't know what the traffic flow was, at

19  least with respect to Ms. Hartung's deposition

20  testimony.  Does that -- having heard that

21  deposition testimony change the opinions you are

22  rendering with regard to speed and traffic flow?

23      A.        No.

24             If you look at the fact that he

25  claims to have been traveling at 5 to 10 miles per



Page 166

1    hour, that, in my mind, tells me that he violated

2    that section .9 out of 111 -- part 383.111, where he

3    didn't manage his speed correctly and recognize that

4    his speed was becoming a danger to the free flow of

5    traffic.  And by traveling five miles -- allegedly 5

6    miles an hour in the right lane, which I think he

7    was at zero.  But, you know, just given the fact of

8    him saying 5 to 10 miles per hour.

9         Q.        Under paragraph 12, "Extreme driving

10   conditions."  You have subparagraph, iii where it

11   says "Extreme driving conditions.  The basic

12   information on operating in extreme driving

13   conditions and the hazards encountered in such

14   conditions including mountain driving."

15             You just said that this was a 2

16   percent grade where the accident happened.

17        A.        Yeah.  I believe it was 2 percent.

18        Q.        So this wasn't particular -- exactly

19   where the accident happened.  This wasn't what you

20   would consider mountain driving.  His inability to

21   understand mountain driving wouldn't have caused

22   this accident?

23        A.        Well, if he understood mountain

24   driving, then he would understand going up a grade,

25   regardless of what that grade is.  Because you are



1  going to always have a transition from a one, to

2  two, to three, to four, to five on a 5 percent

3  grade.

4              If he were trained on mountain

5  driving, he would have understood he was going to

6  have a deceleration issue that's going to be more

7  quick with a turbo failure or a power failure than

8  if he was on a flat run say out in Utah.

9      Q.      How do you make that -- how does that

10  -- you make that -- draw that conclusion and then in

11  15 -- paragraph 15 on page 18, say that this

12  specific area of I77 is not considered a mountain as

13  a personal assessment?

14      A.      Okay.

15      Q.      So how do those two mesh?  The two

16  opinions.  This isn't a mountain, but his lack of

17  training in mountain driving was one of the

18  contributing factors that you said throughout your

19  report to this accident.

20      A.      State of West Virginia -- the State

21  of West Virginia is notorious for mountain driving.

22  They've got runaway truck ramps from West Virginia

23  down into Tennessee.  A driver -- more particularly

24  on the east side.  A driver has got to be cognizant

25  of driving in those conditions.  Motor carrier has



Page 168

1    an obligation to make sure that that driver is

2    trained under those conditions, as it is -- as

3    stated in 383.111 reflecting back on, again, 390.3.

4    All right?  Where the motor carrier has to have that

5    requirement to train their people.

6              Now if they had trained him on that

7    correctly -- this is a mountainous region.  Don't

8    get me wrong.  This is a mountainous region.  Was

9    this particular spot where this crash occurred a

10   mountainous region?  No.  It was mountainous region.

11   But, was it a mountain at that point in time?  No.

12   But, if he was properly trained under mountainous

13   conditions how to operate a commercial motor

14   vehicle, he would've realized that -- once he

15   started getting this power failure five minutes

16   prior, it should have registered in his mind that I

17   could be coming up on a mountain, upon on a hill

18   that I need to make sure that I get this truck off

19   the roadway quickly instead of riding it out.

20      Q.      The accident, itself, did not happen

21   on a mountain?  Yes or no?

22      A.      At -- it happened on the foot of a

23   hill.

24      Q.      I am going to go back to your

25   paragraph 15 again.



Page 169

1      A.      Sure.  It's a hill.

2      Q.      "The undersigned's assessment of the

3  specific area of I77 not being considered a mountain

4  is a personal assessment."  So this wasn't on a

5  mountain.  Right?

6      A.      Again, I referred to it as a hill.

7  It's a slope going up into a hill.  The region was a

8  mountainous region and if he were trained under

9  mountainous driving, he would've realized -- again,

10 he would've realized that I'm having a power

11 problem.  I don't know what's up ahead of me here,

12 whether I'm going to be coming up into an incline

13 where I'm gonna have a problem so maybe I should

14 think about getting off at the next exit to figure

15 out why my truck is losing power.  Instead, he gets

16 on a cell phone and calls daddy.

17     Q.      Again, you are expounding on that

18 which has been asked of you.  Again, I am doing my

19 best not to give you a platform to do that.  But you

20 seem to enjoy --

21     A.      Pontification.

22     Q.      -- pontification and going back to

23 the same points, which honestly, when I ask you a

24 yes or no question as to whether your opinion is

25 that this doesn't happen on a mountain --



Case 2:15-cv-04178   Document 79-2   Filed 07/15/14   Page 170 of 345 PageID #: 1630

Page 170

1          A.        It's a mountainous region.

2          Q.        Where the accident happened.

3          A.        This is a hill.

4          Q.        I'm gonna read number 15.  Are these

5     your words?  "The undersigned's assessment of the

6     specific area of I77 not being considered a mountain

7     is a personal assessment"?  Are those your words?

8          A.        Yes.  I consider the area a region.

9          Q.        It's a yes or no question.  You can't

10    do that.

11                    MS. RAINES:  It's been asked and

12    answered.  I think we can move past that.

13                    MR. MONTGOMERY:  We are moving right

14    along.

15          Q.        On page five, it says "Each of the

16    afore listed points of required knowledge that are

17    addressed below respectively as listed."  Under

18    number one, you offered a solution to this problem.

19    You say they should -- the problem of ensuring that

20    Yelverton knew exactly what he was to do in the

21    event of a catastrophic breakdown of the CMV.

22    Correct?

23          A.        That's correct.

24          Q.        You state that "They should have

25    properly trained him in the proper driving



Page 171

1    techniques when and if he ever suffered a

2    catastrophic failure whereby in this event, he

3    suffered a significant and not near complete power

4    loss."

5              I am just trying to understand what

6    exactly your opinion is.  Did he suffer a complete

7    power loss, a significant power loss, or a near

8    complete power loss?

9         A.        Substantial near complete power loss.

10        Q.        Again, you said before that he was

11   stopped.

12        A.        And I still stick to that.

13             I mean, looking at the ETOG, it

14   appears that he had stopped -- he was stopped on the

15   roadway for a brief second -- brief few seconds and

16   then was struck and then pulled his truck forward to

17   the shoulder.

18        Q.        Wouldn't you describe it, if he was

19   stopped, as being a complete power loss, not a near

20   complete power loss?

21        A.        Not necessarily.  I mean, he's coming

22   down to the point where -- he's slowing down to the

23   extent that he can't figure out what's going on.

24   Likely on his cell phone, suffers a crash where he

25   brings his truck down to zero miles an hour and then



Page 172

1    takes his truck off the side of the road.

2        Q.      When a tractor trailer suffers a

3    power loss, what happens?  Can it be driven?

4        A.      Well, it depends on -- water in the

5    fuel.  I mean, you -- it depends on what the

6    situation is.  You may be able to get it limped off

7    the highway.  There are certain mechanical

8    situations where you can limp a truck off the

9    highway.  There's other ones that you can't.  You

10   know?  You have a total failure of your -- of

11   electronics in your truck and you have a meltdown

12   for whatever reason.  I'm just speculating.

13       Q.      Did you mention water in the fuel?

14       A.      Water in the fuel.  That would be --

15       Q.      What does that have to do with this

16   accident?

17       A.      There's -- you drain the water in

18   your fuel lines every so often.  If you have an

19   automatic -- there's automatic devices that will

20   also relieve water from your system.  If you don't

21   have -- if you don't physically drain some of the

22   older trucks -- drain that water out, it's gonna

23   clog up your system.  It's gonna clog up your fuel

24   lines and it's going to wind up causing your truck

25   to hesitate.  That could be a similar type of



Page 173

1    situation.

2         Q.       That's not what happened here?

3         A.       No.  But, I'm using that as an

4    example.  I'm saying there are other type

5    situations.

6         Q.       If you look at your last sentence

7    here, you say they didn't train it.  They should

8    have properly trained it.  At the bottom, you say

9    "If they opted not to train this, they must ensure

10   his knowledge and ability to apply the regulation."

11        A.       I'm sorry.  Which one are you on?

12        Q.       That first paragraph under

13   subparagraph one.

14               Do you know whether they trained him

15   in this or not?

16        A.       I'm basing that on I saw no evidence

17   of that.  All right?  That they trained him on

18   anything of that -- to that effect.  They trained

19   him on Smith System, which is a good training

20   program.  But, I saw nothing from a syllabus

21   standpoint that said that, you know, Yelverton was

22   trained and the other drivers were trained in the

23   event you suffer a catastrophic failure, your truck

24   breaks down, what have you, get it off the highway.

25        Q.       Did you look at the testing materials



Page 174

1    that he was given?

2         A.       I did.

3         Q.       Did you see any training for that in

4    there?

5         A.       I don't recall seeing anything like

6    that.

7         Q.       Just by virtue of the fact that he is

8    a CDL driver, should he not have this knowledge?

9         A.       You would think.  I mean, he's

10   trained that he's not permitted to drive a tractor

11   trailer with a flat tire, for example.  He's got to

12   get his truck off the road immediately to the safest

13   place of refuge and get it repaired.  So, you know,

14   you would think that that would also translate into

15   other mechanical issues if you have a malfunction.

16                 Now is there anything specifically in

17   the CDL guidance as far as the driver's manual or

18   test, itself that says if you suffer mechanical

19   malfunction, do not park your truck on the highway?

20   I never saw anything like that and I doubt it.

21        Q.       I did it again.  Didn't I?  I opened

22   that door.  I don't have to open it very far.  Do I?

23   That is a yes or no question.

24        A.       Yes.

25        Q.       "Speed management" here you have in



Page 175

1    subsection nine.  You say that "The importance of

2    understanding the effects of speed including speed

3    and traffic flow."  Then you say "They failed in

4    their very basic duty and requirement of ensuring

5    they understood the paramount importance of speed

6    management while operating a CMV."  Correct?

7           A.      Yes.

8           Q.      What information are you relying on,

9    specifically, as specifically as you can be, that

10   ATL/KTC failed to train him on this?

11          A.      They employed him and he applied his

12   truck to come to a -- with respect to speed, allowed

13   his truck to come down to -- that we know of, 5

14   miles per hour that he testified to 5 to 10 miles

15   per hour, that right there in my mind is telling me

16   that he does not understand speed management as it

17   relates to creating a hazard on the roadway.

18          Q.      My question is, it has to do with

19   training?

20          A.      It has to do with training.

21          Q.      What information do you have that he

22   wasn't trained on that?

23          A.      I've seen no document that would

24   indicate as such.

25          Q.      So it is not necessarily his



Page 176

1    behavior.  You just don't have any information

2    concerning -- there's no information in his training

3    that indicates that?

4           A.     It's a combination of both.  His

5    actions and seeing no documents that indicate --

6           Q.        You will agree with me in a

7    hypothetical situation --

8                  MR. MONTGOMERY:  Tammy, you can

9    certainly object.

10          Q.        -- someone could be trained on

11   something and then failed to do it.  Correct?

12                 MS. RAINES:  Object to the

13   hypothetical form.

14                 You can answer.

15          A.     Oh.  Sure.

16          Q.     That could happen?

17          A.     Sure they could.

18                 I would like to see some backup

19   documentation that shows me that he was trained on

20   that particular item.

21          Q.        Do you have any information either

22   way as to whether he had his four-way hazards on at

23   the time of this accident?

24          A.     I believe he testified that he did,

25   although, you know, I don't know -- I don't know if



Page 177

1    I really choose to -- I believe that Hartung said

2    that he didn't.

3              So, I really don't choose -- I don't

4    know if I choose to believe Yelverton based on,

5    again, him stating that he was -- that he does not

6    talk on his cell phone when, before the crash, he

7    was obviously on his cell phone prior to the crash

8    and before his emergency call to his dad.  And then

9    also him stating that the only reason that I didn't

10   drive off on to the shoulder was because I didn't

11   want to drive off the mountain.  So all we have here

12   now is two travel lanes, that's it, no shoulder.

13        Q.      Didn't you testify earlier that Ms.

14   Hartung might not remember exactly what happened

15   prior to the accident --

16        A.      Yeah.

17        Q.      -- 'cause she was in a crash, et

18   cetera?

19        A.      Sure.  That's why I'm putting more

20   weight on to Yelverton's credibility.

21        Q.      By "putting more weight," do you mean

22   you choose to believe him or not believe him?

23        A.      No.  More weight as far as him saying

24   that he had his four-ways on.  I think he would've

25   said anything at that point after he had time to



Page 178

1  think about it.  Because he's on his cell phone.

2  He's not even thinking about getting off the

3  highway.  I think the last thing he's thinking

4  about, okay, let me put my four-way flashers on and

5  come to a complete stop here on the interstate.  I

6  don't think he was even considering that.

7       Q.       Is there any indication in the police

8  report whether he was cited for not having his

9  four-way flashers on?

10      A.       No.

11               But, then again, when they pulled up

12  on-site, he had time to put his four-ways on.

13      Q.       You talk about the word "safe harbor"

14  in your report.  Right?

15      A.       Yes.

16      Q.       Under the Federal Motor Carrier

17  Safety regulations, what is the definition of a safe

18  harbor?

19      A.       I don't believe there is one that I'm

20  aware of.

21      Q.       What is your understanding, as an

22  expert in the field of Federal Motor Carrier Safety,

23  as to what a safe harbor is?

24      A.       It's more of just a -- an artful term

25  saying that, you know, it's a place where, you



Page 179

1    know -- comparatively where a ship would go in the

2    event of a storm.  That's where I -- I've taken that

3    terminology from, that phraseology is, in the event

4    of a storm, a hurricane, that ship, you know, is

5    gonna try to find safe harbor.  So, it's just an

6    artful term that I use in saying that I believe

7    Yelverton should have exited from the roadway, taken

8    his commercial motor vehicle off the roadway to

9    protect others and find a place of safe harbor.

10             Now whether that's the very first

11   exit that he sees, that would be the most optimal

12   place to go once he realizes that he has a

13   mechanical issue.

14        Q.      But you will agree with me that he

15   testified that he didn't know he had a mechanical

16   issue until he heard the pop?

17             MS. RAINES:  Object to form.

18        A.      And again, based on the ETOG data I'm

19   looking at here, if he did not --

20        Q.      My question was about his testimony.

21   Not the ETOG data.  Stick with me.

22        A.      But, I can't use those independently.

23   I can't --

24        Q.      I can ask you -- did you read Mr.

25   Yelverton's testimony?



Page 180

1          A.        I did.

2          Q.        Yes or no?

3          A.        Yes.

4          Q.        Did he testify that he didn't know he

5    was having a mechanical problem?  Yes or no?

6          A.        Yes.  But --

7          Q.        There is no but.

8          A.        There is a but.

9          Q.        It is a yes or no question.

10         A.        With respect, Counselor, I have a

11   right to respond to that.

12                   The answer is yes --

13         Q.        When I ask a yes or no question --

14                   MS. RAINES:  He gave you an answer.

15                   MR. MONTGOMERY:  That's it.  Now he

16   wants to expound on that.  I didn't ask him a

17   question.  That's not productive.

18         Q.        I understand the desire to want to do

19   that.  You have to sort of work within the confines

20   of the system that we have to operate in.  Okay?

21   When I ask a question, you can answer it.  If it's

22   an open-ended question, you can give an open-ended

23   answer.  When I say yes no, you have to answer yes

24   or no.  Quite Frankly, it's getting to be somewhat

25   detrimental to the taking of the deposition.  You



Page 181

1    keep repeating the same, same, same things again.  I

2    don't know that that's necessarily helping.

3                MS. RAINES:  What we are going to do

4    is try to move forward.  I would respectfully ask if

5    you ask him a question, he be allowed to explain his

6    answer.  You can certainly say a yes or no question.

7    In all due fairness, he should be allowed to give

8    you the response to which your question was geared.

9    If you believe he is not being responsive, then you

10   just let us know.  I don't feel like there's been

11   anything he's not answered here today.

12               MR. MONTGOMERY:  If I ask a yes or no

13   question, that's all I want to know.  It's fair and

14   we all do it.  You ask yes or no questions, as do I.

15   A yes or no question is simply answered by a yes or

16   no.  Not a but and then a ten minute explanation.

17   Agreed?

18               MS. RAINES:  No.  I disagree because

19   I don't want his testimony to be cut off by counsel.

20   I don't think that's fair.

21               MR. MONTGOMERY:  I haven't cut him

22   off yet.

23               MS. RAINES:  Okay.

24       Q.      Anyway, back to -- Mr. Yelverton, you

25   read his testimony.  Right?



Page 182

1     A.     I did.

2     Q.     He said he didn't know that he was

3 having a problem with his tractor trailer in the 5

4 minutes and 15 seconds that you said he was?

5     A.     His testimony was that he -- yes.

6 His testimony was that he said that he did not

7 believe that he was having a problem with his

8 commercial truck -- with his truck.

9     Q.     So he wouldn't have had any reason to

10 pull off the road -- pull off the exit.  Your

11 testimony is that he would have passed an exit.

12 Right?

13     A.     He -- within five minutes, no.  I'm

14 sorry.  Within the five minutes, he would've gotten

15 to the Edens Fork exit and he would've seen that

16 opportunity.  He would've had that opportunity to

17 exit the highway.

18     Q.     But if he didn't know he was having a

19 problem with his tractor trailer, he wouldn't have

20 any obligation to get off the roadway?

21     A.     If he didn't know?

22     Q.     Yes.

23     A.     I would agree with that.  Yes.

24     Q.     On page five, when you talk about

25 "Extreme driving conditions," did you testify



Page 183

 1    earlier that the grade of the road in the area where

 2    the accident occurred is at 2 percent?

 3         A.      I did.

 4         Q.      Would you consider that to be an

 5    extreme driving condition?

 6         A.      No.

 7                 But --

 8         Q.      I'll give you the but on this one.

 9         A.      Okay.

10                 The area of the region is extreme

11    driving with respect to a mountainous driving.

12    Therefore, the driver should be aware that if he's

13    experiencing mechanical malfunction five minutes

14    prior, which I believe that he did, all right, that

15    he should have known that he's going to potentially

16    be coming up on another incline somewhere along the

17    way.  And it could be a mountain that's gonna

18    completely shut him down.  All right?  In this case

19    here, it was a 2 percent grade that shut him down

20    and he should have known that.

21         Q.      But this particular grade that he was

22    on was not an extreme grade.  Correct?

23         A.      No.  This particular grade here, no.

24    It wasn't.

25         Q.      Yet you are still rendering an



Page 184

1   opinion that he wasn't properly trained under

2   extreme driving conditions?

3          A.       Based on the region of expectations

4   of the area.

5                   MS. RAINES:  Is that a yes?

6          Q.       Yes?

7          A.       Yes.

8          Q.       Number 13, you talk about "Hazard

9   perceptions."  What I specifically want to focus in

10  on was the last sentence where you say "ATL/KTC

11  should have ensured his understanding as to what to

12  do when he began to unintentionally and

13  uncontrollably slow and vehicles around him were

14  passing him, reasonably assuming vehicles passed him

15  at 10 a.m., Charleston, West Virginia bound."

16                  What I'm focusing on here is, first

17  of all, you are making an assumption that other

18  vehicles passed him in order to apply this

19  particular part of the regulations?

20         A.       Yes.  It's an assumption over a five

21  -- five minute period.

22         Q.       There was no information that you

23  reviewed in the record that supports -- necessarily

24  supports that?

25         A.       No.  There's -- no.  There's nothing



Page 185

1    in the record that says that -- no.  There's nothing

2    that says that.

3          Q.       The first sentence, "When Yelverton

4    recognized his truck slowing due to a mechanical

5    malfunction, he should have reacted to the perceived

6    hazard."  Then you say "ATL/KTC should have ensured

7    his understanding as to what to do when he began to

8    unintentionally and uncontrollably slow."

9                   I take that to mean that he was not

10   intentionally slowing his tractor trailer down and

11   he couldn't necessarily control the fact that the

12   tractor trailer was slowing down.  Is that an

13   accurate assessment of what you have written?

14         A.       That's correct.

15         Q.       In number 14, we kind of touched on

16   this earlier, you use the terms "place of safe

17   refuge" -- the term "A place of safe refuge."  Is

18   that the same as what you mean when you say "safe

19   harbor"?

20         A.       Yes.

21         Q.       Would that be the same as what you

22   would mean when you would say "safe haven" or does

23   safe haven have a different definition?

24         A.       No.  They would all be within the

25   same context.



1       Q.      Would that be -- place of safe

2   refuge, would that be a place off of an exit ramp

3   perhaps?

4       A.      A rest area.  You know.  Anywhere

5   where you're out of the potential of a vehicle

6   striking you.

7       Q.      I've dealt with this term quite a bit

8   in my experience.  Would a place of safe refuge be

9   on an 11 foot improved shoulder?

10      A.      If you had no choice, then I would

11  say yes.  It would be as safe as you're gonna

12  possibly get under the given circumstances.  But,

13  it's not nearly as safe as getting off at Edens Fork

14  and there's a gas station that's right there at

15  Edens Fork on the right-hand side.  Pulling your

16  truck in to there and calling a mechanic out to

17  service your vehicle.

18      Q.      How wide is this tractor trailer?

19      A.      102 inches.

20      Q.      I think you say 106 in your report.

21      A.      No.  It should be 102.

22      Q.      Did you measure it?

23      A.      No.  It's just -- it's not a city

24  truck.  So, it would be 102.

25      Q.      You do say 102.

Page 187

```
 1        A.        It's not a city truck.  So, it would
 2   be 102.
 3        Q.        Did you look up the specifications
 4   for the trailer or the tractor?
 5        A.        No.  I know -- I'm very familiar with
 6   them.  With that type of vehicle.
 7        Q.        Again, in number 19, we talk about
 8   mountain driving again.  We already discussed, ad
 9   nauseam, that this particular area wasn't a
10   mountain.  I'm just asking, explain to me what
11   particularly Mr. Yelverton did or what in the
12   materials you looked at allowed you to come to the
13   conclusion that you reach in number 19.
14        A.        Well, let me just read it real quick
15   first.
16        Q.        That always helps.
17        A.        Well, I didn't see any documents that
18   trained him on mountain driving and the motor
19   carrier sent him in to that region.  Again, the
20   region which was -- is a mountainous region.  West
21   Virginia is probably the most notorious state on the
22   East Coast -- eastern part of the country for
23   mountain driving.
24        Q.        I think they wrote a song about it.
25        A.        So, it's -- there's many songs
```



Page 188

 1    written on bluegrass about mountains in West

 2    Virginia.  Believe me.

 3              So, it's a region of the country that

 4    he should have been well familiar with the potential

 5    of coming into another mountain knowing that he

 6    had -- in my opinion, knowing that -- he knew that

 7    he was having mechanical failures because based on

 8    his ETOG, no reasonable driver would be able to

 9    dismiss by saying I had no idea that I was having a

10    problem until the pop.  Based on that, he should

11    have known, based on the region that he was driving

12    in, that there is a pretty good likelihood that he

13    is going to approach other mountain.  With a

14    mechanical failure, a power loss, he should have

15    recognized that, got his truck off at the very first

16    opportunity that he had.

17        Q.      Let's move on to "5.2.  "Unsafe

18    operations forbidden."  In the first paragraph, you

19    say "The FMCSR strictly prohibits a CMV to be

20    operated in a condition such that a mechanical

21    breakdown may occur.  Therefore, as soon as a driver

22    detects a breakdown potential or suspects a concern

23    that may lead to a breakdown on any roadways, he/she

24    must seek a place of refuge."

25              Are you saying they should get off



Page 189

1    the road on an exit ramp there?

2         A.       Exit ramp or rest area.  Whatever's

3    available to get them off the travel portion of the

4    highway -- especially the travel portion of the

5    highway.  Secondarily, the improved shoulder.

6         Q.       The improved shoulder is sort of a

7    last resort?

8         A.       Yes.

9         Q.       You talk about an exemption to this

10   particular regulation.

11        A.       Well, motor carrier -- I mean, if the

12   driver knows that there's a place where he can get

13   his vehicle to that's -- and he can get it there

14   safely, then he has -- and this is more -- this is

15   often used in motor carriers dealing with motor

16   coaches, buses, to get the vehicle to a safe area.

17   So, if they know that they can get that vehicle to

18   exit -- if there were, hypothetically, Exit 105 and

19   105 had a bus repair facility at it, and he's

20   passing 106 but he's confident that he can get it to

21   there, then he can move -- he can travel on to that

22   point.  A good example of that would be is if the

23   driver has a flat tire on the back of his tanker --

24   on the back of his cargo tank and he's at exit --

25   where this crash point is right here, he looks back,



Page 190

1    the crash never happened hypothetically.  Looks back

2    and sees that he has a flat tire, he does not have

3    to pull over immediately to the roadside -- to the

4    improved shoulder, the breakdown lane.  He can take

5    it off to the next exit and get the tire repaired at

6    that location.  So, that's the exception.

7         Q.       Let me ask you this.  Where is the

8    cutoff?  What would be considered too far away as

9    far as the garage?

10        A.       Well, I would look at it -- if you're

11   unfamiliar with the roadway -- I know that he was

12   familiar with the roadway because he's traveled it

13   before.  But, don't know if he's familiar with it to

14   the extent that he can sit here and name for you and

15   number all the exits.  Very few drivers can do that

16   unless you live on that highway.  So, it's somewhat

17   -- it's not foreign to him, but it's somewhat

18   foreign to him that he's not on that highway every

19   single day, traveling that same route every single

20   day.  Then I would say that he probably knows those

21   exits very well.

22             But, that not being the fact that he

23   saw Exit 106.  He knew that he had problems well

24   before that.  He should have taken the opportunity

25   to come off Exit 106.



Page 191

1    Q.        Again, he testified that he didn't

2    know he had problems before Exit 106.  I understand

3    that that's your conclusion that is based on the

4    ETOG data.  I don't know that you can necessarily --

5    A.        And experience.

6    Q.        -- conclude what the driver knew or

7    didn't know when he testified that he didn't know.

8    A.        And experience as a former truck

9    driver, too.

10   Q.        But that is an important distinction.

11   It's his judgment call, whether or not to get off

12   the road.  Right?

13   A.        Well, it's also his judgment call to

14   take the truck off to the shoulder, where he says is

15   a mountainous drop-off and he's gonna crash and he

16   tried to park it on the shoulder.

17          MR. MONTGOMERY:  I am going to object

18   to that as not being responsive.

19   Q.        What is the definition of a

20   mechanical breakdown under the Federal Motor Carrier

21   Safety regulations?

22   A.        It's a failure of the vehicle to be

23   able to operate safely.

24   Q.        Is that defined under a particular

25   subsection?


MAGNA
LEGAL SERVICES

Case 2:14-cv-11473-AJT-RSW Document 79-2 Filed 07/06/2415 Page 192 of 246 PageID #:1708

Page 192

1        A.        It's under definitions under 390.5?

2    No.  390.5 doesn't define a mechanical breakdown.

3    But, it does -- you can, pretty much, draw the

4    conclusion that a mechanical breakdown would refer

5    to anything that would cause the truck to not be

6    able to function properly in an unsafe fashion.

7        Q.        Did you review the testimony of Mark

8    Follett?

9        A.        I did.

10       Q.        Did you, in your review of that

11   testimony, read the testimony where he stated that

12   the Kenan drivers are trained to seek a place of

13   safe refuge in the event of a mechanical breakdown

14   or failure?

15       A.        I don't specifically recall that.

16   But, if he did, I didn't see anything from a

17   syllabus standpoint, any kind of minutes from a

18   meeting or anything to that effect that trained the

19   drivers to do that.  And obviously based on the fact

20   that Yelverton just sat on the highway and parked

21   his truck on the roadway or stopped --

22       Q.        We are talking, again, about

23   training.

24       A.        I didn't see anything to support

25   that.



Page 193

1    Q.    Let's go to page seven.  Five

2  paragraphs down in the first sentence, you state "in

3  all likelihood, Yelverton was aware that he was

4  having problems with his CMV well before the crash."

5           Is that not inconsistent with the

6  testimony you have given today where you have stated

7  that he did know that he was having problems with

8  his CMV five minutes and 15 seconds before the

9  crash?

10    A.    I think I pretty much have alluded to

11  all likelihood.

12    Q.    We are going to go back and look at

13  the testimony here.  You have consistently --

14    A.    Well, I believe that he did.  I

15  believe that he did.  But, you know, giving him a

16  little bit of latitude for his testimony, I'm saying

17  in all likelihood.  So, in my opinion, he did.  He

18  did know that he had a problem.

19    Q.    But we stated earlier that whether

20  the driver had an obligation or duty to pull off the

21  road was dependent on whether he was able to

22  perceive whether he had a mechanical breakdown or a

23  mechanical issue or not.  Correct?

24    A.    I'm sorry?  I drifted on that one.

25    Q.    We discussed earlier that the driver



1    -- it is a judgment call on the part of the driver.

2    Whether he knew he was having a mechanical issue or

3    not would affect your opinion as to whether he made

4    the right call.  Correct?

5          A.       That is correct.  Yes.

6          Q.       Does it make a difference whether you

7    can testify unequivocally that he knew he was having

8    a mechanical problem or whether you can testify in

9    all likelihood, that he had a mechanical problem?

10   Does that make a difference?

11         A.       I truly believe that he knew that he

12   was having a problem.

13         Q.       Then why give him the latitude that

14   you gave him in this sentence by saying "In all

15   likelihood"?  If that is what you know, why would

16   you ever equivocate, as an expert rendering an

17   opinion, as to fault in an accident like this?

18         A.       I recognize that words have meaning.

19   But, you know, the simple fact is that by using the

20   term "In all likelihood," I guess in hindsight if I

21   were to look back, I would say that he knew.  But, I

22   can't sit here and specifically, without question,

23   say that Yelverton knew that he -- you know, because

24   there has to be some room for this saying in all

25   likelihood because he testified opposite of this.



Page 195

```
1        Q.        That is why I am belaboring this
2   point a little bit.  You testified today -- you said
3   that he knew.  I have asked you time and time again
4   how you know.  You have answered me on that
5   question.  Now are you or are you not sort of
6   equivocating as to whether you can sit here today
7   and say what he did or did not know?
8             MS. RAINES:  I am going to object to
9   that form.  Asked and answered.
10       A.        My opinion is that yeah, he did know.
11  All right?  In the report, I put "In all likelihood"
12  based on the fact of his testimony.  I'm saying
13  "In all likelihood" in my report.  But, I'm telling
14  you here in the deposition, that it is my opinion
15  that he did know that there was something going on
16  with his truck five minutes prior.  Roughly five
17  minutes prior.
18       Q.        A minute and a half ago, you just
19  testified -- when explaining the words "In all
20  likelihood," you said I can't know exactly what he
21  knew at the time of the accident.  Did you not?
22       A.        Right.  But, again, I'm going off
23  ETOG.  And that's where I was trying to go before
24  with the deposition where you had asked me about
25  Yelverton's deposition.  I said yes.  But, you have
```



1   to give me the opportunity to answer with respect to

2   the ETOG data.

3          The ETOG data demonstrates to me that

4   any reasonable truck driver of experience would feel

5   that truck failing, would know that he was having a

6   power failure.  And based on that power failure

7   approximately five minutes prior to the crash, he

8   should have reacted accordingly as a professional

9   truck driver, removed his commercial motor vehicle

10  from the travel portion of the roadway at a minimum,

11  if not the exit.

12     Q.        Moving along to page eight, again,

13  you a "Summation of this issue is as follows:

14  Yelverton knew his CMV was experiencing some degree

15  of engine difficulty well prior to the point of the

16  crash, evidence indicates as such and only a totally

17  disconnected driver would have no awareness of the

18  gravity of his situation."

19          In this paragraph, you are making the

20  statement definitively that he did know.  Correct?

21     A.        Correct.

22     Q.        Again, I am going to ask you what

23  information are you relying on to know what was

24  going on inside the head of Mr. Yelverton on the day

25  of the accident.



Page 197

```
 1              MS. RAINES:  Object to the form.
 2    Asked and answered.
 3         A.      If he understands driving commercial
 4    motor vehicles as presumably a professional driver,
 5    there is -- even if he's only got eight hours
 6    experience in his truck or two or three days
 7    experience in this particular truck, he would know
 8    that he's losing -- he is losing power.  Not only is
 9    he losing power, but the rpms.  His truck, all of a
10    sudden -- when he's not even stepping on his
11    accelerator and all of a sudden the rpms go shooting
12    through the roof just doesn't make sense.  It jumps
13    up 500 rpms.  It spikes up -- you would know
14    instantly that you have a problem with your truck.
15    There's no question in my mind about it.  So, given
16    the latitude of his testimony saying "In all
17    likelihood" prior to this, that's where I -- you
18    know.  That's why I said "In all likelihood," based
19    on his testimony.
20              But my opinion is that he absolutely
21    knew.  And I think that if we even go back to my
22    opinions, it might reflect that he knew.
23              I guess we'll get to that in a little
24    while, though.
25         Q.      God willing.
```



Page 198

```
 1        A.        Tomorrow morning some time.
 2        Q.        In this, you have made commentary
 3   concerning the actions and inactions and what Mr.
 4   Yelverton knew.  Correct?
 5        A.        Yes.
 6        Q.        Again, you have made no comment,
 7   whatsoever, with respect to the actions or inactions
 8   with respect to Ms. Hartung's operation of her
 9   private motor vehicle.
10        A.        Well, if I had information like an
11   ETOG on hers -- on her vehicle, it would be much
12   easier to be able to make -- you know, make an
13   opinion or come up with opinions on that.  But, I
14   don't have that.  So, I'm basing it on testimony.
15                  But, the answer is no.
16        Q.        But you have gone to IPTM school.
17   Right?
18        A.        I did.
19        Q.        They have taught you how to make
20   those sort of -- do that sort of analysis?
21        A.        They did.
22        Q.        But you didn't in this case?
23        A.        Well, it was -- IPTM is more of
24   dealing with trucks.  It's dealing with trucks, not
25   cars.
```



Page 199

1          Q.          But they teach you about perception-

2     reaction?

3          A.          Yes.

4          Q.          And they teach you about after -- let

5     me ask you this.

6                      Do you know the average amount of

7     time it would take a private motor vehicle to make a

8     lane change at the speed that Ms. Hartung was going?

9          A.          It's about 300 feet roughly.

10    Approximately 300 feet.  If I'm not mistaken, I

11    believe it's about 300 feet.  And I'm just

12    estimating that.

13         Q.          Did you look at -- is that consistent

14    with what's in the expert reports of defendants?

15         A.          Oh.  I don't know.  I -- I would have

16    to -- let me take a look at it real quick.  Under

17    Edwards I believe.  Right?

18         Q.          Yes.

19         A.          369 feet to move laterally 12 feet at

20    65 miles per hour.

21         Q.          It would actually take longer than

22    what you said?

23         A.          Right.

24         Q.          More distance?

25         A.          Yes.



Page 200

```
 1        Q.        So you agree with the number Mr.

 2   Edwards -- Dr. Edwards used in his report --

 3        A.        Approximately.

 4        Q.        Let's turn to page nine of your

 5   report.

 6                  MS. RAINES:  Let's take a quick

 7   break.

 8                  (Recess.)

 9        Q.        We are on page nine.  If you look at

10   the top of page nine in your report, you have added

11   sort of a demonstrative picture here of a Ford F-250

12   parked on the improved shoulder.  Is that correct?

13        A.        Yes, sir.

14        Q.        Do you remember exactly where you

15   parked this -- your F-250 on the highway when you

16   took this picture?

17        A.        It was an approximate area of the

18   crash.

19        Q.        When you say "approximate," do you

20   know how close it was or how far it was?

21        A.        As I said earlier, I believe it was

22   maybe 10 to 15 feet either way, give or take.  Just

23   my best estimates.

24        Q.        You note that the F-250 is 6 feet, 4

25   inches in width.  Correct?
```



Page 201

```
1        A.      Yes, sir.
2        Q.      Where you parked your F-250, is that
3   about where -- if a tractor trailer were to pull off
4   the road, where it would be parked?
5        A.      Well, no.  Because you don't -- it's
6   not -- it's not recommended, although you can
7   sometimes.  But, it's not recommended to pull a
8   tractor trailer off on to the soft shoulder because
9   of a roll factor.  You don't know how soft that soft
10  shoulder may be.  If you know that it's been aired
11  out for a long period of time, then you might be
12  able to get away from it.  In this particular case
13  here, you know the ground is frozen, so he might be
14  able to get away with it.  Especially a cargo tank
15  truck you don't want to have on a soft shoulder.
16       Q.      According to your report, if the
17  tractor trailer pulled off the road, you would have
18  wanted that tractor trailer to be to the left of the
19  snow area here in the picture that is in your report
20  on page nine?
21       A.      Where the asphalt starts.  That's
22  correct.
23       Q.      What is the width of where the
24  asphalt starts to the fog line?
25       A.      Approximately 11 feet.
```



Page 202

```
 1        Q.        So that is where you have done your
 2   measurement.  You haven't done it from the
 3   embankment or the soft shoulder?
 4        A.        Right.  When I measure, I do not
 5   measure the lines.  Okay?  I only measure between
 6   the lines.  Because that's actually technically the
 7   traveled portion of the roadway or the shoulder,
 8   itself.
 9        Q.        Moving along, 5.3, again, just for
10   the record, the standard CMV is 102 inches in
11   length.
12        A.        102.  Yes, sir.
13        Q.        Do you know what that converts to in
14   feet?
15        A.        It would be 10 feet, 12 inches.
16        Q.        10 feet, 12 inches would be 11 feet.
17        A.        12 feet is -- 102 inches divided by
18   12 would be 10 feet.
19        Q.        10 feet?
20        A.        Right.  10 times 12 would be 120.
21                  No.  No.  No.  No.
22                  That's -- I'm sorry.  That's wrong.
23   I'm thinking 120.  Actually, it's -- I usually just
24   go by 102.
25                  As soon as I do this, I'm gonna say I
```



Page 203

1    knew that.

2         Q.        That's all right.

3         A.        8.5.

4         Q.        The width of the tractor trailer is 8

5    and a half feet?

6         A.        Right.

7         Q.        Let's move on to "5.3.  Cell phone

8    usage/distraction."

9         A.        Yes, sir.

10        Q.        First off, you make some commentary

11   in your report about when the Federal Motor Carrier

12   Safety Administration outlawed the use of cell

13   phones for commercial drivers.  Do you know when

14   that date was?

15        A.        It was January 3rd I want to say 2000

16   -- hold on one second.

17                  I believe it was January 3, 2012.

18        Q.        It would have been after this

19   accident?

20        A.        Yes, sir.

21        Q.        Do you know if that regulation that

22   was passed applies to hands free cell phones?

23        A.        It's -- it is -- it's applicable to

24   hands free cell phones.  That's correct.

25        Q.        So now it is illegal to operate a



Page 204

1    commercial motor vehicle and use any type of cell

2    phone at all?

3           A.      No.  You can use -- you can use a

4    hands free.

5           Q.      Oh.  You can?

6           A.      Yes.

7           Q.      Is there any reason why that is?

8           A.      You can't dial the phone.  So,

9    basically, essentially would be like a speed dial,

10   press one button, that type of operation.

11          Q.      Is usage, in your opinion, of a hands

12   free cell phone less distracting than if you are

13   using a handheld cell phone?

14          A.      Well, that depends.  Obviously,

15   you're not going to have one hand on the wheel

16   unless you have a headset.  Okay?  Which headsets is

17   considered -- some of them would be considered hands

18   free provided that you're not having to dial the

19   number while you're driving.  There's certain

20   provisions that fall under the cell phone law,

21   itself.

22                  MR. MONTGOMERY:  Off the record.

23                  (Discussion held off the record.)

24          Q.      We were talking about your report on

25   pages nine and ten basically where you have rendered



Page 205

1    some opinions with respect to Mr. Yelverton's cell

2    phone use.  We were kind of talking in general

3    before about the difference between handheld and

4    hands free.  I think your testimony was that in

5    2012, at some point after the accident, the Federal

6    Motor Carrier Safety Administration outlawed the use

7    of handheld cell phones.  Is that correct?

8          A.       Yes.  I believe it was January 3,

9    2012 if I'm not mistaken.

10         Q.       But you are still able to use a hands

11   free device.  Correct?

12         A.       That's correct.

13         Q.       Why would the FMCSA make that

14   distinction in your opinion?

15         A.       Based on research and studies done by

16   National Transportation Safety Board of crashes that

17   have occurred that were resulting from inattentive

18   driving as a result of cell phone usage.

19         Q.       Would that mean that the majority of

20   those crashes were from handheld cell phones?

21         A.       Well, I think that there's also a

22   lobby factor involved here, too, you know, with the

23   cell phone industry.  But, you know, to completely

24   outlaw cell phones was not going to happen.  But,

25   the cell phone -- the cell phone restrictions came



Page 206

1    in from a hands free standpoint around -- I believe

2    -- again, I believe it was January 3, 2012.

3           Q.       It is your opinion, in this case,

4    that Mr. Yelverton's use of the phone was a

5    contributing factor to this accident.  Correct?

6           A.       I believe it was.

7           Q.       Did you review Mr. Yelverton's

8    deposition testimony?

9           A.       I did.

10          Q.       Did you make a distinction as to

11   whether he was using a hands free or a handheld cell

12   phone?

13          A.       To the best of my knowledge, he was

14   using a hands free.

15          Q.       Despite knowing that he was using a

16   hands free, you are still of the opinion that

17   somehow the use of his -- him using a cell phone

18   contributed to this rear-end accident?

19          A.       I do in addition to it's company

20   policy, as well, to not use a cell phone while

21   driving.

22          Q.       Is it your testimony that if Mr.

23   Yelverton had not used his phone at some point --

24   let me ask you this question actually.

25                   Do you know if he was on his phone at



Case 2:13-cv-04178 Document 79-2 Filed 07/15/14 Page 207 of 343 PageID #: 1723

Page 207

1    the time of the crash?

2         A.      I believe that it was just -- he was

3    on the phone just prior to the crash.  So, in other

4    words, in that 45 second window, some time in that

5    span of time I believe that he was on his cell

6    phone.

7         Q.      Based on your review of the documents

8    in this case, do you know where he would have been

9    on the roadway at that point in time?

10        A.      Coming to a coast.  Coming to a coast

11   coming up that slight incline past 106.  Just before

12   the impact.

13        Q.      So he would have been past 106 at

14   that point in time, when he was on his cell phone?

15        A.      Let me just take a look at his cell

16   phone records.  Let me hunt those down.

17               Yes.  He was on his cell phone at the

18   time of -- prior to what -- I would believe he was

19   on his cell phone prior to the exit for 106.  Reason

20   being is that you have a phone call at 9:56 A.

21   Charleston, West Virginia.  And he was on the phone

22   for three minutes.  Then you have a phone call here

23   at 9:59 A and he was on the -- with the same phone

24   number.  He was on the phone for another two

25   minutes.  And then at 10:02, he was on the phone for



Page 208

1    one minute.

2         Q.        What information are you using as to

3    where his tractor trailer was on the roadway that

4    allows you to draw the conclusion that he would have

5    been before Edens Fork exit?

6         A.        Well, looking at the ETOG -- if you

7    look at the ETOG, you can see 9:59 -- 9:59.  He's --

8    he is just seconds away from the crash, itself.  So,

9    at that point, at the 9:59 call, he would've been

10   past Edens Fork.  At the phone call that ensued at

11   9:56, that took place at 9:56, that would place him

12   likely very well before the exit of Edens Fork.  And

13   he was on the phone at that point for three minutes.

14        Q.        You didn't do any mathematical

15   calculations on that?

16        A.        No.  No, sir.

17                  Logic.  Looking at it from a logical

18   standpoint.

19        Q.        We did an analysis earlier with 1,260

20   feet.  Correct?

21        A.        Correct.

22        Q.        In that 45 minutes.  That's what he

23   traveled.  We were able to calculate that at that

24   point in time he was past the Edens Fork exit.

25   Correct?



Page 209

1          A.       Yes.

2          Q.       Do you think it would've been helpful

3    in rendering an opinion with respect to whether he

4    was on the phone or not contributed to this accident

5    as to where he was in relation to the crash when he

6    was on the phone?

7          A.       I don't think that it can be -- I

8    don't think that there is any mathematical formula

9    that can narrow that down to specifically where he

10   was on I77 at a given point in time of his

11   particular time that he was on his cell phone.  I

12   cannot definitively say and I don't believe that

13   anybody can say that he was at milepost 110.2 when

14   that phone call -- original phone call -- for

15   example, that original phone call ensued and he was

16   on that phone conversation until milepost 108.5.  I

17   don't think there's any mathematical formula that

18   you can apply to that encompassed with the ETOG and

19   the cell phone records.  I think it's impossible.

20         Q.       You did just that.  On page 16,

21   paragraph 6, you state "Reginald Yelverton's cell

22   phone usage during critical moments caused him to

23   miss observation of Exit 106 likely due to

24   inattention blindness."  You just told me you can't

25   do it.



Page 210

1      A.      No.  I'm just talking about specifics

2   as breaking it down from milepost A to milepost B,

3   that he was on a telephone conversation for that two

4   minute period.  Because his cell phone records,

5   likewise, don't break it down into seconds.  So what

6   I'm saying in my report is that he had -- obviously

7   if you take a look at three minutes, three minutes

8   leading up to this crash at the time of 9:56.  So

9   that puts him on a three minute phone conversation

10  from 9:56 and how many ever seconds.  We don't know.

11  All right?

12      Q.      Sure.

13      A.      9:56, 9:57, 9:58.  All right?  Then

14  it goes to 9:59.  So he has a one minute block in

15  between there.  And we don't know whether he picked

16  up that phone at 9:59:01 a.m. and hung up that phone

17  at 9:58 and 59 seconds.

18      Q.      We also don't know where his tractor

19  trailer was on the road either.  Do we?

20      A.      As far as -- no.  Specific mileage

21  point?  No.  That's what I said to you.  I said we

22  can't do that.

23              But, I can make an educated look and

24  say that before Exit 106, he was definitely on his

25  cell phone.  There's no question in my mind about



Page 211

1   that.  That period in time, he was he experiencing

2   engine trouble.  Those correlate.  If you look at,

3   again, 9:56, for three minutes, 9:56, 9:57, 9:58,

4   that gives us three minutes there.  So, starting at

5   9:15 at 15 seconds, 9:55, 45 seconds, he's

6   definitely experiencing engine trouble.  He's

7   getting massive strikes with his rpms.  So, he's

8   getting large blips in the screens on his rpms.  So,

9   he knew there was an engine problem.  So, he's now

10  talking to dad or somebody and saying I've got a

11  problem here.  He comes up on Exit 106, goes past

12  it, on the phone again for two minutes, and then

13  winds up with the crash.

14       Q.       You have to commit to a position.

15  You can't say that we can't tell where on the road

16  he was when he was on the phone but say when he was

17  going past 106 he was on the phone.  That's what you

18  just did.

19                Can you tell where he is on the

20  roadway when he is on his phone?  Yes or no?

21                MS. RAINES:  Object to the form.

22  Asked and answered.

23       A.       You cannot -- you cannot narrow it

24  down with specificity exactly where he was located.

25  But, we can make an educated assumption here that



Page 212

1    three minutes prior to the crash, we're looking at

2    now two minutes -- a two minute phone conversation

3    and a three minute phone conversation which is five

4    minutes.  That five minutes occurred within this

5    span of time here.  We know that about four-fifths

6    of a mile before the crash point was the location of

7    Exit 106.  So, obviously, it didn't take him five

8    minutes to go from 106 to -- based on the speed,

9    from 106 to the crash location, four-fifths of a

10   mile.  So, we know that he was much further back.

11   So, he's just engaged in conversation, passes by 106

12   and says in deposition that he never even saw the

13   exit.  Inattention blindness.

14        Q.        Your testimony is you can't tell

15   where he was on the roadway when he was on the

16   phone?

17        A.        Again, with specificity, I cannot sit

18   here and tell you with absolute certainty that at

19   milepost 110.2 he made a phone call.

20        Q.        You can say that he passed 106 then?

21        A.        He was on the phone before he got to

22   106.

23        Q.        But was he on the phone when he drove

24   past 106?  That is the question I am asking you.

25   You are telling me that you can't tell with



Page 213

1    specificity.  Therefore, I don't think you can

2    answer that question in the affirmative.

3            A.        I can.  I can.

4                     Because if you're looking at the

5    phone call at 9:59, which was for two minutes, 9:59,

6    10, 10:01.  Now the phone company, they break these

7    down in rounded off minutes.  We don't know where

8    that phone conversation ended and how many seconds

9    such as the ETOG breaks it down for us in detail of

10   increments of seconds.

11                    So, if you're looking at 9:59 A, here

12   we have -- 9:59 is right here.  He's experiencing

13   engine trouble.  He is at least well before the Exit

14   106.

15           Q.        At 9:59?

16           A.        Because at this point, he's doing 65

17   miles per hour.  He's doing 65 miles per hour at

18   this particular time, at 9:58:30.

19           Q.        How far in front of Exit 106 was he?

20           A.        Oh.  Coming -- approaching 106.

21   Approaching 106.  He said in testimony that he never

22   each saw the exit.  Now a professional commercial

23   motor vehicle operator would be looking for

24   something like that if he had been focused on the

25   task at hand.  And that's getting his truck to a



Page 214

1   safe refuge.

2        Q.        Was it possible he just didn't

3   remember seeing the exit?  This happened June 29th

4   of 2011.  He was deposed over three years later.

5        A.        Is it possible that --

6        Q.        Is it possible?  That is a hard

7   question to answer, but I am asking it.

8                  MS. RAINES:  I will object.

9                  You can answer.

10       A.        If -- you know, is it impossible to

11  recognize that if the young lady's computer is on

12  fire and the fire extinguisher is on the wall there?

13       Q.        Now you are asking questions with

14  questions.  That's completely unfair.

15                 Let me ask you this.  I really want

16  to be straight about this.  I'm very confused by

17  your testimony with respect to where you can tell he

18  was on the road when he was on his cell phone.  You

19  have told me that you can't say where he was

20  specifically but yet you have come up with an

21  explanation which makes no sense to me as to why you

22  can say he drove past 106 when he was on the phone.

23       A.        Let me try to explain it again.

24                 MS. RAINES:  Objection to the

25  question.  I believe it's been asked and answered,



Case 2:13-cv-04178   Document 79-2   Filed 07/15/14   Page 215 of 545 PageID #: 1731

Page 215

 1   thoroughly explained, and a little bit of

 2   mischaracterization.

 3               But have at it.

 4       A.      I will try to explain it again to

 5   you.

 6               I will break it down into finite

 7   detail here.

 8               At 9:54 and 45 seconds was just prior

 9   to him experiencing some degree of engine trouble.

10   Within seconds.  Okay?  That's 9:54 and 45 seconds.

11   All right?

12       Q.      Okay.

13       A.      Then somewhere in the time of 9:56, a

14   phone call occurred.  Either it was inbound or

15   outbound.  I'm not quite certain.  All right?  Hold

16   on one second here.

17               I don't know who he was speaking to

18   at this point.  I think that Mr. Yelverton, Senior

19   had to have a different cell phone number because he

20   was speaking to his dad at this point -- at a later

21   point -- at this point, as well.  But, we weren't

22   provided with that phone number.  We were provided

23   with another phone number that belonged to a Chris

24   Adams, which really kind of confused the issue a

25   little bit.  That call is not recorded on there.



Page 216

1    It's recorded to the (910) 514-5780.

2              So, again, at 9:56 a.m. was within

3    the threshold of time that he was experiencing

4    engine trouble.  Okay?  Because again, the engine

5    trouble began just shortly after 9:54 and 45

6    seconds.  Okay?

7         Q.       Yes.

8         A.       Now at 9:56, he was at -- he was

9    traveling at approximately 50 miles per hour.  His

10   rpms were all over the place at this point in time

11   and they had been for a minute prior.

12        Q.       How fast was he going?

13        A.       He, at that point, was doing 50 miles

14   an hour.  At 9:50.  All right?

15             His rpms are all over the place.

16   Excuse me.  At 9:56.  9:56.

17             His rpms are all the over the place.

18   So, he's had now -- oh, boy.  Maybe about a minute

19   and a half, two minutes of engine problems that he

20   determined that obviously there was something going

21   on here.

22        Q.       My question relates --

23        A.       Let me finish.  I would like to

24   finish with this response because I don't want to

25   confuse you again.



Page 217

1          Then at 9:59 a.m., again, we don't

2    have a definitive number as to seconds from that

3    phone call.  That's from the cell phone service.  At

4    9:59 a.m., that puts him on to his second phone

5    call.  Whether it was inbound or outbound, I'm not

6    quite certain.  I believe that one would be outbound

7    because he's making a call as testified to by him

8    and his dad.  His dad made the original phone call

9    at that 9:56 or believed it was his father.

10          Then at 9:59, his speed is -- again,

11   after fluctuating substantially throughout that

12   period of time, his speed is at 55 miles an hour

13   and, again, his rpms are all over the chart, which

14   is not normal for a commercial motor vehicle.  And

15   an experienced driver would feel that, whether he

16   was driving his truck or driving a substitute truck

17   for only a day.  He would he feel that.  He would

18   know it.  All right?  That's at 9:59.  Now that

19   phone call takes place for two minutes.

20          The crash occurred -- we can agree

21   that the crash occurred at approximately 10 -- it

22   would be about 10 -- bear with me a second.  About

23   10:40.  10.00.40.  That puts him in to that phone

24   call.  At 9:59, that would put him in to that phone

25   call.  Because that phone call now is for two



Page 218

1   minutes.  So, it's 9:59, 10, 10:01.  So if you take

2   that time and you look at that compared to the ETOG,

3   that puts him right in the crash.  So, in all

4   likelihood, he was actually on his phone at the time

5   of the crash.

6       Q.       That's not the question.

7       A.       That definitely -- the question is

8   would that put him past the exit of Edens Fork.  By

9   example of everything I just laid out, it certainly

10  would put him past the exit because it occurred

11  after Edens Fork.

12      Q.       He had already past Edens Fork when

13  he was on his phone?

14      A.       Yes.

15               But, no.  He was -- he was on his

16  phone prior to that with his first conversation that

17  began at 9:56, which lasted three minutes.

18      Q.       Okay.  Again, how can you determine,

19  with specificity, that he was on his phone when he

20  drove past the exit?  That is one of the opinions

21  that you rendered in your report.  I don't think you

22  can.

23      A.       9:56 -- again, 9:56, 9:57, 9:58.  The

24  next call is 9:59, 10 o'clock.  That's five minutes

25  of almost solid conversation here because you have



Page 219

1   9:56 for the first call is three minutes.  Second

2   call is 9:59 with two minutes.  That's a total of

3   five minutes.  So, he loses the call -- you lose the

4   call with somebody.  I'm not gonna ask the question

5   but I'll say that if I lose a call with my wife, I

6   hit resend immediately.  "Hey, I lost the call."

7   It's not let's wait two, three minutes.  That's

8   demonstrated by this report right here from the

9   phone company.

10       Q.       You did an analysis of the ETOG data.

11  You have relied on that analysis to determine

12  certain distances that he traveled.  Correct?

13       A.       Yes.

14       Q.       Did you ever determine how far, based

15  on the ETOG -- how long from the ETOG data -- how

16  much time elapsed from the point he passed 106 to

17  the accident location?  Did you ever do that

18  calculation?

19       A.       I'm sorry.  Repeat that one more

20  time.

21       Q.       Did you ever calculate how much time

22  elapsed between when Mr. Yelverton passed 106 to

23  when the accident happened?

24       A.       No.

25       Q.       Let's go to page nine.  If I'm



Page 220

1    looking at the last paragraph, which spills on to

2    the next page, it says "Perhaps Yelverton was not

3    properly trained with respect to cell phone usage."

4              I am just trying to -- what is your

5    opinion in this matter?  To me, that sort of seems

6    like you are equivocating there.

7              MS. RAINES:  Object to the form.  I

8    think I am confused by it.

9              Go ahead.

10       A.      Not a -- I don't believe so.  I mean,

11   it's -- I'm saying that Yelverton, you know, perhaps

12   he was -- he's not clear on the cell phone policy.

13   And he should've been taught as such by his father

14   slash coach about the cell phone policy.

15       Q.      Perhaps.  What does the word

16   "perhaps" mean to you?

17              MS. RAINES:  Object to the form.

18   It's argumentative.  Hypothetical.

19       A.      I -- it's -- in my opinion, his

20   father did lead him down the wrong road.  So, it's

21   not a perhaps.  It's an actual.  His father taught

22   him incorrectly.

23       Q.      That is not what you put in the

24   report.  That's why I'm asking the questions.

25       A.      Okay.  Fair enough.



Page 221

1      Q.        Moving along.  5.5.  We have already

2   kind of covered the comments with respect to Mr.

3   Yelverton's credibility.  We can move past that.

4              Look at page 14.  I found this

5   particular excerpt to be interesting.  You note here

6   that "Based on the plethora of CMV crashes

7   investigated by the NTSB, then NTSB Chairwoman

8   Hersman stated the following regarding "professional

9   drivers" on July 12, 2010."

10              I will read the italics.  "Truck

11   drivers are held to a higher standard than the

12   average driver and need to address issues

13   accordingly.  In addition, they are professional

14   drivers and the standard of care and the level of

15   expectations for them and their performance are

16   higher."

17              First of all, who is Chairwoman

18   Hersman?

19       A.      Then Chairwoman of the NTSB.

20       Q.      Where did she make this statement?

21       A.      It was National -- excuse me.

22   Transport Topics Magazine, which you may be familiar

23   with from American Trucking Association.  It was in

24   a conference and they printed it.

25       Q.      So this was a statement that she made



Case 2:14-cv-11473-AJT Document 59-2 Filed 07/08/14 Page 222 of 948 PageID #:1738

Page 222

1    during a speech?

2        A.      That's correct.

3        Q.      To your knowledge, has this been

4    codified into law in any way, shape, or form?

5        A.      No.  No.

6        Q.      To your knowledge, you have rendered

7    opinions with respect to Mr. Yelverton's driving in

8    the State of West Virginia, is there any case law or

9    any legislation in the State of West Virginia that

10   holds commercial motor vehicle drivers to a higher

11   standard of care than someone driving a private

12   motor vehicle?

13              MS. RAINES:  Object to the form and

14   to the point that it is a legal conclusion.

15       A.      No.  Well, I think that based on the

16   fact that a commercial motor vehicle driver has to

17   go for an additional driver's license, CDL, and so

18   forth, is required to understand, under 390.3, the

19   entire Federal Motor Carrier Safety regulations,

20   that they need to have a better understanding of the

21   fact that they're driving an 80,000 pound -- now

22   that's whether on plaintiff or defense.  I recognize

23   that a commercial motor vehicle operator does have a

24   higher degree of standard of care.

25       Q.      Can you point to any case law or any



Page 223

1   statute that says -- we are talking specifically

2   about standard of care.  That they are held to a

3   higher standard of care?

4           MS. RAINES:  Object to the form.

5   Asked and answered.

6       A.      I'm just -- I am reciting Secretary

7   Hersman's --

8       Q.      But that is not a law.

9       A.      No.  Of course it's not a law.

10      Q.      Do you know of any law?

11      A.      No.

12              But, again, it as a standard of care

13  that I see as a standard that is out there based on

14  the fact of driver training that's required, et

15  cetera.  A car -- person driving a car can come in

16  from the country of India and have a driver's

17  license in about a week.  You take that same person

18  and he's gonna have to go through a much more

19  in-depth training program in order to be able to

20  drive a commercial motor vehicle.

21      Q.      I did it again.  Didn't I?

22              "7.0.  Nexus of Kenan Advantage Group

23  companies."  Why did you render an opinion with

24  regard to the interrelationship between Kenan and

25  Advantage Tank Lines?



Page 224

1          A.          It was just something I saw on some

2     documents that I felt were kind of -- they were --

3     some of the training documents and so forth.  I

4     believe they're training.  Where above on the driver

5     qualification, they have various companies rather

6     than individual, independent.

7                    Now, I'm a former CEO of a nationwide

8     company and I would make sure that we kept

9     separation of the companies -- they're two companies

10    actually.  We kept separations of our corporations.

11    So, it was HMHTTC Response Incorporated and SL

12    Turner & Son Waste Transport.  We kept them

13    independent of each other where we had employees for

14    the trucking operation, we had employees for the

15    response company.  And we tried at our best, not to

16    comingle training or anything like that because

17    there are two separate entities and we don't want to

18    have any kind of bleed over in the event of a

19    problem.

20                    So, I noticed in the documents

21    provided by -- through discovery that there were --

22    almost seemed to me to be inseparable in addition

23    to, you know -- it didn't seem like a real extensive

24    lease agreement either.

25          Q.          Did you look at any information,



Page 225

1    outside of what was provided to you by counsel, in

2    rendering your opinion with regard to the nexus in

3    7.0?

4                   MS. RAINES:  Your question is other

5    than what is listed?

6                   MR. MONTGOMERY:  Yes.

7        A.        Other than what's been provided?  No.

8    I haven't looked outside of that.

9        Q.        We are now on 8.0.  We may be able to

10   fast track through this.  We probably talked about

11   most of it --

12       A.        Most of it.

13       Q.        -- as we went through the report.

14                  Paragraph one, again, the words

15   "contributing factors to the crash."  Contributing

16   factors.  It is your opinion that there was a number

17   of different contributing factors to this crash.

18       A.        No.

19                  I always use terminology

20   "contributing factors."  A contributing factor would

21   be things like Yelverton failing to pull his vehicle

22   to the roadside.  You know.  Yelverton failing to

23   pull his vehicle off Exit 106.  So, there is a

24   number of them.

25                  But, to answer your question, yes.



Page 226

1     Q.        Again, Ms. Hartung's inability to

2  perceive and react to the tractor trailer in front

3  of her, in your opinion, is not a contributing

4  factor to the crash?

5     A.        I believe that there is a -- it is a

6  much lesser contributing factor than the factors of

7  Yelverton parking his truck, for all intent and

8  purposes, on Interstate 77.

9     Q.        So her actions were a contributing

10  factor, but a lesser contributing factor?

11     A.        To a much, much lesser extent.

12              MS. RAINES:  Object to the form.

13     Q.        So you are admitting that she did

14  something wrong?

15              MS. RAINES:  Object to the form.

16  Mischaracterization of testimony.

17     A.        I don't know for a fact that she did.

18              She had a collision with the vehicle.

19  Right?  She had a collision with the vehicle.  So --

20  with the vehicle that was parked in front of her.

21  Now looking at it from that standpoint, I don't

22  think that she was -- that she was contributing -- a

23  contributing factor.  The -- as she's approaching

24  that vehicle, could she have cut off to the left a

25  little bit quicker?  I don't know for certain.  But,



Page 227

1    that, in my mind, may have been a slight

2    contributing factor.

3        Q.        I will just take that.

4                  Number two, second paragraph,

5    "Yelverton's failure to comply with FMCSR and the

6    standard of care were contributing factors to the

7    crash that occurred."

8                  What do you mean when you say

9    "standards of care"?  That is kind of a legal term.

10   I am asking what you mean when you put that in that

11   report.

12       A.        Well, parking a truck on a highway --

13   an interstate highway.  There's -- I don't think

14   that there's anything out there that specifically

15   says that because nobody can imagine that somebody

16   would actually park their truck on a highway.  A

17   professional truck driver would take the truck off

18   the road surface.  Off the travel portion of the

19   highway.

20       Q.        Again, the words "contributing

21   factors."  So there is more than one factor?

22       A.        Yes.

23       Q.        What is your understanding of what

24   inattention blindness is?  Let me back it up.

25                 You have attached, as an exhibit to



Page 228

1  your report, the "National Safety Council

2  understanding the distracted brain."  What was the

3  purpose of attaching this to your report?

4       A.       Well, it's -- I relied on it pretty

5  heavily in that Yelverton, in spite of his company

6  policy of not using his cell phone while operating

7  his truck and him testifying that he doesn't use his

8  cell phone while driving his truck, uses his cell

9  phone regardless.  The distracted brain white paper

10  is discussing not necessarily phone usage, but hands

11  free cell phone usage and why it's so dangerous.

12  And it causes a state of inattention blindness.

13       Q.       I am asking, what is inattention

14  blindness?

15       A.       Where you get focused on one thing.

16  You're focusing on -- you can't multitask.  The old

17  multitasking thing.  All right?  Where you're --

18  inattention blindness is where you're paying

19  attention to one thing and missing the other things

20  around you.  It's the most simplistic way of

21  explaining it.  So, you're focusing -- you can only

22  really focus on one thing.  But, you're focusing

23  your attention on that, where you're missing other

24  things that may be going on that are important to

25  that environment.  That's the reason that you have



Page 229

1    -- drivers are supposed to scan the road and things

2    like that.

3           Q.        All drivers are supposed to scan the

4    road?

5                     Yes?

6           A.        Commercial motor vehicle drivers are

7    trained in the Smith System to make sure that they

8    scan the road.

9           Q.        Does a driver of a private motor

10   vehicle also have an obligation to scan the road and

11   pay attention?

12          A.        Right.  All drivers.

13          Q.        Right.  That is what I was asking.

14                    You have no information or haven't

15   formed any opinion that Mr. Yelverton knew that this

16   accident was going to happen.  Correct?

17                    MS. RAINES:  Object to the form of

18   the question.

19          A.        At what point in time?

20          Q.        Does it make a difference?

21          A.        I mean, did he wake up in the morning

22   and say I'm gonna get into a crash today?  I don't

23   think that happened.

24          Q.        When he was driving his tractor

25   trailer.



Page 230

1          A.          Well, just seconds before, he had

2     said to his father, apparently on the cell phone,

3     that I'm about to get hit, or this lady's gonna plow

4     into me, or something to that effect.  So, in terms

5     of him knowing he was going to be involved in a

6     crash, yes.  That's why I asked for a definition of

7     time.

8          Q.          How long, before he was struck in the

9     rear, to your recollection, was it before -- when he

10    said that to when he was actually struck?

11         A.          I believe it was just seconds.

12              MR. MONTGOMERY:  Let's take a break.

13              (Recess.)

14         Q.          Have you ever reviewed or, in your

15    capacity as an expert, looked at the passenger

16    vehicle driver's manual?

17         A.          I have.  But, not, you know, with any

18    -- I've never really opined on it in any way.

19         Q.          You talk about logic and commonsense

20    when coming to certain conclusions and opinions you

21    have rendered in this case.  Whether or not you

22    have, you know, verbatim memory of it I don't think

23    matters for this next series of questions.  You are

24    familiar with it and you are familiar with the

25    obligations and duties of a driver of a passenger of



Page 231

1    a motor vehicle.  Yes or no?

2         A.      Yes.

3         Q.      Is it your understanding that a

4    driver of a passenger motor vehicle has a duty to

5    control themselves and their vehicles?

6              MS. RAINES:  Object to the form and

7    legal conclusion.

8         A.      They do.

9         Q.      And they have a duty to be alert and

10   be ready to respond to traffic around them?

11        A.      They do.

12        Q.      Is it your opinion in this case that

13   Ms. Hartung was alert and ready to respond to the

14   traffic around her?

15             MS. RAINES:  Object to the form.

16        A.      Well, I know that she attempted an

17   evasive maneuver.  Whether she had enough time to

18   get around that vehicle, obviously that didn't

19   occur.  But, she attempted an evasive maneuver,

20   which tells me that she was at least somewhat aware

21   of what was going on.  She was aware of what was

22   going on.  Other than that, it would've been just a

23   dead-on rear impact.

24        Q.      When she would have reacted, it

25   would've been too late.  Correct?



Page 232

 1                    MS. RAINES:  Object to the form.

 2          Q.       Or she would have avoided the

 3    accident.

 4          A.       Yeah.  Well, you're closing speed at

 5    65 miles an hour then seeing that -- observing that

 6    at 500 -- roughly 400 to 500 feet and needing 300 --

 7    about 300 feet to make the lane change, that's where

 8    I think that -- you know.  Did she get her lane

 9    change quick enough?  Apparently not.  Did she

10    attempt that lane change?  You know, maybe she's not

11    as quick and as confident in making that quick

12    emergency maneuver lane change as other folks might

13    be, like myself.

14          Q.       Again, when you use 500 feet, that is

15    an accepted numerical figure with respect to when

16    she should have perceived that there was a problem.

17    Right?

18                    MS. RAINES:  Object to form.

19          A.       At the testified to speeds.

20          Q.       1.5 perception-reaction time, that's

21    also an accepted numerical figure with respect to

22    perception-reaction time, also.  Correct?

23                    MS. RAINES:  Same objection.

24          A.       One says 1.5, one says 1.6.  But, I

25    go by 1.5.



Page 233

1    Q.        What is that based on?  Is that the

2  average response time?

3    A.        It is.

4    Q.        Does the driver of a private motor

5  vehicle have an obligation to look ahead and scan?

6              MS. RAINES:  Object to the form.

7    A.        Yes.

8    Q.        Do they have an obligation or duty to

9  look ahead and scan the road for vehicles that may

10 be in the road by the time you reach them?

11             MS. RAINES:  Same objection.

12   A.        Yes.

13   Q.        Do they have an obligation to look

14 ahead for signs warning of danger?

15   A.        They do.

16   Q.        Do they have an obligation to look

17 ahead for traffic conditions that may require speed

18 reduction, breaking, or stopping?

19             MS. RAINES:  Same objection.

20   A.        They do.

21   Q.        Does a driver of a private motor

22 vehicle have an obligation to keep a cushion of

23 space around the vehicle?

24   A.        They're not trained as such.  I mean,

25 there's no training, to the best of my knowledge,



Page 234

1    like a commercial motor vehicle driver is about -- I

2    don't believe that there's any space cushion

3    training, if you will.

4         Q.        But does the manual say that they

5    should?

6         A.        Yes.

7              MS. RAINES:  Object to the form.

8              When you say "manual," so I'm clear,

9    are you referring specifically to Ms. Hartung's

10   manual or --

11             MR. MONTGOMERY:  No.  Driver's

12   manual.  He knows what I'm talking about.

13        A.        State of West Virginia Driver's

14   Manual.

15        Q.        Does that also state to the driver of

16   a private motor vehicle that the only way to be sure

17   that they will have enough time to react is to leave

18   plenty of space between your vehicle and the

19   vehicles around you?

20        A.        Yes.

21        Q.        And that the key to anticipate what

22   could -- the key is to anticipate what could happen

23   and to be able to stop in time?

24        A.        Yeah.  But, this is not a tailgating

25   issue.  That's referring to tailgating somebody.

MAGNA
LEGAL SERVICES

Page 235

1          Q.          Have you ever heard of the four

2     second rule?

3          A.          I have.

4          Q.          What does the four second rule say?

5          A.          Following distance from a fixed

6     object.

7          Q.          Does that rule also say that a driver

8     should constantly try and maintain their vehicle's

9     position so that no matter what may occur while

10    driving, a four second interval with respect to time

11    and distance would give the driver an opportunity to

12    avoid a potentially dangerous situation?

13         A.          If she had a vehicle that was

14    traveling 65 miles in front of her or 55 miles an

15    hour or something to that effect, I would agree.

16    Yes.

17                    MR. MONTGOMERY:  Off the record.

18                    (Recess.)

19         Q.          Mr. Turner, have you ever been

20    certified to testify as an expert in any Federal

21    Court in the United States?

22         A.          I know that State Court and Federal.

23    I'm not sure which was which.  But, I'm not a

24    hundred percent certain.

25         Q.          Have you ever been certified to



Page 236

1    testify as an expert in state court?

2          A.       Yes.

3          Q.       When I say "certified," I mean

4    somebody challenged your qualifications and

5    credentials and a judge ruled that you were

6    certified to testify as an expert.

7          A.       Yes.  Yes.

8          Q.       You have?

9          A.       Yes.

10         Q.       How many times?

11         A.       My reports have a tendency to keep me

12   out of trial.  So, I think it's only been three

13   times if I'm not mistaken.

14         Q.       So you have been certified as an

15   expert in three separate courts and you are not sure

16   whether that was in state or federal?

17         A.       Yeah.  I know that one was out in

18   Allegheny County.  I believe it was Allegheny

19   County, itself.

20         Q.       That would be in Pittsburgh?

21         A.       Yes, sir.

22                  But, that was -- there was a truck

23   explosion in a terminal.  Loading rack.

24                  The other two, I'm not certain if

25   they were federal or state.  I just don't recall.  I



Page 237

1    can find out, though.

2         Q.        Who did you testify for in Allegheny

3    County?  Do you remember the lawyer?

4         A.        Sure.  It was -- do you have that

5    list by chance?  That's easy enough.

6         Q.        Here it is.

7         A.        Yeah.  It was completely nonrelevant,

8    though, to this type matter here.

9                   Wendy O'Connor.

10        Q.        Do you know what law firm she is

11   with?

12        A.        No, I don't.  She's -- the firm that

13   she was with at that point, she's trans -- she's

14   moved on to another firm now.

15        Q.        In what capacity were you certified

16   as an expert?

17        A.        At a loading rack.  There was a

18   explosion.  A tank explosion.  And a guy got

19   injured.  So, essentially, it was a loading rack

20   explosion on a cargo tank truck.

21        Q.        You obviously weren't testifying as

22   an accident reconstructionist.

23        A.        No.  No.  It's commercial motor

24   vehicle slash hazmat expert.

25        Q.        On the other two occasions, do you



Page 238

1    remember what, specifically, you testified about?

2         A.      I -- no.  I -- I don't remember

3    specifically what they were.  I could find out.

4         Q.      Have you ever been certified to

5    testify in any court as an accident

6    reconstructionist?

7                 MS. RAINES:  Object to the form.  It

8    is a legal term.

9                 You can answer if you know.

10        A.      No.  I don't believe so.

11        Q.      Other than this commercial motor

12   vehicle/hazmat expert testimony that you have given,

13   you don't remember in what capacity you were

14   certified in the other two courts?

15        A.      No.

16                But, you know -- oh.  There was one

17   up in Boston, too as a matter of fact.  There's one

18   up in Boston.  Again, I'm not sure if that was

19   federal or not.  I just don't recall.  And that was

20   dealing with off tracking.  An off tracking related

21   matter.

22        Q.      Did you do a reconstruction?

23        A.      No.

24        Q.      You didn't testify in that case as an

25   accident reconstructionist?



Page 239

1        A.        No.

2        Q.        Just so I am clear, none of those

3    three occasions wherein you were certified to

4    testify in court were you -- did you do a

5    reconstruction in any of those cases?

6        A.        No, sir.

7        Q.        You didn't testify as an accident

8    reconstructionist in any of those cases?

9        A.        No.

10       Q.        Looking at your report, I apologize

11   if you put it away, page 14, you note that you

12   inspected the site extensively at the point of the

13   crash to the point of Exit 111, approximately six

14   miles preceding the approximate crash location.  You

15   state that you observed in excess of 20 commercial

16   motor vehicles traveling in the southbound

17   direction.  Then you gave some sort of commentary on

18   the speed of those motor vehicles.  What was the

19   purpose of doing that?

20       A.        It was at the point of the estimated

21   crash -- the approximate crash area.  And just

22   watching these commercial motor vehicles going up

23   that hill, none of them were going down where

24   Yelverton was trying to say that the reason that his

25   truck was cutting back to 5 to 10 mile an hour was



Page 240

1    because of lagging and as well as the experts.  I

2    think it was Rickard said the same thing.  It was

3    because of climbing a mountain.

4         Q.        This was a six mile area.  Correct?

5         A.        Yes.

6         Q.        And in the six miles prior to the

7    accident, based on the ETOG data, you testified

8    today that Mr. Yelverton was going 45 miles per hour

9    at some point in time.  Correct?

10        A.        Right.  Yep.

11        Q.        And you use 50 miles per hour as the

12   cut off with regard to your perception or your best

13   guess as to how fast those vehicles were going.

14   Correct?

15        A.        It was plus or minus 50 miles per

16   hour.

17        Q.        But you do admit that you didn't use

18   radar.  Right?

19        A.        No, sir.  I mean, it's just from, you

20   know, however many years I've been driving.  It's

21   been considerable -- I'm 52 years old.  I've been

22   driving since I was 17.  So --

23        Q.        And you also note that you have no

24   training in determining a CMV speed by visual

25   observation?



Page 241

1          A.        No.

2          Q.        When you use 50 miles an hour as a

3    cut off, is that what you would consider to be a

4    safe speed in that area?

5                    MS. RAINES:  Object to form.

6          A.        No.  It wasn't for that purpose.  I

7    wasn't demonstrating the 50 miles per hour for that

8    purpose.  I was demonstrating that 50 miles per hour

9    in showing that the commercial motor vehicle

10   involved in this crash, Yelverton's truck, was not

11   hindered by a mountain, the reason that he was doing

12   only 5 to 10 miles per hour, as he stated.

13         Q.        You specifically refer to 20 motor

14   vehicles.  Did you record any data or take any notes

15   with regard to those 20 commercial motor vehicles

16   you observed?

17         A.        What?  Like, license plate numbers

18   and stuff like that?

19         Q.        The type of truck.

20         A.        No.  No.

21         Q.        What they were hauling?

22         A.        They were 80,000 -- looking at them

23   as they're going by, they all look to be 80,000

24   GBWR, gross vehicle weight rating, registered as

25   80,000.  They're all 18 wheelers that I included



Page 242

1  into this count.  This approximate 20.

2      Q.      Do you know if they were loaded?

3  Empty?

4      A.      No.  I would -- I would think --

5  knowing the driving industry, very few trucks going

6  down a road are driving around empty because

7  deadhead miles don't get you any revenue.  So,

8  you're looking at out of those 20 trucks, I'll

9  guarantee you that 15 of them -- at least 15 of them

10 were loaded.

11              Now if you're in an industrial area,

12 you may have trucks that are empty going from one

13 location to the other.  But, you're out on an

14 interstate heading into Charleston.  Highly unlikely

15 somebody's gonna send a truck 150, 200 miles empty.

16     Q.      There's no hard data or information

17 upon which you are relying to state, as we are

18 sitting here today, that those were all loaded

19 vehicles?

20     A.      No.  No.  I would doubt very, very

21 highly that they were all empty, though.

22     Q.      Upon that, you are basing Mr.

23 Yelverton's tractor trailer should have been able to

24 travel 50 miles per hour up that hill?

25     A.      Oh.  Easy.  Yes, sir.



Page 243

1       At that point, as he goes further up

2    that hill, though, he might lag down a little bit

3    more.  But, at that point where the crash occurred,

4    he should've been able to accomplish at least 50

5    miles per hour.

6       Q.       Based on your visual observation --

7       A.       That's correct.

8       Q.       -- of those 20 commercial motor

9    vehicles?

10      A.       And experience.

11      Q.       Did you look at the documents when

12   you were formulating your opinions as to what Mr.

13   Yelverton was loaded with at the time of the

14   accident?

15      A.       I -- if I'm not mistaken, it was

16   liquid asphalt, which is an HOT load.  Hot load.

17   Elevated temperature material.

18      Q.       Do you know how many pounds or did it

19   matter in your analysis?

20      A.       No.  Of course it would -- it would

21   -- if it were empty, it would certainly be a factor.

22   But, they -- they run these tanks full.  They're not

23   going to run them half full or something like that

24   on a long trip that he's taking with this liquid

25   asphalt.  So, if I'm not mistaken, he would have a



Page 244

 1    full load on, which would put him close to that

 2    80,000 mark.

 3         Q.        That is all the questions that I

 4    have.

 5

 6    BY MS. RAINES:

 7         Q.        Just very briefly, you have given the

 8    opinions that you hold in this case based upon the

 9    information that you have been provided presently.

10    Is that correct?

11         A.        That's correct.

12         Q.        If, after your deposition today, you

13    formulate any additional opinions, I do ask that you

14    would provide them to me and thus I can provide them

15    to defense counsel.  Is that fair?

16         A.        Of course.

17                   (Deposition concluded at 4:14 p.m.)

18

19

20

21

22

23

24

25



Page 245

1                    C E R T I F I C A T E

2

3

4

5

6              I HEREBY CERTIFY that the witness

7    was duly sworn by me and that the deposition is a

8    true record of the testimony given by the witness.

9

10

11

12          _____

13                GINA A. FAROLDI, CCR

14                CCR License No. 30XIOO179800

15                Expiration Date:  June 30, 2014

16

17

18

19              (The foregoing certification of this

20    transcript does not apply to any reproduction of the

21    same by any means, unless under the direct control

22    and/or supervision of the certifying reporter.)

23

24

25

