## Page 1

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
-----------------------------*

PAUL GOODMAN and LINDA GOODMAN,

Plaintiffs,

vs.

DILLON TRANSPORTATION, LLC, a
Tennessee limited liability company,
Defendant.
-----------------------------*

VIDEOCONFERENCE AND TELEPHONIC
DEPOSITION OF:  SCOTT L. TURNER

DATE TAKEN:  Thursday, December 15, 2016

## Page 2

1    T R A N S C R I P T of the stenographic
2  notes of the proceedings in the above-entitled
3  matter, as taken by and before PATRICIA A.
4  MOHYLA-KLEIN, a Certified Court Reporter and Notary
5  Public of the State of New Jersey, held at the
6  office of FITZSIMMONS REPORTING & VIDEOCONFERENCE
7  CENTER, 570 West Mount Pleasant Avenue, Livingston,
8  New Jersey, on Thursday, December 15, 2016,
9  commencing at 10:17 a.m.
10
11  A P P E A R A N C E S :
12    SMITH BOVILL, P.C.
        BY:  ANDREW D. CONCANNON, ESQ.
13        200 Saint Andrews Road
          Saginaw, Michigan 48638
          Attorneys for Plaintiffs
14        PAUL GOODMAN and LINDA GOODMAN
15    SEGAL, McCAMBRIDGE, SINGER & MAHONEY, ESQS.
        BY:  ERIC P. CONN, ESQ.
16        39475 Thirteen Mile Road, Suite 203
          Novi, Michigan 48377
17        Attorneys for Defendant
          DILLON TRANSPORTATION, LLC
18
19
20
21
22
23
24
25

## Page 3

1              I N D E X
2
3
   WITNESS        DIRECT  CROSS  REDIRECT  RECROSS
4
   SCOTT L. TURNER
5    BY:  Mr. Conn    4        139
        BY:  Concannon        125          147
6
7
8  EXHIBIT      DESCRIPTION          IDENT.
9
10
11        (NONE MARKED.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1              S C O T T   L.   T U R N E R,
2  business address of P.O. Box 185, Blairstown, New
3  Jersey, 07825, having been duly sworn, testifies as
4  follows:
5
6  DIRECT EXAMINATION BY MR. CONN:
7
8        Q     Sir, can you please state your full
9  name for the record.
10    A     Sure.  It's Scott Lee Turner, T-u-r-n-e-r.
11        MR. CONN:  Let the record reflect
12  this is the deposition of Scott Turner taken
13  pursuant to notice and to be used for all reasons
14  under the Federal Rules of Civil Procedure and the
15  Federal Rules of Evidence.
16        Q     Mr. Turner, we're here today to
17  take your discovery deposition in the Goodman
18  matter.  I assume you've had your deposition taken
19  before; is that correct?
20    A     Yes, sir.
21        Q     Okay.  A couple of ground rules to
22  go by.  Because we're on videoconference, I'm going
23  to ask that you give me some time to ask my
24  questions, and then I'll wait for you to fully
25  respond before we continue on to the next; okay?

Page 5

1    A    Sure.
2        Q    Okay.  If you answer my questions,
3    I'm going to assume that you understood them; is
4    that fair?
5    A    Yes, sir.
6        Q    Okay.  What's your current
7    professional address, please.
8    A    Well, it's a P.O. Box.  It's P.O. Box 185,
9    Blairstown, New Jersey 07825.
10        Q    Can you tell me, are you currently
11    employed?
12    A    Yes, sir.
13        Q    Where at?
14    A    Self-employed.
15        Q    What's the name of your company?
16    A    It's two companies.  One is Scott L.
17    Turner Consulting, LLC, and the other one is T-Bone
18    Cattle Company, LLC.
19        Q    How do you split the time between
20    those two?  Is it 50/50 or is one more?
21    A    I would say it's probably in the
22    neighborhood of about 50/50.  Yes, sir.
23        Q    I assume your cattle company has
24    nothing do with your opinions in this case; is that
25    correct?

Page 6

1    A    No, sir.  Unless we're having steak for
2    lunch, no, sir.
3        Q    Okay.  Well, when I'm up there,
4    maybe we will; how about that?
5    A    Sounds good.
6        Q    What is Scott L. Turner Consulting?
7    A    Uhm, predominantly we provide expert
8    testimony and consulting services for the legal
9    community, both plaintiff and defense.  And from
10    time-to-time we do some training for commercial
11    motor vehicle carriers.
12        Q    You said "we."  Are there multiple
13    employees --
14    A    No.
15        Q    -- for Scott L. Turner Consulting?
16    A    It's always been just a way that I express.
17    "We" meaning myself.  I'm the guy that does all the
18    work, so --
19        Q    The royal "we"?
20    A    That's correct.
21        Q    Okay.  How many active files do you
22    have currently that you're working on through Scott
23    L. Turner Consulting?
24    A    I would say it's approximate --
25    approximately 50.

Page 7

1        Q    Can you tell me over the last five
2    years approximately how many depositions you've
3    given?
4    A    Last five years, I would estimate it's
5    been, say in the neighborhood of about 30, I guess.
6        Q    Over the last five years, have you
7    testified at trial?
8    A    I have.
9        Q    How many occasions?
10    A    I would say that that probably has been in
11    the neighborhood of about six or seven.
12        Q    We're here today talking about a
13    lowboy or drop-deck trailer; is that correct?
14    A    Yes, sir.
15        Q    Have any of the cases you've worked
16    on over the last five years involved a lowboy or
17    drop-deck trailer?
18    A    Uhm, first off, let me explain the
19    difference between a true equipment lowboy for the
20    benefit of the jury and a -- and a lowboy trailer
21    and what we're referring to here.  The lowboy
22    trailer that is utilized, such as a Roger's trailer,
23    would be utilized for hauling heavy equipment.
24    That's a drop deck, or as some refer to it as a
25    lowboy, and I have testified on matters involving

Page 8

1    those.
2        And then there's the other type, which are
3    lowboy or drop-deck-type trailer -- or not a
4    drop-deck trailer, but a lowboy trailer that we
5    are -- that was involved in this particular case
6    here.
7        Q    So this is a lowboy box truck?
8    A    That's correct.  Box -- van -- van trailer.
9        Q    Yeah.  Okay.  So just for the
10    purposes of today, when we're referring to drop-deck
11    or lowboy, let's you and I have an agreement that
12    we're talking about the trailer -- the type of
13    trailer that was involved in this incident; okay?
14    A    Certainly.
15        Q    Okay.  That being said, can you
16    tell me over the last five years, have any of the
17    cases that you've worked on dealt with a lowboy or
18    drop-deck trailer?
19    A    I really -- over the last five years, I
20    don't recall.  I've dealt with them before.  Over
21    the last five years, I couldn't tell you
22    specifically, though.
23        Q    Okay.  Have you ever had a case,
24    this being in your career now, where you have had a
25    situation where you've been asked to provide expert

Page 9

1    testimony about a drop-deck or lowboy trailer that
2    has precipitously collapsed?
3    A      Yes, sir.  Well, not --
4        Q      Okay.  How many --
5    A      Let -- let -- let me back up on that.  I
6    have dealt with many cases where semitrailers have
7    dropped, using that term, at a loading dock for one
8    reason or another.  And then I have -- but as far as
9    it being a drop-deck-type trailer -- or excuse me --
10   a lowboy-type trailer that we're talking about
11   actually dropping at a loading dock, no, sir.
12       Q      Okay.  So for purposes of what we
13   are dealing with today where there was a Hendrickson
14   MaxiLok system on this particular trailer, if I'm
15   understanding your testimony correctly, you've never
16   dealt with a similar situation in your consulting
17   experience; is that correct?
18   A      To clarify, I have never dealt with this
19   specific type MaxiLok system dropping at a loading
20   dock.  However, I have dealt with these type
21   trailers in the past.
22       Q      In what capacity or what types of
23   situations have you dealt with these types of
24   trailers in the past?
25   A      Crashes, loading, offloading, things of

Page 10

1    that nature.
2        Q      Have you ever been asked to perform
3    a causal analysis as to why a lowboy trailer such as
4    the one in this case has fallen, either at a loading
5    dock or another location?
6    A      A specific MaxiLok-type system, no, sir,
7    but I have on PosiLok, which is P-o-s-i-L-o-k, which
8    is a very similar-type setup.  Yes, I -- and they're
9    the same purpose -- essentially they're the same
10   purpose.  I have testified on those in the past,
11   yes, sir.
12       Q      All right.  I'm going to jump ahead
13   just for a second.  There's a reference to a PosiLok
14   in your report that you provided in this particular
15   case.  Is that the PosiLok system that you were
16   working on previously --
17   A      I've worked on --
18       Q      -- and made reference to?
19   A      Not just one, I've worked on others, but
20   yes, sir.
21       Q      Okay.  And I assume the photograph
22   that's included in your report is a photograph from
23   one of your prior --
24   A      Can you --
25       Q      -- one of your prior --

Page 11

1    A      Would you be so kind --
2        Q      Sure.
3    A      -- as to point me to the photograph you're
4    referring to, please.
5        Q      The photograph is on page 16 of
6    your report.
7    A      No, that's actually -- the page 16, which
8    is Photo 11, identified as Photo 11, SLTC -- Source
9    SLTC-PCI, which is postcrash inspection, that's
10   actually from this particular subject trailer.
11       Q      Okay.  And I guess what I was
12   referring to actually was on page 17.
13   A      Well, that's just -- that's an
14   illustration, it's not really a photograph.  But
15   that would be -- that would come from the
16   SAF-HOLLAND, all capital letters, SAF-HOLLAND, the
17   PosiLok system, and that would be -- that's a
18   similarity of what I'm trying to demonstrate there.
19       Q      Okay.  We kind of got off tangent.
20   Let's go back to what we were talking about
21   previously.
22           Over the last five years, can you tell me
23   on how many occasions or percentage of cases you've
24   had plaintiff testimony versus defense testimony?
25   A      On average, I would say over the last five

Page 12

1    years it's been about 50/50.  Of late, it's been a
2    little bit more on the 60/40 side with the weight
3    being on the defense.
4        Q      You understand that your deposition
5    today was noticed duces tecum?
6    A      Yes, sir.
7        Q      And you brought some documents with
8    you.  I don't have those yet because they're being
9    scanned and sent over to me, but is one of the
10   things that you provided a list of cases that you
11   worked on over the past five or ten years?
12   A      Yes, sir.  I don't have that in front of
13   me.  This is the file that I worked off of.  You
14   have it on its way to you electronically.  I brought
15   it in a jump drive that I provided to Fitzsimmons,
16   and they're copying it and sending it to you.
17       Q      Okay.
18   A      Actually, it's four years, sir.  I follow
19   the federal regulations, Rule 26 on that.
20           (Whereupon there is a discussion
21   held off the record.)
22   BY MR. CONN:
23       Q      Let's talk about a bit about your
24   education.  I assume you graduated from high school;
25   is that correct?

Page 13

1  A     That is correct. Right after high school
2  went into --
3       Q     What year?
4  A     1981. And right after high school, went
5  into the working world.
6       Q     Okay. Any secondary education,
7  university, college?
8  A     No, sir. Started in heavy-highway
9  construction right after high school.
10      Q     Is one of the documents that's on
11  its way to me a copy of your C.V.?
12  A     It is.
13      Q     Okay. Does it include your
14  relevant experience after high school?
15  A     Yes. There should be a copy of the --
16  well, no, I don't think there is on this one. It is
17  in the jump drive that's being sent to you, yes,
18  sir.
19      Q     Okay. Since I don't have that, I'm
20  just going to go through a couple of questions here.
21      You have no formal education in
22  engineering; is that correct?
23  A     No, sir.
24      Q     That -- is that correct?
25  A     No, I do not have formal education in

Page 14

1  engineering. That is correct.
2       Q     Okay. Have you ever worked as a
3  mechanic?
4  A     Not in a shop. I worked as -- doing
5  mechanical work on my own tractor-trailer when I
6  was -- once I -- after doing heavy-highway
7  construction, I got into driving over the road, and
8  I used to do my own mechanic work.
9       Q     Have you ever been licensed as a
10  mechanic?
11  A     No, sir.
12      Q     Have you ever had any formal
13  training in pneumatics?
14  A     Uhm, as far as pneumatics are concerned
15  with dealing with air brakes and trained by Bendix,
16  I'm also a Level 1 FMCSA roadside inspector, and
17  you're trained in dealing with those on roadside
18  inspections. So as far as pneumatics, as you refer,
19  or airline systems on commercial motor vehicles,
20  yes, I'm very well trained on that.
21      Q     Okay. What type of training have
22  you received in pneumatics?
23  A     Again, that would be through Bendix.
24      Q     Well, what one training --
25  A     I'm sorry?

Page 15

1       Q     What in addition to your -- you
2  talked about your Level 1 training for highway
3  inspections; correct?
4  A     FMCSA, that's correct.
5       Q     And then what other training have
6  you received?
7  A     Ben -- I'm certified as a Bendix -- in
8  Bendix foundation air brake systems, which deals
9  with all the pneumatics, of course.
10      Q     And when you say "all the
11  pneumatics," are you talking about on a tractor?
12  A     On the tractor and the trailer.
13      Q     Okay.
14  A     The entire system from bumper-to-bumper.
15      Q     Are we talking about air suspension
16  and air brakes?
17  A     Air system. Everything to do with the air
18  system. So in this particular case here, it would
19  be in relation to the foundation air brakes and it
20  would be in relation to any air supply to anything
21  else such as either a MaxiLok- or a PosiLok-type
22  system.
23      Q     Have you ever had any formal
24  training on a MaxiLok or PosiLok pneumatic system?
25  A     No, sir.

Page 16

1       Q     No formal training?
2  A     No, sir. No -- there's none that I'm aware
3  of.
4       Q     Do you have any training in valves?
5  A     I'm sorry?
6       Q     Did you hear -- oh. Do you have
7  any formal training in valves?
8  A     In valves? Valves, v-a-l-v-e-s?
9       Q     Yes, v-a-l -- right, sir.
10  A     Well, again, so far as I know, there's no
11  specific training that directly is eight hours in --
12  with regard to valves. That's all-encompassed into
13  the Bendix training. It's also encompassed into the
14  Level 1 FMCSA roadside inspector training.
15      Q     Bendix you're referring to, that's
16  a company; correct?
17  A     That's correct.
18      Q     They're a manufacturer of brake and
19  brake systems?
20  A     That's correct. Airline -- the whole
21  airline system on commercial motor vehicles.
22      Q     You're not a medical doctor; is
23  that correct?
24  A     No. No, sir.
25      Q     Okay. Do you currently have a CDL?

Page 17

1    A    No, sir.
2        Q    It sounds to me like you had one in
3    the past?
4    A    I did. Well, not a CDL.
5        Q    Okay. What --
6    A    Forgive me. Not a CDL, but a commercial
7    motor vehicle operator's license when it was
8    state-by-state.
9        Q    Okay. When did you have that
10   license?
11   A    Late '80s.
12       Q    How is it that you became involved
13   in this matter?
14   A    I got contacted by Attorney Concannon
15   asking me to take a look at this and -- as to, you
16   know, potential liability-related issues. And that
17   was essentially how I came -- how I became involved.
18       Q    Do you know when you became
19   involved?
20   A    Sure. Bear with me one second.
21       Q    Sure.
22   A    October 19th -- well, it says 201, but we
23   know that's not right. So I would say -- it doesn't
24   say the year. It doesn't say 2015 or '14 or '13.
25   It just says 201, so I don't have the exact year.

Page 18

1    But if we were to look at invoicing, which is on the
2    jump drive coming to you, that would more define the
3    year.
4        Q    Okay. We'll look at that in a
5    minute.
6    A    We, of course, know it was post-2012.
7        Q    Sure. Were you hired to be an
8    independent witness or an advocate on behalf of
9    Mr. Goodman?
10   A    No. I only provide independent witness
11   testimony. I -- that's why I turn down about 50 to
12   60 cases a year because I just -- there's cases that
13   I don't believe in and/or I get asked to do things
14   that I just don't find to be -- don't find to be
15   fair to either side.
16       Q    Okay. So in this particular case,
17   then, you were asked to look at the evidence that's
18   admissible and make a determination as to cause; is
19   that correct?
20   A    That's correct. In addition to looking at
21   evidence at -- at the actual -- I know this is
22   considered evidence, but the actual commercial motor
23   vehicle that was involved as well.
24       Q    Sure. Feel free to refer to your
25   report and your subsequent Affidavit, but can you

Page 19

1    tell me what information that you reviewed to assist
2    you in performing your causal analysis in this case?
3    A    Well, on the main report, it's deposition
4    transcript of Paul Goodman with exhibits; deposition
5    transcript of Ashley Ousterhout with exhibits;
6    Defendant Dillon Transportation, LLC's witness list;
7    Complaint; jurisdictional allegations; Defendant
8    Answer to Plaintiff Complaint; plaintiff's witness
9    list; Plaintiff's Answers to Defendant's
10   Interrogatories; defendant Dillon Transportation,
11   LLC's Responses to Plaintiff's Request to Produce;
12   Defendant Dillon Transportation, LLC's Response to
13   Plaintiff's Interrogatories; 20 color photos of TRW
14   loading dock area; documents responsive to discovery
15   demand from plaintiff; 2012 OSHA Form 300.
16       And I'm going to have to find -- you want
17   to bear with me a moment -- the Affidavit. For some
18   reason, I don't have it in front of me, the
19   Affidavit. I don't -- I don't -- I've got all --
20   the whole file here and I just don't know where it
21   is. It's in here somewhere. If you want to take a
22   break and --
23       Q    Okay. I'll help you out.
24   A    Okay.
25       Q    No, I'll help you out. I got it in

Page 20

1    front of me.
2        The Affidavit is signed by you, I believe,
3    it's dated May 5, 2016, and it refers to the
4    deposition testimony of Miguel Urjiles.
5        Do you recall also reviewing the deposition
6    testimony of the driver in rendering your opinions
7    in this case?
8    A    Yes, sir.
9        Q    Okay. In addition to those we just
10   discussed and since you authored your report and
11   your Affidavit, have you reviewed anything else?
12   A    Other than supporting like, for example,
13   FMCSA, which if you go into the report --
14       Q    That's contained within your
15   report, however; isn't that correct?
16   A    That's correct.
17       Q    I'm talking about after you
18   prepared your report and Affidavit, did you review
19   anything in addition?
20   A    No, sir.
21       Q    Do you know who Donald Wilcutt is?
22   A    Is that from ESI? I just --
23       Q    No.
24   A    Donald Wilcutt?
25       Q    Correct.

Page 21

1     A     It sounds -- it sounds familiar, but this
2     not being a memory test, it's not coming to me right
3     now.
4          Q     So if he's authored opinions in
5     this case related to causation, you wouldn't know
6     what those are; is that direct?
7     A     Is Wilcutt from ESI, if I can ask you that
8     question?
9          Q     No, he is not.
10    A     Okay. Then --
11         Q     No, he is not.
12    A     -- I don't recall seeing it.
13         Q     Okay. It's not --
14    A     I'm not saying for absolute certain that I
15    did not review it, but -- and if I did review it and
16    there was no follow-up Affidavit, then there would
17    have been no additional opinions.
18         Q     Okay.
19    A     That -- that's the basis of -- that's how
20    I'm able to make a determination. If I did review
21    it and there's no follow-up Affidavit, then there
22    would be -- there would be no additional opinions.
23    It would not have changed the foundation or the
24    opinions that I have authored. Fair enough?
25         Q     Okay. Fair enough.

Page 22

1          The gentleman from ESI, his name is Dr. Jim
2     Sprague.
3     A     Right.
4          Q     Have you reviewed his report?
5     A     Yes, sir.
6          Q     So that would be something that you
7     reviewed after the -- at least your report; is that
8     correct?
9     A     I believe so, yes. I -- yes, it would have
10    been, I'm relatively certain.
11         Q     Do you know whether or not it was
12    after you issued your Affidavit?
13    A     I don't recall.
14         Q     Would your invoicing reflect that?
15    A     It -- it wouldn't -- it wouldn't
16    reflect -- my invoicing would never reflect specific
17    names of what I reviewed that day when you say
18    document review or file review.
19         Q     Okay. Have you ever been precluded
20    as testifying by -- as an expert by any court?
21    A     In Boston, one time I was precluded from
22    partial testimony. It was regarding Federal Motor
23    Carrier Safety Regulations, but I was not forbidden
24    from testifying on that. I was forbidden to
25    testifying on the OSHA part, and the only reason was

Page 23

1     the Court said that they had an OSHA expert that was
2     already retained by the side that I was -- that I
3     was engaged or retained by. So they simply said
4     that they didn't want redundancy. That was the only
5     time, so far as I recall -- so far as I recall, of
6     course.
7          Q     Okay. Are you familiar with the
8     Michigan OSHA regulations or MiOSHA?
9     A     Not in specific, no, sir.
10         Q     Have you ever provided expert
11    testimony in Michigan, either state or federal?
12    A     I believe that I have. I provided -- as
13    a -- as an expert witness, has not gone to trial,
14    though. I didn't testify in trial. I believe that
15    I have done cases in Michigan in the past, though.
16    I'm pretty certain I have.
17         Q     In coming to the opinions that you
18    have in this case, did you do any modeling or
19    testing of any kind?
20    A     The only -- the only testing I did was at
21    the time that we did the PCI or the postcrash --
22    postincident inspection.
23         Q     At that point in time, you would
24    have taken photographs as well; is that correct?
25    A     That's correct.

Page 24

1          Q     Are those the only photographs that
2     you've taken related to this matter?
3     A     Yes, sir, and they would be on the jump
4     drive as well or the Dropbox that's coming to you.
5          Q     Have you looked at any animations
6     to assist you in either rendering your opinions or
7     presenting those to the jury?
8     A     No, sir.
9          Q     Have you prepared any demonstrative
10    evidence at any point in time related to this
11    evidence?
12    A     No, sir.
13         Q     Other than the subject trailer,
14    have you inspected any other exemplars in assistance
15    with formulating your opinions in this case?
16    A     No, sir, other than dealing with PosiLok's
17    in the past, nothing specific than MaxiLok.
18         MR. CONCANNON: Eric, I'm sorry to
19    interrupt. I wanted to make a clarification for the
20    record so you're not misled. There are dozens of
21    photographs that Mr. Turner has taken. I will be
22    utilizing several of those for purposes of his trial
23    testimony which will be captured by video.
24         He's not preparing anything new for me.
25    They've already been prepared and you've already

Page 25

1    seen them, but I wanted to make sure you weren't
2    misled into thinking that no pictures would come in
3    at trial.
4    BY MR. CONN:
5        Q     No. We discussed the fact that you
6    took pictures, Mr. Turner; is that correct?
7    A    That's correct.
8        Q     Okay. But you haven't taken
9    pictures of anything that was not either equipment
10   or a part of the trailer or the equipment that was
11   involved in this incident; is that correct?
12   A    That is correct.
13       MR. CONN: Let's go off the record
14   for just a second.
15       (Whereupon there is a discussion
16   held off the record.)
17   BY MR. CONN:
18       Q     Sir, have you reviewed or relied
19   upon any scholarly articles in the preparation of
20   your opinions?
21   A    No, sir.
22       Q     You understand that when this
23   particular trailer is alleged to have collapsed,
24   Mr. Goodman was on a high/low?
25   A    Yes, sir.

Page 26

1        Q     Do you have any special training or
2    certification in the use of high/lows?
3    A    I am trained and I've also trained
4    people -- folks on forklift operations, which is --
5    falls under 1910.178 of OSHA.
6        Q     Is that federal OSHA or is that
7    particular to New Jersey?
8    A    That's -- no, it's federal. That's
9    federal. There's no specific New Jersey OSHA. It's
10   federal.
11       Q     You understand that Michigan has
12   its own OSHA standards; is that correct?
13   A    That is correct. But so far as I
14   understand, they've adopted most of OSHA. I don't
15   know specific stuff.
16       Q     As it pertains to this case, do you
17   have any opinions as to the training that
18   Mr. Goodman received on his high/low?
19   A    No, sir. I -- I -- I didn't really --
20   well, I didn't look at it specifically as a
21   high/low-related matter. I did look at Mr. -- at
22   the operator, Mr. Goodman's operating mannerisms,
23   but I didn't -- I didn't specifically break it down
24   into what did he -- what did he -- if he violated,
25   anything like that at all.

Page 27

1        Q     Do you recall how fast Mr. Goodman
2    was traveling at the time this incident occurred?
3    And by "incident," I'm referring to at the time the
4    trailer fell.
5    A    Well, there is nothing that can break down
6    the speed limit because they don't have speedometers
7    on them, nor would there be such as an EMC on a
8    forklift that would break down a specific speed;
9    although the testimony said that he was -- he was
10   going in at a decent pace, something -- something to
11   that effect. But there's nothing that would break
12   that down into specificity as he was doing 5 miles
13   an hour, 15 miles an hour or 10.
14       Q     If I told you that his testimony
15   was he was moving quite fast immediately before the
16   incident occurred, would you have any reason to
17   disagree with that?
18   A    No, sir. That's what I -- that's what I
19   was referring to is that he was moving at a -- at a
20   reasonable speed or a quicker speed or whatever the
21   phraseology was that I used.
22       Q     He said "quite fast," but you bring
23   up a good point. You don't know whether or not the
24   speed that he was traveling was reasonable; is that
25   correct?

Page 28

1    A    Well, I think that, you know, if you take
2    10 people and put them on a side of a road and ask
3    them how fast an 18-wheeler is going down the
4    roadway versus how fast a car is going down the
5    roadway, you're going to get 10 different answers
6    and they can vary greatly as I've learned through
7    deposition process and testimony. So what his
8    perception of "quite fast" may be completely
9    different than somebody else's quite fast.
10       So I don't really have -- I wasn't there at
11   the time, so I can't testify exactly to speed.
12       Q     So you don't have an opinion as to
13   whether or not his speed was reasonable?
14   A    I -- again, if he's using the phraseology
15   "quite fast," I would say that might be a little bit
16   too fast. I don't -- I can't say for certain,
17   though, because, again, his definition of quite fast
18   in a car may be 60 miles an hour; whereas mine might
19   be 70 miles an hour, 75 miles an hour.
20       Q     You understand that he's been a
21   high/low driver for a bit of time prior to this
22   incident; correct?
23   A    Yes, sir. I just don't recall the time
24   frame, though.
25       Q     Okay. As an experienced high/low

Page 29

1   driver, would you agree with me that he would have
2   some type of knowledge about what fast is on
3   high/low and what slow is on a high/low?
4   A    Well, again --
5        Q    Would you expect that of somebody
6   that you trained on a high/low?
7   A    Again, it's really going to -- it's going
8   to be an interpretation of the individual of how he
9   perceives being fast.  He may -- he may crawl around
10  on a forklift on a regular basis, but for some
11  reason there may have been a rush on a load where
12  he's told to go quicker.  So 5 miles an hour, 10
13  miles an hour may be considered fast to him at that
14  point in time.
15       So I'm not going to sit here and testify,
16  outside of what his testimony was, "quite fast."
17  I'm not going to assign a speed limit to that nor a
18  statement of carelessness, recklessness or anything
19  like that at all because it just would be -- would
20  be beyond unfair.
21       Q    We already talked about the fact
22  that you prepared a report as a result of your
23  retention in this case.  Your report contains, I
24  believe, 22 pages; is that correct?
25  A    That's correct.

Page 30

1        Q    And then I know you don't have it
2   in front of you, we will need to find that at some
3   point in time, but maybe we'll do that on a break,
4   an Affidavit, which I'll tell you right now is two
5   pages long; okay?
6   A    Yes, sir.
7        Q    Okay.  Your report and your
8   Affidavit contain your opinions in this case; is
9   that correct?
10  A    That's correct.
11       Q    Have you authored any additional
12  opinions since you prepared your report and your
13  Affidavit?
14  A    No, sir.
15       Q    Have you been asked since you
16  prepared your report and your Affidavit to review
17  this matter and author additional opinions in other
18  areas that are not already discussed in your report
19  and Affidavit?
20  A    No, sir.
21       Q    Do you currently have any plans to
22  author any additional reports -- or I'm sorry --
23  opinions in this case?
24  A    At this point in time, no, unless other
25  evidence comes out at a later point in time.  I --

Page 31

1   there's nothing else I have to offer.
2        Q    To save you the time from reading
3   them, is it safe to assume that the opinions that
4   you have in this case are encapsulated on page 20
5   and 21 of your report at numbered paragraphs 1
6   through 8?
7   A    That's correct.
8        MR. CONN:  Let's go off the record
9   for a second.
10       (Whereupon there is a discussion
11  held off the record.)
12  BY MR. CONN:
13       Q    While we're waiting to send that, I
14  think we can go back on the record and at least talk
15  about your report.
16  A    Sure.
17       Q    In reviewing your opinions, it
18  appears to me that numbered paragraphs 1 through 6
19  deal in various ways with your opinions that a
20  proper visual inspection was not performed of the
21  MaxiLok legs that rest on Axle 2; is that correct?
22  A    That's correct.  That's the heart of the
23  matter.
24       Q    Okay.  Paragraph 7 is an opinion
25  that deals with Dillon Transportation's alleged

Page 32

1   failure to properly train its driver; is that
2   correct?
3   A    That's correct.
4        Q    And then paragraph 8 deals with
5   Dillon Transportation's alleged failure to properly
6   lubricate the MaxiLok system; is that correct?
7   A    Yes, sir.
8        MR. CONN:  Off the record.
9        (Whereupon there is a discussion
10  held off the record.)
11  BY MR. CONN:
12       Q    We can continue until that comes in
13  now if you're ready.
14  A    Yes, sir.
15       Q    Based upon your review of the
16  documentation referenced previously, can you tell me
17  how it is you understand this incident to have
18  occurred?
19  A    Sure.  Urjiles -- I'm always having a hard
20  time with that.
21       Q    Urjiles.
22  A    Urjiles?
23       Q    Urjiles, yup.
24  A    I'm married to a Latino woman, you'd figure
25  I'd know that.  But Urjiles.

Page 33

1    Mr. Urjiles, being a commercial motor
2  vehicle driver, is required -- as a CDL driver as
3  well, is required to inspect a commercial motor
4  vehicle before use. So that's pretrip inspection.
5  This would not be applicable to pretrip inspection.
6    It would be applicable to inspection of
7  the -- the MaxiLok prior to backing the trailer --
8  or excuse me -- once he elevates the trailer and
9  drops it down onto the MaxiLok system, so activates
10  the MaxiLok by activating the black button on the
11  driver's side. Once he activates the MaxiLok
12  system, he needs to observe, and it says right on
13  the panel, that he -- that he has to, as a driver
14  for safe operation, observe that MaxiLok to make
15  sure that it's seated properly on the axle, on the
16  Number 2 axle.
17    And when I'm saying Number 2 axle, not to
18  be confused with the tractor as well. It would be
19  Number 5 axle at that point, but Number 2 axle
20  meaning the -- the axle -- Number 2 on the
21  semitrailer.
22    Q    That would be the rear-most axle on
23  the trailer?
24  A    That's correct.
25    Q    Okay. I want to take a step back

Page 34

1  because you got a bit into your opinions, and I just
2  want to know what your understanding is of how this
3  incident itself occurred.
4    What was Mr. Urjiles doing? What was
5  Mr. Goodman doing? How did the incident itself
6  occur, if you could describe that for me?
7  A    Sure. Okay. Well, in my opinion, the only
8  way that it could have occurred is Mr. Urjiles
9  backed his trailer up to the loading dock, and not
10  fully up to the loading dock, but in the direction
11  of the loading dock, and he went to set his MaxiLok
12  system.
13    And how he does that, he gets out, pulls
14  the actuator button. That activates the MaxiLok
15  system and causes -- without belaboring all the
16  details -- causes the MaxiLok to kick in and drop to
17  a 90 degree from the road -- road angle, more or
18  less, and sit right on top -- there's angle iron
19  that will actually sit right on top of the axle as
20  shown in my report and that will prevent the -- that
21  will actually keep the trailer at an elevated
22  position so that he can back it up to the loading
23  dock in order to be able to safely be offloaded by
24  either a dock plate or a -- some type of form of a
25  gap separation or closure, if you will, from the

Page 35

1  dock to the trailer.
2    Mr. Urjiles -- Mr. Urjiles didn't examine
3  that properly. If he had examined that properly,
4  there's no way that that trailer would have
5  collapsed when the forklift went -- had gone in on
6  the fifth or sixth trip.
7    Q    I'm going to stop you there for a
8  second. You said Mr. Urjiles did not examine it
9  properly. The examination that you're talking about
10  is intended to make sure that those angle irons, as
11  you referred to them, are properly seated over the
12  axle; is that correct?
13  A    That's correct.
14    Q    Okay. So however a visual
15  inspection occurs, if somebody confirms that those
16  angle irons are over the axle, they've successfully
17  performed that visual inspection; is that correct?
18  A    If they absolutely confirm that they
19  were -- they were seated properly as designed, then
20  that would be correct.
21    Q    Now, you talked about what
22  Mr. Goodman did. You said he went in about five or
23  six times; correct?
24  A    It was something like that, yes, sir. He
25  had removed --

Page 36

1    Q    He was driving or not?
2  A    He had removed --
3    Q    He was driving a high/low.
4  A    He had removed some pallets from the --
5  from the trailer.
6    Q    Okay. He was driving a high/low
7  into and out of his trailer; is that correct?
8  A    That's correct.
9    Q    Do you know how much the high/low
10  that he was riding in weighed?
11  A    No, sir, I don't.
12    Q    There are various kinds of
13  high/lows; is that correct?
14  A    Yes, sir.
15    Q    There are some that are designed
16  specifically for use indoors and there are some that
17  are designed for use indoors and outdoors; correct?
18  A    Well, there's all different types. There's
19  construction high/lows. There's warehouse type,
20  which would be the type that's applicable here.
21    Q    Some high/lows weigh more than
22  others?
23  A    Yes, sir.
24    Q    Mr. Goodman testified that he
25  thought the high/low he was riding on weighed

Page 37

1    approximately 16,000 pounds.
2         Any reason to disagree with that?
3    A    No, that's usually about the average weight
4    that you're going to find and give or take a couple
5    thousand pounds.
6         Q    You recall that Mr. Goodman
7    testified that the trailer collapsed when the front
8    wheels of his 16,000-pound trailer hit the floor of
9    the trailer on that fifth or sixth trip into it --
10   A    On the tailboard.
11        Q    -- do you recall that testimony?
12   A    On the tailboard, yes, sir.
13        Q    That's right.
14        When we talk about tailboard, we're talking
15   about the wood flooring within the trailer; correct?
16   A    Well, usually in the back section, there's
17   typically a section of diamond plate and then you'll
18   get wood flooring after that on the decking. But
19   there's a section of diamond plate that's about two,
20   three feet long depending on the manufacturer. This
21   being a Great Dane, I would imagine it's probably
22   three feet and then you have wood decking after that
23   typically.
24        Q    Does the dock plate usually cover
25   that diamond plating that you're referring to?

Page 38

1    A    It typically does, yes.
2         Q    Okay. So --
3    A    At least part of it.
4         Q    So that was --
5    A    At least part of it.
6         Q    Well, when we talked about the fact
7    that his front wheels would have been hitting the
8    trailer then, is it safe for us to assume, or isn't
9    it, that he was on wood at that point in time?
10   A    Not necessarily. It could have been the
11   diamond plate, partly the diamond plate. It could
12   have been the wood. It all depends. It depends on
13   the dock leveler system as well. It depends on what
14   they were actually utilizing.
15        Q    I'm going to go through a list of a
16   couple of things to see if you and I have a similar
17   understanding about the facts and evidence in this
18   case. Let me know if you agree or disagree with
19   each of these.
20        First, do you agree with me that the
21   trailer dropped between 10 and 11 inches?
22   A    It -- I would say 11 inches, yes, that
23   would be -- was my -- my understanding as -- as from
24   the inspection.
25        Q    Okay. ESI believes that it was

Page 39

1    approximately 10 inches, and you take a little bit
2    of issue with that in your report; is that correct?
3    A    I do. And the reason is that they used
4    their measurement -- it's an engineering stick.
5    They used their measurement engineering stick a few
6    feet in from the back of the tailboard of the
7    trailer, and I used it -- I did the measurement at
8    the very back of the tailboard of the trailer, which
9    would be more relative to where he was when he
10   entered into the trailer itself. So that's where I
11   did my measurement to get a full understanding of
12   the full drop it would have happened.
13        Q    I'm sorry. What was that?
14   A    I -- there was somebody outside.
15        Q    Oh, okay.
16        Do you agree with me that the axle weight
17   would have been its greatest on Mr. Goodman's first
18   trip into the trailer?
19   A    Repeat that question again. I'm sorry. I
20   was distracted by the door and all.
21        Q    No problem.
22        Do you agree with me that the axle weight
23   would have been its greatest when Mr. Goodman first
24   entered the trailer to remove that first pallet?
25   A    That's correct.

Page 40

1         Q    You said earlier that you reviewed
2    Mr. Urjiles' deposition testimony; is that correct?
3    A    That's correct.
4         Q    Do you agree with me that he
5    received, at a minimum of 30 minutes of training
6    from his employer on the Hendrickson MaxiLok system?
7         MR. CONCANNON: Eric, I'm sorry,
8    you cut out on that. Could you repeat that?
9         MR. CONN: Sure.
10        Madam Court Reporter, did you get it.
11        THE COURT REPORTER: Yes.
12        MR. CONN: Could you repeat it,
13   please.
14        (Whereupon the last question is
15   read by the reporter.)
16        MR. CONCANNON: Thank you. I
17   didn't know that.
18   A    I don't recall that in deposition. To be
19   quite frank, it was some time ago that I read it.
20   I don't recall specifics as to how long his training
21   was or the effectiveness of his training, but I look
22   at it from an effectiveness standpoint. He didn't
23   inspect.
24   BY MR. CONN:
25        Q    He did inspect, is that what you

Page 41

```
 1    said?
 2    A    He did not inspect, clearly by what had
 3    occurred.
 4         Q    Okay.  That's your testimony.
 5         This incident occurred on April 26th, 2012;
 6    is that correct?
 7    A    Yes, sir.
 8         Q    Where were you on April 26th, 2012?
 9    A    Oh, I have no idea.
10         Q    Were you in Michigan?
11    A    No, sir.
12         Q    Okay.  You weren't looking over
13    Miguel Urjiles's shoulder when he was raising this
14    particular trailer; is that correct?
15    A    No, sir.
16         Q    Okay.  So you don't have any
17    personal knowledge as to whether or not he performed
18    an inspection; is that correct?
19    A    It's based on the failure.  It's based on
20    the analysis of the failure.
21         Q    All due respect, that wasn't my
22    question.
23         My question was, you don't have any
24    personal knowledge of whether he inspected; is that
25    correct?
```

Page 42

```
 1    A    All I could say to you is that there's no
 2    way that it could have been inspected properly for
 3    this failure to have occurred.
 4         Q    I appreciate your opinions, and
 5    we'll talk about those in a second.  My question is
 6    pretty simple, though.
 7         You don't have any personal knowledge
 8    because you weren't there to determine whether or
 9    not he performed a visual inspection; is that
10    correct?
11    A    No, physically I was not there, but based
12    on analysis.
13         Q    Okay.  So you weren't there, so you
14    don't know personally whether he had performed an
15    inspection; is that correct?
16    A    Personally observing him?  Are you --
17         Q    Correct.
18    A    I was not there personally observing him,
19    that's correct.
20         Q    Okay.  You read the deposition
21    testimony of Paul Goodman; correct?
22    A    That's correct.
23         Q    Did you read in Paul Goodman's
24    deposition testimony that he was watching Miguel
25    Urjiles, and he didn't see him perform an
```

Page 43

```
 1    inspection?
 2    A    I believe I recall that, yes.
 3              MR. CONCANNON:  Don't answer.  I
 4    object to the form.  You haven't given a particular
 5    timeframe where Paul was, whether he was on a
 6    high/low or not.  It's vague as phrased.
 7         Mr. Turner, please answer, if you can.
 8    BY MR. CONN:
 9         Q    You can go ahead again.
10    A    You want to repeat that, please.
11         Q    Sure.  My question was:  Did Paul
12    Goodman testify that he didn't see Miguel Urjiles or
13    that he watched him and determined that he didn't
14    perform an inspection?
15    A    I don't recall, but I believe -- with
16    absolute certainty, I don't recall, but I do believe
17    that he said something to that effect.
18         Q    Okay.  I don't want you to guess.
19    A    No, no.  I got --
20         Q    So if you don't know, that's
21    perfectly fine for you to say that.
22    A    Right, right.  I'm not absolutely certain,
23    I just don't recall.
24         Q    Okay.  You read Ashley Ousterhout's
25    deposition, too; is that correct?
```

Page 44

```
 1    A    I'm sorry?
 2         Q    Ashley Ousterhout, she testified in
 3    this case and you read her transcript; correct?
 4    A    Correct.
 5         Q    She didn't testify that Mr. Urjiles
 6    did or didn't perform an inspection, right; she
 7    didn't know?
 8    A    She did not know.
 9         Q    Okay.  You told me earlier that you
10    were hired to be an independent consultant in this
11    case and that you were supposed to look at the
12    evidence in this case to evaluate what happened.
13         Were you -- do you agree with me that you
14    are discounting Mr. Urjiles's deposition
15    testimony --
16    A    No.  I'm not discounting --
17         Q    -- and don't believe he performed
18    an inspection as he testified he did?
19    A    As a retained expert, I have to analyze the
20    testimony of the persons that are involved and I
21    have to analyze the -- the facts of what I see when
22    I examine a commercial motor vehicle.  In every case
23    I do, 50-some-odd cases a year, I have to analyze.
24    And I've seen, you know, a lot -- a lot of things
25    come back that -- after doing an analysis, that
```

Page 45

1    could not have been what was said in deposition
2    transcript.
3         So I look at this here and analyze what
4    Mr. Urjiles said versus what, in my opinion, my very
5    strong opinion what had occurred, and they just
6    don't match.
7         Q    All -- all due respect, your very
8    strong opinion, you would agree with me, is not
9    borne out by the evidence in this case that's
10   admissible at the time of trail; is that true?
11            MR. CONCANNON:  Object to the form.
12   It's argument.  We don't know what's going to be in
13   at trial when he testifies.
14            You can answer.
15            MR. CONN:  We certainly know what
16   the deposition testimony of Mr. Urjiles is.
17   BY MR. CONN:
18        Q    You can answer the question, sir.
19   Go ahead.
20   A    Repeat it again, please.
21            MR. CONN:  Madam Court Reporter.
22            (Whereupon the last question is
23   read by the reporter.)
24   A    No, that's not true.  The evidence -- part
25   of the evidence --

Page 46

1    BY MR. CONN:
2         Q    Well, you testified --
3    A    Part of the evidence is the inspection that
4    I did on the commercial motor vehicle, on the
5    semitrailer.  So that's part of the evidence.
6    That's very, very strong, incontrovertible piece of
7    evidence that I examined very closely being an
8    experienced commercial motor vehicle expert, and I
9    was able to make a determination that the only way
10   that this could have occurred would have been by
11   the kick -- what I refer to as kickstands being
12   improperly seated.
13        Q    But you weren't there on the date
14   this incident occurred; is that correct?
15   A    That's correct.
16        Q    And Mr. Urjiles has testified he
17   performed a visual inspection and that the legs or
18   arms on the MaxiLok system were secured over the
19   axle; is that correct?
20   A    Sir, I will say that's correct.  However, I
21   have read deposition --
22        Q    Okay.
23   A    No, no.  Sir, I do have a right to finish
24   my answer.
25        Q    Let me --

Page 47

1    A    I have a right to finish my answer.
2         Q    You did.
3    A    Sir, I have every right to answer fully the
4    way that I see fit.  It's not a yes-or-no answer.
5    The answer is correct.  However, I -- I have read
6    depositions of drivers in many cases in the past
7    that have testified that they've done a pretrip
8    inspection, and I come to find out that at the time
9    of the crash, two, three, four hours later that
10   there were numerous violations on the commercial
11   motor vehicle such as brake adjustments and so
12   forth.
13        So I have -- as an expert, I have to look
14   at and examine everything involved with the crash or
15   with the incident.
16            MR. CONN:  I move to strike the
17   nonresponsive portions.
18   BY MR. CONN:
19        Q    Sir, you said you reviewed some
20   additional documentation after you formulated your
21   opinion.  The documentation that you provided today
22   included a motion for Summary Judgment that was
23   prepared by my office.  Did you read that?
24   A    Give me a minute.  I'll have to locate it
25   here.

Page 48

1         Q    I don't need you to actually find
2    it.  We're not going to talk about it, but I just
3    want to know if it was something that you reviewed.
4    A    Yes, sir, it is.
5         Q    Okay.  Were you provided a -- a
6    copy of the Court's opinion and order related to
7    that motion?
8    A    Yes, sir.
9         Q    Okay.  Did you read that?
10   A    I did.
11        Q    Okay.  Do you agree with me that
12   the MaxiLok system requires the operator, in this
13   case Mr. Urjiles, simply to activate a knob and wait
14   for the system's complete before performing a visual
15   inspection?
16   A    That is -- that is correct.
17        Q    Okay.  The system itself determines
18   how high it's going to go; is that correct?
19   A    That's correct.
20        Q    Mr. Urjiles doesn't have to adjust
21   the height of the trailer in any way; does he?
22   A    No, sir, he -- it's all automated.
23        Q    And this isn't the type of switch
24   that he has to push continuously; right?  It's one
25   that he pulls and he lets go?

Page 49

1    A      That's correct.
2         Q      Do you agree with me that
3    artificial light, such as a flashlight, is not
4    required to make a visual inspection on the MaxiLok
5    system and where the location of the arms are?
6    A      What time of the day?  What hours?  What
7    lighting is available in the area, the ambient
8    lighting.  I mean, it's -- you know, if it were
9    midnight, certainly it would require a flashlight.
10   If it's in the middle of the day and it's shaded
11   behind a building next to a loading dock, there is a
12   very good potential that a flashlight should be
13   utilized in order to make that determination.
14        Q      So there are factors that you would
15   take into consideration before making that opinion;
16   is that correct?
17   A      Sure.
18        Q      Such as, for example, whether it's
19   winter or summer and when the sun rises and the sun
20   sets?
21   A      Shading as well.
22        Q      Okay.  You would also take into
23   consideration things such as cloud cover?
24   A      Yes.
25        Q      Whether it's raining, snowing,

Page 50

1    anything of that nature?
2    A      Well, on that particular day, there was
3    intermittent overcast.  You know, pulling the
4    weather report on this, there was intermittent
5    overcast, which would cast shadows potentially on
6    the subject, maybe behind the building, things of
7    that nature.  So we have to look at all of those,
8    and is there potential for shading.  Even if it's in
9    a broad daylight, you could be sunblind by looking
10   at the side of a white trailer and you look
11   underneath that trailer in the dark, you may not get
12   a full observation of what you're looking at.
13        So I would say that a flashlight is not
14   mandated, but a proper inspection is mandated.  So
15   whatever tools are necessary to make that proper
16   inspection effective, then yes, I would say a
17   flashlight would have been beneficial.
18        Q      Would that be in the discretion of
19   the driver based upon what he or she can see when
20   looking at the system?
21   A      Yes, sir.
22        Q      Okay.  You just brought up
23   something interesting.  You said what the weather
24   condition was or the cloud cover was on the day this
25   incident occurred.

Page 51

1         Did you pull weather reports for this day?
2    A      Yes, sir.  It's on the jump drive -- the
3    jump drive that you have, all the data.
4         Q      Okay.  I don't see it listed on
5    page 21 of the documents you reviewed in this case.
6    Is it there and I'm missing it?
7    A      Yes, sir.  If you look at page 22, the
8    second bullet point down says "Weather Source."
9         Q      Oh, I apologize for that.
10        Is that a website?
11   A      Yes, it is.
12        Q      Okay.  Did you pull it -- the
13   official weather record for that area on that
14   particular day?
15   A      I did, and it's -- like I said, it's on the
16   Dropbox that you should have in front of you
17   shortly.
18        Q      Okay.
19   A      And the word "intermittent overcast" is
20   quoted on that document.
21        Q      That comes directly from the
22   document is what you're saying?
23   A      Yes, sir.  It's not my analysis.
24        Q      Okay.  You understand this incident
25   occurred at 10 a.m. --

Page 52

1    A      I do.
2         Q      -- or thereabouts?
3    A      Yes, sir.  Roughly.
4         Q      Okay.  The intermittent cloudiness,
5    does that come from the 10 a.m. observations, as you
6    recall?
7    A      So far as I recall, yeah.  It gives you a
8    blow-by-blow throughout the day, if you will, of the
9    weather conditions.  And I believe at that
10   approximate time, there was intermittent overcast.
11   Again, that's so far as I recall.
12        Q      And again, you weren't there, so
13   you don't know if it was the intermittent part where
14   it was overcast or not when Mr. Urjiles performed
15   his inspection of the legs on the PosiLok system;
16   correct?
17   A      I could just go by what I -- what I read
18   from the weather source.  If they say -- if they say
19   it's intermittent overcast at that point in time at
20   that day, on a given day, that's all I could report
21   on my report.  I'm not a weather expert.
22        Q      Okay.  At the inspection of the
23   trailer that you attended in Ann Arbor, Michigan,
24   can you tell me, were you able to get the trailer to
25   unseat properly?

Page 53

```
 1    A    Well, I gave a -- what I refer to as an
 2  exemplar of that particular position of it being
 3  unseated of what I suspect at that -- it would have
 4  gotten hung up as, and that would be the photograph
 5  that you referred to earlier on page 16, Photo
 6  Number 11, Source SLTC-PCI.  And it shows -- it
 7  showed that angle iron sitting partially off and
 8  hanging up on the axle itself.
 9    Q    You don't know whether or not
10  that's the way that system looked on the day this
11  incident occurred; is that correct?
12    A    That -- no, I don't know for certain
13  because I certainly was not under the trailer when
14  this occurred on the date of the incident, but logic
15  and looking at this from an analysis standpoint,
16  that's the only answer that could be as to what
17  occurred.
18    Q    Do you know where Mr. Urjiles was
19  when this incident occurred?
20    A    I believe he was in his tractor.
21    Q    In the sleeper birth or in the
22  seat?
23    A    I believe he was in the sleeper birth
24  looking at a magazine or something.  I don't recall
25  exactly.
```

Page 54

```
 1    Q    Do you agree with me that
 2  Mr. Urjiles being in the sleeper birth has no causal
 3  bearing on this incident?
 4    MR. CONCANNON:  Object to form.
 5  You haven't defined "this incident."
 6    You can answer, Scott.
 7  BY MR. CONN:
 8    Q    We talked about it already.  I did
 9  define it previously.  And, sir, I will refer to the
10  incident as when the trailer falls as the incident.
11  You understand that?
12    A    Okay.  Put all that together in one
13  question, if you would, I'd appreciate it.
14    Q    Okay.  I just need you to affirm
15  that you understand --
16    A    Yes.
17    Q    -- when I refer to the incident,
18  I'm talking about when the trailer falls.
19    A    Going forward, I do understand that, yes,
20  sir.
21    Q    Thank you.
22    Do you agree with me that Mr. Urjiles'
23  presence in the sleeper birth has no causal bearing
24  on this incident?
25    A    Being in the sleeper birth at that given
```

Page 55

```
 1  time, I would agree with that.
 2    Q    In fact, all the controls for the
 3  raising and lowering of the PosiLok -- I'm sorry --
 4  the MaxiLok system are on the side of the trailer;
 5  is that correct?
 6    A    On the -- on the driver's side, that's
 7  correct.
 8    Q    Do you agree with me that based
 9  upon the timing of the incident and the fact that
10  the plaintiff was going quite fast in his
11  16,000-pound fork truck, that the presence of the
12  high/low contributed to this incident?
13    MR. CONCANNON:  Object to the form.
14    A    No, I don't agree with that.  I -- the -- I
15  don't agree that it would be a contributory factor.
16  BY MR. CONN:
17    Q    I'm sorry.  You're done?
18    A    Yes.  Yes, sir.
19    Q    Okay.  You believe it's merely
20  coincidental that the trailer fell when the high/low
21  first put its wheels on the trailer the fifth or
22  sixth time?
23    A    Well, he's replacing weight as well.  So
24  you're replacing weight, you're pulling pallets off
25  and replacing it with the forklift as time goes on
```

Page 56

```
 1  into the fifth or sixth pallet.  So in replacing
 2  weight, these trailers, these MaxiLoks and PosiLoks,
 3  for that matter, are designed in such a way that --
 4  and if you look at the report of ESI, they're
 5  even -- they are even -- without -- they are
 6  unwittingly stating that that pos -- or the MaxiLok
 7  kickstand legs couldn't kick out unless the air
 8  system was deflating.
 9    If you -- if you -- if you read the report
10  and if you'd like me to explain further, I can.  So
11  the -- let me explain it this way.
12    Q    My -- my question --
13    A    Let me --
14    Q    No, no.  My question was -- my
15  question was pretty simple.
16    A    Go ahead.
17    Q    My question was:  Do you believe
18  it's coincidental that this trailer collapsed right
19  when the 16,000-pound, quite fast moving high/low,
20  put its tires in the trailer?
21    A    Yeah.  I did get kind of lost on that
22  question; didn't I?
23    Q    I thought so.
24    A    I -- I would say that the -- if you're
25  looking at a -- at a causal effect and you were to
```

Page 57

1   look at it from a percentage basis, 99 percent of
2   this is the fact that those kickstands were not
3   placed properly.
4       Then you're looking at the lubrication
5   factor. No matter what weight you put in there,
6   whether it's a forklift, which is doing its job by
7   going inside this trailer and pulling pallets off --
8   and again, speed is subjective here, very
9   subjective. I can't -- five miles an hour with a
10  forklift may be considered very fast, for one. I've
11  already gone through that.
12      So I don't look at the forklift as being
13  causal. I look at the fact that the -- that the
14  kickstands were not properly -- were not properly
15  seated and then the potential -- the high -- the
16  likely probability of the failure of lubrication of
17  the system, which would be causative to the
18  incident.
19      Q    So you believe it's coincidental?
20  A   Again, you could have taken a forklift in
21  there at two miles an hour, and just by the
22  movement, any movement at all, with something
23  sitting, as I demonstrated in the photograph in my
24  report and I believe it was on, again, page 16,
25  Photograph Number 11, looking at that photograph,

Page 58

1   that, to me, in my mind, clearly says to me that
2   that is just waiting for the slightest maneuvering
3   going on inside that trailer to cause those
4   kickstands to kickback. And that, in my opinion, is
5   what occurred here.
6       Q    Would you agree with me that the
7   slightest maneuvering in this particular case was
8   the presence of the 16,000-pound high/low?
9           MR. CONCANNON: Object to the form.
10  Calls for him to speculate.
11          You can answer, Scott.
12  A   It could have also been from people walking
13  in there. I can't answer that question for you. I
14  can't without absolutely certainty say -- I can't
15  without absolute certainty say that a forklift
16  that's doing two miles an hour or a forklift that's
17  doing four miles an hour or six miles an hour, which
18  you're not going to go very much -- you're not going
19  to go much faster than that inside of a trailer.
20  You just don't do that. It's just not going to
21  happen. You can't maneuver a forklift that quickly
22  inside of a trailer. I've been there. I'm
23  experienced in this. So --
24      Q    Let's play the fishing game.
25      Was there somebody walking inside the

Page 59

1   trailer when this incident occurred?
2   A   I don't recall. I don't believe so.
3       Q    Okay. Well, you read the
4   deposition testimony of Mr. Goodman; correct?
5   A   Yes.
6       Q    Okay. And he didn't testify that
7   there was anybody walking around this trailer;
8   right?
9   A   Typically, there's not. I just can't -- I
10  can't say for absolute certainty is what I'm saying
11  to you.
12      Q    Okay. You read the deposition
13  testimony of Ashley Ousterhout?
14  A   Yes, sir.
15      Q    And she didn't say there was
16  anybody walking in this trailer; correct?
17  A   That's correct.
18      Q    So we can eliminate that as a
19  possibility based upon your understanding of the
20  deposition testimony.
21      What other movement was happening inside
22  this trailer based upon the evidence and that's
23  admissible other than the 16,000-pound fork truck?
24          MR. CONCANNON: Object to the form
25  and foundation.

Page 60

1       You can answer, Scott.
2   A   I don't know if prior to that -- I just
3   don't know. I mean, could it have been a fork truck
4   that's doing two or three, four miles an hour, five
5   miles an hour, which you're not going to go very
6   much faster than that in the back of a semitrailer.
7   It's just not going to happen.
8       That being said, these kickstand legs --
9   and this goes to the report of ESI, which really
10  discounts their opinion, not -- not even -- it
11  crushes their opinion, quite frankly, is that --
12  it's like taking a car -- they say in their report
13  is that -- that the only three ways that these
14  kickstand legs could have kicked out was from it
15  being broken or something else. I can't remember
16  what it was.
17      But the third one, the most significant,
18  was that it could be significantly out of
19  adjustment. There's no verification one way or the
20  other whether this was significantly out of
21  adjustment. It's just like taking a car to a
22  mechanic. You take a car to a mechanic and that
23  noise was happening all week long until you pulled
24  into the mechanic's driveway, and all of a sudden
25  you find out that in your truck they can't find the

Page 61

1  problem because it's not making that noise anymore.
2  So these kickstands --
3          MR. CONN: I move to --
4  A    Go ahead.
5          MR. CONN: I'm going to move to
6  strike the nonresponsive portions.
7  BY MR. CONN:
8      Q    You said that speed, whether it's
9  two miles an hour or what have you, of the fork
10  truck is important, and I didn't refer to speed in
11  my question, so I'm going to ask it again.
12      Could it be that the presence of a
13  16,000-pound fork truck caused this incident?
14  A    The -- it wouldn't be -- it would not be
15  the cause. The cause is the failure to inspect the
16  kickstand legs. The presence of a fork truck doing,
17  again -- and speed has an issue here. You can't --
18  it's not mutually exclusive. So speed being two,
19  four, six miles an hour, it's going to -- it
20  doesn't -- it's irrelative.
21      Q    So let's go back to my original
22  question then.
23  A    Sure.
24      Q    Is the presence of the fork truck
25  and the immediate collapse thereafter merely

Page 62

1  coincidental?
2  A    No, I wouldn't say it's coincidental. I
3  mean, if he's -- again, he's doing two miles an
4  hour, three, four, five miles an hour -- I hate
5  repeating myself, but I have no choice -- and he
6  goes and picks up a pallet, that's a lot of movement
7  that's going on. And if those -- if those angle
8  irons on the bottom of the kickstands on those wear
9  pads, what are referred to as wear pads, if they're
10  not properly seated, they stand a substantial chance
11  of being kicked out, and that's what occurred here.
12      Q    Do you agree with me, then, that if
13  Mr. Goodman hadn't gone into the trailer on this
14  fifth -- fifth or sixth time, that the trailer would
15  not have collapsed?
16  A    I couldn't answer that one way or the
17  other. I -- I don't know. It depends -- you know,
18  it's really going to, quite frankly, depend on how
19  unseated these wear pads, the angle iron -- angle
20  iron pads were actually off. I mean, the -- there's
21  a -- there's a --
22      Q    You don't know --
23  A    -- probability, sir, that they could have
24  sat there and watched this trailer for 15 minutes
25  because it was just sitting on the precipice of a

Page 63

1  collapse and just collapses in and of itself. I
2  don't know that one way or the other. Could it have
3  happened? Certainly it could have.
4      Q    But as to where the angle irons
5  are, you don't know one way or the other; correct?
6  You don't know if it's on the precipice or further
7  back or really where they are?
8  A    Based on my analysis and based on observing
9  how this unit actually functions and works and my
10  knowledge of them in the past, I would say there's
11  no question in my mind about the way that this
12  occurred. It's almost impossible -- and I'm going
13  to say it's impossible -- for it to occur any other
14  way than to physically pick this trailer up, allow
15  the legs to kick out, if they were able to, because
16  they're spring-loaded, that's the only other way it
17  could happen if you used the forklift in the back to
18  lift it up.
19      I couldn't see it happening any other way,
20  and a very big forklift at that because of the
21  freight and the weight of the semitrailer.
22  16,000-pound forklift couldn't do it.
23      Q    Do you agree with me that you are
24  taking the credibility of Mr. Urjiles' deposition
25  testimony into account in rendering your opinions?

Page 64

1          MR. CONCANNON: Object to the form
2  as argumentative.
3          You can answer.
4  A    Absolutely I'm taking -- I'm taking it into
5  account, and I do that all the time when I'm looking
6  at drivers that say that they've done pretrip
7  inspections that clearly they haven't that were
8  causative to a crash with a commercial motor vehicle
9  four hours later, as I used that example prior.
10  BY MR. CONN:
11      Q    If the legs were not seated
12  properly over the axle, you said a moment ago that
13  Mr. Urjiles had to back his trailer into the dock;
14  is that correct?
15  A    That's correct. After he -- after he
16  elevated.
17      Q    Right. And what I'm understanding
18  your opinion is, when he elevated it, the legs
19  weren't seated properly; is that true?
20  A    That's correct.
21      Q    That's one of your opinions?
22  A    That's correct.
23      Q    Okay. Wouldn't it be more likely
24  if he's backing the trailer into the dock, that the
25  legs would have collapsed at that time if you're

Page 65

1  right and they were on a precipice?
2  A     Not necessarily. I mean, again, you take
3  the -- you take your pickup truck to a mechanic and
4  it's not making that noise anymore. Not to repeat
5  myself.
6  Q     Well, you talked about the fact
7  that there's weight that's taken into consideration,
8  and we've already agreed that the axle weight was
9  its greatest when Mr. Goodman first went in; is that
10  right?
11  A     Well, you know, on that question --
12  Q     Do you agree with that point?
13  A     On that question -- let me rephrase that
14  answer, because it depends on how far back the
15  pallets are actually loaded onto the semitrailer.
16  Excuse me. Often pallets are loaded right to the
17  door, and if they're loaded right to the door, you
18  don't have room to get a forklift all the way in.
19  So essentially, you're using -- you have to
20  shift the dock plate or you have a dock leveler, and
21  you have to go in and pick the load -- the pallets
22  off the left side and barely your front wheels are
23  on the -- on the forklift are inside the trailer.
24  So you still have the back side, which is the --
25  where the counterweights are, which is very heavy,

Page 66

1  still sitting on the dock leveler or the dock plate.
2  Now you go and pick up the pallet on the
3  right-hand side. So you've already moved two
4  potentially without -- without ever having to go
5  fully inside the trailer. So that's the rephrasing
6  of my answer from your prior question and this
7  question. So as he's going in, in the very
8  beginning, he may not have full weight of that -- of
9  that forklift in the semitrailer.
10  Q     Well, that wasn't my question. My
11  question was what the axle weight was. You don't
12  know what the weight of the brake calipers he was
13  removing were; do you?
14  A     No, but I -- I -- knowing the way that
15  components -- brake components like that are
16  transported, in all probability, in all probability,
17  we're looking at a total close to 80,000 GBWR -- or
18  not GBWR, gross vehicle weight, period.
19  Q     You're speculating as to that;
20  isn't that correct? You don't know for sure?
21  A     It's speculation, but just knowing the
22  weight of steel brake calipers, that would be a
23  pretty good educated guess based on experience.
24  Q     Do you agree with me that at the
25  time the trailer dropped, that it was under the

Page 67

1  exclusive control of TRW?
2  A     At the time the trailer dropped, it was
3  under the -- no. No, sir.
4  Q     Okay.
5  A     If you look at the FMCSR, the FMCSR, that
6  driver has responsibility for that trailer from the
7  point that he takes it in the morning or the
8  beginning of his shift, whichever it is, to the time
9  that he signs off at the end of his shift. He is
10  the person responsible for that commercial motor
11  vehicle.
12  Q     Do you agree with me that he had --
13  or I'm sorry -- that TRW had some control over the
14  trailer?
15  A     I wouldn't say that they had control over
16  the trailer, no, sir. They were merely taking
17  freight out of the trailer. They weren't -- they
18  didn't have control over it.
19  Q     So could Mr. Goodman have left at
20  any point in time he wanted to?
21  A     I suppose that if he had an argument with
22  his dispatcher and he said I'm closing up the doors
23  and I'm leaving, he could have done that. Or if he
24  had an argument with the dock hands, and for
25  whatever reason, he could have closed his doors up

Page 68

1  and left. There's nobody that could have stopped
2  him other than the threat of being fired.
3  Q     Would you agree with me that's a
4  pretty strong consideration?
5  A     As to what?
6  Q     Being fired.
7  A     Well, I'm saying --
8  Q     Would he want to be fired for --
9  A     I'm saying that he is in control of that
10  vehicle. Let me put it another way to you; all
11  right? If he sees something that is occurring that
12  is unsafe with his commercial motor vehicle, whether
13  it's by him or forklift operators or whatever, he
14  has the right to pull that trailer away from that
15  dock, close his doors up and say "I'm leaving." And
16  if he doesn't do that, he's responsible for the
17  actions.
18  Now, that goes to whistle blower laws
19  within the FMCSA or FMCSR where -- if he was fired
20  for that reason, he's protected. He's
21  well-protected.
22  Q     Who was using the trailer at that
23  particular point in time?
24  A     He's the driver. He's responsible.
25  Q     I didn't ask that question. I

Page 69

1    asked who was using the trailer.
2       A    He's using the trailer to bring freight to
3    TRW.  He is using the trailer to bring freight to
4    TRW.  TRW has a contractual commitment, written or
5    verbal, to remove the freight from the trailer.
6    That's the limit of it.
7       Q    And they were using it to remove
8    the freight; is that correct?
9       A    That's correct.  TRW.
10      Q    And that would be through its
11   employee Paul Goodman; is that correct?
12      A    That is correct, but that's not a control
13   matter.
14      Q    Do you have any explanation for how
15   this incident occurred at the fifth or sixth time
16   and not at the first, second, third or fourth time?
17      A    I guess it's kind of like playing a game, I
18   can't remember what it's called, Jenga or something
19   like that where you pull the little rectangular
20   blocks out one at a time and eventually when you get
21   to one where it's teetering and you think it's going
22   to fall but it doesn't fall, and eventually your
23   friend pulls the one out that you know is going to
24   cause it to collapse and it collapses.
25       So it's not going to happen immediately.

Page 70

1        So it's a series of events.  So going in, eventually
2    it gets disturbed to the extent that it relieves
3    itself from that improper supported position.
4       Q    You now have in front of you your
5    Affidavit; is that correct?
6       A    I have it in front of me, sir, yes.  Mind
7    if I take a quick read of it?
8       Q    No, please do.
9            MR. CONN:  We can go off the record
10   while he's doing that.
11           THE WITNESS:  Can we take a quick
12   five, if we could?
13           MR. CONCANNON:  Yes.  A five-minute
14   break.  That's fine.
15           THE WITNESS:  Great.  Thank you.
16           (Whereupon a short recess was
17   held.)
18   BY MR. CONN:
19      Q    Have you had a chance to look at
20   your Affidavit?
21      A    I did.
22      Q    Okay.  Are you ready to proceed?
23      A    I am.
24      Q    Okay.  Sir, while we were on break,
25   you had a chance to look at your Affidavit that

Page 71

1    we've been discussing today; is that correct?
2       A    Yes, sir.
3       Q    And I'm going to paraphrase it a
4    little bit, but essentially it confirms the fact
5    that you read the deposition of Miguel Urjiles and
6    then it bolsters your opinions in some respect; is
7    that fair?
8       A    That's fair.
9       Q    Okay.  It doesn't necessarily
10   change any of your opinions that were in your
11   report, though; is that correct?
12      A    No, sir.
13      Q    Okay.  You cite in paragraph two of
14   that Affidavit some questions and answers from his
15   deposition testimony; is that correct?
16      A    Yes, sir.
17      Q    In paragraph three, you state --
18   and I'm going to read it -- "The testimony offered
19   by Miguel Urjiles causes for my opinions to be
20   further substantiated, whereas Mr. Urjiles used an
21   audible to determine that the semitrailer's MaxiLok
22   assembly was properly secured before allowing dock
23   workers to enter the semitrailer."
24       First question for you, did I read that
25   correctly?

Page 72

1       A    Yes, sir.
2       Q    Are you referring to the audible
3    sounds that he refers to in his deposition?
4       A    Well, it -- yes.  It's that and -- yes,
5    it's that and then there's also in my report
6    something that reflects to that as well, not the
7    audible, but the fact he didn't inspect.  He didn't
8    physically inspect it with his eyes, in other words,
9    did not put a set of eyes on it.
10      Q    And that's based upon -- strike
11   that.
12       You did read, however, page 77 of his
13   deposition testimony where he said that the
14   inspection did, in fact, occur and that the legs
15   were, in fact, over Axle Number 2?
16      A    Well, I did.  I did, yes.  However --
17      Q    Okay.
18      A    -- in looking at my report, if you go to
19   page 13, when it was freshest on his mind, he was
20   asked about how he handled that and he gave a
21   statement -- a signed statement on April 26th, 2012,
22   where he said, "I lifted the trailer up when I was
23   completed and then I backed into the dock."  Never
24   saying anything about inspecting it, and that was a
25   key issue here.  So I take that, in addition to the

18  (Pages 69 to 72)

Page 73

1  fact that he just heard that, that whoosh sound from
2  the air and that was his methodology of inspecting.
3       So I have no evidence that says to me that
4  he actually visually observed that the wear pad,
5  angle irons were sitting on the axle.
6       Q    Is that despite his deposition
7  testimony where he says that the legs were secure
8  over the axle?
9       A    Well, he had time to think about it, so,
10  you know, I question -- I view his -- that part of
11  his deposition testimony into high question. And
12  the reason is, as I said, I've read many, many
13  depositions of drivers in the past where they have
14  said that they've inspected their vehicles prior to
15  their shift and it turns out that they have not.
16       Q    So you are guessing in this
17  particular incident that Mr. Urjiles, with the
18  ability of reflection, made the determination that
19  it would be in his best interest to lie during his
20  deposition?
21       A    I don't like to use the word "lie." I just
22  say that it's inconsistent with the facts.
23  Inconsistent with the facts of me inspecting the
24  vehicle and his prior testimony and the statement on
25  the 26th of April.

Page 74

1       Q    The statement itself says that he
2  lifted the system or something to that regard; is
3  that correct?
4       A    Exactly what he said is, "I lifted the
5  trailer up.  When it was completed up, then backed
6  into the dock." Says nothing about, in the middle
7  there where he inspected it or anything like that.
8       Then you go fast-forward to his deposition
9  where he says on April 15th, 2015, "No, that tells
10  me that the legs were already locked." So that was
11  his methodology was audible rather than visual.
12       Q    Does the -- does the statement say
13  that he pushed the button to activate the system?
14       A    He had to.  He said -- and that would be --
15       Q    Is that what he says?
16       A    Counselor, that would be all part of --
17       Q    It does say that; doesn't it, sir?
18       A    That would be all part of "I lifted the
19  trailer up."
20       Now, inspecting is a totally different --
21  he didn't physically get under there with his arms
22  and lift it up, of course.  He lifted the trailer up
23  by methodology of pulling the button; okay?  That's
24  part of that, of course.
25       Then he doesn't say in here -- when it is

Page 75

1  completed up, he doesn't say anything about being
2  inspected where he would say, at that point, he
3  should have said I then inspected, visually
4  inspected for proper seating.  And then he would --
5  should have said I then backed into the dock.  He
6  didn't say that.  And then later in testimony he
7  said that he went by an audible.
8       Q    Does Hendrickson -- well, he said
9  he went by an audible, but he said he also did a
10  visual; right?
11       A    I just -- again, the visual --
12       Q    Do we agree on that or don't we?
13       A    The visual -- the visual doesn't -- either
14  he did an ineffective inspection or he didn't
15  inspect at all, which I believe he didn't inspect at
16  all based on the facts in front of me.
17       Q    And what witness testified to the
18  fact that he didn't do an inspection?
19       A    Again, you know, I -- I --
20       Q    Well, what witness, sir?  What
21  witness?
22       A    No, there is no witness other than himself.
23       Q    Okay.  Hendrickson has instructions
24  as to how to operate this system; is that correct?
25       A    Yes, sir.  It's right on -- it's actually

Page 76

1  right on the door, too, of the control panel.
2       Q    Does Hendrickson consider the
3  inspection to be a part of operating the system?
4       A    They do.
5       Q    Okay.
6       A    Well, let me back up --
7       Q    I'm going to go to your --
8       A    Let me back up on that, if I may,
9  because --
10       Q    No.  There's no question.
11       A    I would like to fully answer the --
12       Q    I'm going to go to the Court's
13  opinion and order --
14       A    Sir, excuse me.  One second.
15       Q    I'll conduct my deposition the way
16  I want to.
17       A    Sir, one second.  I understand it's your
18  deposition, but --
19       Q    I'm asking questions, and you're
20  giving answers.  You've given your answer, let's
21  move on to the next question.
22       A    No, sir.  Your -- I understand it's your
23  deposition.
24       Q    I will obtain an order --
25       A    Sir, it's your deposition --

Page 77

```
1          Q    -- on Summary Judgment.
2     A    Sir, it's your deposition, I understand
3  that, but I have a right to fully answer the
4  question when it's posed to me.
5          Q    And you did.
6     A    No, I didn't fully answer it.
7          Q    I think you did.
8     A    All right.  Would you look at -- if you
9  look at page 12 --
10         Q    You said you wanted to go back.
11 We're not going back.
12    A    If you look at page --
13         Q    We've already answered the
14 question.  We're moving on to the Court's opinion
15 and order dated June 9, 2016.
16         MR. CONCANNON:  Move on, and we'll
17 cover it on follow-up.
18         THE WITNESS:  Okay.  Very good.
19    A    Go ahead, sir.
20 BY MR. CONN:
21         Q    Court's opinion and order dated
22 June 9, 2016, do you have that in front of you?
23    A    I -- I don't have it in front of me, no.
24         Q    Could you find it, please?
25    A    I should be able to, yes.  The only thing I
```

Page 78

```
1  have in front of me, sir, is I have the defendant's
2  motion for Summary Judgment pursuant to Rule 56.
3  That would have been in the electronic file, which
4  would have been downloaded into the -- into the jump
5  drive, which would have been forwarded to you, which
6  you should have it there.  I don't seem to have it
7  in front of me, though.  Because these are separate
8  files.
9          Q    You don't have the --
10    A    I'm sorry.
11         Q    Okay.  You don't have the opinion
12 and order is what you're saying?
13    A    No, sir, I guess I don't.  I only have the
14 motion for Summary Judgment.
15         Q    Okay.  No problem.  We'll move on
16 then.
17    A    Okay.
18         Q    Let's go back to your report and
19 the enumerated paragraphs that have your opinions.
20 Page 2, I believe, is where it starts.
21    A    Yes, sir.
22         Q    Okay.  For Opinion No. 1, are you
23 aware of any evidence or testimony that refutes that
24 opinion?
25    A    Let me read it, if I may.
```

Page 79

```
1          Q    Absolutely.
2     A    Okay.  The question was?
3          Q    Are you aware of any evidence or
4  testimony that refutes that opinion?
5     A    No, sir.
6          Q    For Opinion No. 2 --
7     A    Well, opinions --
8          Q    -- are you aware of any evidence --
9     A    Let me back up.  You have opinions from ESI
10 obviously that are conflicting with my opinions.
11 Outside of that, no.
12         Q    I'll tell you that neither your
13 report or ESI's report are in evidence in this case.
14 So when I refer to evidence, I'm talking about
15 physical evidence or I'm talking about the
16 deposition testimony when I say "testimony"; okay?
17    A    Okay.  Very good.
18         Q    Okay.  So I'm going to go back and
19 I want to make sure we're both clear now.
20         Are you aware of any physical evidence or
21 testimony that refutes Opinion No. 1?
22    A    No, sir.
23         Q    Okay.  Same question for Opinion
24 No. 2, are you aware of any evidence or testimony
25 that refutes it?
```

Page 80

```
1     A    Let me read it real quick.
2          Q    Please do.
3     A    No, sir.
4          Q    Opinion No. 3, are you aware of any
5  evidence or testimony that refutes it?
6     A    No, sir.
7          Q    Opinion No. 4, are you aware of any
8  evidence or testimony that refutes it?
9     A    No, sir.
10         Q    Opinion No. 5, are you aware of any
11 evidence or testimony that refutes it?
12    A    I'm going to say no, sir.  However, I'm
13 going to add a blanket statement to this, to all of
14 these opinions, and that is --
15         Q    Sure.
16    A    -- obviously, Mr. Urjiles has given, you
17 know, testimony that would contradict with what
18 my -- what my findings are.
19         Q    Okay.
20    A    Outside of -- outside of that, I don't
21 believe so.
22         Q    Okay.  Were we on -- I'm sorry.  I
23 lost track based upon your explanation.  We were on
24 5?
25    A    I believe we've already -- I said no on
```

Page 81

1    number 5, I believe.
2         Q    Okay.  Number 6, are you aware of
3    any evidence or testimony that refutes it?
4         A    No, sir.
5         Q    Okay.  And for 1 through 6, I
6    believe you're including your blanket statement that
7    you're conditioning it on the fact that Mr. Urjiles'
8    deposition testimony would contradict; is that
9    correct?
10        A    That's correct.
11        Q    Okay.  And number --
12        A    And as far as the training -- as far as the
13   training is concerned, obviously Dillon has a
14   different opinion of that, but I -- I -- I stand by
15   my statement here, my opinions.
16        Q    Okay.  So we're onto number 7.
17        A    Yes, sir.
18        Q    Let me ask the question, then you
19   can give your answer.
20        A    Sure.
21        Q    My question is:  Are you aware of
22   any evidence or testimony that refutes your Opinion
23   No. 7?
24        A    Well, as I -- as I stated, number 7, Dillon
25   has, based on a driver cue file, they had a

Page 82

1    different opinion as to the training than what I
2    have here.
3         Q    Okay.  And then number 8, are you
4    aware of any evidence or testimony that's -- refutes
5    that opinion?
6         A    There is -- not necessarily with
7    specifically lubrication.  However, there was an
8    inspection that occurred afterwards that would --
9    would probably make an attempt to refute my opinion,
10   yes.
11        Q    When you say make an attempt to
12   refute your opinion, what do you mean?
13        A    Well, there -- I guess it's probably a poor
14   choice of words.  That they -- they're trying to
15   make -- they're trying to draw the conclusion that
16   based on an inspection that occurred after the
17   incident, they sent it to a trailer repair facility
18   and the facility looked at it and said there is no
19   problem with it, with the -- with the MaxiLok
20   system.  So that's my point there.  That's the
21   information that's out there that may -- may be
22   something where somebody would have conflict with
23   what I'm saying.
24        Q    Okay.  Again, as far as what the
25   lubrication was of this particular trailer on

Page 83

1    April 26th, 2012; do you know?
2         A    No.  This is based on -- based on my
3    opinion of looking at the semitrailer at the time
4    that I inspected it, and I noticed that there was
5    not a substantial amount of lubrication on it, which
6    led me to that conclusion.
7         Q    What was the date of your
8    inspection?
9         A    April 14, 2015.
10        Q    And the incident involved in this
11   case occurred April 26, 2012?
12        A    Yes, sir.
13        Q    So you're presuming the lubrication
14   of a trailer was deficient two years -- based upon
15   its condition, two years after the incident
16   occurred?
17        A    No.  This is just an analysis of mine
18   because it's the lubricant -- the lubricating point
19   that if friction were the causing factor, to keep
20   the kickstands from actually dropping into place
21   effectively 100 percent, then that would be a direct
22   causative factor.
23             And if that were not a problem in the
24   commercial motor vehicle industry, then, quite
25   frankly, you wouldn't see the Regulation 396.5 under

Page 84

1    the FMCSR where it requires that motor carriers
2    lubricate their vehicles appropriately.
3         Q    So again, going back, you don't
4    have any personal knowledge what the lubrication was
5    on April 26th, 2012; is that correct?
6         A    No, sir, I don't.
7         Q    Is it possible the system was
8    properly lubricated on April 26, 2012?
9         A    I would say possible, but highly
10   improbable.
11        Q    Highly improbable based upon what
12   evidence --
13        A    Based on --
14        Q    -- the fact that the trailer
15   collapsed?
16        A    Again, the FMCSR -- if vehicles were always
17   lubricated the way that they're supposed to be in
18   accordance with manufacturer specifications, then
19   the FMCSR would never have written a regulation,
20   396.5, called lubrication specifically because it
21   wouldn't be a problem.  But being that it is a
22   factor in incidents, in crashes and so forth, the
23   Federal Motor Carrier Safety Regulations do specify
24   that.
25             So looking at that logically, looking at

Page 85

1   the unit, the only friction point that could occur
2   there would be those two lubrication points.  So it
3   is a logical analysis performed by me as a
4   commercial vehicle expert.
5        Q    Two years after the accident
6   occurred?
7   A    Two years after the accident occurred.
8        Q    Have you done any legislative
9   history research to figure out what the purpose of
10  that federal regulation is that you're citing to?
11  A    Have I done any legislative history
12  research on it?
13       Q    Yeah.  Did you -- did you go back
14  and look and see why the federal regulators included
15  that subsection?
16  A    I know why.  I don't -- I don't need to go
17  back to regulations to make a determination why they
18  put a regulation in place.  It's common logic that
19  they tell drivers not to utilize their -- or not to
20  text for a reason, because it's a careless behavior
21  that could lead to crashes.
22       So everything in the Federal Motor Carrier
23  Safety Regulations -- and I emphasize "safety" -- is
24  there for one reason; safety of both the motoring
25  public and the drivers as well as dock workers.  So

Page 86

1   I look at that from a -- from a simplistic analysis
2   of the Federal Motor Carrier Safety Regulations
3   realize that drivers are not lubricating vehicles as
4   they're supposed to in every case, and I have seen
5   it literally hundreds, if not thousands of times
6   where these were -- these were problematic.
7        In my experience, I have responded
8   personally to over a thousand truck crashes, and
9   I've seen a lot of these as a result of failure to
10  lubricate.
11       Q    So is it your testimony here today
12  that the federal regulators had a particular idea in
13  mind and you know what that idea was?
14  A    Sure.  To reduce friction points of areas
15  of metal-on-metal that are supposed to be
16  lubricated.  That's exactly what it is.
17       Q    Do you know what I'm thinking right
18  now?
19  A    Not really.
20       Q    Okay.  Would you agree with me that
21  Opinions 1 through 6 in your report are based upon
22  solely the fact that the trailer collapsed?
23  A    Can you rephrase that another way, please?
24       Q    Sure.  My question was pretty
25  simple.  You're referring to the fact -- and we

Page 87

1   already talked about this, so I want to make sure I
2   guess we have agreement.
3        Opinions 1 through 6, we agreed earlier
4   that they essentially state that Miguel Urjiles
5   failed to inspect the legs on the MaxiLok system; is
6   that true?
7   A    That's true.
8        Q    We agree on that?
9   A    Yes, sir.
10       Q    Okay.  So my question for you is:
11  Are all of those opinions that you have based upon
12  failures that Mr. Urjiles performed is simply based
13  upon the fact that this particular trailer fell and
14  there had to have been a reason for it?
15  A    A very specific reason, yes.
16       Q    And that specific reason is
17  essentially the trailer collapsed, and then you have
18  to work back from there and figure out why; is that
19  true?
20  A    Correct.
21       Q    Okay.
22       MR. CONN:  Could we go off the
23  record just a second, please?
24       THE WITNESS:  Sure.
25       (Whereupon there is a discussion

Page 88

1   held off the record.)
2        MR. CONN:  All set?
3   A    Yes.  Just getting comfortable.
4        Q    Hey, I'm all about comfort, so --
5   in fact, if I didn't have a deposition this
6   afternoon, I'd be in jeans, too.  So I feel you.
7   A    Oh, you saw that, huh?  I thought I was
8   doing a Sean Hannity here.
9        MR. CONN:  Off the record.
10       (Whereupon there is a discussion
11  held off the record.)
12  BY MR. CONN:
13       Q    Did you speak with Mr. Concannon at
14  any time within the last two or three weeks to
15  prepare for your deposition?
16  A    Uhm, yes.  Actually -- no, no.  Actually,
17  not -- oh, no, I take it back.  Yes, we did very
18  briefly.  Very briefly.  I think it was maybe three
19  or four days ago.
20       Q    You say three to four days ago.
21  Today is Thursday.  Do you know if it was before or
22  after Tuesday?
23  A    I really -- I really couldn't tell you.  It
24  may have been Monday or Tuesday, I just don't
25  recall.

Page 89

1     Q     Well, do you know if it was in the
2  morning or the afternoon?
3     A     I would just say midday.  I -- I don't
4  recall.  Actually, I think it was actually in the
5  early evening, if I'm not mistaken.
6     Q     Let's turn to page 2 of your
7  report, if you don't mind.
8     A     Okay.
9     Q     Down on the bottom there's a
10  heading there that says, "3.0 General Description."
11     Do you see that?
12     A     Yes, sir.
13     Q     The second paragraph there, the
14  first sentence says, "Said unexpected precipitous
15  collapse caused injury to Goodman," and then it
16  continues on.  We talked at the outset about the
17  fact that you're not a doctor; is that correct?
18     A     That's correct.
19     Q     So you don't actually have a
20  medical opinion as to whether or not this incident
21  caused Mr. Goodman's injury; is that correct?
22     A     No.
23     Q     You defer to the medical doctors on
24  that?
25     A     Yes, sir.

Page 90

1     Q     Next page, 3, under "Assignment,"
2  that's where it encapsulates essentially -- and I'm
3  going to quote from the last portion there of that
4  first paragraph.  Your job was to determine probable
5  causation as to the semitrailer collapse that caused
6  injury to plaintiff.
7     Again, you're not saying that the collapse
8  definitely caused injury because you can't opine as
9  to that; correct?
10     A     That's correct.
11     Q     Okay.  However, you were asked to
12  formulate a causation opinion, if possible; is that
13  right?
14     A     As to the -- as to the collapse itself.
15     Q     Yes.  Of course.
16     A     Not -- not as to his injury.
17     Q     Not a medical opinion?
18     A     Correct.  That's correct.
19     Q     Page 4, please.
20     A     Okay.
21     Q     Second paragraph, second sentence,
22  you start off that sentence by saying, "Evidence
23  indicates, as does the mere fact of the collapse
24  itself and no reported damage to the semitrailer's
25  MaxiLok system of the (sic) accident, that driver

Page 91

1  failure was the main and most probable only
2  contributing factor of the collapse."
3     Did I read that correctly?
4     A     Yes, sir.
5     Q     Okay.  We talked about the fact
6  that the collapse itself is the basis for Opinions 1
7  through 6 in -- that are later in the report, but
8  you also say "evidence indicates."
9     What evidence are you referring to there?
10     A     Well, evidence indicates, meaning the
11  inspection that I did and everything that's in front
12  of me here and everything -- everything you have in
13  the jump drive.
14     Q     Okay.  So it would include the
15  documentation that you've produced to me today
16  essentially; is that fair?
17     A     That's correct.
18     Q     Okay.
19     A     And the inspection as well.
20     Q     All right.  I apologize.  The
21  inspection as well; yes?
22     A     Yes.
23     Q     Okay.  Did you -- and forgive me, I
24  don't have all the documentation from the jump file
25  in front of me.  Did you take measurements, draw on

Page 92

1  the schematic, make drawings, diagrams, things of
2  that nature at the inspection?
3     A     I -- I took -- I took dimensions.  I took
4  measurements, but I did not -- any -- any dimensions
5  that are in here were essentially height drop and so
6  forth of the trailer itself.
7     Q     Did you take notes at the
8  inspection?
9     A     Uhm, no, I -- whatever was -- whatever
10  notes would have been transferred right to the
11  report.
12     Q     I got to ask that again because it
13  sounds like you may have taken notes and used those
14  notes to put information into your report.
15     A     Yes.
16     Q     So my question is:  Did you take --
17     A     That would be part of the jump drive as
18  well.  It's right here showing it to you on the
19  screen.  That's the only notes, but they are all
20  transferred in the report is my point.  It's only
21  one page.  It's one page.
22     Q     Okay.  Page 11, please.
23     A     Okay.
24     Q     You indicate there on the second
25  paragraph, "The only two probable causes as to the

Page 93

1   precipitous collapse that occurred would be that the
2   kickstand legs were either damaged, whereas they
3   were incapable of supporting the semitrailer, or the
4   kickstand legs were not properly seated on the wear
5   pads."
6        Did I read that correctly?
7   A    That's correct, but within that, the
8   kickstands were not properly seated would have been
9   the lubrication aspect is involved in that as well.
10  Q    Okay. And -- I mean, to be fair to
11  you, that is an opinion that you have later in your
12  report; correct?
13  A    That's correct.
14  Q    Okay. So now I'm done being fair
15  to you.
16  A    Okay.
17  Q    It was a joke.
18  A    Yep. No, I get it.
19  Q    You said there were only two
20  probable causes. Can you think of any other
21  improbable causes?
22  A    Not really. I mean, the --
23  Q    As to the --
24  A    -- the two probable causes I have --
25  Q    I'm stuck in the phraseology of

Page 94

1   probable.
2   A    Right.
3   Q    So are they the only two causes
4   that you can think of, or are there improbable
5   causes that you can think of that you eliminated in
6   some respect?
7   A    No, sir. It's very cut and dry and simple
8   far as I'm concerned.
9   Q    So if I'm understanding you
10  correctly, there are no improbable causes that you
11  can fathom that would have led to this incident
12  occurring?
13  A    Outside of what I put down, no, sir. No,
14  no. Improbable, there's no improbable causes,
15  that's correct.
16  Q    Well, we spoke a little bit earlier
17  about the fact that if you took a much heavier
18  high/low, I think you referred to it as, and you
19  lifted up the back end, those legs -- I think you
20  said with the springs, and correct me if I'm wrong
21  here -- would cause the legs to spring back up.
22       Would that be an improbable cause?
23  A    Yes. But there was no testimony that was
24  provided where anybody said that there was, you
25  know, a 40,000-pound forklift that came up and

Page 95

1   lifted up the back of the semitrailer.
2   Q    I understand that completely, but
3   that is an improbable cause that you believe would
4   not be based upon the evidence in this case?
5   A    I wouldn't put it within the realm of
6   possibilities, but I understand what you're saying.
7   Okay. I understand.
8   Q    And that's -- that's all I'm trying
9   to get at because I'm trying to find out in your
10  head did you take the entire world of potential
11  causes and narrow it down to probable causes?
12  That's what I'm getting at.
13  A    Yes, sir, I did.
14  Q    Okay. So there are improbable
15  causes that you have considered, but for one reason
16  or another ruled out?
17  A    No. I -- I would say to you that there
18  would be very, very -- they would be very minimal
19  based on the design of the MaxiLok system. It
20  really drew me to the -- almost immediate conclusion
21  when I was inspecting the commercial motor vehicle
22  out there or the semitrailer. So I really didn't
23  have to take things that were out of reasonableness,
24  that weren't reasonable, causative factors and have
25  time to ponder things that really were impossible,

Page 96

1   such as a 45,000-pound forklift that would have
2   lifted up the back of the trailer and caused the
3   legs to kickback. Or I should say the nonsensical
4   points, I don't -- I didn't consider.
5   Q    Let's move to page 13.
6   A    Okay.
7   Q    Top of the page, I believe you're
8   quoting the instructions that are contained on
9   the -- or in the switch box --
10  A    That's correct.
11  Q    -- of the unit; is that correct?
12  A    Yes, sir.
13  Q    Would you agree with me based
14  simply on Mr. Urjiles testimony and nothing further,
15  he believes, or his testimony confirms, that he
16  performed those two things?
17  A    No, sir, he didn't. Matter of fact, if you
18  go back to his -- if you go back to the -- that's
19  where I put on -- in my report here on page 13,
20  third paragraph, if you look at, first off, the
21  second bullet point or arrow point there on that --
22  on the page here, page 13, it says, "Do not attempt
23  to load or unload the trailer without having both
24  support stands resting on each axle." Forgive me.
25  I meant the first bullet point.

Page 97

```
1      "Verify that both support stands have swung
2   into position over the axle and the springs have
3   exhausted"; okay?
4      He didn't verify -- in my opinion, he did
5   not verify because he said in the statement written
6   that day, I lifted -- and it's in the page -- third
7   paragraph here -- second paragraph on this report,
8   page 13, "I lifted trailer up. When it was
9   completed up, then I backed into the dock."
10      He didn't follow the instructions that
11  clearly say to him that he needs to verify it.
12      Q    Do you know what Mr. Urjiles
13  intended when he said "when it is completed up"?
14      A    After he heard -- he heard the -- what he
15  referred to, I think, the whooshing noise or
16  something to that effect. After he heard the --
17  after he heard the air exhaust, that was what he
18  made an assumption at that point that it was
19  properly seated, that the trailer kickstand legs
20  were properly seated.
21      Q    Where do you glean that information
22  from?
23      A    Because if you look at the -- okay. Right
24  here. If you go back to the -- my Affidavit, you
25  can read on there where it says -- and where I quote
```

Page 98

```
1   his statements, and I'll read halfway through:
2      "QUESTION: Sure. I'm just trying to get
3   the process. I've seen it. I've heard -- I've
4   heard you describe it. I just want to make sure I
5   get -- I get it.
6      "Once you hear that sound, that last kind
7   of pssah" -- he spelled it p-s-s-a-h -- "of air,
8   that sound that told me --
9      "Uh-huh," answer.
10      Then question: "That tells you that the
11  legs have come down; correct?
12      "ANSWER: No. That tells me that the legs
13  were already locked."
14      So he's saying that he's going by an
15  audible, and that goes right consistent with page 13
16  of my report. It's very consistent with page 13,
17  so --
18      Q    You'll agree with me that your
19  Affidavit doesn't include a quotation from page 77?
20      A    Again, I look at -- I look at depositions
21  and when you have people who may have a horse in the
22  race, I have to take into account what may be or may
23  not be consistent with the facts. And when I look
24  at that, page 77, that was not consistent with prior
25  testimony nor his statement on -- near the day of
```

Page 99

```
1   the incident.
2      Q    But again, you don't know what he
3   intended on the day closer to the incident what he
4   meant by, "I lift the trailer up. When it is
5   completed up, I'll then back into the dock"? You
6   don't know what was in his head?
7      A    Well, it's certainly not inspection,
8   because if you look back here, again, go to the
9   Affidavit, he says in testimony there, that based on
10  his deposition, that he was able to determine based
11  on -- based on the airbags deflating that the
12  kickstand legs were accurate -- accurately -- or I
13  shouldn't use accurately -- but properly seated.
14      Q    I believe his deposition also says
15  that he performed a visual inspection; isn't that
16  true?
17      A    Again --
18      Q    So that way your Affidavit is based
19  upon incomplete information?
20      A    No, sir. I read his deposition, and the
21  deposition said on page 77 that he said that he
22  inspected after he was baited into that, into that
23  question, okay, that he said that he inspected it.
24      Now, I look at that and I take
25  consideration of that, of numerous, hundreds of
```

Page 100

```
1   commercial motor vehicle drivers in the past -- and
2   I hate to repeat myself -- that have testified in
3   deposition that they inspected their commercial
4   motor vehicle before they rear-ended the back of
5   another vehicle. And when I go out there and
6   inspect the vehicle, the brakes are severely
7   deficient as to what's required under the Federal
8   Motor Carrier Safety Regulations, Part 393. So I
9   look at that and say that his testimony is
10  inconsistent with the facts.
11      Q    Or is it that your opinion is
12  inconsistent with the evidence in this case?
13      A    Absolutely not. Absolutely not.
14      Q    You have to -- you agree it's one
15  or the other; right?
16      A    It's -- I'm telling you right now it's --
17  it's the way -- what I'm telling you is what
18  happened.
19      Q    Either your opinion is inconsistent
20  with the evidence or his testimony is inconsistent
21  with your opinion. It can't be both.
22      A    I would say to you yes, but you're
23  incorrect in assuming or even stating that my
24  opinion is incorrect. The facts line up on my side
25  very much so.
```

Page 101

```
 1        Q     In your opinion?
 2    A     Well, in my opinion, yes.  And if you --
 3    you know, there's -- and again, it's based on the
 4    evidence that's in front of me and the inspection.
 5        Q     How much have you been paid so far
 6    for your opinion?
 7    A     I don't know.  I don't keep track of that.
 8        Q     Well, you keep track of invoicing;
 9    right?
10    A     I don't do the invoicing.  That's done --
11    that's done in my office.  My assistant --
12        Q     Well, it's your business.
13    A     My assistant does all --
14        Q     Your business --
15    A     Yeah.  My assistant does all the invoicing.
16    I don't -- I don't even see the invoices.
17        Q     You enter the time; correct?
18    A     I'm sorry?
19        Q     You enter the time.  You calculate
20    the time associated with how long it takes you to do
21    certain things?
22    A     I put a -- every day I work, I fill out
23    timesheets and I put them in a bin right next to my
24    desk and that bin is cleaned out every --
25    periodically, I would say, and my assistant bills
```

Page 102

```
 1    out.  I don't see them from that point on.  I don't
 2    see them, nor do I see the invoicing.
 3        I do see, however, a total gross billing
 4    that comes in on -- that we -- that we do both from
 5    a consulting practice of training truck drivers and
 6    to providing expert -- expert testimony.
 7        Q     What's the total number of hours
 8    you've billed on this case so far?
 9    A     Again, I -- once again, I have no idea.  If
10    you told me it was 30, if you told me it was 40 or
11    50, I wouldn't be able to tell you which was
12    accurate.  I just don't know.
13        Q     What's your cost for deposition
14    here today?
15    A     $400 an hour, plus travel.
16        Q     Do you have a minimum payment?
17    A     Uhm, I believe there's -- we just changed
18    the -- not too long ago we changed our retainer
19    agreement.  I believe that there's a four-hour
20    minimum or something like that.  There is a copy of
21    the retainer agreement on that jump drive as well.
22        Q     Do you have a copy of your
23    invoicing?
24    A     I don't have that with me, sir.  It's on
25    the jump drive, and you have that.  That
```

Page 103

```
 1    was -- that's part of the electronic file that I
 2    don't have.  I just have the work product in front
 3    of me, discovery.
 4        Q     It looks like you charged a
 5    retainer fee of $5,000.  Does that sound about
 6    accurate?
 7    A     Yes, sir.
 8        Q     Is it typical for you to work
 9    multiple days on your expert report?
10    A     Yeah.  I -- as I stated earlier, I have
11    about 50 cases currently going on, and that's --
12    that's pretty consistent for me.  So, you know,
13    between phone calls and such, you know, I may put an
14    hour in here, two hours there, you know, four hours.
15    It varies.
16        Q     For example, I'm looking at your
17    May 11 -- I know you don't have it in front of you,
18    which is why I'm just going to read it into the
19    record and see if I can understand what you're
20    talking about.
21    A     Sure.
22        Q     On your May 11, 2015, invoice, it's
23    Invoice 15-421, there's an entry from 2:50 p.m. to
24    4:05 p.m. on April 28, 2015, which is a review,
25    begin foundation of report, which sounds to me like
```

Page 104

```
 1    you're probably preparing to do your report; does
 2    that sound fair?
 3    A     Yeah, base -- now, basically, foundation of
 4    the report is the -- if you look on the report, you
 5    can see the front page and it's got -- it's got
 6    things in there such as the DOT numbers and things.
 7    It's not getting into opinions and the substance of
 8    the report.  It's more or less what I refer to as
 9    foundation.
10        Q     And then the next entry is
11    April 30, 2015, and there's two entries that just
12    say "report."
13    A     Yes, sir.
14        Q     One from 8:30 to noon and then
15    another one from 4:05 to 4:40.  And I guess that's
16    what I'm getting at, it takes you -- something might
17    pull you away from writing your report as you're
18    working throughout the day?
19    A     Well, sometimes --
20        Q     So there are multiple entries for
21    report, is that indicative of the fact of when you
22    were preparing it?
23    A     Yes.  And what happens is that I may have a
24    conference call at -- you know, if the billing is
25    from, say, 2 to 4, I may have a conference call with
```

Page 105

1  another matter at 4:30, so I have a half-hour prep
2  time for that conference call. So I stop the clock
3  at 4 o'clock on that particular job, you know, so it
4  really varies.
5        Sometimes I may spend literally 20 minutes
6  on a report and I log it because all of a sudden,
7  you know, I'm down at the dinner table and something
8  pops into my head about a case and I have to get
9  it -- I've got to get it down on paper. My wife
10 loves me for that, too.
11        Q    Have you ever worked with
12 Mr. Concannon or his firm before this --
13 A    No, sir.
14        Q    -- case?
15 A    No, sir.
16        Q    You said you worked with some
17 attorneys, you believe, in the past in Michigan. Do
18 you know the names of any of those attorneys?
19 A    No. If I don't remember the case, I
20 wouldn't remember the attorneys' names.
21        Q    Do you know whether or not they
22 were plaintiff's cases or defense cases?
23 A    You got a 50/50 shot on that one.
24        Q    I understand that.
25 A    I just don't --

Page 106

1        Q    I'm just wondering if you remember.
2  A    No, I don't recall.
3        Q    In your opinion, are there any
4  design alternatives that Hendrickson could have used
5  to indicate to a driver that the axles are -- or I'm
6  sorry -- the arms are over the axle where they're
7  supposed to be?
8  A    No. I'm not a design individual, so I
9  really would not opine on that.
10        Q    Same question for manufacturing.
11 You wouldn't have any opinions as to the
12 manufacturer of this particular Hendrickson system;
13 is that correct?
14 A    No, sir.
15        Q    Do you believe it would be helpful
16 for a driver if there was a light on the control box
17 that would indicate red or green indicating the legs
18 are where they're supposed to be on the axle?
19        MR. CONCANNON: Object to the form
20 as to the relevance and ultimately defensibility on
21 this issue.
22        You can answer, Scott.
23 A    I do believe that it would be helpful, but
24 there's -- in this particular case here, if a driver
25 is still, you know, listening for a sound, going by

Page 107

1  an audible and not physically inspecting, the result
2  may be the same. So I really -- I don't have an
3  opinion outside of that.
4        Q    Going back to opinions 1 through 6
5  for a second, would you agree with me that your
6  opinions can be summarized as the system failed and
7  Mr. Urjiles failed to discover it?
8  A    That -- that would be correct, that he
9  would be -- that he had failed to do -- to inspect
10 it.
11        Q    Well, he had failed to find that,
12 in your opinion, the angle irons were not situated
13 properly?
14 A    That the wear pads -- the angle iron wear
15 pads were not -- were not properly seated. That's
16 correct.
17        Q    As you sit here today, do you know
18 at what angle those arms would have been at?
19 A    They drop down to an approximate 90 degree
20 off the roadway.
21        Q    That I understand, but I'm asking
22 about on April 26th, 2012, do you know what angle
23 they would have been at?
24 A    No, I don't. I mean, it would have been --
25 it would have been less than a 90-degree angle being

Page 108

1  that it's not seated properly. It would have
2  been -- and again, this is pure speculation. It
3  would have been more like maybe an 85 or something
4  like that. I just don't have a solid answer for
5  you.
6        Q    Do you believe Mr. Goodman could
7  have performed an inspection to make sure that the
8  legs were seated properly over the axle?
9  A    There's nothing in the Federal Motor
10 Carrier Safety Regulations that requires a dock
11 worker or forklift operator to inspect a commercial
12 motor vehicle. That's the responsibility of a
13 commercial motor vehicle operator.
14        Q    Is there anything within the
15 Federal Motor Carrier Safety Regulations that
16 prevent a load or a dock worker to do that?
17 A    No, nothing that would prevent it, but he
18 would have to know what he's looking at. And in
19 this particular-type trailer -- these are not very
20 common-type trailers, by the way, so it's highly --
21 highly probable that he wouldn't even have a clue
22 that those kickstand legs that that -- that MaxiLok
23 system existed underneath there.
24        Q    Is it your opinion that lowboy
25 trailers are not common, are commonly used within

Page 109

```
 1   the automotive industry?
 2   A     They are, but they're rare.  They are used,
 3   but they are rare-type trailers.  They're not very
 4   common, comparatively speaking to a standard flat
 5   deck-type semitrailer, van trailer.
 6        Q     Do you know how common lowboy
 7   trailers were used at the TRW facility on
 8   the -- this particular loading dock that Mr. Goodman
 9   would have unloaded during the course of his career?
10   A     Well, I know that this trailer in
11   particular, they had a -- they had some angst about
12   it coming in because of problems.  So -- but I know
13   that he had been there sometimes in the past, I just
14   don't recall the exact number.
15        Q     Did you ever investigate an
16   incident involving Mr. Goodman where a trailer
17   collapsed prior to this one to determine whether or
18   not he was actually a cause of the trailer dropping?
19   A     No, sir.
20        Q     You read his deposition testimony
21   where he was involved in a prior incident?
22   A     Yes, I don't -- I don't recall specifics on
23   it, though.
24        Q     You actually weren't provided the
25   TRW employment records; were you?
```

Page 110

```
 1   A     No, sir.
 2        Q     All right.  So you wouldn't have
 3   any information related to that prior incident; is
 4   that correct?
 5   A     That's correct.
 6        Q     Is it possible that information
 7   could have been informative to you in rendering your
 8   opinions?
 9   A     If it were the same exact type trailer,
10   I -- based on -- based on what had occurred on this
11   particular trailer, I don't think so.  If it had
12   happened in this particular -- or this same trailer,
13   for that matter, then I would say there's a real
14   problem with this MaxiLok system.  So that would go
15   back to your question several questions ago that
16   there is a systemic problem.
17        But if it's a regular, flat-deck type,
18   common standard, if you will, semitrailer, 53-footer
19   that came in and there was a collapse, it could --
20   it could have been a PosiLok system.  And again,
21   that would -- that would likewise be driver error.
22        If it was a MaxiLok system, that would be
23   very probable driver error.  If it were -- I don't
24   know what type of case this was.  If he drove off
25   the back of the trailer and there was a collapse,
```

Page 111

```
 1   which is considered sometimes a collapse, if that
 2   had occurred, that would have been possibly chocking
 3   error or possibly driver error.
 4        I can't -- without having more information
 5   on that, I can't really answer the question
 6   effectively.
 7        Q     It's possible, though, that if you
 8   had additional information, it could indicate to you
 9   whether there was additional involvement outside
10   what we've already discussed by Mr. Goodman?
11   A     It would have to really be -- it would have
12   to be -- you would have to tell me in detail what
13   had occurred here, and then I would be able to
14   answer you effectively for the purposes of this
15   deposition.
16        Q     Had you ever spoken with
17   Mr. Goodman?
18   A     Have I ever -- no, sir.
19        Q     Okay.  Have you ever requested
20   information related to that separate incident to
21   answer some of the questions that you have that you
22   just told me about?
23   A     No, sir, I didn't.
24        Q     Okay.
25             MR. CONN:  We have to go off the
```

Page 112

```
 1   record for a second.  Our call -- videoconference is
 2   about to end in 10 minutes.  I have to expand the
 3   time because I have more than 10 minutes of
 4   questions and I assume Andy has some, too.  So give
 5   me one second so I can get that extended.
 6             THE WITNESS:  Sure.
 7             (Whereupon a short recess was
 8   held.)
 9   BY MR. CONN:
10        Q     Based upon your training, are you
11   qualified to render opinions related to hours of
12   service?
13   A     Yes, sir, absolutely.
14        Q     Have you rendered any opinions as
15   to hours of service in this case?
16   A     I don't recall seeing anything that would
17   have been problematic.  Now, we're, of course,
18   talking about hours of service with respect to
19   Federal Motor Carrier Safety Regulations.
20        Q     That is correct, yes.
21   A     I did not see anything that would have set
22   up a red flag.
23        Q     I want to talk to you now about
24   Dr. Sprague's report.  We talked about it a little
25   bit.  I want to talk about it in a little more
```

Page 113

```
 1    detail now.
 2         I understand, based upon what we've talked
 3    about here today, you have criticisms of that
 4    report; is that fair?
 5    A     Yes, sir.
 6         Q    Tell me what those criticisms are.
 7    A     Well, essentially everything that he had --
 8    the controversy that he brought up with respect to
 9    my report, but the -- the main thing that I would
10    point to on his report -- bear with me one second
11    here, if you would.
12         If you look at page 11 -- excuse me --
13    page 8 of 11 --
14         Q    That's of Dr. Sprague's report?
15    A     It is.  ESI.
16         Q    Page 8.  Yeah, that's Dr. Sprague.
17    You said page 8 of 11?
18    A     Yes, sir.
19         Q    Okay.  I'm there.
20    A     It says, "In accordance with the MaxiLok
21    documentation reproduced, Figure 7, for the airbag
22    system to be caused to exhaust prior to suspension
23    supports, achieving their intended support position,
24    the control valve and/or its associated linkage must
25    be broken, damaged, or otherwise significantly out
```

Page 114

```
 1    of adjustment," and he goes on to speak further.
 2         What I take issue with is that he says
 3    "significantly out of adjustment."  When I was
 4    there, there were no tests that were performed that
 5    would have determined whether this was significantly
 6    out of adjustment or not.  In addition, we're
 7    talking about over two years later.
 8         And then if you look at the report -- not
 9    the report, but the -- yeah, I guess it would be the
10    report -- from the trailer repair facility, they
11    said nothing about adjusting to make sure that it
12    was not -- that it was significantly adjusted or not
13    adjusted or improperly adjusted, I should say.  So
14    you take that --
15         Q    So you're saying that -- go ahead.
16    A     Take that into effect when you're -- when
17    you're looking at that, I get again -- I get -- I go
18    back again to when the mechanic says that there was
19    no problems with the trailer.
20         Well, as I stated earlier, is that how many
21    times have you seen where somebody is taking their
22    pickup truck to a mechanic and the problem that they
23    were talking about, that they were hearing or what
24    have you, doesn't exist when they get there.  What
25    I've had it happen to me and probably every juris has had
```

Page 115

```
 1    it happen to them as well.  So that's what I'm
 2    referring to regarding significantly out of
 3    adjustment if I'm -- if you're following my logic
 4    here.
 5         Q    I don't know that I am to be
 6    completely honest with you.
 7         I understand that you're taking issue with
 8    the fact that he refers to the fact that in order
 9    for this to have occurred, it needed to be broken,
10    damaged or significantly out of adjustment.  I
11    understand that.
12         But I think what you're saying, and correct
13    me if I'm wrong, you didn't find any evidence based
14    upon your inspection that this particular trailer
15    was significantly out of adjustment; is that true?
16    A     No, no.  That's not what I'm saying.  Let
17    me clarify.
18         Q    Okay.
19    A     What I'm saying, both myself and ESI agree
20    that there was no damage.  There was no damage that
21    caused what my conclusion is as to what caused this
22    truck -- so far as I can understand, they do not
23    list anything as to being damaged.  I say that there
24    was nothing damaged there either.  I do say there is
25    a lubrication issue and I say that there was a
```

Page 116

```
 1    seating -- a proper seating issue with the
 2    kickstands, kickstand legs.
 3         Now, take that into account that there's
 4    nothing broken or damaged, it's acknowledged by ESI
 5    that the trailer MaxiLift system can be -- can be
 6    significantly out of adjustment.  Well, that would
 7    likewise mean that it could be moderately out of
 8    adjustment.  So they not performing an inspection as
 9    to the adjustment being in or out and the mechanic
10    not doing an adjust -- an adjustment inspection as
11    well, that really can't be testified to.  So that
12    very well could have been the problem where the
13    kickstand legs were not, in effect, sitting properly
14    on the axle as they were intended to be.
15         So I guess my point is, is that the
16    causative issue may have been that it was
17    significantly out of adjustment or somewhat out of
18    adjustment where it caused the kickstand legs to not
19    fully seat.  Mr. Urjiles --
20         Q    Urjiles.
21    A     I'll get it right by the end of the
22    deposition.
23         -- heard that the audible of the airbag
24    deflating and took that as fact that the kickstand
25    legs were in effect sitting on the axle.
```

Page 117

1    Q    Do you have any other criticisms
2  other than that issue with Dr. Sprague's report?
3    A    Well, he criticizes -- on page 10, the
4  first full paragraph all the way down at the end, he
5  says, "In the absence of any specific testing
6  supporting the unusual hypothesis identifying
7  lubrication as a root cause for this incident is
8  speculative at best."
9         I'm agreeing that that is speculative.
10  However, take his same statement and apply that to
11  "significantly out of adjustment." They never
12  checked that at the time of the inspection. I was
13  there; I watched them. They never -- they never
14  checked --
15    Q    "They" meaning?
16    A    "They" meaning ESI.
17    Q    "They" meaning?
18    A    Meaning ESI.
19    Q    Okay.
20    A    ESI never checked this for being out of
21  adjustment significantly or otherwise, because I was
22  there and I watched what they were doing. So taking
23  those two statements together where he's going to
24  criticize me in saying that my hypothesis, unusual
25  hypothesis -- and again, I agree with it, that it is

Page 118

1  a -- it is somewhat speculative, however, a
2  well-thought out speculation, if you will. It's a
3  well-thought out point that friction could very well
4  have been the issue that caused these kickstand legs
5  to hang up.
6    Q    But again, you agree that it's
7  speculative, although well-thought out?
8    A    Absolutely. I wasn't there, so it has to
9  be some degree of speculation.
10    Q    So we talked about then two
11  criticisms, then, including the -- the one on
12  page 10. Any other criticisms of Dr. Sprague's
13  report other than those two?
14    A    Well, the general analysis of my report.
15  How he came after my report with -- and he
16  essentially has no basis for his findings. He just
17  criticizes me, which is -- which is fine. I -- but
18  he's incorrect.
19    Q    So you have a problem with
20  "significantly out of adjustment." You have a
21  problem with the speculative nature, and that
22  involves in some respects the out of adjustment, and
23  then you believe just frankly he's wrong?
24    A    Yes. Absolutely. I mean, he -- I believe
25  that he really knows what's -- what happened here.

Page 119

1  But he appears to me to be coming across as an
2  advocate to try and go after my report and not
3  provide any opinions as to what did happen; okay?
4         If you're going to come after my report and
5  sit here and try to criticize me, that's fine, I can
6  handle that, but at least come up and try to give me
7  your opinion as to how you think it happened. There
8  is none. That's why nothing is there.
9    Q    Can you tell me whose report more
10  closely is based upon the testimony of the witnesses
11  in this case?
12    A    I believe that mine is by far. I mean, I
13  put quotes in here from -- from depositions in my
14  report.
15    Q    Despite the fact that you've
16  already admitted that you're ignoring the deposition
17  testimony of Miguel Urjiles?
18    A    At the risk of redundancy, and I'll say
19  this again, is that looking at a commercial motor
20  vehicle driver that has a horse in the race, you
21  know, I look at it and say that a pretrip inspection
22  or any type of inspection conducted by a commercial
23  motor vehicle driver that I find at a later point,
24  two or three hours after the crash, that it was
25  causative, what he said and he checked off on his

Page 120

1  inspection report that it was fine, not one day, two
2  days, but five, six days in a row if not more, it
3  caused me -- has caused me over the years to use
4  precaution in analyzing the deposition of a
5  defendant or plaintiff, whichever the case may be.
6         But in particular, in examining closely a
7  commercial motor vehicle driver's deposition as to
8  whether he is being -- I'm not going to use the word
9  "truthful," but if he's testifying in line with the
10  facts that I have determined and have seen in the
11  case.
12    Q    Any other criticisms with
13  Mr. Sprague's -- or Dr. Sprague's report?
14    A    No. Again, it would just be essentially
15  page 9 -- 9 and 10 where he -- where he goes after
16  my report with no foundation -- with no -- no basis.
17  And page 11, for that matter.
18    Q    You don't have your case list in
19  front of you; do you?
20    A    No, sir, I don't.
21    Q    Looking at the firms that you've
22  worked with, you recall providing a list of those?
23    A    Yes. That would be on -- on the
24  spreadsheet.
25    Q    The Sam Bernstein law firm, is that

Page 121

1    a firm that you've worked with in Michigan?
2    A    That sounds familiar, yes.
3        Q    Do you know the attorney or
4    attorneys you worked with at the Sam Bernstein law
5    firm?
6    A    Their names should be on there. Should be
7    right after the date.
8        Q    I think I understand what you're
9    saying, but I -- I don't have it in spreadsheet
10   format.
11   A    Yeah. No, you're going to get it in pieces
12   there unfortunately because it is a spreadsheet.
13       Q    I sure did.
14   A    You're going to have to kind of tape them
15   together somehow, I guess. But that was a -- that
16   was a crash.
17       Q    Trucking accident, you would have
18   worked for plaintiff's counsel?
19   A    Yes, sir. If I remember correctly, it was
20   a tanker crash. I'm not 100 percent certain,
21   though.
22       Q    Do you know if you've ever done
23   work for my firm, Segal, McCambridge, Singer &
24   Mahoney?
25   A    Actually, you all have an office down in

Page 122

1    Philadelphia; correct?
2        Q    We do.
3    A    Yeah, I think I've worked for you -- I
4    think I've worked for you folks down in
5    Philadelphia.
6        Q    Do you know who in particular?
7    A    No, I don't. I just recall the firm's
8    name. I've either worked for you or against you. I
9    just don't remember.
10       Q    And that's fair because I saw the
11   name of the firm on here, but I don't know if you
12   have firm for and firm against.
13   A    No, I don't.
14       Q    Do you know the --
15   A    Right, right. Well, that -- that would be
16   working for.
17       Q    Okay. Does the spreadsheet
18   indicate whether you were retained by plaintiff or
19   defense?
20   A    No, it does not, I don't believe. Your
21   version would not.
22       MR. CONCANNON: Eric, the question
23   cut out. You said "Does the spreadsheet indicate
24   that you were" -- and then it went blank. Can you
25   repeat it for me?

Page 123

1        THE WITNESS: Worked for plaintiff
2    or defense.
3        MR. CONCANNON: All right. Thank
4    you. Okay.
5        MR. CONN: Yeah, yeah. Let's go
6    off the record for a second.
7        (Whereupon there is a discussion
8    held off the record.)
9    BY MR. CONN:
10       Q    I want to correct something that we
11   talked about earlier. We talked about your retainer
12   agreement and how much your fee is. I think we said
13   it was $5,000. The engagement letter that you have
14   seemingly indicates that it's $4200.
15   A    Okay. Then that would have been -- right.
16   We had changed that sometime. I don't recall what
17   the date was that we changed the retainer agreement.
18   We went from -- there was a couple changes, one of
19   which was we went from 4200 to 5,000. And then
20   there was another change that went from -- for
21   deposition testimony, from $400 to $450 an hour, so
22   you're getting a bargain. And I think those were
23   the two only changes.
24       Q    Okay.
25   A    So that would have been on the old version,

Page 124

1    in other words.
2        MR. CONN: Let's go off the record
3    again for a second.
4        (Whereupon there is a discussion
5    held off the record.)
6    BY MR. CONN:
7        Q    Sir, do you charge for trial
8    testimony?
9    A    I do.
10       Q    What is your charge for trial
11   testimony?
12   A    Well, again, it goes to the old -- the old
13   rate, to the new one. There were some structural
14   changes on that as well. It used to be $400 an hour
15   and now it's 2500 a day plus travel and standby
16   time. So in this particular matter here, it would
17   be $400 an hour plus travel.
18       Q    You'll stand by the old agreement?
19   A    Yes, sir. Yes, sir.
20       MR. CONN: Sir, I don't have any
21   other questions. Thanks for your time.
22       THE WITNESS: Thank you.
23
24
25

Page 125

CROSS-EXAMINATION BY MR. CONCANNON:

Q     Scott, I do have a few. I'll just
try to cover a couple items, but working backwards
towards the end, you talked about Mr. Conn's firm of
Segal, McCambridge, Singer & Mahoney. Your file
spreadsheet reflects a David Yavil, who I can tell
you, I think, is with the Philadelphia office of
that firm. Does that name David Yavil ring a bell
for you?

A     Yes, it does. I actually --

Q     That was the case of Matie
(phonetic) versus Transtar Intermodal. Was that a
trucking case?

A     Yes. Everything I do is trucking cases.
There were two cases with him.

Q     All right. Oh, you had two with
Mr. Yavil?

A     Yavil, yes.

Q     Yavil. And Mr. Yavil's firm sought
you out as an expert in trucking?

A     Yes, sir.

Q     And trucking safety?

A     Yes, sir.

Q     And in those cases, were you

Page 126

qualified as an expert?

A     We never went --

MR. CONN: Form. Foundation.

A     We never went to trial on them. So, I
mean, qualified from the law firm's extent, yes, but
not from the court.

BY MR. CONCANNON:

Q     I will ask it a different way.
That was a good point. You've been -- strike that.
Have you testified in trial?

A     Yes.

Q     Have you testified in the federal
system?

A     I believe so, yes.

Q     Okay. And in -- it's semantics,
but have you testified as a qualified trucking
expert by a United States federal judge?

A     I believe by a United States federal judge,
yes, but I -- you know, state courts, yes, but I
believe federal as well.

Q     Okay. You were asked about your
comparisons, if you will, of the report that you had
with Mr. -- or I'm sorry, Dr. Sprague, and you
talked about the issue of lubrication. I want to
ask you: Does he provide any explanation himself of

Page 127

what happened?

A     No, just criticisms of my report.

Q     Okay. When you talk about what
happened in your view, do you -- is it your view
that this -- what Mr. Conn described as the incident
of the falling of the trailer, can that happen
without negligence?

A     One more time on that. I'm sorry, Andrew.

Q     In this case, did the trailer fall
as a consequence, in your view, of negligence?

A     Yes.

Q     And with --

MR. CONN: Object to the form of
the question. Calls for speculation.

Q     -- the issue of controlling --

BY MR. CONCANNON:

Q     And with this issue of
controlling --

MR. CONN: Whoa, whoa, whoa, whoa.

THE WITNESS: There was an
objection.

MR. CONN: Did you get my
objection?

THE COURT REPORTER: I did.

MR. CONCANNON: I didn't hear it.

Page 128

I didn't hear it all. What was it?

MR. CONN: Calls for speculation.

BY MR. CONCANNON:

Q     Okay. Scott, with respect to the
issue of control of the trailer, you recall being
asked control of the trailer, a few questions by
Mr. Conn; is that right?

A     Yes.

Q     All right. I'll ask you about
control of the actuator or the device that elevates
the system. Did anybody, other than Mr. Urjiles,
exercise control over that device?

A     So far as I know, no, sir.

MR. CONN: Foundation.

BY MR. CONCANNON:

Q     And am I correct --

MR. CONN: Did you hear that?

THE WITNESS: He just said
"foundation."

MR. CONCANNON: Thanks, Eric.

BY MR. CONCANNON:

Q     Is it your view that the
elevation -- I'm sorry -- the elevation of the
system was the act of negligence here or at least
one of the acts of negligence here?

32  (Pages 125 to 128)

Page 129

1    A    The elevation of the system?
2         Q    Or elevation of the system by
3   utilizing the lever or the switch to elevate it?
4         MR. CONN:  Form of the question.
5    A    Maybe you could repeat that question a
6   different way.  It's a little --
7   BY MR. CONCANNON:
8         Q    There are -- there are two -- let's
9   put it this way.
10        You ascribed negligence in the manner in
11  which this system was raised or elevated and that
12  there wasn't an inspection with respect to the
13  seating of the legs; is that correct?
14   A    Yes, sir.
15        Q    All right.  Does that -- do those
16  two things have anything to do with Paul Goodman?
17   A    With what?
18        Q    Do those two things have anything
19  to do with the activity of Paul Goodman?
20   A    Oh, with Paul Goodman, no.
21        MR. CONN:  Asked and answered.
22  BY MR. CONCANNON:
23        Q    Now, you were asked some time ago a
24  question that you tried to explain, and we moved on.
25  There was a question about the Hendrickson

Page 130

1   instructions.
2    A    Yes, sir.
3         Q    Okay.  Doesn't Mr. -- if you --
4   doctor -- I keep calling him Mr. -- if you look at
5   Dr. Sprague's report, he provides a graphic of
6   instructions or warnings on that system at page 8 of
7   his report; is that right?
8    A    He does.
9         Q    And it has two photographs -- I'm
10  sorry -- two illustrations within the warnings.  One
11  is a, quote/unquote, correct position and one is of
12  incorrect position.
13        Did you see that in his report?
14   A    Yes, sir.
15        Q    All right.  Am I correct that the
16  system can be elevated and those -- the legs dropped
17  in incorrect position, but the trailer will still
18  remain elevated for a time?
19   A    Yes.  And that's exactly my point.  If you
20  look at these illustrations here on -- on the ESI
21  report, there is a probability that those legs will
22  not sit all the way back, and that goes into the
23  significantly, quote, significantly out of
24  adjustment issue that I have -- that I addressed
25  earlier.

Page 131

1         Q    So even -- even Hendrickson's own
2   drawing acknowledges that the system can work for a
3   time, even if the system's been improperly raised?
4    A    That's correct.  And that's why they have
5   it on the label right next to the control valve
6   about making sure that it's properly inspected and
7   not just going by a verbal.
8         Q    Okay.  You were asked a little bit
9   about --
10   A    Or audible, I should say.  Sorry.
11        Q    -- whether or not you trusted
12  Mr. Urjiles' testimony and his credibility.  I don't
13  want to ask you about that, but I do want to ask you
14  about when you quoted in your Affidavit.  To the
15  extent that he inspected visually the legs, was he
16  inspecting it from the site of the knob based on
17  what he testified to?
18   A    Let me just read --
19        MR. CONN:  Foundation.
20   A    Let me just read this one section real
21  quick here.
22        Go ahead.  Repeat the question, please.
23        Q    I'll rephrase it, Scott.  I won't
24  go from your report.  I'm going to go from his
25  testimony.

Page 132

1         His testimony in his deposition was that he
2   inspected the -- you understood he claimed to have
3   inspected the legs; correct?  We're in agreement, he
4   testified that he did?
5    A    That's correct.
6         Q    Are we to understand your testimony
7   thus far that you're somewhat skeptical that he
8   either actually did or meaningfully inspected it?
9    A    I -- I think it's highly improbable that he
10  gave it any kind of inspection.
11        Q    Okay.  Now, I'm going to read into
12  the record -- you don't have his deposition in front
13  of you given how this has worked out today, but I'm
14  going to ask you -- I'm going to read something into
15  the record and ask you a question; fair enough?
16   A    That's fine.
17        Q    All right.  This is first his
18  answer:  "Stay there by the knob.  You can see from
19  there -- "
20        MR. CONN:  Whoa.  Whoa.
21        THE WITNESS:  Hold on a second.
22  Hold on a second.
23        MR. CONCANNON:  Yup.
24        MR. CONN:  Page and line.
25        MR. CONCANNON:  Okay.  Page 40 and

Page 133

1   41, Eric.
2   BY MR. CONCANNON:
3        Q     So he says, "I stayed there by the
4   knob. You can see from there the axle is right
5   there."
6        This is my first question, Mr. Turner.
7        Can you see the axle where these two legs
8   are supposed to be seated from -- standing from the
9   knob?
10  A    You can, but it's --
11       MR. CONN:  Object to the
12  foundation.
13  A    You can, but it's not a real good visual.
14  BY MR. CONCANNON:
15       Q     Let me ask you for foundational
16  purposes.  You -- have you elevated this very system
17  before?
18  A    Yes.
19       Q     All right.  And in your inspection,
20  did you stand at the knob location?
21  A    Yes.
22       Q     Okay.  And from that location --
23       MR. CONN:  I'm going to object to
24  the form.  Hold on.  I'm going to object to the form
25  of the question as to "knob location."

Page 134

1   BY MR. CONCANNON:
2        Q     Okay.  Scott, did you understand
3   what I mean?  There's only one knob that elevates
4   the system on the body of the trailer; is that
5   right?
6   A    Yes, sir.
7        Q     All right.  And at the time of your
8   inspection, you still stood by that knob or actuator
9   device; correct?
10  A    Yes.
11       Q     And do you have personal knowledge
12  of seeing the location of the axle where these legs
13  would sit in relation to where that actuator is
14  located; yes or no?
15  A    You can see it, but it's -- it's not a real
16  good visual.
17       Q     Okay.  Fair enough.
18       Do you believe that an inspection -- strike
19  that.
20       Do you believe that one can reasonably rely
21  on that visual inspection from that location as
22  sufficient evidence that the legs are properly
23  seated?
24  A    No.
25       MR. CONN:  Form.

Page 135

1
2   BY MR. CONCANNON:
3        Q     Are you required in your view to
4   form opinions here to have a degree in engineering?
5   A    No, sir.  Absolutely not.
6        MR. CONN:  Foundation.  Form and
7   legal conclusion.
8   BY MR. CONCANNON:
9        Q     Have you been stricken as a witness
10  by any court for lacking a degree in engineering?
11  A    No, sir.
12       Q     Have you been stricken by any court
13  as --
14       MR. CONN:  Form.
15  BY MR. CONCANNON:
16       Q     -- an expert based upon
17  insufficient knowledge of pneumatic systems --
18  A    No, sir.
19       Q     -- and how they work?
20  A    No, sir.
21       Q     Other than being stricken on the
22  basis your testimony would be duplicative, have you
23  ever been stricken on any other basis?
24  A    Not that I'm aware of, no.
25       MR. CONN:  Same objection.

Page 136

1
2   BY MR. CONCANNON:
3        Q     You talked about -- you were asked
4   about lighting.  You talked about earlier that this
5   was intermittent overcast at approximately 10 a.m.
6   when -- it was a nearby time for this accident; is
7   that correct?
8   A    Yes, sir.
9        Q     All right.  Does the fact
10  that the -- let me back up.
11       Have you seen pictures of the loading dock
12  where this incident took place?
13  A    No, sir -- I saw pictures, yes.
14       Q     Would the presence of a trailer
15  being backed down into a loading dock impact on
16  ambient light under the trailer?
17  A    Sure.
18       MR. CONN:  Foundation, and he
19  hasn't been present at the actual site.
20       Q     For now this is a yes or no, Mr.
21  Turner.  Is it a yes or no?
22  A    Yes.
23       Q     Explain how.
24       MR. CONN:  Hold on a second.  I'm
25  objecting.

Page 137

1    MR. CONCANNON: I understand that.
2    I heard it. You can --
3    MR. CONN: Can I put my objection
4    on the record?
5    MR. CONCANNON: I've heard it.
6    You said "foundation;" right?
7    MR. CONN: I said objection to
8    foundation insofar as he hasn't been at the actual
9    scene. Now you can go.
10   MR. CONCANNON: Thank you.
11   MR. CONN: Yup.
12   BY MR. CONCANNON:
13   Q     Scott, can you explain why you said
14   yes?
15   A     Well, shadowing potential and things of
16   that nature. You could have -- behind a building,
17   it could actually be between trailers. I mean,
18   there's a lot of variables, you know, besides just
19   weather -- ambient weather conditions.
20   Q     Okay. Is it any relevance really
21   to you that Mr. Goodman had any prior incident with
22   respect to being involved in a trailer causing an
23   injury?
24   A     Not necessarily.
25   MR. CONN: Foundation. Asked and

Page 138

1    answered.
2    A     If it had -- if it were a collapse of a
3    trailer, I -- I don't know if it would really -- it
4    depends. If it was the same type trailer, then I
5    certainly would want to see it. But if it were a
6    different-type trailer where, you know, a forklift
7    fell off the dock or a PosiLok failed or something
8    like that, yeah, I would want to see it, but I don't
9    see it in this particular case.
10   Q     Okay. When you did your
11   inspection, were you able to -- let me back up.
12   You tried to give an answer earlier, Scott,
13   that was cut off. Do you remember that?
14   A     Yes.
15   Q     Can you share with us what that
16   answer was that you were --
17   A     I don't remember the context of the answer
18   or the content of it, but I --
19   Q     It had to do with Hendrickson
20   instructions.
21   A     Okay. Hold on one second. I don't -- I
22   don't remember. I know it was Hender -- with regard
23   to Hendrickson instructions, but I don't -- I think
24   that we ultimately wound up covering that.
25   Q     Okay. That's really what I needed

Page 139

1    to know.
2    A     Yeah, at a later point we covered it.
3    MR. CONCANNON: Very good. Then I
4    don't have anything else. Thanks.
5
6    REDIRECT EXAMINATION BY MR. CONN:
7
8    Q     Sir, Mr. Concannon asked you
9    questions about Mr. Urjiles' deposition testimony.
10   Did you ever go back into his deposition testimony
11   to see what he meant or he intended when he said, "I
12   lift the trailer up. When it is completed up, then
13   backed into the dock?"
14   A     What he meant?
15   Q     What he intended by that statement,
16   yes.
17   A     Essentially how he -- how he prepared the
18   trailer and how he prepared the trailer for being
19   able to be offloaded and backed to the dock.
20   Q     And my understanding is your
21   understanding of that is he performs an audible
22   inspection, but not a visual inspection; is that
23   true?
24   A     Well, if you take that and you look at it
25   with respect to his deposition and contrast that to

Page 140

1    his written statement the day, day after, day of,
2    whatever it was, he says -- he essentially says that
3    it was an audible that he relied upon, not a visual.
4    I mean, he doesn't specifically say it that way, but
5    I could read it for you what he does say if you
6    like.
7    Q     I believe you have his deposition
8    transcript in front of you; is that correct?
9    A     I -- unfortunately I don't, and I don't
10   know why his deposition is not here, but I don't
11   have it with me. It was sent -- it was sent to you
12   electronically.
13   Q     And I have a copy because I was
14   actually at his deposition. So Mr. Concannon
15   started to read you a portion of Mr. Urjiles'
16   deposition testimony, but he neglected to state for
17   the record he didn't finish reading the answer and I
18   think it might be appropriate on this issue.
19   He said: "I stay there by the knob. You
20   can see from there, the axle is right there. I just
21   stay right there and just stay right there. That's
22   my job to do is stay right there until the trailer
23   goes up. And then when the trailer goes up, like I
24   said, there is a sound on the trailer. First of
25   all, you know, like the leg -- legs goes down. You

Page 141

```
 1    can hear a click in there. And then when the leg
 2    starts straightening out, they get on top of the
 3    axles. And then when they -- when those legs are on
 4    top of the axles, there is an air sound that goes
 5    chhh" -- that's spelled by the way for the court
 6    reporter c-h-h-h -- "and that shows me there is
 7    complete. I just look at the legs on there, and
 8    then after that I go back to the cab and back to the
 9    dock and then, you know, shut off the truck and
10    apply the brakes."
11    A      What page --
12         Q     Does that assist you at all?
13    A      What page testimony is that?
14         Q     Page 41. It's the complete portion
15    of Mr. Urjiles' deposition testimony that
16    Mr. Concannon didn't read for you.
17    A      Right. But he --
18         Q     My question for you is --
19    A      Go ahead.
20         Q     Does that help determine what
21    Mr. Urjiles means by "complete"?
22    A      It sounds more to me like he's using this
23    as a general -- a general experience rather than
24    what he did on that specific day. Now, that -- that
25    is completely different than when he says what he
```

Page 142

```
 1    did on these other -- on these other -- both the
 2    statement. The statement clearly says what it says.
 3    I mean, it -- there's no -- there's no controversy
 4    there; all right? So I'm basing this on his
 5    statement.
 6         What you're -- what you're reciting is his
 7    general duty of what he says that he does on a daily
 8    basis, the way I interpret it. On a regular basis,
 9    this is what he's supposed to do.
10         Q     Do you have the deposition
11    testimony in front of you?
12    A      Like I said, I don't. I'm basing that what
13    you just said to me and so far as I recall.
14         Q     So Mr. Concannon was actually
15    talking to him about this particular day, April 26.
16    That would undermine what you just said; is that
17    correct?
18    A      No, sir. Like I said, I am going to his
19    statement --
20         Q     You're not being an advocate in
21    this regard; are you?
22    A      Absolutely not. And you know what? Quite
23    honestly, you know --
24         Q     Okay. Nothing further.
25    A      -- I'm kind of offended on that. But I
```

Page 143

```
 1    could tell you right now that when his memory is
 2    most fresh, recollection, look at his statement.
 3    His statement does not say that he inspected. That
 4    was the important -- that was the important part.
 5    Then we go look forward -- jump forward to page 44
 6    of his -- excuse me -- 28, page 28 of his testimony
 7    where says it was an audible -- I'm just
 8    paraphrasing -- an audible that told him that the
 9    legs were down. Now, that's specific to this
10    incident.
11         Q     Excuse me, sir. There's no
12    question.
13    A      What you're referring to is -- what you're
14    referring to is general instructions.
15         Q     You're assuming that. You don't
16    have his deposition testimony in front of you, and
17    the question was actually referring to what happened
18    on April 26th.
19         That being said, the statement itself
20    doesn't say he didn't do an inspection; does it?
21    A      If he did --
22         Q     Just answer as to whether or not he
23    did.
24    A      So if he did --
25         Q     He's silent on that issue.
```

Page 144

```
 1    A      If he did an inspection --
 2         Q     It's silent as to that issue; isn't
 3    it?
 4    A      If he did an inspection --
 5         Q     Yes or no?
 6    A      No, it's not a yes or no answer. If he did
 7    an inspection --
 8         Q     Yes or no --
 9    A      -- the angle iron wear pads would have been
10    on the axle.
11         Q     Yes or no, does his statement say
12    one way or the other if he performed an inspection?
13    A      Again, I'm -- I'm basing it on what I have
14    here in front of me and what you just said. He's
15    given a general synopsis on how it would be done.
16         Q     Look at the statement and tell me,
17    is there a statement in there or is the word
18    "inspection" in there, one way or another?
19    A      Can you repeat that back to me what you
20    just read?
21         Q     Sure. Is the word "inspection" in
22    the statement at all?
23    A      Read that back to me what you just referred
24    to and I can tell you.
25         Q     The statement that you refer to in
```

Page 145

```
 1   your report.
 2   A     Oh.  Oh, okay.  I'm sorry.  Hold on one
 3   second.  I got to locate it.  Where did that go?
 4        Q     Page 13.
 5   A     Yeah, I got it right here.
 6        "In a signed statement by the driver
 7   Urjiles on April 26th, 2012, he states the following
 8   as to the protocol which he applied" -- "the
 9   protocol that he applied in raising of the
10   semitrailer's MaxiLok system."
11        "I lifted," all right.  He's not saying I
12   would lift.  Words have meaning, I would lift; in
13   other words, this is my general instructions.  He's
14   saying "I lifted trailer up."  So that to me in my
15   mind is specific to that day because he is making a
16   statement about something that just occurred.
17        So he says, "I lift the trailer up.  When
18   it is completed up, then I backed onto the dock."
19   That's specific to that day, no question about that.
20        Q     Do you -- do you remember what my
21   question was?
22   A     Yes.  And I think I just answered it.
23        Q     What was my question?
24   A     I believe I just answered it.
25        Q     You didn't.  My question was:  Is
```

Page 146

```
 1   the word "inspect" in that statement?
 2   A     No, it's not, and that's part of the
 3   problem.
 4        Q     Thank you.  Exactly.
 5        So you don't know what it actually means
 6   when he says it's completed; right?
 7   A     "When it's completed up.  When it's
 8   completed up."  He goes by an audible which tells
 9   him that the legs are -- excuse me -- the kickstand
10   legs are backed down.
11        Q     Where does he say in that statement
12   he goes by an audible?  Where does it say in that
13   statement he goes by audible?
14   A     If you go back -- go back to his
15   deposition.  Again, page 28 --
16        Q     No, sir.  He --
17   A     Now I'm following --
18        Q     I asked specifically about the
19   statement.  Does the statement say "audible"?
20   A     But I am following up with all the
21   evidence.  You want me to consider all the evidence;
22   correct?
23        Q     The question on the table is -- the
24   question on the table is does the statement say
25   "audible"?
```

Page 147

```
 1   A     But didn't you ask me to consider all of
 2   the evidence in this case?  So now you want me to
 3   cherry pick?
 4        Q     Now for this question I'm not.
 5        MR. CONCANNON:  Answer the question
 6   as he phrased it, please.
 7   BY MR. CONN:
 8        Q     I'm asking you specifically does it
 9   state "audible"?
10   A     In this particular one here, no.
11        MR. CONN:  Thank you.  Nothing
12   further.
13
14   RECROSS-EXAMINATION BY MR. CONCANNON:
15
16        Q     I do want to follow-up now again
17   for purposes -- you don't have the deposition in
18   front of you?
19   A     No.
20        Q     I'm going to read probably an
21   innocuous question, but it needs to be set up.
22        So the question:  "Miguel, I want to get a
23   timeframe here, and it may or may not prove to be
24   vital, but I don't know.  Once you're in the cab" --
25        MR. CONN:  Objection.  What page?
```

Page 148

```
 1   What line?
 2        BY MR. CONCANNON:  48, lines 19,
 3   and it's going to go through page 49, line 13.
 4   BY MR. CONCANNON:
 5        Q     I said, "It might prove to be
 6   vital, but I don't know.  Once you were in the cab,
 7   can you tell me was it five minutes before Paul
 8   started his delivery -- strike that.
 9        "When you got in the cab, did you get on
10   the phone with your wife basically right away or
11   once you parked it?
12        "ANSWER:  I don't remember, sir, to tell
13   you the truth.
14        "QUESTION:  Okay.  That's fine.
15        "ANSWER:  I don't remember.  It's been four
16   years.
17        "QUESTION:  Okay.  But you remembered what
18   you did in terms of elevating the" --
19        And then he answers:  "That's my job.  I do
20   that every -- every week, sir.
21        "QUESTION:  And, in part, the reason you
22   remember it is because you do it the same way every
23   time; correct?
24        "ANSWER:  Yes, sir.
25        "QUESTION:  So you might not remember doing
```

37 (Pages 145 to 148)

Page 149

1  it exactly that way that day, but that's the way you
2  normally do it; fair?"
3          And there was an objection.
4          I say: "You can answer. Is that a yes?"
5          He was instructed he can answer, and then
6  his answer was, quote, "Yes, sir."
7          Scott, first of all --
8          MR. CONN: I have an objection I
9  want to place on the record. Because there's
10  objection to that testimony, I believe it's improper
11  to ask this witness about it without the Court
12  ruling on it.
13          That said, go ahead.
14          MR. CONCANNON: Sure.
15  BY MR. CONCANNON:
16      Q   Scott, the fact of the matter is,
17  as far as -- do you read Mr. Urjiles' deposition to
18  be describing what he would normally do as opposed
19  to what he actually did when he --
20          MR. CONN: Foundation.
21  BY MR. CONCANNON:
22      Q   -- the Hendrickson system?
23          MR. CONN: Foundation and form of
24  the question as well.
25          Go ahead.

Page 150

1      A   I don't find it to be a consistent pattern
2  of what he -- of what he did on a daily basis based
3  on that testimony.
4      Q   Okay.
5      A   And that was taken into consideration.
6      Q   By you?
7      A   Yes.
8      Q   All right. And when he gave the
9  statement the day of the incident -- or within a day
10  or two of the incident, he -- did he describe
11  visually seeing the legs locked?
12      A   No.
13      Q   All right.
14          MR. CONN: Asked and answered.
15          MR. CONCANNON: Nothing further.
16          MR. CONN: We're all done.
17          THE WITNESS: Okay. Thanks,
18  everybody. Merry Christmas.
19          THE COURT REPORTER: Mr. Concannon,
20  this is Pat, the court reporter.
21          MR. CONCANNON: I want a mini.
22          THE COURT: You want, I'm sorry,
23  e-trans and a mini?
24          MR. CONCANNON: Yes. Could I give
25  you my E-mail?

Page 151

1          THE COURT REPORTER: Yes, that
2  would be good. What is your e-mail?
3          MR. CONCANNON: A-C-O-N -- it's my
4  first initial and last name basically.
5  Aconcannon@smithbovill.com.
6          And am I on speaker still?
7          THE WITNESS: Yes.
8          MR. CONCANNON: Would you tell
9  Mr. Turner to call me on his ride back, please.
10          THE WITNESS: Will do.
11          MR. CONN: I'd like a mini and an
12  e-trans as well, please.
13          THE COURT REPORTER: What is your
14  e-mail.
15          MR. CONN: It's econn@smsm.com.
16          (Whereupon the deposition was
17  adjourned at 1:35 p.m. for the day.)
18
19
20
21
22
23
24
25

Page 152

1          C E R T I F I C A T E
2
3          I, PATRICIA A. MOHYLA-KLEIN, a Notary
4  Public and Certified Court Reporter of the State of
5  New Jersey, do hereby certify that prior to the
6  commencement of the examination SCOTT L. TURNER, was
7  duly sworn by me to testify the truth, the whole
8  truth and nothing but the truth.
9          I DO FURTHER CERTIFY that the foregoing is
10  a true and accurate transcript of the testimony as
11  taken by and before me at the time, place and on the
12  date hereinbefore set forth.
13          I DO FURTHER CERTIFY that I am neither a
14  relative nor employee nor attorney nor counsel of
15  any of the parties to this action and that I am
16  neither a relative nor employee of such attorney or
17  counsel, and that I am not financially interested in
18  the action.
19
20
21
          Notary Public of the State of New Jersey
22  License Number XI 00998
23
24  Dated: December 21, 2016
25

**A**

A-C-O-N 151:3
a.m 2:9 51:25 52:5
  136:5
ability 73:18
able 21:20 34:23
  46:9 52:24 63:15
  77:25 99:10
  102:11 111:13
  138:11 139:19
above-entitled 2:2
absence 117:5
absolute 21:14
  43:16 58:15 59:10
absolutely 35:18
  43:22 58:14 64:4
  79:1 100:13,13
  112:13 118:8,24
  135:5 142:22
accident 85:5,7
  90:25 121:17
  136:6
account 63:25 64:5
  98:22 116:3
accurate 99:12
  102:12 103:6
  152:10
accurately 99:12
  99:13
achieving 113:23
acknowledged
  116:4
acknowledges
  131:2
Aconcannon@s...
  151:5
act 128:24
action 152:15,18
actions 68:17
activate 48:13
  74:13
activates 33:9,11
  34:14
activating 33:10
active 6:21
activity 129:19
acts 128:25
actual 18:21,22
  136:19 137:8

actuator 34:14
  128:10 134:8,13
add 80:13
addition 15:1 18:20
  20:9,19 72:25
  114:6
additional 21:17,22
  30:11,17,22 47:20
  111:8,9
address 4:2 5:7
addressed 130:24
adjourned 151:17
adjust 48:20
  116:10
adjusted 114:12,13
  114:13
adjusting 114:11
adjustment 60:19
  60:21 114:1,3,6
  115:3,10,15 116:6
  116:8,9,10,17,18
  117:11,21 118:20
  118:22 130:24
adjustments 47:11
admissible 18:18
  45:10 59:23
admitted 119:16
adopted 26:14
advocate 18:8
  119:2 142:20
Affidavit 18:25
  19:17,19 20:2,11
  20:18 21:16,21
  22:12 30:4,8,13
  30:16,19 70:5,20
  70:25 71:14 97:24
  98:19 99:9,18
  131:14
affirm 54:14
afternoon 88:6
  89:2
ago 40:19 64:12
  88:19,20 102:18
  110:15 129:23
agree 29:1 38:18,20
  39:16,22 40:4
  44:13 45:8 48:11
  49:2 54:1,22 55:1
  55:8,14,15 58:6

62:12 63:23 65:12
  66:24 67:12 68:3
  75:12 86:20 87:8
  96:13 98:18
  100:14 107:5
  115:19 117:25
  118:6
agreed 65:8 87:3
agreeing 117:9
agreement 8:11
  87:2 102:19,21
  123:12,17 124:18
  132:3
ahead 10:12 43:9
  45:19 56:16 61:4
  77:19 114:15
  131:22 141:19
  149:13,25
air 14:15 15:8,15
  15:16,17,17,19,20
  56:7 73:2 97:17
  98:7 141:4
airbag 113:21
  116:23
airbags 99:11
airline 14:19 16:20
  16:21
all-encompassed
  16:12
allegations 19:7
alleged 25:23 31:25
  32:5
allow 63:14
allowing 71:22
alternatives 106:4
ambient 49:7
  136:16 137:19
amount 83:5
analysis 10:3 19:2
  41:20 42:12 44:25
  51:23 53:15 63:8
  83:17 85:3 86:1
  118:14
analyze 44:19,21
  44:23 45:3
analyzing 120:4
and/or 18:13
  113:24
Andrew 2:12 127:8

Andrews 2:12
Andy 112:4
angle 34:17,18
  35:10,16 53:7
  62:7,19,19 63:4
  73:5 107:12,14,18
  107:22,25 144:9
angst 109:11
animations 24:5
Ann 52:23
answer 5:2 19:8
  43:3,7 45:14,18
  46:24 47:1,3,4,5
  53:16 54:6 58:11
  58:13 60:1 62:16
  64:3 65:14 66:6
  76:11,20 77:3,6
  81:19 98:9,12
  106:22 108:4
  111:5,14,21
  132:18 138:12,16
  138:17 140:17
  143:22 144:6
  147:5 148:12,15
  148:24 149:4,5,6
answered 77:13
  129:21 138:1
  145:22,24 150:14
answers 19:9 28:5
  71:14 76:20
  148:19
anybody 59:7,16
  94:24 128:11
anymore 61:1 65:4
apologize 51:9
  91:20
appears 31:18
  119:1
applicable 33:5,6
  36:20
applied 145:8,9
apply 117:10
  141:10
appreciate 42:4
  54:13
appropriate 140:18
appropriately 84:2
approximate 6:24
  52:10 107:19

approximately
  6:25 7:2 37:1
  39:1 136:5
April 41:5,8 72:21
  73:25 74:9 83:1,9
  83:11 84:5,8
  103:24 104:11
  107:22 142:15
  143:18 145:7
Arbor 52:23
area 19:14 49:7
  51:13
areas 30:18 86:14
argument 45:12
  67:21,24
argumentative
  64:2
arms 46:18 49:5
  74:21 106:6
  107:18
arrow 96:21
articles 25:19
artificial 49:3
ascribed 129:10
Ashley 19:5 43:24
  44:2 59:13
asked 8:25 10:2
  18:13,17 30:15
  69:1 72:20 90:11
  126:21 128:6
  129:21,23 131:8
  136:3 137:25
  139:8 146:18
  150:14
asking 17:15 76:19
  107:21 147:8
aspect 93:9
assembly 71:22
assign 29:17
Assignment 90:1
assist 19:1 24:6
  141:12
assistance 24:14
assistant 101:11,13
  101:15,25
associated 101:20
  113:24
assume 4:18 5:3,23
  10:21 12:24 31:3

38:8 112:4
assuming 100:23
  143:15
assumption 97:18
attempt 82:9,11
  96:22
attended 52:23
attorney 17:14
  121:3 152:14,16
attorneys 2:13,17
  105:17,18 121:4
attorneys' 105:20
audible 71:21 72:2
  72:7 74:11 75:7,9
  98:15 107:1
  116:23 131:10
  139:21 140:3
  143:7,8 146:8,12
  146:13,19,25
  147:9
author 30:17,22
authored 20:10
  21:4,24 30:11
automated 48:22
automotive 109:1
available 49:7
Avenue 2:7
average 11:25 37:3
aware 16:2 78:23
  79:3,8,20,24 80:4
  80:7,10 81:2,21
  82:4 135:24
axle 31:21 33:15,16
  33:17,19,19,20,22
  34:19 35:12,16
  39:16,22 46:19
  53:8 64:12 65:8
  66:11 72:15 73:5
  73:8 96:24 97:2
  106:6,18 108:8
  116:14,25 133:4,7
  134:12 140:20
  144:10
axles 106:5 141:3,4

_____ B _____

back 9:5 11:20
  31:14 33:25 34:22
  37:16 39:6,8

44:25 60:6 61:21
  63:7,17 64:13
  65:14,24 76:6,8
  77:10,11 78:18
  79:9,18 84:3
  85:13,17 87:18
  88:17 94:19,21
  95:1 96:2,18,18
  97:24 99:5,8
  100:4 107:4
  110:15,25 114:18
  130:22 136:10
  138:11 139:10
  141:8,8 144:19,23
  146:14,14 151:9
backed 34:9 72:23
  74:5 75:5 97:9
  136:15 139:13,19
  145:18 146:10
backing 33:7 64:24
backwards 125:4
baited 99:22
barely 65:22
bargain 123:22
base 104:3
based 32:15 41:19
  41:19 42:11 50:19
  55:8 59:19,22
  63:8,8 66:23
  72:10 75:16 80:23
  81:25 82:16 83:2
  83:2,14 84:11,13
  86:21 87:11,12
  95:4,19 96:13
  99:9,10,11,18
  101:3 110:10,10
  112:10 113:2
  115:13 119:10
  131:16 135:16
  150:2
basically 104:3
  148:10 151:4
basing 142:4,12
  144:13
basis 21:19 29:10
  57:1 91:6 118:16
  120:16 135:22,23
  142:8,8 150:2
bear 17:20 19:17

113:10
bearing 54:3,23
beginning 66:8
  67:8
behalf 18:8
behavior 85:20
belaboring 34:15
believe 18:13 20:2
  22:9 23:12,14
  29:24 43:2,15,16
  44:17 52:9 53:20
  53:23 55:19 56:17
  57:19,24 59:2
  75:15 78:20 80:21
  80:25 81:1,6 95:3
  96:7 99:14 102:17
  102:19 105:17
  106:15,23 108:6
  118:23,24 119:12
  122:20 126:14,18
  126:20 134:18,20
  140:7 145:24
  149:10
believes 38:25
  96:15
bell 125:9
Ben 15:7
Bendix 14:15,23
  15:7,8 16:13,15
beneficial 50:17
benefit 7:20
Bernstein 120:25
  121:4
best 73:19 117:8
beyond 29:20
big 63:20
billed 102:8
billing 102:3
  104:24
bills 101:25
bin 101:23,24
birth 53:21,23 54:2
  54:23,25
bit 12:2,23 28:15
  28:21 34:1 39:1
  71:4 94:16 112:25
  131:8
black 33:10
Blairstown 4:2 5:9

blank 122:24
blanket 80:13 81:6
blocks 69:20
blow-by-blow 52:8
blower 68:18
body 134:4
bolsters 71:6
borne 45:9
Boston 22:21
bottom 62:8 89:9
BOVILL 2:11
box 4:2 5:8,8 8:7,8
  96:9 106:16
brake 15:8 16:18
  16:19 47:11 66:12
  66:15,22
brakes 14:15 15:16
  15:19 100:6
  141:10
break 19:22 26:23
  27:5,8,11 30:3
  70:14,24
briefly 88:18,18
bring 27:22 69:2,3
broad 50:9
broken 60:15
  113:25 115:9
  116:4
brought 12:7,14
  50:22 113:18
building 49:11 50:6
  137:16
bullet 51:8 96:21
  96:25
bumper-to-bum...
  15:14
business 4:2 101:12
  101:14
button 33:10 34:14
  74:13,23

_____ C _____

C 2:1,10 4:1 152:1
  152:1
c-h-h-h 141:6
C.V 13:11
cab 141:8 147:24
  148:6,9
calculate 101:19

calipers 66:12,22
call 104:24,25
  105:2 112:1 151:9
called 69:18 84:20
calling 130:4
calls 58:10 103:13
  127:14 128:2
capacity 9:22
capital 11:16
captured 24:23
car 28:4,18 60:12
  60:21,22
career 8:24 109:9
careless 85:20
carelessness 29:18
Carrier 22:23
  84:23 85:22 86:2
  100:8 108:10,15
  112:19
carriers 6:11 84:1
case 5:24 8:5,23
  10:4,15 15:18
  18:16 19:2 20:7
  21:5 23:18 24:15
  26:16 29:23 30:8
  30:23 31:4 38:18
  44:3,11,12,22
  45:9 48:13 51:5
  58:7 79:13 83:11
  86:4 95:4 100:12
  102:8 105:8,14,19
  106:24 110:24
  112:15 119:11
  120:5,11,18
  125:12,14 127:9
  138:9 147:2
cases 7:15 8:17 9:6
  11:23 12:10 18:12
  18:12 23:15 44:23
  47:6 103:11
  105:22,22 125:15
  125:16,25
cast 50:5
cattle 5:18,23
causal 10:3 19:2
  54:2,23 56:25
  57:13
causation 21:5 90:5
  90:12

causative 57:17
64:8 83:22 95:24
116:16 119:25
cause 18:18 58:3
61:15,15 69:24
94:21,22 95:3
109:18 117:7
caused 61:13 89:15
89:21 90:5,8 96:2
113:22 115:21,21
116:18 118:4
120:3,3
causes 34:15,16
71:19 92:25 93:20
93:21,24 94:3,5
94:10,14 95:11,11
95:15
causing 83:19
137:22
CDL 16:25 17:4,6
33:2
CENTER 2:7
certain 21:14 22:10
23:16 28:16 43:22
53:12 101:21
121:20
certainly 8:14
45:15 49:9 53:13
63:3 99:7 138:5
certainty 43:16
58:14,15 59:10
certification 26:2
certified 2:4 15:7
152:4
certify 152:5,9,13
chance 62:10 70:19
70:25
change 71:10
123:20
changed 21:23
102:17,18 123:16
123:17
changes 123:18,23
124:14
charge 124:7,10
charged 103:4
checked 117:12,14
117:20 119:25
cherry 147:3

chhh 141:5
chocking 111:2
choice 62:5 82:14
Christmas 150:18
cite 71:13
citing 85:10
Civil 4:14
claimed 132:2
clarification 24:19
clarify 9:18 115:17
cleaned 101:24
clear 79:19
clearly 41:2 58:1
64:7 97:11 142:2
click 141:1
clock 105:2
close 66:17 68:15
closed 67:25
closely 46:7 119:10
120:6
closer 99:3
closing 67:22
closure 34:25
cloud 49:23 50:24
cloudiness 52:4
clue 108:21
coincidental 55:20
56:18 57:19 62:1
62:2
collapse 61:25 63:1
69:24 89:15 90:5
90:7,14,23 91:2,6
93:1 110:19,25
111:1 138:2
collapsed 9:2 25:23
35:5 37:7 56:18
62:15 64:25 84:15
86:22 87:17
109:17
collapses 63:1
69:24
college 13:7
color 19:13
come 11:15 25:2
44:25 47:8 52:5
98:11 119:4,6
comes 30:25 32:12
51:21 102:4
comfort 88:4

comfortable 88:3
coming 18:2 21:2
23:17 24:4 109:12
119:1
commencement
152:6
commencing 2:9
commercial 6:10
14:19 16:21 17:6
18:22 33:1,3
44:22 46:4,8
47:10 64:8 67:10
68:12 83:24 85:4
95:21 100:1,3
108:11,13 119:19
119:22 120:7
commitment 69:4
common 85:18
108:25 109:4,6
110:18
common-type
108:20
commonly 108:25
community 6:9
companies 5:16
company 1:7 5:15
5:18,23 16:16
comparatively
109:4
comparisons
126:22
Complaint 19:7,8
complete 48:14
141:7,14,21
completed 72:23
74:5 75:1 97:9,13
99:5 139:12
145:18 146:6,7,8
completely 28:8
95:2 115:6 141:25
components 66:15
66:15
Concannon 2:12
3:5 17:14 24:18
40:7,16 43:3
45:11 54:4 55:13
58:9 59:24 64:1
70:13 77:16 88:13
105:12 106:19

122:22 123:3
125:1 126:7
127:16,25 128:3
128:15,20,21
129:7,22 132:23
132:25 133:2,14
134:1 135:2,8,15
136:2 137:1,5,10
137:12 139:3,8
140:14 141:16
142:14 147:5,14
148:2,4 149:14,15
149:21 150:15,19
150:21,24 151:3,8
concerned 14:14
81:13 94:8
conclusion 82:15
83:6 95:20 115:21
135:7
condition 50:24
83:15
conditioning 81:7
conditions 52:9
137:19
conduct 76:15
conducted 119:22
conference 104:24
104:25 105:2
confirm 35:18
confirms 35:15
71:4 96:15
conflict 82:22
conflicting 79:10
confused 33:18
Conn 2:15 3:5 4:6
4:11 12:22 25:4
25:13,17 31:8,12
32:8,11 40:9,12
40:24 43:8 45:15
45:17,21 46:1
47:16,18 54:7
55:16 61:3,5,7
64:10 70:9,18
77:20 87:22 88:2
88:9,12 111:25
112:9 123:5,9
124:2,6,20 126:3
127:5,13,19,22
128:2,7,14,17

129:4,21 131:19
132:20,24 133:11
133:23 134:25
135:6,14,25
136:18,24 137:3,7
137:11,25 139:6
147:7,11,25 149:8
149:20,23 150:14
150:16 151:11,15
Conn's 125:5
consequence
127:10
consider 76:2 96:4
146:21 147:1
consideration
49:15,23 65:7
68:4 99:25 150:5
considered 18:22
29:13 57:10 95:15
111:1
consistent 98:15,16
98:23,24 103:12
150:1
construction 13:9
14:7 36:19
consultant 44:10
consulting 5:17 6:6
6:8,15,23 9:16
102:5
contacted 17:14
contain 30:8
contained 20:14
96:8
contains 29:23
content 138:18
context 138:17
continue 4:25
32:12
continues 89:16
continuously 48:24
contractual 69:4
contradict 80:17
81:8
contrast 139:25
contributed 55:12
contributing 91:2
contributory 55:15
control 67:1,13,15
67:18 68:9 69:12

76:1 106:16
113:24 128:5,6,10
128:12 131:5
controlling 127:15
127:18
controls 55:2
controversy 113:8
142:3
copy 13:11,15 48:6
102:20,22 140:13
copying 12:16
correct 4:19 5:25
6:20 7:13 8:8
9:17 12:25 13:1
13:22,24 14:1
15:3,4 16:16,17
16:20,23 18:19,20
20:15,16,25 22:8
23:24,25 25:6,7
25:11,12 26:12,13
27:25 28:22 29:24
29:25 30:9,10
31:7,21,22 32:2,3
32:6 33:24 35:12
35:13,17,20,23
36:7,8,13,17
37:15 39:2,25
40:2,3 41:6,14,18
41:25 42:10,15,17
42:19,21,22 43:25
44:3,4 46:14,15
46:19,20 47:5
48:16,18,19 49:1
49:16 52:16 53:11
55:5,7 59:4,16,17
63:5 64:14,15,20
64:22 66:20 69:8
69:9,11,12 70:5
71:1,11,15 74:3
75:24 81:9,10
84:5 87:20 89:17
89:18,21 90:9,10
90:18,18 91:17
93:7,12,13 94:15
94:20 96:10,11
98:11 101:17
106:13 107:8,16
110:4,5 112:20
115:12 122:1

123:10 128:16
129:13 130:11,15
131:4 132:3,5
134:9 136:7 140:8
142:17 146:22
148:23
correctly 9:15
71:25 91:3 93:6
94:10 121:19
cost 102:13
counsel 121:18
152:14,17
Counselor 74:16
counterweights
65:25
couple 4:21 13:20
37:4 38:16 123:18
125:4
course 15:9 18:6
23:6 74:22,24
90:15 109:9
112:17
court 1:1 2:4 22:20
23:1 40:10,11
45:21 126:6
127:24 135:10,12
141:5 149:11
150:19,20,22
151:1,13 152:4
Court's 48:6 76:12
77:14,21
courts 126:19
cover 37:24 49:23
50:24 77:17 125:4
covered 139:2
covering 138:24
crash 47:9,14 64:8
119:24 121:16,20
crashes 9:25 84:22
85:21 86:8
crawl 29:9
credibility 63:24
131:12
criticisms 113:3,6
117:1 118:11,12
120:12 127:2
criticize 117:24
119:5
criticizes 117:3

118:17
CROSS 3:3
CROSS-EXAMI...
125:1
crushes 60:11
cue 81:25
current 5:6
currently 5:10 6:22
16:25 30:21
103:11
cut 40:8 94:7
122:23 138:13

D

D 2:12 3:1
daily 142:7 150:2
damage 90:24
115:20,20
damaged 93:2
113:25 115:10,23
115:24 116:4
Dane 37:21
dark 50:11
data 51:3
date 1:12 46:13
53:14 83:7 121:7
123:17 152:12
dated 20:3 77:15
77:21 152:24
David 125:7,9
day 22:17 49:6,10
50:2,24 51:1,14
52:8,20,20 53:10
97:6 98:25 99:3
101:22 104:18
120:1 124:15
140:1,1,1 141:24
142:15 145:15,19
149:1 150:9,9
151:17
daylight 50:9
days 88:19,20
103:9 120:2,2
deal 31:19
dealing 9:13 14:15
14:17 24:16
deals 15:8 31:25
32:4
dealt 8:17,20 9:6,16

9:18,20,23
December 1:12 2:8
152:24
decent 27:10
deck 7:24
deck-type 109:5
decking 37:18,22
defendant 1:8 2:17
19:6,7,10,12
120:5
defendant's 19:9
78:1
defense 6:9 11:24
12:3 105:22
122:19 123:2
defensibility
106:20
defer 89:23
deficient 83:14
100:7
define 18:2 54:9
defined 54:5
definitely 90:8
definition 28:17
deflating 56:8
99:11 116:24
degree 34:17
107:19 118:9
135:4,10
delivery 148:8
demand 19:15
demonstrate 11:18
demonstrated
57:23
demonstrative 24:9
depend 62:18
depending 37:20
depends 38:12,12
38:13 62:17 65:14
138:4
deposition 1:10
4:12,17,18 12:4
19:3,4 20:4,5 28:7
40:2,18 42:20,24
43:25 44:14 45:1
45:16 46:21 59:4
59:12,20 63:24
71:5,15 72:3,13
73:6,11,20 74:8

76:15,18,23,25
77:2 79:16 81:8
88:5,15 99:10,14
99:20,21 100:3
102:13 109:20
111:15 116:22
119:16 120:4,7
123:21 132:1,12
139:9,10,25 140:7
140:10,14,16
141:15 142:10
143:16 146:15
147:17 149:17
151:16
depositions 7:2
47:6 73:13 98:20
119:13
describe 34:6 98:4
150:10
described 127:5
describing 149:18
Description 3:8
89:10
design 95:19 106:4
106:8
designed 35:19
36:15,17 56:3
desk 101:24
despite 73:6 119:15
detail 111:12 113:1
details 34:16
determination
18:18 21:20 46:9
49:13 73:18 85:17
determine 42:8
71:21 90:4 99:10
109:17 141:20
determined 43:13
114:5 120:10
determines 48:17
device 128:10,12
134:9
diagrams 92:1
diamond 37:17,19
37:25 38:11,11
difference 7:19
different 28:5,9
36:18 74:20 81:14
82:1 126:8 129:6

141:25
different-type
  138:6
Dillon 1:6 2:17
  19:6,10,12 31:25
  32:5 81:13,24
dimensions 92:3,4
dinner 105:7
direct 3:3 4:6 21:6
  83:21
direction 34:10
directly 16:11
  51:21
disagree 27:17 37:2
  38:18
discounting 44:14
  44:16
discounts 60:10
discover 107:7
discovery 4:17
  19:14 103:3
discretion 50:18
discussed 20:10
  25:5 30:18 111:10
discussing 71:1
discussion 12:20
  25:15 31:10 32:9
  87:25 88:10 123:7
  124:4
dispatcher 67:22
distracted 39:20
DISTRICT 1:1,1
disturbed 70:2
DIVISION 1:2
dock 9:7,11,20 10:5
  19:14 34:9,10,11
  34:23,24 35:1
  37:24 38:13 49:11
  64:13,24 65:20,20
  66:1,1 67:24
  68:15 71:22 72:23
  74:6 75:5 85:25
  97:9 99:5 108:10
  108:16 109:8
  136:11,15 138:7
  139:13,19 141:9
  145:18
doctor 16:22 89:17
  130:4

doctors 89:23
document 22:18
  51:20,22
documentation
  32:16 47:20,21
  91:15,24 113:21
documents 12:7
  13:10 19:14 51:5
doing 14:4,6 27:12
  34:4,5 44:25 57:6
  58:16,17 60:4
  61:16 62:3 70:10
  88:8 116:10
  117:22 148:25
Donald 20:21,24
door 39:20 65:17
  65:17 76:1
doors 67:22,25
  68:15
DOT 104:6
downloaded 78:4
dozens 24:20
Dr 22:1 112:24
  113:14,16 117:2
  118:12 120:13
  126:23 130:5
draw 82:15 91:25
drawing 131:2
drawings 92:1
drew 95:20
drive 12:15 13:17
  18:2 24:4 51:2,3
  78:5 91:13 92:17
  102:21,25
driver 20:6 28:21
  29:1 32:1 33:2,2
  33:13 50:19 67:6
  68:24 81:25 90:25
  106:5,16,24
  110:21,23 111:3
  119:20,23 145:6
driver's 33:11 55:6
  120:7
drivers 47:6 64:6
  73:13 85:19,25
  86:3 100:1 102:5
driveway 60:24
driving 14:7 36:1,3
  36:6

drop 7:24 34:16
  39:12 92:5 107:19
drop-deck 7:13,17
  8:4,10,18 9:1
drop-deck-type 8:3
  9:9
Dropbox 24:4
  51:16
dropped 9:7 38:21
  66:25 67:2 130:16
dropping 9:11,19
  83:20 109:18
drops 33:9
drove 110:24
dry 94:7
duces 12:5
due 41:21 45:7
duly 4:3 152:7
duplicative 135:22
duty 142:7

——————————
E

E 2:10,10 3:1 4:1
  152:1,1
e-mail 150:25
  151:2,14
e-trans 150:23
  151:12
earlier 40:1 44:9
  53:5 87:3 94:16
  103:10 114:20
  123:11 130:25
  136:4 138:12
early 89:5
EASTERN 1:1
econn@smsm.com
  151:15
educated 66:23
education 12:24
  13:6,21,25
effect 27:11 43:17
  56:25 97:16
  114:16 116:13,25
effective 50:16
effectively 83:21
  111:6,14
effectiveness 40:21
  40:22
eight 16:11

either 10:4 15:21
  18:15 23:11 24:6
  25:9 34:24 75:13
  93:2 100:19
  115:24 122:8
  132:8
electronic 78:3
  103:1
electronically
  12:14 140:12
elevate 129:3
elevated 34:21
  64:16,18 129:11
  130:16,18 133:16
elevates 33:8
  128:10 134:3
elevating 148:18
elevation 128:23,23
  129:1,2
eliminate 59:18
eliminated 94:5
else's 28:9
EMC 27:7
emphasize 85:23
employed 5:11
employee 69:11
  152:14,16
employees 6:13
employer 40:6
employment
  109:25
encapsulated 31:4
encapsulates 90:2
encompassed 16:13
engaged 23:3
engagement 123:13
engineering 13:22
  14:1 39:4,5 135:4
  135:10
enter 71:23 101:17
  101:19
entered 39:10,24
entire 15:14 95:10
entries 104:11,20
entry 103:23
  104:10
enumerated 78:19
equipment 7:19,23
  25:9,10

Eric 2:15 24:18
  40:7 122:22
  128:20 133:1
error 110:21,23
  111:3,3
ESI 20:22 21:7
  22:1 38:25 56:4
  60:9 79:9 113:15
  115:19 116:4
  117:16,18,20
  130:20
ESI's 79:13
ESQ 2:12,15
ESQS 2:15
essentially 10:9
  17:17 65:19 71:4
  87:4,17 90:2
  91:16 92:5 113:7
  118:16 120:14
  139:17 140:2
estimate 7:4
evaluate 44:12
evening 89:5
events 70:1
eventually 69:20,22
  70:1
everybody 150:18
evidence 4:15
  18:17,21,22 24:10
  24:11 30:25 38:17
  44:12 45:9,24,25
  46:3,5,7 59:22
  73:3 78:23 79:3,8
  79:13,14,15,20,24
  80:5,8,11 81:3,22
  82:4 84:12 90:22
  91:8,9,10 95:4
  100:12,20 101:4
  115:13 134:22
  146:21,21 147:2
exact 17:25 109:14
  110:9
exactly 28:11 53:25
  74:4 86:16 130:19
  146:4 149:1
examination 4:6
  35:9 139:6 152:6
examine 35:2,8
  44:22 47:14

examined 35:3 46:7
examining 120:6
example 20:12
  49:18 64:9 103:16
exclusive 61:18
  67:1
excuse 9:9 33:8
  65:16 76:14
  113:12 143:6,11
  146:9
exemplar 53:2
exemplars 24:14
exercise 128:12
exhaust 97:17
  113:22
exhausted 97:3
EXHIBIT 3:8
exhibits 19:4,5
exist 114:24
existed 108:23
expand 112:2
expect 29:5
experience 9:17
  13:14 66:23 86:7
  141:23
experienced 28:25
  46:8 58:23
expert 6:7 8:25
  22:20 23:1,10,13
  44:19 46:8 47:13
  52:21 85:4 102:6
  102:6 103:9
  125:21 126:1,17
  135:16
explain 7:18 56:10
  56:11 129:24
  136:23 137:13
explanation 69:14
  80:23 126:25
express 6:16
extended 112:5
extent 70:2 126:5
  131:15
eyes 72:8,9

F

F 152:1
facility 82:17,18
  109:7 114:10

fact 25:5 29:21
  38:6 55:2,9 57:2
  57:13 65:6 71:4
  72:7,14,15 73:1
  75:18 81:7 84:14
  86:22,25 87:13
  88:5 89:17 90:23
  91:5 94:17 96:17
  104:21 115:8,8
  116:24 119:15
  136:9 149:16
factor 55:15 57:5
  83:19,22 84:22
  91:2
factors 49:14 95:24
facts 38:17 44:21
  73:22,23 75:16
  98:23 100:10,24
  120:10
failed 87:5 107:6,7
  107:9,11 138:7
failure 32:1,5 41:19
  41:20 42:3 57:16
  61:15 86:9 91:1
failures 87:12
fair 5:4 18:15 21:24
  21:25 71:7,8
  91:16 93:10,14
  104:2 113:4
  122:10 132:15
  134:17 149:2
fall 69:22,22 127:9
fallen 10:4
falling 127:6
falls 26:5 54:10,18
familiar 21:1 23:7
  121:2
far 9:8 14:14,18
  16:10 23:5,5
  26:13 52:7,11
  65:14 81:12,12
  82:24 94:8 101:5
  102:8 115:22
  119:12 128:13
  132:7 142:13
  149:17
fast 27:1,15,22 28:3
  28:4,8,9,15,16,17
  29:2,9,13,16

55:10 56:19 57:10
fast-forward 74:8
faster 58:19 60:6
fathom 94:11
federal 4:14,15
  12:19 22:22 23:11
  26:6,8,9,10 84:23
  85:10,14,22 86:2
  86:12 100:7 108:9
  108:15 112:19
  126:12,17,18,20
fee 103:5 123:12
feel 18:24 88:6
feet 37:20,22 39:6
fell 27:4 55:20
  87:13 138:7
fifth 35:6 37:9
  55:21 56:1 62:14
  62:14 69:15
figure 32:24 85:9
  87:18 113:21
file 12:13 19:20
  22:18 78:3 81:25
  91:24 103:1 125:6
files 6:21 78:8
fill 101:22
financially 152:17
find 18:14,14 19:16
  30:2 37:4 47:8
  48:1 60:25,25
  77:24 95:9 107:11
  115:13 119:23
  150:1
findings 80:18
  118:16
fine 43:21 70:14
  118:17 119:5
  120:1 132:16
  148:14
finish 46:23 47:1
  140:17
fired 68:2,6,8,19
firm 105:12 120:25
  121:1,5,23 122:11
  122:12,12 125:5,9
  125:20
firm's 122:7 126:5
firms 120:21
first 7:18 38:20

39:17,23,24 55:21
  65:9 69:16 71:24
  89:14 90:4 96:20
  96:25 117:4
  132:17 133:6
  140:24 149:7
  151:4
fishing 58:24
fit 47:4
Fitzsimmons 2:6
  12:15
five 7:1,4,6,16 8:16
  8:19,21 11:22,25
  12:11 35:22 57:9
  60:4 62:4 70:12
  120:2 148:7
five-minute 70:13
flag 112:22
flashlight 49:3,9,12
  50:13,17
flat 109:4
flat-deck 110:17
floor 37:8
flooring 37:15,18
FMCSA 14:16 15:4
  16:14 20:13 68:19
FMCSR 67:5,5
  68:19 84:1,16,19
folks 26:4 122:4
follow 12:18 97:10
follow-up 21:16,21
  77:17 147:16
following 115:3
  145:7 146:17,20
follows 4:4
forbidden 22:23,24
foregoing 152:9
forgive 17:6 91:23
  96:24
fork 55:11 59:23
  60:3 61:9,13,16
  61:24
forklift 26:4 27:8
  29:10 35:5 55:25
  57:6,10,12,20
  58:15,16,21 63:17
  63:20,22 65:18,23
  66:9 68:13 94:25
  96:1 108:11 138:6

form 19:15 34:24
  43:4 45:11 54:4
  55:13 58:9 59:24
  64:1 106:19 126:3
  127:13 129:4
  133:24,24 134:25
  135:4,6,14 149:23
formal 13:21,25
  14:12 15:23 16:1
  16:7
format 121:10
formulate 90:12
formulated 47:20
formulating 24:15
forth 47:12 84:22
  92:6 152:12
forward 54:19
  143:5,5
forwarded 78:5
foundation 15:8,19
  21:23 59:25
  103:25 104:3,9
  120:16 126:3
  128:14,19 131:19
  133:12 135:6
  136:18 137:6,8,25
  149:20,23
foundational
  133:15
four 12:18 47:9
  58:17 60:4 61:19
  62:4 64:9 88:19
  88:20 103:14
  148:15
four-hour 102:19
fourth 69:16
frame 28:24
frank 40:19
frankly 60:11
  62:18 83:25
  118:23
free 18:24
freight 63:21 67:17
  69:2,3,5,8
fresh 143:2
freshest 72:19
friction 83:19 85:1
  86:14 118:3
friend 69:23

**front** 12:12 19:18
  20:1 30:2 37:7
  38:7 51:16 65:22
  70:4,6 75:16
  77:22,23 78:1,7
  91:11,25 101:4
  103:2,17 104:5
  120:19 132:12
  140:8 142:11
  143:16 144:14
  147:18
**full** 4:8 39:11,12
  50:12 66:8 117:4
**fully** 4:24 34:10
  47:3 66:5 76:11
  77:3,6 116:19
**functions** 63:9
**further** 56:10 63:6
  71:20 96:14 114:1
  142:24 147:12
  150:15 152:9,13

**G**
**game** 58:24 69:17
**gap** 34:25
**GBWR** 66:17,18
**general** 89:10
  118:14 141:23,23
  142:7 143:14
  144:15 145:13
**gentleman** 22:1
**getting** 88:3 95:12
  104:7,16 123:22
**give** 4:23 37:4
  47:24 81:19 112:4
  119:6 138:12
  150:24
**given** 7:3 43:4
  52:20 54:25 76:20
  80:16 132:13
  144:15
**gives** 52:7
**giving** 76:20
**glean** 97:21
**go** 4:22 11:20 13:20
  20:13 25:13 29:12
  31:8,14 38:15
  43:9 45:19 48:18
  48:25 52:17 56:16

58:18,19 60:5
61:4,21 65:21
66:2,4 70:9 72:18
74:8 76:7,12
77:10,19 78:18
79:18 85:13,16
87:22 96:18,18
97:24 99:8 100:5
110:14 111:25
114:15,17 119:2
123:5 124:2
131:22,24,24
137:9 139:10
141:8,19 143:5
145:3 146:14,14
148:3 149:13,25
**goes** 55:25 60:9
62:6 68:18 98:15
114:1 120:15
124:12 130:22
140:23,23,25
141:4 146:8,12,13
**going** 4:22 5:3
10:12 13:20 19:16
27:10 28:3,4,5
29:7,7,15,17 35:7
37:4 38:15 45:12
48:2,18 54:19
55:10 57:7 58:3
58:18,18,20 60:5
60:7 61:5,11,19
62:7,18 63:12
66:7 69:21,23,25
70:1 71:3,18 76:7
76:12 77:11 79:18
80:12,13 84:3
90:3 98:14 103:11
103:18 106:25
107:4 117:23
119:4 120:8
121:11,14 131:7
131:24 132:11,14
132:14 133:23,24
142:18 147:20
148:3
**good** 6:5 27:23
49:12 66:23 77:18
79:17 126:9
133:13 134:16

139:3 151:2
**Goodman** 1:3,3
2:14,14 4:17 18:9
19:4 25:24 26:18
27:1 34:5 35:22
36:24 37:6 39:23
42:21 43:12 59:4
62:13 65:9 67:19
69:11 89:15 108:6
109:8,16 111:10
111:17 129:16,19
129:20 137:21
**Goodman's** 26:22
39:17 42:23 89:21
**gotten** 53:4
**graduated** 12:24
**graphic** 130:5
**Great** 37:21 70:15
**greatest** 39:17,23
65:9
**greatly** 28:6
**green** 106:17
**gross** 66:18 102:3
**ground** 4:21
**guess** 7:5 11:11
43:18 66:23 69:17
78:13 82:13 87:2
104:15 114:9
116:15 121:15
**guessing** 73:16
**guy** 6:17

**H**
**half-hour** 105:1
**halfway** 98:1
**handle** 119:6
**handled** 72:20
**hands** 67:24
**hang** 118:5
**hanging** 53:8
**Hannity** 88:8
**happen** 58:21 60:7
63:17 69:25
114:25 115:1
119:3 127:6
**happened** 39:12
44:12 63:3 100:18
110:12 118:25
119:7 127:1,4

143:17
**happening** 59:21
60:23 63:19
**happens** 104:23
**hard** 32:19
**hate** 62:4 100:2
**hauling** 7:23
**head** 95:10 99:6
105:8
**heading** 89:10
**hear** 16:6 98:6
127:25 128:1,17
141:1
**heard** 73:1 97:14
97:14,16,17 98:3
98:4 116:23 137:2
137:5
**hearing** 114:23
**heart** 31:22
**heavier** 94:17
**heavy** 7:23 65:25
**heavy-highway**
13:8 14:6
**height** 48:21 92:5
**held** 2:5 12:21
25:16 31:11 32:10
70:17 88:1,11
112:8 123:8 124:5
**help** 19:23,25
141:20
**helpful** 106:15,23
**Hender** 138:22
**Hendrickson** 9:13
40:6 75:8,23 76:2
106:4,12 129:25
138:19,23 149:22
**Hendrickson's**
131:1
**hereinbefore**
152:12
**Hey** 88:4
**high** 12:24 13:1,4,9
13:14 48:18 57:15
73:11
**high/low** 25:24
26:18 28:21,25
29:3,3,6 36:3,6,9
36:25 43:6 55:12
55:20 56:19 58:8

94:18
**high/low-related**
26:21
**high/lows** 26:2
36:13,19,21
**highly** 84:9,11
108:20,21 132:9
**highway** 15:2
**hired** 18:7 44:10
**history** 85:9,11
**hit** 37:8
**hitting** 38:7
**Hold** 132:21,22
133:24 136:24
138:21 145:2
**honest** 115:6
**honestly** 142:23
**horse** 98:21 119:20
**hour** 27:13,13
28:18,19,19 29:12
29:13 57:9,21
58:16,17,17 60:4
60:5 61:9,19 62:4
62:4 102:15
103:14 123:21
124:14,17
**hours** 16:11 47:9
49:6 64:9 102:7
103:14,14 112:11
112:15,18 119:24
**huh** 88:7
**hundreds** 86:5
99:25
**hung** 53:4
**hypothesis** 117:6
117:24,25

**I**
**idea** 41:9 86:12,13
102:9
**IDENT** 3:8
**identified** 11:8
**identifying** 117:6
**ignoring** 119:16
**illustration** 11:14
**illustrations** 130:10
130:20
**imagine** 37:21
**immediate** 61:25

95:20
immediately 27:15 69:25
impact 136:15
important 61:10 143:4,4
impossible 63:12 63:13 95:25
improbable 84:10 84:11 93:21 94:4 94:10,14,14,22 95:3,14 132:9
improper 70:3 149:10
improperly 46:12 114:13 131:3
incapable 93:3
inches 38:21,22 39:1
incident 8:13 25:11 27:2,3,16 28:22 32:17 34:3,5 41:5 46:14 47:15 50:25 51:24 53:11,14,19 54:3,5,10,10,17 54:24 55:9,12 57:18 59:1 61:13 69:15 73:17 82:17 83:10,15 89:20 94:11 99:1,3 109:16,21 110:3 111:20 117:7 127:5 136:12 137:21 143:10 150:9,10
incidents 84:22
include 13:13 91:14 98:19
included 10:22 47:22 85:14
including 81:6 118:11
incomplete 99:19
inconsistent 73:22 73:23 100:10,12 100:19,20
incontrovertible 46:6
incorrect 100:23,24

118:18 130:12,17
independent 18:8 18:10 44:10
indicate 92:24 106:5,17 111:8 122:18,23
indicates 90:23 91:8,10 123:14
indicating 106:17
indicative 104:21 106:8
indoors 36:16,17
industry 83:24 109:1
ineffective 75:14
information 19:1 82:21 92:14 97:21 99:19 110:3,6 111:4,8,20
informative 110:7
initial 151:4
injury 89:15,21 90:6,8,16 137:23
innocuous 147:21
inside 57:7 58:3,19 58:22,25 59:21 65:23 66:5
insofar 137:8
inspect 33:3 40:23 40:25 41:2 61:15 72:7,8 75:15,15 87:5 100:6 107:9 108:11 146:1
inspected 24:14 41:24 42:2 73:14 74:7 75:2,3,4 83:4 99:22,23 100:3 131:6,15 132:2,3 132:8 143:3
inspecting 72:24 73:2,23 74:20 95:21 107:1 131:16
inspection 11:9 23:22 31:20 33:4 33:5,6 35:15,17 38:24 41:18 42:9 42:15 43:1,14

44:6,18 46:3,17 47:8 48:15 49:4 50:14,16 52:15,22 72:14 75:14,18 76:3 82:8,16 83:8 91:11,19,21 92:2 92:8 99:7,15 101:4 108:7 115:14 116:8,10 117:12 119:21,22 120:1 129:12 132:10 133:19 134:8,18,21 138:11 139:22,22 143:20 144:1,4,7 144:12,18,21
inspections 14:18 15:3 64:7
inspector 14:16 16:14
instructed 149:5
instructions 75:23 96:8 97:10 130:1 130:6 138:20,23 143:14 145:13
insufficient 135:17
intended 35:10 97:13 99:3 113:23 116:14 139:11,15
interest 73:19
interested 152:17
interesting 50:23
intermittent 50:3,4 51:19 52:4,10,13 52:19 136:5
Intermodal 125:13
interpret 142:8
interpretation 29:8
Interrogatories 19:10,13
interrupt 24:19
investigate 109:15
invoice 103:22,23
invoices 101:16
invoicing 18:1 22:14,16 101:8,10 101:15 102:2,23
involved 7:16 8:5 8:13 17:12,17,19

18:23 25:11 44:20 47:14 83:10 93:9 109:21 137:22
involvement 111:9
involves 118:22
involving 7:25 109:16
iron 34:18 53:7 62:19,20 107:14 144:9
irons 35:10,16 62:8 63:4 73:5 107:12
irrelative 61:20
issue 39:2 61:17 72:25 106:21 114:2 115:7,25 116:1,16 117:2 118:4 126:24 127:15,17 128:5 130:24 140:18 143:25 144:2
issued 22:12
issues 17:16
items 125:4

————————
J
jeans 88:6
Jenga 69:18
Jersey 2:5,8 4:3 5:9 26:7,9 152:5,21
Jim 22:1
job 57:6 90:4 105:3 140:22 148:19
joke 93:17
judge 126:17,18
Judgment 47:22 77:1 78:2,14
jump 10:12 12:15 13:17 18:2 24:3 51:2,3 78:4 91:13 91:24 92:17 102:21,25 143:5
June 77:15,22
juris 114:25
jurisdictional 19:7
jury 7:20 24:7

————————
K
keep 34:21 83:19 101:7,8 130:4

key 72:25
kick 34:16 46:11 56:7 63:15
kickback 58:4 96:3
kicked 60:14 62:11
kickstand 56:7 60:8,14 61:16 93:2,4 97:19 99:12 108:22 116:2,13,18,24 118:4 146:9
kickstands 46:11 57:2,14 58:4 61:2 62:8 83:20 93:8 116:2
kind 11:1,19 23:19 56:21 69:17 98:6 121:14 132:10 142:25
kinds 36:12
knob 48:13 131:16 132:18 133:4,9,20 133:25 134:3,8 140:19
know 16:10 17:16 17:18,23 18:6,21 19:20 20:21 21:5 22:11 26:15 27:23 28:1 30:1 32:25 34:2 36:9 38:18 40:17 42:14 43:20 44:7,8,24 45:12 45:15 48:3 49:8 50:3 52:13 53:9 53:12,18 60:2,3 62:17,17,22 63:2 63:5,6 65:11 66:12,20 69:23 73:10 75:19 80:17 83:1 85:16 86:13 86:17 88:21 89:1 94:25 97:12 99:2 99:6 101:3,7 102:12 103:12,13 103:14,17 104:24 105:3,7,18,21 106:25 107:17,22 108:18 109:6,10 109:12 110:24

115:5, 119:21
121:3,22 122:6,11
122:14 126:19
128:13 137:18
138:3,6,22 139:1
140:10,25 141:9
142:22,23 146:5
147:24 148:6
knowing 66:14,21
knowledge 29:2
41:17,24 42:7
63:10 84:4 134:11
135:17
knows 118:25

**L**

L 1:10 3:4 4:1 5:16
6:6,15,23 152:6
label 131:5
lacking 135:10
late 12:1 17:11
Latino 32:24
law 120:25 121:4
126:5
laws 68:18
lead 85:21
learned 28:6
leaving 67:23 68:15
led 83:6 94:11
Lee 4:10
left 65:22 67:19
68:1
leg 140:25 141:1
legal 6:8 135:7
legislative 85:8,11
legs 31:21 46:17
52:15 56:7 60:8
60:14 61:16 63:15
64:11,18,25 72:14
73:7 74:10 87:5
93:2,4 94:19,21
96:3 97:19 98:11
98:12 99:12
106:17 108:8,22
116:2,13,18,25
118:4 129:13
130:16,21 131:15
132:3 133:7
134:12,22 140:25

141:3,7 143:9
146:9,10 150:11
let's 8:11 11:20
12:23 25:13 31:8
58:24 61:21 76:20
78:18 89:6 96:5
123:5 124:2 129:8
letter 123:13
letters 11:16
Level 14:16 15:2
16:14
leveler 38:13 65:20
66:1
lever 129:3
liability 1:7
liability-related
17:16
license 17:7,10
152:22
licensed 14:9
lie 73:19,21
lift 63:18 74:22
99:4 139:12
145:12,12,17
lifted 72:22 74:2,4
74:18,22 94:19
95:1 96:2 97:6,8
145:11,14
light 49:3 106:16
136:16
lighting 49:7,8
136:4
likewise 110:21
116:7
limit 27:6 29:17
69:6
limited 1:7
LINDA 1:3 2:14
line 100:24 120:9
132:24 148:1,3
lines 148:2
linkage 113:24
list 12:10 19:6,9
38:15 115:23
120:18,22
listed 51:4
listening 106:25
literally 86:5 105:5
little 12:2 28:15

39:1 69:19 71:4
94:16 112:24,25
129:6 131:8
Livingston 2:7
LLC 1:6 2:17 5:17
5:18
LLC's 19:6,11,12
load 29:11 65:21
96:23 108:16
loaded 65:15,16,17
loading 9:7,11,19
9:25 10:4 19:14
34:9,10,11,22
49:11 109:8
136:11,15
locate 47:24 145:3
located 134:14
location 10:5 49:5
133:20,22,25
134:12,21
locked 74:10 98:13
150:11
log 105:6
logic 53:14 85:18
115:3
logical 85:3
logically 84:25
long 30:5 37:20
40:20 60:23
101:20 102:18
look 17:15 18:1,4
18:17 26:20,21
40:21 44:11 45:3
47:13 50:7,10
51:7 56:4 57:1,12
57:13 67:5 70:19
70:25 77:8,9,12
85:14 86:1 96:20
97:23 98:20,20,23
99:8,24 100:9
104:4 113:12
114:8 119:21
130:4,20 139:24
141:7 143:2,5
144:16
looked 24:5 53:10
82:18
looking 18:20
41:12 50:9,12,20

53:15,24 56:25
57:4,25 64:5
66:17 72:18 83:3
84:25,25 103:16
108:18 114:17
119:19 120:21
looks 103:4
lost 56:21 80:23
lot 44:24,24 62:6
86:9 137:18
loves 105:10
lowboy 7:13,16,19
7:20,21,25 8:3,4,7
8:11,17 9:1 10:3
108:24 109:6
lowboy-type 9:10
lowering 55:3
lubricant 83:18
lubricate 32:6 84:2
86:10
lubricated 84:8,17
86:16
lubricating 83:18
86:3
lubrication 57:4,16
82:7,25 83:5,13
84:4,20 85:2 93:9
115:25 117:7
126:24
lunch 6:2

**M**

Madam 40:10
45:21
magazine 53:24
Mahoney 2:15
121:24 125:6
main 19:3 91:1
113:9
making 49:15 61:1
65:4 131:6 145:15
mandated 50:14,14
maneuver 58:21
maneuvering 58:2
58:7
manner 129:10
mannerisms 26:22
manufacturer
16:18 37:20 84:18

106:12
manufacturing
106:10
MARKED 3:11
married 32:24
match 45:6
Matie 125:12
matter 2:3 4:18
17:13 24:2 26:21
30:17 31:23 56:3
57:5 69:13 96:17
105:1 110:13
120:17 124:16
149:16
matters 7:25
MaxiLift 116:5
MaxiLok 9:14,19
15:24 24:17 31:21
32:6 33:7,9,10,11
33:14 34:11,14,16
40:6 46:18 48:12
49:4 55:4 56:6
71:21 82:19 87:5
90:25 95:19
108:22 110:14,22
113:20 145:10
MaxiLok- 15:21
MaxiLok-type 10:6
MaxiLoks 56:2
McCAMBRIDGE
2:15 121:23 125:6
mean 49:8 60:3
62:3,20 65:2
82:12 93:10,22
107:24 116:7
118:24 119:12
126:5 134:3
137:17 140:4
142:3
meaning 6:17
33:20 91:10
117:15,16,17,18
145:12
meaningfully 132:8
means 141:21
146:5
meant 96:25 99:4
139:11,14
measurement 39:4

39:5,7,11
measurements
91:25 92:4
mechanic 14:3,8,10
60:22,22 65:3
114:18,22 116:9
mechanic's 60:24
mechanical 14:5
medical 16:22
89:20,23 90:17
memory 21:2 143:1
mere 90:23
merely 55:19 61:25
67:16
Merry 150:18
metal-on-metal
86:15
methodology 73:2
74:11,23
Michigan 1:1 2:13
2:16 23:8,11,15
26:11 41:10 52:23
105:17 121:1
midday 89:3
middle 49:10 74:6
midnight 49:9
Miguel 20:4 41:13
42:24 43:12 71:5
71:19 87:4 119:17
147:22
Mile 2:16
miles 27:12,13
28:18,19,19 29:12
29:13 57:9,21
58:16,17,17 60:4
60:5 61:9,19 62:3
62:4
mind 58:1 63:11
70:6 72:19 86:13
89:7 145:15
mine 28:18 83:17
119:12
mini 150:21,23
151:11
minimal 95:18
minimum 40:5
102:16,20
minute 18:5 47:24
minutes 40:5 62:24

105:5 112:2,3
148:7
MiOSHA 23:8
misled 24:20 25:2
missing 51:6
mistaken 89:5
modeling 23:18
moderately 116:7
MOHYLA-KLE...
2:4 152:3
moment 19:17
64:12
Monday 88:24
morning 67:7 89:2
motion 47:22 48:7
78:2,14
motor 6:11 14:19
16:21 17:7 18:22
22:22 33:1,3
44:22 46:4,8
47:11 64:8 67:10
68:12 83:24 84:1
84:23 85:22 86:2
95:21 100:1,4,8
108:9,12,13,15
112:19 119:19,23
120:7
motoring 85:24
Mount 2:7
move 47:16 61:3,5
76:21 77:16 78:15
96:5
moved 66:3 129:24
movement 57:22
57:22 59:21 62:6
moving 27:15,19
56:19 77:14
multiple 6:12 103:9
104:20
mutually 61:18

——— N ———

N 2:1,10 3:1 4:1
name 4:9 5:15 22:1
122:8,11 125:9
151:4
names 22:17
105:18,20 121:6
narrow 95:11

nature 10:1 50:1,7
92:2 118:21
137:16
near 98:25
nearby 136:6
necessarily 38:10
65:2 71:9 82:6
137:24
necessary 50:15
need 30:2 48:1
54:14 85:16
needed 115:9
138:25
needs 33:12 97:11
147:21
neglected 140:16
negligence 127:7
127:10 128:24,25
129:10
neighborhood 5:22
7:5,11
neither 79:12
152:13,16
never 9:15,18
22:16 72:23 84:19
117:11,13,13,20
126:2,4
new 2:5,8 4:2 5:9
24:24 26:7,9
124:13 152:5,21
noise 60:23 61:1
65:4 97:15
nonresponsive
47:17 61:6
nonsensical 96:3
noon 104:14
normally 149:2,18
NORTHERN 1:2
Notary 2:4 152:3
152:21
notes 2:2 92:7,10
92:13,14,19
notice 4:13
noticed 12:5 83:4
Novi 2:16
number 33:16,17
33:19,19,20 53:6
57:25 72:15 81:1
81:2,11,16,24

82:3 102:7 109:14
152:22
numbered 31:5,18
numbers 104:6
numerous 47:10
99:25

——— O ———

O 4:1
o'clock 105:3
object 43:4 45:11
54:4 55:13 58:9
59:24 64:1 106:19
127:13 133:11,23
133:24
objecting 136:25
objection 127:21
127:23 135:25
137:3,7 147:25
149:3,8,10
observation 50:12
observations 52:5
observe 33:12,14
observed 73:4
observing 42:16,18
63:8
obtain 76:24
obviously 79:10
80:16 81:13
occasions 7:9 11:23
occur 34:6 63:13
72:14 85:1
occurred 27:2,16
32:18 34:3,8 41:3
41:5 42:3 45:5
46:10,14 50:25
51:25 53:11,14,17
53:19 58:5 59:1
62:11 63:12 69:15
82:8,16 83:11,16
85:6,7 93:1
110:10 111:2,13
115:9 145:16
occurring 68:11
94:12
occurs 35:15
October 17:22
offended 142:25
offer 31:1

offered 71:18
office 2:6 47:23
101:11 121:25
125:8
official 51:13
offloaded 34:23
139:19
offloading 9:25
oh 16:6 39:15 41:9
51:9 88:7,17
125:17 129:20
145:2,2
okay 4:21,25 5:2,6
6:3,21 8:9,13,15
8:23 9:4,12 10:21
11:11,19 12:17
13:6,13,19 14:2
14:21 15:13 16:25
17:5,9 18:4,16
19:23,24 20:9
21:10,13,18,25
22:19 23:7 25:8
28:25 30:5,7
31:24 33:25 34:7
35:14 36:6 38:2
38:25 39:15 41:4
41:12,16 42:13,20
43:18,24 44:9
46:22 48:5,9,11
48:17 49:22 50:22
51:4,12,18,24
52:4,22 54:12,14
55:19 59:3,6,12
64:23 67:4 70:22
70:24 71:9,13
72:17 74:23 75:23
76:5 77:18 78:11
78:15,17,22 79:2
79:16,17,18,23
80:19,22 81:2,5
81:11,16 82:3,24
86:20 87:10,21
89:8 90:11,20
91:5,14,18,23
92:22,23 93:10,14
93:16 95:7,14
96:6 97:3,23
99:23 111:19,24
113:19 115:18

117:19 119:3
122:17 123:4,15
123:24 126:15,21
127:3 128:4 130:3
131:8 132:11,25
133:22 134:2,17
137:20 138:10,21
138:25 142:24
145:2 148:14,17
150:4,17
old 123:25 124:12
124:12,18
once 14:6 33:8,11
98:6 102:9 147:24
148:6,11
operate 75:24
operating 26:22
76:3
operation 33:14
operations 26:4
operator 26:22
48:12 108:11,13
operator's 17:7
operators 68:13
opine 90:8 106:9
opinion 28:12
31:24 34:7 45:4,5
45:8 47:21 48:6
49:15 58:4 60:10
60:11 64:18 76:13
77:14,21 78:11,22
78:24 79:4,6,21
79:23 80:4,7,10
81:14,22 82:1,5,9
82:12 83:3 89:20
90:12,17 93:11
97:4 100:11,19,21
100:24 101:1,2,6
106:3 107:3,12
108:24 119:7
opinions 5:24 20:6
21:4,17,22,24
23:17 24:6,15
25:20 26:17 30:8
30:12,17,23 31:3
31:17,19 34:1
42:4 63:25 64:21
71:6,10,19 78:19
79:7,9,10 80:14

81:15 86:21 87:3
87:11 91:6 104:7
106:11 107:4,6
110:8 112:11,14
119:3 135:4
opposed 149:18
order 34:23 48:6
49:13 76:13,24
77:15,21 78:12
115:8
original 61:21
OSHA 19:15 22:25
23:1,8 26:5,6,9,12
26:14
Ousterhout 19:5
44:2 59:13
Ousterhout's 43:24
outdoors 36:17
outset 89:16
outside 29:16 39:14
79:11 80:20,20
94:13 107:3 111:9
overcast 50:3,5
51:19 52:10,14,19
136:5

P
P 2:1,10,10,15
P-o-s-i-L-o-k 10:7
p-s-s-a-h 98:7
P.C 2:11
p.m 103:23,24
151:17
P.O 4:2 5:8,8
pace 27:10
pad 73:4
pads 62:9,9,19,20
93:5 107:14,15
144:9
page 11:5,7,12 31:4
51:5,7 53:5 57:24
72:12,19 77:9,12
78:20 89:6 90:1
90:19 92:21,21,22
96:5,7,19,22,22
97:6,8 98:15,16
98:19,24 99:21
104:5 113:12,13
113:16,17 117:3

118:12 120:15,17
130:6 132:24,25
141:11,13,14
143:5,6 145:4
146:15 147:25
148:3
pages 29:24 30:5
paid 101:5
pallet 39:24 56:1
62:6 66:2
pallets 36:4 55:24
57:7 65:15,16,21
panel 33:13 76:1
paper 105:9
paragraph 31:24
32:4 71:13,17
89:13 90:4,21
92:25 96:20 97:7
97:7 117:4
paragraphs 31:5
31:18 78:19
paraphrase 71:3
paraphrasing
143:8
parked 148:11
part 22:25 25:10
38:3,5 45:24 46:3
46:5 52:13 73:10
74:16,18,24 76:3
92:17 100:8 103:1
143:4 146:2
148:21
partial 22:22
partially 53:7
particular 8:5 9:14
10:14 11:10 15:18
18:16 25:23 26:7
41:14 43:4 50:2
51:14 53:2 58:7
68:23 73:17 82:25
86:12 87:13 105:3
106:12,24 109:8
109:11 110:11,12
115:14 120:6
122:6 124:16
138:9 142:15
147:10
particular-type
108:19

parties 152:15
partly 38:11
Pat 150:20
PATRICIA 2:3
152:3
pattern 150:1
Paul 1:3 2:14 19:4
42:21,23 43:5,11
69:11 129:16,19
129:20 148:7
payment 102:16
PCI 23:21
people 26:4 28:2
58:12 98:21
perceives 29:9
percent 57:1 83:21
121:20
percentage 11:23
57:1
perception 28:8
perfectly 43:21
perform 10:2 42:25
43:14 44:6
performed 31:20
35:17 41:17 42:9
42:14 44:17 46:17
52:14 85:3 87:12
96:16 99:15 108:7
114:4 144:12
performing 19:2
48:14 116:8
performs 139:21
period 66:18
periodically 101:25
person 67:10
personal 41:17,24
42:7 84:4 134:11
personally 42:14
42:16,18 86:8
persons 44:20
pertains 26:16
Philadelphia 122:1
122:5 125:8
phone 103:13
148:10
phonetic 125:13
Photo 11:8,8 53:5
photograph 10:21
10:22 11:3,5,14

53:4 57:23,25,25
photographs 23:24
24:1,21 130:9
photos 19:13
phrased 43:6 147:6
phraseology 27:21
28:14 93:25
physical 79:15,20
physically 42:11
63:14 72:8 74:21
107:1
pick 63:14 65:21
66:2 147:3
picks 62:6
pickup 65:3 114:22
pictures 25:2,6,9
136:11,13
piece 46:6
pieces 121:11
place 83:20 85:18
136:12 149:9
152:11
placed 57:3
plaintiff 6:9 11:24
19:8,15 55:10
90:6 120:5 122:18
123:1
plaintiff's 19:8,9,11
19:13 105:22
121:18
Plaintiffs 1:4 2:13
plans 30:21
plate 34:24 37:17
37:19,24 38:11,11
65:20 66:1
plating 37:25
play 58:24
playing 69:17
Pleasant 2:7
please 4:8 5:7 11:4
40:13 43:7,10
45:20 70:8 77:24
80:2 86:23 87:23
90:19 92:22
131:22 147:6
151:9,12
plus 102:15 124:15
124:17
pneumatic 15:24

135:17
pneumatics 14:13
14:14,18,22 15:9
15:11
point 11:3 23:23
24:10 27:23 29:14
30:3,24,25 33:19
38:9 51:8 52:19
65:12 67:7,20
68:23 75:2 82:20
83:18 85:1 92:20
96:21,21,25 97:18
102:1 113:10
116:15 118:3
119:23 126:9
130:19 139:2
points 85:2 86:14
96:4
ponder 95:25
poor 82:13
pops 105:8
portion 90:3
140:15 141:14
portions 47:17 61:6
pos 56:6
posed 77:4
PosiLok 10:7,13,15
11:17 15:24 52:15
55:3 110:20 138:7
PosiLok's 24:16
PosiLok-type
15:21
PosiLoks 56:2
position 34:22 53:2
70:3 97:2 113:23
130:11,12,17
possibilities 95:6
possibility 59:19
possible 84:7,9
90:12 110:6 111:7
possibly 111:2,3
post-2012 18:6
postcrash 11:9
23:21
postincident 23:22
potential 17:16
49:12 50:8 57:15
95:10 137:15
potentially 50:5

66:4
pounds 37:1,5
practice 102:5
precaution 120:4
precipice 62:25
63:6 65:1
precipitous 89:14
93:1
precipitously 9:2
precluded 22:19,21
predominantly 6:7
prep 105:1
preparation 25:19
prepare 88:15
prepared 20:18
24:9,25 29:22
30:12,16 47:23
139:17,18
preparing 24:24
104:1,22
presence 54:23
55:11 58:8 61:12
61:16,24 136:14
present 136:19
presenting 24:7
presuming 83:13
pretrip 33:4,5 47:7
64:6 119:21
pretty 23:16 42:6
56:15 66:23 68:4
86:24 103:12
prevent 34:20
108:16,17
previously 10:16
11:21 32:16 54:9
prior 10:23,25
28:21 33:7 60:2
64:9 66:6 73:14
73:24 98:24
109:17,21 110:3
113:22 137:21
152:5
probability 57:16
62:23 66:16,16
130:21
probable 90:4 91:1
92:25 93:20,24
94:1 95:11 108:21
110:23

probably 5:21 7:10
37:21 82:9,13
104:1 114:25
147:20
problem 39:21 61:1
78:15 82:19 83:23
84:21 110:14,16
114:22 116:12
118:19,21 146:3
problematic 86:6
112:17
problems 109:12
114:19
Procedure 4:14
proceed 70:22
proceedings 2:2
process 28:7 98:3
Produce 19:11
produced 91:15
product 103:2
professional 5:7
proper 31:20 50:14
50:15 75:4 116:1
properly 32:1,5
33:15 35:3,3,9,11
35:19 42:2 52:25
57:3,14,14 62:10
64:12,19 71:22
84:8 93:4,8 97:19
97:20 99:13
107:13,15 108:1,8
116:13 131:6
134:22
protected 68:20
protocol 145:8,9
prove 147:23 148:5
provide 6:7 8:25
18:10 119:3
126:25
provided 10:14
12:10,15 23:10,12
47:21 48:5 94:24
109:24
provides 130:5
providing 102:6
120:22
pssah 98:7
public 2:5 85:25
152:4,21

pull 51:1,12 68:14
69:19 104:17
pulled 60:23
pulling 50:3 55:24
57:7 74:23
pulls 34:13 48:25
69:23
pure 108:2
purpose 10:9,10
85:9
purposes 8:10 9:12
24:22 111:14
133:16 147:17
pursuant 4:13 78:2
push 48:24
pushed 74:13
put 28:2 54:12
55:21 56:20 57:5
68:10 72:9 85:18
92:14 94:13 95:5
96:19 101:22,23
103:13 119:13
129:9 137:3

**Q**

qualified 112:11
126:1,5,16
question 21:8 39:19
40:14 41:22,23
42:5 43:11 45:18
45:22 54:13 56:12
56:14,15,17,22
58:13 61:11,22
63:11 65:11,13
66:6,7,10,11
68:25 71:24 73:10
73:11 76:10,21
77:4,14 79:2,23
81:18,21 86:24
87:10 92:16 98:2
98:10 99:23
106:10 110:15
111:5 122:22
127:14 129:4,5,24
129:25 131:22
132:15 133:6,25
141:18 143:12,17
145:19,21,23,25
146:23,24 147:4,5

147:21,22 148:14
148:17,21,25
149:24
questions 4:24 5:2
13:20 71:14 76:19
110:15 111:21
112:4 124:21
128:6 139:9
quick 70:7,11 80:1
131:21
quicker 27:20
29:12
quickly 58:21
quite 27:15,22 28:8
28:9,15,17 29:16
40:19 55:10 56:19
60:11 62:18 83:24
142:22
quotation 98:19
quote 90:3 97:25
130:23 149:6
quote/unquote
130:11
quoted 51:20
131:14
quotes 119:13
quoting 96:8

**R**

R 2:1,1,10 4:1,1
152:1
race 98:22 119:20
raining 49:25
raised 129:11 131:3
raising 41:13 55:3
145:9
rare 109:2
rare-type 109:3
rate 124:13
read 40:15,19
42:20,23 43:24
44:3 45:23 46:21
47:5,23 48:9
52:17 56:9 59:3
59:12 70:7 71:5
71:18,24 72:12
73:12 78:25 80:1
91:3 93:6 97:25
98:1 99:20 103:18

109:20 131:18,20
132:11,14 140:5
140:15 141:16
144:20,23 147:20
149:17
reading 31:2
140:17
ready 32:13 70:22
real 80:1 110:13
131:20 133:13
134:15
realize 86:3
really 8:19 11:14
26:19 28:10 29:7
60:9 62:18 63:7
86:19 88:23,23
93:22 95:20,22,25
105:4 106:9 107:2
111:5,11 116:11
118:25 137:20
138:3,25
realm 95:5
rear-ended 100:4
rear-most 33:22
reason 9:8 19:18
22:25 27:16 29:11
37:2 39:3 67:25
68:20 73:12 85:20
85:24 87:14,15,16
95:15 148:21
reasonable 27:20
27:24 28:13 95:24
reasonableness
95:23
reasonably 134:20
reasons 4:13
recall 8:20 20:5
21:12 22:13 23:5
23:5 27:1 28:23
37:6,11 40:18,20
43:2,15,16,23
52:6,7,11 53:24
59:2 88:25 89:4
106:2 109:14,22
112:16 120:22
122:7 123:16
128:5 142:13
received 14:22 15:6
26:18 40:5

recess 70:16 112:7
reciting 142:6
recklessness 29:18
recollection 143:2
record 4:9,11 12:21
24:20 25:13,16
31:8,11,14 32:8
32:10 51:13 70:9
87:23 88:1,9,11
103:19 112:1
123:6,8 124:2,5
132:12,15 137:4
140:17 149:9
records 109:25
RECROSS 3:3
RECROSS-EXA...
147:14
rectangular 69:19
red 106:17 112:22
REDIRECT 3:3
139:6
reduce 86:14
redundancy 23:4
119:18
refer 7:24 14:18
18:24 46:11 53:1
54:9,17 61:10
79:14 104:8
144:25
reference 10:13,18
referenced 32:16
referred 35:11 53:5
62:9 94:18 97:15
144:23
referring 7:21 8:10
11:4,12 16:15
27:3,19 37:25
72:2 86:25 91:9
115:2 143:13,14
143:17
refers 20:3 72:3
115:8
reflect 4:11 22:14
22:16,16
reflection 73:18
reflects 72:6 125:7
refute 82:9,12
refutes 78:23 79:4
79:21,25 80:5,8

80:11 81:3,22
82:4
regard 16:12 74:2
138:22 142:21
regarding 22:22
115:2
regular 29:10
110:17 142:8
regulation 83:25
84:19 85:10,18
regulations 12:19
22:23 23:8 84:23
85:17,23 86:2
100:8 108:10,15
112:19
regulators 85:14
86:12
related 21:5 24:2
24:10 48:6 110:3
111:20 112:11
relation 15:19,20
134:13
relative 39:9
152:14,16
relatively 22:10
relevance 106:20
137:20
relevant 13:14
relied 25:18 140:3
relieves 70:2
rely 134:20
remain 130:18
remember 60:15
69:18 105:19,20
106:1 121:19
122:9 138:13,17
138:22 145:20
148:12,15,22,25
remembered
148:17
remove 39:24 69:5
69:7
removed 35:25
36:2,4
removing 66:13
render 112:11
rendered 112:14
rendering 20:6
24:6 63:25 110:7

repair 82:17
114:10
repeat 39:19 40:8
40:12 43:10 45:20
65:4 100:2 122:25
129:5 131:22
144:19
repeating 62:5
rephrase 65:13
86:23 131:23
rephrasing 66:5
replacing 55:23,24
55:25 56:1
report 10:14,22
11:6 18:25 19:3
20:10,13,15,18
22:4,7 29:22,23
30:7,12,16,18
31:5,15 34:20
39:2 50:4 52:20
52:21 56:4,9
57:24 60:9,12
71:11 72:5,18
78:18 79:13,13
86:21 89:7 91:7
92:11,14,20 93:12
96:19 97:7 98:16
103:9,25 104:1,4
104:4,8,12,17,21
105:6 112:24
113:4,9,10,14
114:8,9,10 117:2
118:13,14,15
119:2,4,9,14
120:1,13,16
126:22 127:2
130:5,7,13,21
131:24 145:1
reported 90:24
reporter 2:4 40:10
40:11,15 45:21,23
127:24 141:6
150:19,20 151:1
151:13 152:4
REPORTING 2:6
reports 30:22 51:1
reproduced 113:21
Request 19:11
requested 111:19

require 49:9
required 33:2,3
49:4 100:7 135:3
requires 48:12 84:1
108:10
research 85:9,12
respect 41:21 45:7
71:6 94:6 112:18
113:8 128:4
129:12 137:22
139:25
respects 118:22
respond 4:25
responded 86:7
Response 19:12
Responses 19:11
responsibility 67:6
108:12
responsible 67:10
68:16,24
responsive 19:14
rest 31:21
resting 96:24
result 29:22 86:9
107:1
retained 23:2,3
44:19 122:18
retainer 102:18,21
103:5 123:11,17
retention 29:23
review 20:18 21:15
21:15,20 22:18,18
30:16 32:15
103:24
reviewed 19:1
20:11 22:4,7,17
25:18 40:1 47:19
48:3 51:5
reviewing 20:5
31:17
ride 151:9
riding 36:10,25
right 10:12 13:1,4,9
16:9 17:23 21:2
22:3 30:4 33:12
34:18,19 37:13
43:22,22 44:6
46:23 47:1,3
48:24 56:18 59:8

64:17 65:1,10,16
65:17 68:11,14
75:10,25 76:1
77:3,8 86:17
90:13 91:20 92:10
92:18 94:2 97:23
98:15 100:15,16
101:9,23 110:2
116:21 121:7
122:15,15 123:3
123:15 125:17
128:7,9 129:15
130:7,15 131:5
132:17 133:4,19
134:5,7 136:9
137:6 140:20,21
140:21,22 141:17
142:4 143:1 145:5
145:11 146:6
148:10 150:8,13
**right-hand** 66:3
**ring** 125:9
**rises** 49:19
**risk** 119:18
**road** 2:12,16 14:7
28:2 34:17,17
**roadside** 14:16,17
16:14
**roadway** 28:4,5
107:20
**Roger's** 7:22
**room** 65:18
**root** 117:7
**Roughly** 52:3
**row** 120:2
**royal** 6:19
**Rule** 12:19 78:2
**ruled** 95:16
**rules** 4:14,15,21
**ruling** 149:12
**rush** 29:11

**S**

**S** 2:1,10 4:1
**SAF-HOLLAND**
11:16,16
**safe** 31:3 33:14
38:8
**safely** 34:23

**safety** 22:23 84:23
85:23,23,24 86:2
100:8 108:10,15
112:19 125:23
**Saginaw** 2:13
**Saint** 2:12
**Sam** 120:25 121:4
**sat** 62:24
**save** 31:2
**saw** 88:7 122:10
136:13
**saying** 21:14 33:17
51:22 59:10 68:7
68:9 72:24 78:12
82:23 90:7,22
95:6 98:14 114:15
115:12,16,19
117:24 121:9
145:11,14
**says** 17:22,25 33:12
51:8 58:1 73:3,7
74:1,6,9,15 89:10
89:14 96:22 97:25
99:9,14 113:20
114:2,18 117:5
133:3 140:2,2
141:25 142:2,2,7
143:7 145:17
146:6
**scanned** 12:9
**scene** 137:9
**schematic** 92:1
**scholarly** 25:19
**school** 12:24 13:1,4
13:9,14
**Scott** 1:10 3:4 4:10
4:12 5:16 6:6,15
6:22 54:6 58:11
60:1 106:22 125:3
128:4 131:23
134:2 137:13
138:12 149:7,16
152:6
**screen** 92:19
**Sean** 88:8
**seat** 53:22 116:19
**seated** 33:15 35:11
35:19 46:12 57:15
62:10 64:11,19

93:4,8 97:19,20
99:13 107:15
108:1,8 133:8
134:23
**seating** 75:4 116:1
116:1 129:13
**second** 10:13 17:20
25:14 31:9 35:8
42:5 51:8 69:16
76:14,17 87:23
89:13 90:21,21
92:24 96:21 97:7
107:5 112:1,5
113:10 123:6
124:3 132:21,22
136:24 138:21
145:3
**secondary** 13:6
**section** 37:16,17,19
131:20
**secure** 73:7
**secured** 46:18
71:22
**see** 38:16 42:25
43:12 44:21 47:4
50:19 51:4 63:19
83:25 85:14 89:11
101:16 102:1,2,2
102:3 103:19
104:5 112:21
130:13 132:18
133:4,7 134:15
138:5,8,9 139:11
140:20
**seeing** 21:12 112:16
134:12 150:11
**seemingly** 123:14
**seen** 25:1 44:24
86:4,9 98:3
114:21 120:10
136:11
**sees** 68:11
**Segal** 2:15 121:23
125:6
**Self-employed** 5:14
**semantics** 126:15
**semitrailer** 33:21
46:5 60:6 63:21
65:15 66:9 71:23

83:3 90:5 93:3
95:1,22 109:5
110:18
**semitrailer's** 71:21
90:24 145:10
**semitrailers** 9:6
**send** 31:13
**sending** 12:16
**sent** 12:9 13:17
82:17 140:11,11
**sentence** 89:14
90:21,22
**separate** 78:7
111:20
**separation** 34:25
**series** 70:1
**service** 112:12,15
112:18
**services** 6:8
**set** 34:11 72:9 88:2
112:21 147:21
152:12
**sets** 49:20
**setup** 10:8
**seven** 7:11
**severely** 100:6
**shaded** 49:10
**shading** 49:21 50:8
**shadowing** 137:15
**shadows** 50:5
**share** 138:15
**shift** 65:20 67:8,9
73:15
**shop** 14:4
**short** 70:16 112:7
**shortly** 51:17
**shot** 105:23
**shoulder** 41:13
**showed** 53:7
**showing** 92:18
**shown** 34:20
**shows** 53:6 141:6
**shut** 141:9
**sic** 90:25
**side** 12:2 18:15
23:2 28:2 33:11
50:10 55:4,6
65:22,24 66:3
100:24

**signed** 20:2 72:21
145:6
**significant** 60:17
**significantly** 60:18
60:20 113:25
114:3,5,12 115:2
115:10,15 116:6
116:17 117:11,21
118:20 130:23,23
**signs** 67:9
**silent** 143:25 144:2
**similar** 9:16 38:16
**similar-type** 10:8
**similarity** 11:18
**simple** 42:6 56:15
86:25 94:7
**simplistic** 86:1
**simply** 23:3 48:13
87:12 96:14
**Singer** 2:15 121:23
125:6
**sir** 4:8,20 5:5,12,22
6:1,2 7:14 9:3,11
10:6,11,20 12:6
12:12,18 13:8,18
13:23 14:11 15:25
16:2,9,24 17:1
20:8,20 22:5 23:9
24:3,8,12,16
25:18,21,25 26:19
27:18 28:23 30:6
30:14,20 32:7,14
35:24 36:11,14,23
37:12 41:7,11,15
45:18 46:20,23
47:3,19 48:4,8,22
50:21 51:2,7,23
52:3 54:9,20
55:18 59:14 62:23
67:3,16 70:6,24
71:2,12,16 72:1
74:17 75:20,25
76:14,17,22,25
77:2,19 78:1,13
78:21 79:5,22
80:3,6,9,12 81:4
81:17 83:12 84:6
87:9 89:12,25
91:4 94:7,13

95:13 96:12,17
99:20 102:24
103:7 104:13
105:13,15 106:14
109:19 110:1
111:18,23 112:13
113:5,18 120:20
121:19 124:7,19
124:19,20 125:22
125:24 128:13
129:14 130:2,14
134:6 135:5,11,18
135:20 136:8,13
139:8 142:18
143:11 146:16
148:12,20,24
149:6
sit 29:15 34:18,19
107:17 119:5
130:22 134:13
site 131:16 136:19
sitting 53:7 57:23
62:25 66:1 73:5
116:13,25
situated 107:12
situation 8:25 9:16
situations 9:23
six 7:11 35:23
58:17 61:19 120:2
sixth 35:6 37:9
55:22 56:1 62:14
69:15
skeptical 132:7
sleeper 53:21,23
54:2,23,25
slightest 58:2,7
slow 29:3
SLTC 11:8
SLTC-PCI 11:9
53:6
SMITH 2:11
snowing 49:25
solely 86:22
solid 108:4
somebody 28:9
29:5 35:15 39:14
58:25 82:22
114:21
somewhat 116:17

118:1 132:7
sorry 14:25 16:5
24:18 30:22 39:13
39:19 40:7 44:1
55:3,17 67:13
78:10 80:22
101:18 106:6
126:23 127:8
128:23 130:10
131:10 145:2
150:22
sought 125:20
sound 73:1 98:6,8
103:5 104:2
106:25 140:24
141:4
sounds 6:5 17:2
21:1,1 72:3 92:13
103:25 121:2
141:22
source 11:8 51:8
52:18 53:6
speak 88:13 114:1
speaker 151:6
speaking 109:4
special 26:1
specific 9:19 10:6
16:11 22:16 23:9
24:17 26:9,15
27:8 87:15,16
117:5 141:24
143:9 145:15,19
specifically 8:22
26:20,23 36:16
82:7 84:20 140:4
146:18 147:8
specifications
84:18
specificity 27:12
specifics 40:20
109:22
specify 84:23
speculate 58:10
speculating 66:19
speculation 66:21
108:2 118:2,9
127:14 128:2
speculative 117:8,9
118:1,7,21

speed 27:6,8,20,20
27:24 28:11,13
29:17 57:8 61:8
61:10,17,18
speedometers 27:6
spelled 98:7 141:5
spend 105:5
split 5:19
spoke 94:16
spoken 111:16
Sprague 22:2
113:16 126:23
Sprague's 112:24
113:14 117:2
118:12 120:13,13
130:5
spreadsheet 120:24
121:9,12 122:17
122:23 125:7
spring 94:21
spring-loaded
63:16
springs 94:20 97:2
stand 62:10 81:14
124:18 133:20
standard 109:4
110:18
standards 26:12
standby 124:15
standing 133:8
standpoint 40:22
53:15
stands 96:24 97:1
start 90:22
started 13:8 140:15
148:8
starts 78:20 141:2
state 2:5 4:8 23:11
71:17 87:4 126:19
140:16 147:9
152:4,21
state-by-state 17:8
stated 81:24 103:10
114:20
statement 29:18
72:21,21 73:24
74:1,12 80:13
81:6,15 97:5
98:25 117:10

139:15 140:1
142:2,2,5,19
143:2,3,19 144:11
144:16,17,22,25
145:6,16 146:1,11
146:13,19,19,24
150:9
statements 98:1
117:23
states 1:1 126:17
126:18 145:7
stating 56:6 100:23
stay 132:18 140:19
140:21,21,22
stayed 133:3
steak 6:1
steel 66:22
stenographic 2:1
step 33:25
stick 39:4,5
stood 134:8
stop 35:7 105:2
stopped 68:1
straightening
141:2
stricken 135:9,12
135:21,23
strike 47:16 61:6
72:10 126:9
134:18 148:8
strong 45:5,8 46:6
68:4
structural 124:13
stuck 93:25
stuff 26:15
subject 11:10 24:13
50:6
subjective 57:8,9
subsection 85:15
subsequent 18:25
substance 104:7
substantial 62:10
83:5
substantiated
71:20
successfully 35:16
sudden 60:24 105:6
sufficient 134:22
Suite 2:16

summarized 107:6
Summary 47:22
77:1 78:2,14
summer 49:19
sun 49:19,19
sunblind 50:9
supply 15:20
support 96:24 97:1
113:23
supported 70:3
supporting 20:12
93:3 117:6
supports 113:23
suppose 67:21
supposed 44:11
84:17 86:4,15
106:7,18 133:8
142:9
sure 4:10 5:1 11:2
17:20,21 18:7,24
25:1 31:16 32:19
33:15 34:7 35:10
40:9 43:11 49:17
61:23 66:20 79:19
80:15 81:20 86:14
86:24 87:1,24
98:2,4 103:21
108:7 112:6
114:11 121:13
131:6 136:17
144:21 149:14
suspect 53:3
suspension 15:15
113:22
switch 48:23 96:9
129:3
sworn 4:3 152:7
swung 97:1
synopsis 144:15
system 9:14,19 10:6
10:15 11:17 15:14
15:17,18,22,24
16:21 32:6 33:9
33:12 34:12,15
38:13 40:6 46:18
48:12,17 49:5
50:20 52:15 53:10
55:4 56:8 57:17
74:2,13 75:24

76:3 82:20 84:7
87:5 90:25 95:19
106:12 107:6
108:23 110:14,20
110:22 113:22
116:5 126:13
128:11,24 129:1,2
129:11 130:6,16
131:2 133:16
134:4 145:10
149:22
system's 48:14
131:3
systemic 110:16
systems 14:19 15:8
16:19 135:17

**T**

T 2:1,1 4:1,1,1
152:1,1
T-Bone 5:17
T-u-r-n-e-r 4:10
table 105:7 146:23
146:24
tailboard 37:10,12
37:14 39:6,8
take 4:17 17:15
19:21 28:1 33:25
37:4 39:1 49:15
49:22 60:22 65:2
65:3 70:7,11
72:25 88:17 91:25
92:7,16 95:10,23
98:22 99:24 114:2
114:14,16 116:3
117:10 139:24
taken 1:12 2:3 4:12
4:18 23:24 24:2
24:21 25:8 57:20
65:7 92:13 150:5
152:11
takes 67:7 101:20
104:16
talk 12:23 31:14
37:14 42:5 48:2
112:23,25 127:3
talked 15:2 29:21
35:21 38:6 54:8
65:6 87:1 89:16

91:5 112:24 113:2
118:10 123:11,11
125:5 126:24
136:3,4
talking 7:12 8:12
9:10 11:20 15:11
15:15 20:17 35:9
37:14 54:18 79:14
79:15 103:20
112:18 114:7,23
142:15
tangent 11:19
tanker 121:20
tape 121:14
tecum 12:5
teetering 69:21
TELEPHONIC
1:10
tell 5:10 7:1 8:16,21
11:22 19:1 30:4
32:16 52:24 79:12
85:19 88:23
102:11 111:12
113:6 119:9 125:7
143:1 144:16,24
148:7,12 151:8
telling 100:16,17
tells 74:9 98:10,12
146:8
ten 12:11
Tennessee 1:7
term 9:7
terms 148:18
test 21:2
testified 7:7,25
10:10 36:24 37:7
44:2,18 46:2,16
47:7 75:17 100:2
116:11 126:10,12
126:16 131:17
132:4
testifies 4:3 45:13
testify 23:14 28:11
29:15 43:12 44:5
59:6 152:7
testifying 22:20,24
22:25 120:9
testimony 6:8 9:1
9:15 11:24,24

18:11 20:4,6
22:22 23:11 24:23
27:9,14 28:7
29:16 37:11 40:2
41:4 42:21,24
44:15,20 45:16
59:4,13,20 63:25
71:15,18 72:13
73:7,11,24 75:6
78:23 79:4,16,16
79:21,24 80:5,8
80:11,17 81:3,8
81:22 82:4 86:11
94:23 96:14,15
98:25 99:9 100:9
100:20 102:6
109:20 119:10,17
123:21 124:8,11
131:12,25 132:1,6
135:22 139:9,10
140:16 141:13,15
142:11 143:6,16
149:10 150:3
152:10
testing 23:19,20
117:5
tests 114:4
text 85:20
Thank 40:16 54:21
70:15 123:3
124:22 137:10
146:4 147:11
Thanks 124:21
128:20 139:4
150:17
thereabouts 52:2
thing 77:25 113:9
things 9:25 12:10
18:13 38:16 44:24
49:23 50:6 92:1
95:23,25 96:16
101:21 104:6,6
129:16,18 137:15
think 13:16 28:1
31:14 69:21 73:9
77:7 88:18 89:4
93:20 94:4,5,18
94:19 97:15
110:11 115:12

119:7 121:8 122:3
122:4 123:12,22
125:8 132:9
138:23 140:18
145:22
thinking 25:2
86:17
third 60:17 69:16
96:20 97:6
Thirteen 2:16
thought 36:25
56:23 88:7
thousand 37:5 86:8
thousands 86:5
threat 68:2
three 37:20,22 47:9
60:4,13 62:4
71:17 88:14,18,20
119:24
Thursday 1:12 2:8
88:21
time 4:23 5:19
22:21 23:5,21,23
24:10 27:2,3
28:11,21,23 29:14
30:3,24,25 31:2
32:20 38:9 40:19
45:10 47:8 49:6
52:10,19 55:1,22
55:25 62:14 64:5
64:25 66:25 67:2
67:8,20 68:23
69:15,16,20 73:9
83:3 88:14 95:25
101:17,19,20
105:2 112:3
117:12 124:16,21
127:8 129:23
130:18 131:3
134:7 136:6
148:23 152:11
time-to-time 6:10
timeframe 43:5
147:23
times 35:23 86:5
114:21
timesheets 101:23
timing 55:9
tires 56:20

today 4:16 7:12
8:10 9:13 12:5
47:21 71:1 86:11
88:21 91:15
102:14 107:17
113:3 132:13
told 27:14 29:12
44:9 98:8 102:10
102:10 111:22
143:8
tools 50:15
top 34:18,19 96:7
141:2,4
total 66:17 102:3,7
totally 74:20
track 80:23 101:7,8
tractor 15:11,12
33:18 53:20
tractor-trailer 14:5
trail 45:10
trailer 7:13,17,20
7:22,22 8:3,4,4,8
8:12,13,18 9:1,9
9:10,14 10:3
11:10 15:12 24:13
25:10,23 27:4
33:7,8,23 34:9,21
35:1,4 36:5,7 37:7
37:8,9,15 38:8,21
39:7,8,10,18,24
41:14 48:21 50:10
50:11 52:23,24
53:13 54:10,18
55:4,20,21 56:18
56:20 57:7 58:3
58:19,22 59:1,7
59:16,22 62:13,14
62:24 63:14 64:13
64:24 65:23 66:5
66:25 67:2,6,14
67:16,17 68:14,22
69:1,2,3,5 72:22
74:5,19,22 82:17
82:25 83:14 84:14
86:22 87:13,17
92:6 96:2,23 97:8
97:19 99:4 108:19
109:5,10,16,18
110:9,11,12,25

114:10,19 115:14
116:5 127:6,9
128:5,6 130:17
134:4 136:14,16
137:22 138:3,4,6
139:12,18,18
140:22,23,24
145:14,17
trailers 9:21,24
56:2 108:20,25
109:3,7 137:17
train 32:1
trained 14:15,17,20
26:3,3 29:6
training 6:10 14:13
14:21,24 15:2,5
15:24 16:1,4,7,11
16:13,14 26:1,17
40:5,20,21 81:12
81:13 82:1 102:5
112:10
transcript 19:4,5
44:3 45:2 140:8
152:10
transferred 92:10
92:20
Transportation 1:6
2:17 19:6,10,12
Transportation's
31:25 32:5
transported 66:16
Transtar 125:13
travel 102:15
124:15,17
traveling 27:2,24
trial 7:7 23:13,14
24:22 25:3 45:13
124:7,10 126:4,10
tried 129:24 138:12
trip 35:6 37:9
39:18
truck 8:7 55:11
59:23 60:3,25
61:10,13,16,24
65:3 86:8 102:5
114:22 115:22
141:9
trucking 121:17
125:14,15,21,23

126:16
true 7:19 45:10,24
64:19 87:6,7,19
99:16 115:15
139:23 152:10
trusted 131:11
truth 148:13 152:7
152:8,8
truthful 120:9
TRW 19:13 67:1
67:13 69:3,4,4,9
109:7,25
try 119:2,5,6 125:4
trying 11:18 82:14
82:15 95:8,9 98:2
Tuesday 88:22,24
turn 18:11 89:6
Turner 1:10 3:4
4:10,12,16 5:17
6:6,15,23 24:21
25:6 43:7 133:6
136:21 151:9
152:6
turns 73:15
two 5:16,20 30:4
37:19 47:9 57:21
58:16 60:4 61:9
61:18 62:3 66:3
71:13 83:14,15
85:2,5,7 88:14
92:25 93:19,24
94:3 96:16 103:14
104:11 114:7
117:23 118:10,13
119:24 120:1
123:23 125:16,17
129:8,16,18 130:9
130:10 133:7
150:10
type 8:2,12 9:19,20
14:21 29:2 34:24
36:19,20 48:23
110:9,17,24
119:22 138:4
types 9:22,23 36:18
typical 103:8
typically 37:17,23
38:1 59:9

| **U** |
| U 4:1 |

Uh-huh 98:9
Uhm 6:7 7:18
14:14 88:16 92:9
102:17
ultimately 106:20
138:24
undermine 142:16
underneath 50:11
108:23
understand 12:4
25:22 26:11,14
28:20 32:17 51:24
54:11,15,19 76:17
76:22 77:2 95:2,6
95:7 103:19
105:24 107:21
113:2 115:7,11,22
121:8 132:6 134:2
137:1
understanding
9:15 34:2 38:17
38:23 39:11 59:19
64:17 94:9 139:20
139:21
understood 5:3
132:2
unexpected 89:14
unfair 29:20
unfortunately
121:12 140:9
unit 63:9 85:1
96:11
United 1:1 126:17
126:18
university 13:7
unload 96:23
unloaded 109:9
unsafe 68:12
unseat 52:25
unseated 53:3
62:19
unusual 117:6,24
unwittingly 56:6
Urjiles 20:4 32:19
32:21,22,23,25
33:1 34:4,8 35:2,2
35:8 42:25 43:12

44:5 45:4,16
46:16 48:13,20
52:14 53:18 54:2
64:13 71:5,19,20
73:17 80:16 87:4
87:12 96:14 97:12
107:7 116:19,20
119:17 128:11
141:21 145:7
Urjiles' 40:2 54:22
63:24 81:7 131:12
139:9 140:15
141:15 149:17
Urjiles's 41:13
44:14
use 26:2 33:4 36:16
36:17 73:21 99:13
120:3,8
usually 37:3,16,24
utilize 85:19
utilized 7:22,23
49:13
utilizing 24:22
38:14 129:3

| **V** |
| v-a-l 16:9 |

v-a-l-v-e-s 16:8
vague 43:6
valve 113:24 131:5
valves 16:4,7,8,8,12
van 8:8,8 109:5
variables 137:18
varies 103:15 105:4
various 31:19
36:12
vary 28:6
vehicle 6:11 17:7
18:23 33:2,4
44:22 46:4,8
47:11 64:8 66:18
67:11 68:10,12
73:24 83:24 85:4
95:21 100:1,4,5,6
108:12,13 119:20
119:23 120:7
vehicles 14:19
16:21 73:14 84:2
84:16 86:3

verbal 69:5 131:7
verification 60:19
verify 97:1,4,5,11
version 122:21
123:25
versus 11:24 28:4
45:4 125:13
video 24:23
videoconference
1:10 2:6 4:22
112:1
view 73:10 127:4,4
127:10 128:22
135:3
violated 26:24
violations 47:10
visual 31:20 35:14
35:17 42:9 46:17
48:14 49:4 74:11
75:10,11,13,13
99:15 133:13
134:16,21 139:22
140:3
visually 73:4 75:3
131:15 150:11
vital 147:24 148:6
vs 1:5

| **W** |
| wait 4:24 48:13 |

waiting 31:13 58:2
walking 58:12,25
59:7,16
want 19:16,21 23:4
33:25 34:2 43:10
43:18 48:3 68:8
76:16 79:19 87:1
98:4 112:23,25
123:10 126:24
131:13,13 138:5,8
146:21 147:2,16
147:22 149:9
150:21,22
wanted 24:19 25:1
67:20 77:10
warehouse 36:19
warnings 130:6,10
wasn't 28:10 41:21
66:10 118:8

129:12
watched 43:13
  62:24 117:13,22
watching 42:24
way 6:16 12:14
  13:11 34:8 35:4
  42:2 46:9 47:4
  48:21 53:10 56:3
  56:11 60:19 62:16
  63:2,5,11,14,16
  63:19 65:18 66:14
  68:10 76:15 84:17
  86:23 99:18
  100:17 108:20
  117:4 126:8 129:6
  129:9 130:22
  140:4 141:5 142:8
  144:12,18 148:22
  149:1,1
ways 31:19 60:13
we'll 18:4 30:3 42:5
  77:16 78:15
we're 4:16,22 6:1
  7:12,21 8:10,12
  9:10 31:13 37:14
  48:2 66:17 77:11
  77:14 79:19 81:16
  112:17 114:6
  132:3 150:16
we've 65:8 71:1
  77:13 80:25
  111:10 113:2
wear 62:8,9,19 73:4
  93:4 107:14,14
  144:9
weather 50:4,23
  51:1,8,13 52:9,18
  52:21 137:19,19
website 51:10
week 60:23 148:20
weeks 88:14
weigh 36:21
weighed 36:10,25
weight 12:2 37:3
  39:16,22 55:23,24
  56:2 57:5 63:21
  65:7,8 66:8,11,12
  66:18,22
well-protected

68:21
well-thought 118:2
  118:3,7
went 13:2,4 34:11
  35:5,22 65:9 75:7
  75:9 122:24
  123:18,19,20
  126:2,4
weren't 25:1 41:12
  42:8,13 46:13
  52:12 64:19 67:17
  95:24 109:24
West 2:7
wheels 37:8 38:7
  55:21 65:22
whichever 67:8
  120:5
whistle 68:18
white 50:10
whoa 127:19,19,19
  127:19 132:20,20
whoosh 73:1
whooshing 97:15
wife 105:9 148:10
Wilcutt 20:21,24
  21:7
winter 49:19
witness 3:3 18:8,10
  19:6,8 23:13
  70:11,15 75:17,20
  75:21,22 77:18
  87:24 112:6 123:1
  124:22 127:20
  128:18 132:21
  135:9 149:11
  150:17 151:7,10
witnesses 119:10
woman 32:24
wondering 106:1
wood 37:15,18,22
  38:9,12
word 51:19 73:21
  120:8 144:17,21
  146:1
words 72:8 82:14
  124:1 145:12,13
work 6:18 14:5,8
  87:18 101:22
  103:2,8 121:23

131:2 135:19
worked 7:15 8:17
  10:17,19 12:11,13
  14:2,4 105:11,16
  120:22 121:1,4,18
  122:3,4,8 123:1
  132:13
worker 108:11,16
workers 71:23
  85:25
working 6:22 10:16
  13:5 104:18
  122:16 125:4
works 63:9
world 13:5 95:10
wouldn't 21:5
  22:15,15 61:14
  62:2 64:23 67:15
  83:25 84:21 95:5
  102:11 105:20
  106:11 108:21
  110:2
wound 138:24
writing 104:17
written 69:4 84:19
  97:5 140:1
wrong 94:20
  115:13 118:23

X
X 3:1
XI 152:22

Y
Yavil 125:7,9,18,19
  125:20
Yavil's 125:20
yeah 8:9 52:7 56:21
  85:13 101:15
  103:10 104:3
  113:16 114:9
  121:11 122:3
  123:5,5 138:8
  139:2 145:5
year 13:3 17:24,25
  18:3,12 44:23
years 7:2,4,6,16
  8:16,19,21 11:22
  12:1,11,18 83:14
  83:15 85:5,7

114:7 120:3
  148:16
Yep 93:18
yes-or-no 47:4
yup 32:23 132:23
  137:11

Z

0
00998 152:22
07825 4:3 5:9

1
1 14:16 15:2 16:14
  31:5,18 78:22
  79:21 81:5 86:21
  87:3 91:6 107:4
1:35 151:17
10 27:13 28:2,5
  29:12 38:21 39:1
  51:25 52:5 112:2
  112:3 117:3
  118:12 120:15
  136:5
10:17 2:9
100 83:21 121:20
11 11:8,8 38:21,22
  53:6 57:25 92:22
  103:17,22 113:12
  113:13,17 120:17
12 77:9
125 3:5
13 17:24 72:19 96:5
  96:19,22 97:8
  98:15,16 145:4
  148:3
139 3:5
14 17:24 83:9
147 3:5
15 1:12 2:8 27:13
  62:24
15-421 103:23
15th 74:9
16 11:5,7 53:5
  57:24
16,000 37:1
16,000-pound 37:8
  55:11 56:19 58:8
  59:23 61:13 63:22

17 11:12
18-wheeler 28:3
185 4:2 5:8
19 148:2
1910.178 26:5
1981 13:4
19th 17:22

2
2 31:21 33:16,17,19
  33:20 72:15 78:20
  79:6,24 89:6
  104:25
2:50 103:23
20 19:13 31:4 105:5
200 2:12
201 17:22,25
2012 19:15 41:5,8
  72:21 83:1,11
  84:5,8 107:22
  145:7
2015 17:24 74:9
  83:9 103:22,24
  104:11
2016 1:12 2:8 20:3
  77:15,22 152:24
203 2:16
21 31:5 51:5 152:24
22 29:24 51:7
2500 124:15
26 12:19 83:11 84:8
  142:15
26th 41:5,8 72:21
  73:25 83:1 84:5
  107:22 143:18
  145:7
28 103:24 143:6,6
  146:15

3
3 80:4 90:1
3.0 89:10
30 7:5 40:5 102:10
  104:11
300 19:15
393 100:8
39475 2:16
396.5 83:25 84:20

4

**4** 3:5 80:7 90:19
  104:25 105:3
**4:05** 103:24 104:15
**4:30** 105:1
**4:40** 104:15
**40** 102:10 132:25
**40,000-pound**
  94:25
**400** 102:15 123:21
  124:14,17
**41** 133:1 141:14
**4200** 123:14,19
**44** 143:5
**45,000-pound** 96:1
**450** 123:21
**48** 148:2
**48377** 2:16
**48638** 2:13
**49** 148:3

---
**5**
---

**5** 20:3 27:12 29:12
  33:19 80:10,24
  81:1
**5,000** 103:5 123:13
  123:19
**50** 6:25 18:11
  102:11 103:11
**50-some-odd** 44:23
**50/50** 5:20,22 12:1
  105:23
**53-footer** 110:18
**56** 78:2
**570** 2:7

---
**6**
---

**6** 31:18 81:2,5
  86:21 87:3 91:7
  107:4
**60** 18:12 28:18
**60/40** 12:2

---
**7**
---

**7** 31:24 81:16,23,24
  113:21
**70** 28:19
**75** 28:19
**77** 72:12 98:19,24
  99:21

---
**8**
---

**8** 31:6 32:4 82:3
  113:13,16,17
  130:6
**8:30** 104:14
**80,000** 66:17
**80s** 17:11
**85** 108:3

---
**9**
---

**9** 77:15,22 120:15
  120:15
**90** 34:17 107:19
**90-degree** 107:25
**99** 57:1