# GOODMAN v. DILLON TRANSPORTATION, LLC.

## MIGUEL URJILES

## April 15, 2015

Prepared by

**Network**Reporting

STATEWIDE COURT REPORTERS

depos@networkreporting.com
Phone: 800.632.2720
Fax: 800.968.8653
www.networkreporting.com

*Let us assist you GLOBALLY for all of your deposition needs.*

UNITED STATES DISTRICT COURT

IN THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

PAUL GOODMAN and
LINDA GOODMAN,

      Plaintiffs,

v                          File No. 2:14-cv-11473-AJT-RSW

                          HON. ARTHUR J. TARNOW

DILLON TRANSPORTATION, LLC,
A Tennessee Limited Liability Company,

      Defendant.
                    /

DEPOSITION OF MIGUEL URJILES

Taken by the Plaintiffs on the 15th day of April, 2015, at

39475 13 Mile Road, Novi, Michigan, at 11:00 a.m.

APPEARANCES:

For the Plaintiffs:      MR. ANDREW D. CONCANNON (P49336)
                        Smith Bovill PC
                        200 St. Andrews Road
                        Saginaw, Michigan 48638
                        (989) 792-9641

For the Defendant:      MR. ERIC P. CONN (P64500)
                        Segal McCambridge Singer & Mahoney
                        39475 13 Mile Road, Suite 203
                        Novi, Michigan 48377
                        (248) 994-0060

RECORDED BY:           Sheila H. Raymond, CER 6932
                        Certified Electronic Recorder
                        Network Reporting Corporation
                        Firm Registration Number 8151
                        1-800-632-2720



GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

---

**Page 2**

TABLE OF CONTENTS

PAGE

Examination by Mr. Concannon. . . . . . . . . . . . .3, 77
Examination by Mr. Conn . . . . . . . . . . . . . . . . . 76

---

**Page 4**

1    Miguel, "yes" or "no" or if you don't know I don't know is
2    fine so long as you don't say "uh-huh" or "unh-unh" or nod
3    or shrug.  It's hard for Sheila to take that down; okay?
4  A  Okay.
5  Q  Also if you have a question, you don't understand my
6    question or it's confusing by all means ask me to rephrase
7    or repeat or clarify the question for you, fair enough?
8  A  Yes, sir.
9  Q  Okay.  Miguel, what's your date of birth?
10 A  January 13, 195y.
11 Q  Okay.  What's your high school background?  Did you go to
12   high school?
13 A  I just went to school back in my country and I never --
14 Q  Which is where?
15 A  Ecuador.
16 Q  Ecuador?
17 A  South America.
18 Q  How far did you go to school in Ecuador?
19 A  Oh, like, 11th grade.
20 Q  11th grade.  When did you immigrate to the United States?
21 A  In 1976.
22 Q  So you were about 29 years old at the time, give or take?
23   My math is wrong?
24 A  No, sir.  I was 19 years old.
25 Q  You would have been 19 years old at the time?

---

**Page 3**

1           Novi, Michigan
2           Wednesday, April 15, 2015 - 11:08 a.m.
3           REPORTER:  Raise your right hand.  Do you solemnly
4    swear or affirm that the testimony you're about to give will
5    be the whole truth?
6           MR. URJILES:  Yes, ma'am.
7           REPORTER:  Thank you.  Make sure to keep your
8    voice up for me too.
9           MIGUEL URJILES
10     having been called by the Plaintiff and sworn:
11           EXAMINATION
12 BY MR. CONCANNON:
13 Q  Would you state your name?
14 A  Miguel Urjiles.
15 Q  Urheless (pronouncing)?
16 A  Urheless (pronouncing).
17 Q  Okay.  I'm going to call you Miguel if that's okay.
18 A  That's fine; that's fine.
19 Q  We met yesterday.  I'm Andy Concannon.  I represent Paul and
20   Linda Goodman in a lawsuit that's been filed against Dillon
21   Transportation.  Have you ever given a deposition before?
22 A  No, sir.
23 Q  Okay.  It's pretty informal.  The court reporter just swore
24   you in to tell the truth, of course, so you need to do that
25   but also in a deposition if you can answer my questions,

---

**Page 5**

1  A  Yes, sir.
2  Q  So all of your -- would your formal schooling have all taken
3    place in Ecuador?
4  A  Yes, sir.
5  Q  Okay.  When you came into the United States in 1976 you had
6    no schooling from 1976 up to the present; is that correct?
7  A  Correct.
8  Q  Okay.  When you came to the United States where did you go
9    to?  Where did you come to?  Did you come to Michigan right
10   away?
11 A  No.  I was in Chicago.
12 Q  Chicago, Illinois from 1976 til when?
13 A  To 1995, somewhere around there.
14 Q  Okay.  When you immigrated to the United States in '76 did
15   you have a job when you got here, did it take some time to
16   get employed?
17 A  It takes a little time to get employed, yes.
18 Q  It took some time?
19 A  Yes, sir.
20 Q  When you did get your job what was your first job once you
21   came to the states?
22 A  Washing dishes.
23 Q  Okay.  How long did you do that?
24 A  About three years.
25 Q  How long did it take you after immigrating to the United

---

GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

| | Page 6 | | Page 8 |
|---|---|---|---|
| 1 | States to get a license to drive? | 1 | Q You're wearing glasses in the photo? |
| 2 | A Probably I ended up getting my license when I was around 25. | 2 | A Yes, sir. |
| 3 | Q Early 80s, '81, '82? | 3 | Q It says "none" but do you wear those glasses to drive? |
| 4 | A Somewhere around there, yes, sir. | 4 | A Yes, sir. |
| 5 | Q So you were in Illinois until 1995? | 5 | Q Okay. It says class A endorsement here. Any combination of |
| 6 | A Yes, sir. | 6 | vehicles with a GVWR of 26,000 pounds or more provided the |
| 7 | Q Then where did you move to? | 7 | GVWR of the vehicle being towed is in excess of 10,000 |
| 8 | A I moved to Connecticut. | 8 | pounds. It also gives you a tank endorsement and a twin |
| 9 | Q How long were you in Connecticut? | 9 | endorsement. What does a tank endorsement mean? |
| 10 | A Two years. | 10 | A I can drive a tanker. |
| 11 | Q That puts us to '97? | 11 | Q Okay. What does a twin endorsement mean, two trailers? |
| 12 | A Yes, sir. | 12 | A Two trailers, yes, sir. |
| 13 | Q Where did you go in '97? | 13 | Q Okay. How long have you had the CDL license, Miguel? |
| 14 | A Then I moved back to South Carolina. | 14 | A I've had my CDL since '97. |
| 15 | Q South Carolina. Back to South Carolina? | 15 | Q '97? |
| 16 | A Uh-huh (affirmative). | 16 | A Yes, sir. |
| 17 | Q So had you lived in South Carolina previously? | 17 | Q Okay. Did you go to any kind of school for that? |
| 18 | A No, sir. | 18 | A Yes, sir. |
| 19 | Q Okay. How long were you in South Carolina? | 19 | Q Where did you go? |
| 20 | A About six years. | 20 | A That was in Connecticut. I went to school to get my |
| 21 | Q So that puts us to about 2003, give or take? | 21 | license. I don't remember the name of the school. |
| 22 | A Somewhere around there. | 22 | Q Do you know what city it was in? |
| 23 | Q So since 2003 where have you lived? | 23 | A I think it was West Haven. I'm not sure. |
| 24 | A Moved up to North Carolina. | 24 | Q West Haven, Connecticut? |
| 25 | Q Where do you live in North Carolina now? | 25 | A Uh-huh (affirmative). |

| | Page 7 | | Page 9 |
|---|---|---|---|
| 1 | A Nebo, North Carolina. | 1 | MR. CONN: "Yes"? You said "uh-huh." Is that a |
| 2 | Q Can you spell the city? | 2 | "yes"? |
| 3 | A N-e-b-o. | 3 | THE WITNESS: Oh, yes. |
| 4 | Q Nebo, North Carolina? | 4 | A Yes. I'm sorry. |
| 5 | A Nebo, North Carolina. | 5 | Q So when you were at the truck driving school, wherever it |
| 6 | Q And that's since 2003? | 6 | was, how long was that program? |
| 7 | A Yes, sir. | 7 | A It took me about six months to get my license because I was |
| 8 | Q Okay. Miguel, what licenses do you have right now to drive? | 8 | working. I had a job to work and I was just -- you know, I |
| 9 | A CDL. | 9 | think on, like, Saturdays, sometimes two days a week that's |
| 10 | Q Okay. Can I see that license, please? | 10 | why, you know, I went about six months. |
| 11 | A Yes, sir. | 11 | Q Okay. Once you completed that course of study did you have |
| 12 | (Witness hands document to counsel) | 12 | to take some kind of a test? |
| 13 | MR. CONCANNON: The record should reflect a State | 13 | A They put me in, like, a training -- they put me in this |
| 14 | of North Carolina issue -- or license issued by the | 14 | company that they trained me for about a month or two months |
| 15 | Department of Motor Vehicles for the State of North Carolina | 15 | and then after that when I complete my training thing so |
| 16 | reflecting an address of 244 Ivy Drive in Nebo, N-e-b-o, | 16 | then they just put me in my own. |
| 17 | North Carolina? | 17 | Q So it sounds like the school itself gave you some education |
| 18 | A Yes, sir. | 18 | onsite and then sent you on kind of like an internship or |
| 19 | Q Okay. | 19 | pick a name you like with an actual trucking company? |
| 20 | MR. CONCANNON: Class A with an endorsement MT | 20 | A Yes, sir. |
| 21 | issued June 14th of 2014 expiring of January 13th of 2017. | 21 | Q Kinda learning on the job type of thing? |
| 22 | A Yes, sir. | 22 | A Yes, sir. |
| 23 | Q And it indicates your birth date in January 13th, 1957. | 23 | Q Okay. And once you completed that two months or so then the |
| 24 | Okay. Do you have any vision restrictions on this? | 24 | school gave you whatever degree or diploma that you were |
| 25 | A (No verbal response) | 25 | entitled to get? |

3 (Pages 6 to 9)

GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

| | | Page 10 | | | Page 12 |
|---|---|---|---|---|---|

**Page 10**

1 A Yes, sir.
2 Q Okay. Since you got in '97, I take it, you became a CDL
3    operator, a licensed endorsement soon after?
4 A Yes, sir.
5 Q Was your original CDL in Connecticut?
6 A Yes, sir.
7 Q All right. Once you got your CDL in '97 or so in
8    Connecticut did you drive a truck right away?
9 A Yeah.
10 Q Okay.
11 A Yes, sir.
12 Q Since 1997 up through the present for the last 18 years have
13    you essentially been a full-time trucker at your occupation?
14 A Yes, sir.
15 Q Okay. Who was the first company that you got a job with
16    driving -- let's start with '97. The first company you
17    would have gotten a job with driving a truck?
18 A I don't remember the name of the company.
19 Q All right. Where was the company?
20 A They was out of Pennsylvania, and they went off the road and
21    Swift took over.
22 Q Swift?
23 A Yes, sir.
24 Q The meat company?
25 A No, Swift Company. There is the name of the company, Swift.

**Page 12**

1 Q Kollins with a "K"?
2 A Yes, sir.
3 Q Where did he live in South Carolina?
4 A Lawrence, South Carolina.
5 Q So you and he had a company together?
6 A No; no; no. We drove together --
7 Q You drove together.
8 A -- as a team.
9 Q Okay. Is that common where truckers will operate as a team
10    if they're driving out to, like, California or Vegas or
11    somewhere like that?
12 A Yes, sir.
13 Q Okay. How long did you and Freddie Kollins operate as team
14    truckers?
15 A Roughly about a year, year and a half.
16 Q And would that be '98 to 2000, '99?
17 A Yes, sir; yes, sir.
18 Q Okay. When you told me about this trucking school in
19    Connecticut that you went to Freddie was your trainer at
20    that school?
21 A Yes, sir.
22 Q Okay.
23 A Not in school. He was my trainer on the company truck he
24    was working.
25 Q Oh, so whatever company that you went to as part of your

**Page 11**

1 Q Now, you said it was originally a Pennsylvania company.
2    Were you driving in Connecticut or did you move to
3    Pennsylvania?
4 A No, I was driving over the road.
5 Q Okay. When you say "over the road," I've heard that term.
6    I've used that term. I think I know what it means, but it
7    means you're driving all of the states?
8 A All over the states, yes, sir.
9 Q Okay. I'm with you. So you started basically as an
10    over-the-road trucker in '97 and in the 18 years that you
11    have been a trucker I gather you have been an over-the-road
12    truck this whole time, sir?
13 A Yes, sir.
14 Q Following that first job that you got in '97 what was the
15    next job you got as a trucker?
16 A Me and my trainer we team up and my trainer, the guy he
17    trained me in the previous company he used to live in South
18    Carolina and we ended up getting a job and this other
19    company, the name of the company was MK, just like two
20    letters, MK.
21 Q MK?
22 A MK, that was the name of the company and then we start
23    driving together, me and my trainer.
24 Q What was your trainer's name?
25 A Freddie Kollins. And he used to live in South Carolina.

**Page 13**

1    education with the trucking school is that where you met
2    Freddie?
3 A Yes, sir.
4 Q Okay. I follow you. So up to 2000 you had stopped working
5    as a tandem truck driver with Freddie?
6 A Yes, sir; yes, sir. I'm sorry.
7 Q Okay. So what was your next employment, Miguel?
8 A So then I met this other guy that he lives in North
9    Carolina, his name is Keith Holdsclaw and we team up and we
10    move up to this other company -- the name of the company
11    was -- sir, I don't remember the name of the company but me
12    and him we worked together for about six years in that
13    company.
14 Q Okay. Hold on. So that gets us to about 2000, 2006. Is it
15    H-o-l-d-s-c-l-a-w?
16 A Holdsclaw; Holdsclaw (pronouncing), yes, sir.
17 Q Okay. And he was in North Carolina?
18 A Yeah, he lived in North Carolina.
19 Q Where in North Carolina?
20 A He is my neighbor. He lives right there by me.
21 Q In Nebo?
22 A Uh-huh (affirmative).
23 Q So you don't know what company you worked for but you and he
24    again were tandem truck drivers or team?
25 A (Nodding head in affirmative)

                                                    4 (Pages 10 to 13)

GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

| | |
|---|---|
| 1 Q "Yes"? | 1 working with Keith. What happens? Where do you go next? |
| 2 A Yes, sir. | 2 A Keith had to go off the road. I stayed with the company for |
| 3 Q All right. Along the way from '97 up through '06, let's | 3 a couple more years. And after that Keith get back on the |
| 4 say, in order to keep your CDL license what kind of things | 4 road and we team up back again. |
| 5 would you have to do, education-wise, certification-wise, | 5 Q So you're with Keith from 2000 to 2006 or so? |
| 6 what would you have to do? | 6 A Uh-huh (affirmative). |
| 7 A Just work, drive. | 7 Q A couple more years to, let's say, '08 without Keith? |
| 8 Q Okay. Do you have to take any, like, continuing education | 8 A (Nodding head in affirmative) |
| 9 over the years to get kind of schooled up on new | 9 Q "Yes"? |
| 10 regulations, new equipment, anything like that? | 10 A Yes, sir. |
| 11 A Well, every time, you know, they got, you know, new | 11 Q That gets us to '08, and then you spend another couple years |
| 12 regulations that's that but anything else, no, sir. | 12 with Keith when Keith comes back? |
| 13 Q Okay. If a new regulation comes out and you work for | 13 A Yes, sir. |
| 14 company X, Y, Z company is the company in your experience | 14 Q Does that take us to '10, '11? |
| 15 the one that kinda helps you sort through those? | 15 A I start working with the other company in 2004, sir. |
| 16 A Yes, sir. | 16 Q Okay. Okay. So all the dates that we had starting in 2000 |
| 17 Q So you're under no obligation on your own to keep up your | 17 when you started driving -- when you started driving with |
| 18 license by doing anything specific to getting yourself | 18 Keith in 2000 -- |
| 19 educated; is that correct? | 19 A Uh-huh (affirmative). |
| 20 MR. CONN: We're just talking about in terms of | 20 Q Is that a "yes"? |
| 21 education? | 21 A Yes, sir. |
| 22 MR. CONCANNON: For the CDL, yeah. | 22 Q When you drove with Keith 2000 however it was that you drove |
| 23 MR. CONN: Okay. | 23 with him for awhile Keith took some time off? |
| 24 MR. CONCANNON: Yeah. | 24 A Uh-huh (affirmative). |
| 25 MR. CONN: Okay. | 25 Q You drove with Keith again. It was between the time that |
| Page 14 | Page 16 |

| | |
|---|---|
| 1 A Yes, sir. | 1 you started in 2000 -- it was between the time of 2000 and |
| 2 Q Are you obligated which -- we got my next question. Are you | 2 the time you started with Dillon; correct? |
| 3 obligated, Miguel, to road test every couple of years to | 3 A Yes, sir. |
| 4 keep your CDL license? | 4 Q Okay. Whenever that was? |
| 5 A No, sir. | 5 A Yes, sir. |
| 6 Q Have you ever had to road test to re-up that CDL license? | 6 Q And your best memory today is that you started with Dillon |
| 7 A If you changing jobs. | 7 in 2004? |
| 8 Q Okay. So when you road test when you change jobs is that to | 8 A 2004, yes, sir. |
| 9 your understanding because the new company wants to make | 9 Q So for the last 11 years, give or take, you have been |
| 10 sure you can drive or is it because the license requirement | 10 driving for Dillon? |
| 11 is that you need to retest? | 11 A It's exactly about ten years, sir, -- |
| 12 A What I understand is in order to get hired there is a | 12 Q Ten years? |
| 13 procedure that they have. | 13 A -- that I've been driving for Dillon. |
| 14 Q Okay. So the company that hires you wants to make sure you | 14 Q Okay. Let's call it 2005 then you got in there. So when |
| 15 know how to drive? | 15 you have been driving for Dillon since '04 or '05 have you |
| 16 A Yes, sir. | 16 worked for any other company along the way? |
| 17 Q Okay. So it gets us up to '06 but -- I'm going to back up. | 17 A No, sir. |
| 18 You've got a medallion that's attached to your necklace | 18 Q Okay. When you drove for Dillon -- strike that. When you |
| 19 there. Is that a military thing? | 19 hired in for Dillon did they road test you? |
| 20 A No, sir. | 20 A Yes, sir. |
| 21 Q Oh, it's not. | 21 Q Okay. What kind of a truck or tractor-trailer system did |
| 22 A No. | 22 they road test you on? |
| 23 Q Okay. Have you served in the military, Miguel? | 23 A Regular -- that was the ones that I have. |
| 24 A No, sir. | 24 Q Okay. Yesterday we had the chance to meet personally and I |
| 25 Q Okay. Very good. So once you get to '06 you had been | 25 saw the trailer was used for the TRW delivery that we'll |
| Page 15 | Page 17 |

GOODMAN v. DILLON TRANSPORTATION, LLC.                          DEPOSITION OF MIGUEL URJILES

| | |
|---|---|
| 1    talk about in a minute.  That's what's called a low boy | 1   Q   So basically you just pull it up to get it to get it to dock |
| 2    trailer? | 2    level, park your rig and then that's the end of your |
| 3   A   **We call drop deck; drop deck.** | 3    responsibility until you drive away? |
| 4   Q   You call it a drop deck? | 4   A   **Yes, sir.** |
| 5   A   **Drop deck, yes, sir.** | 5   Q   All right.  I am assuming since you got to Dillon you have |
| 6   Q   So if I saw low boy by mistake at some point later I mean | 6    not drive -- strike that -- you have not driven as a tandem |
| 7    the same thing. | 7    truck driver anymore, you have just been by yourself? |
| 8   A   **They're the same thing.** | 8   A   **Yes, sir.** |
| 9   Q   Drop deck and low boy, you and I will agree those are the | 9   Q   Okay.  You're still what's known as an over-the-road trucker |
| 10    same? | 10    however? |
| 11   A   **Yes, sir.** | 11   A   **Yes, sir.** |
| 12   Q   Okay.  When you drove before you had gotten to Dillon, so in | 12   Q   Okay.  Since you have been at Dillon since '04 has your work |
| 13    '97 up through whenever you got to Dillon have you ever | 13    schedule essentially been the same?  Have you worked the |
| 14    driven a drop deck trailer before? | 14    similar hours year after year? |
| 15   A   **No, sir.** | 15   A   **Yes, sir.** |
| 16   Q   Is Dillon's fleet -- strike that.  When you got there in '04 | 16   Q   So if I asked you what your normal work schedule would be it |
| 17    did you test on a drop deck? | 17    would be pretty constant over the last ten years? |
| 18   A   **Yes, sir.** | 18   A   **Yes, sir.** |
| 19   Q   Okay.  So up that you had never had a drop deck trailer | 19   Q   Can you share with me what your normal work schedule is in a |
| 20    to use? | 20    given year or month, however it's easier for you to do? |
| 21   A   **No, sir.** | 21   A   **Well, usually I leave out Sunday night and I get back home** |
| 22   Q   All right.  Describe what a drop deck trailer does. | 22    **Friday nights.** |
| 23   A   **Okay.  Drop deck, the trailers that we have -- the reason we** | 23   Q   So the truck that I saw you with yesterday -- I don't know |
| 24    **call it drop deck is because, you know, they drop, they drop** | 24    that I have the license number but we'll agree that -- I'll |
| 25    **down, and the way it's built up is they got legs.  Every** | 25    lay the foundation.  You and I met yesterday; correct? |
| Page 18 | Page 20 |

| | |
|---|---|
| 1    **time, you know, we back into the dock they got buttons and** | 1   A   **Uh-huh; yes, sir.  Yeah.** |
| 2    **we can operate those operate those things to lift it up.** | 2   Q   And the truck that was inspected was the truck that you |
| 3    **And then when we got to the back to try to lift it up and** | 3    drove to the TRW dock on April 23rd, 2012? |
| 4    **even it out with that plate.  That's why we call it drop** | 4    MR. CONN:  The truck or the trailer? |
| 5    **deck.** | 5    MR. CONCANNON:  The trailer.  My mistake. |
| 6   Q   Okay.  So just so the record is clear, your understanding is | 6   Q   The trailer that we saw yesterday was the trailer that was |
| 7    that the drop deck trailer tends to be lower than the normal | 7    at the dock at TRW on April 23rd, 2012; is that correct? |
| 8    dock height that you're going to be delivering to? | 8   A   **Yes, sir.** |
| 9   A   **Yes, sir.** | 9   Q   April 26th, for the record.  And the tractor might change |
| 10   Q   And there is a device on the side of the trailer itself that | 10    over time but that trailer is the same trailer? |
| 11    will elevate the back end of the trailer? | 11   A   **Yes, sir; the trailer is the same trailer.** |
| 12   A   **Yes, sir.** | 12   Q   Is that trailer your trailer typically that you drive? |
| 13   Q   Okay.  And you mentioned that the dock plate, the goal of | 13   A   **No, sir.** |
| 14    the system is to even the back of the trailer to the level | 14   Q   Okay.  When you drive in a given week, let's say, so it |
| 15    of the dock plate; is that correct? | 15    sounds like Sunday night to Friday, those five nights or |
| 16   A   **Yes, sir.** | 16    whatever it is will you have one trailer that you'll use |
| 17   Q   All right.  When you're on a site, by the way, when you get | 17    that five days running? |
| 18    to a dock are you as the driver, Miguel, responsible for | 18   A   **No, sir.** |
| 19    putting the dock plate on the back of your trailer or is the | 19   Q   Okay.  So will you go to a dispatch site and pick up a |
| 20    company that you're delivering to? | 20    different trailer from time to time? |
| 21   A   **The company.** | 21   Q   You'll have the same tractor for those five days? |
| 22   Q   Okay.  And when you are getting a load from a company does | 22   A   **Yes, sir.** |
| 23    the same thing apply, the person that's giving you the load | 23   Q   Yes, sir. |
| 24    has to handle the dock plate? | 24   Q   But you won't have the same trailer? |
| 25   A   **Yes, sir.** | 25   A   **Yes, sir.** |
| Page 19 | Page 21 |

GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

1  Q  All right.  Are all the trailers, from wherever you pick
2     them up, Miguel, to wherever you drop them off, are they all
3     the drop deck for Dillon?
4  A  No, sir.
5  Q  Okay.  Of the trailers that you typically use today in 2015
6     are they mostly drop deck trailers still?
7  A  No, sir, because -- no, sir.
8  Q  In 2012 were most of the runs that you would have with a
9     trailer from Dillon drop deck trailers?
10 A  No, sir, it was a mix.
11 Q  Okay.  Do you particularly, yourself as a driver, have any
12    preference driving a drop deck versus driving something
13    other than a drop deck?
14 A  No, sir.
15 Q  Okay.  It doesn't matter to you?
16 A  No, sir.
17 Q  Okay.  So you described to me the elevation system of the
18    drop deck.  When you first got to Dillon up to April 26th of
19    2012 that, whatever it was, 12-year period -- I'm sorry --
20    8-year, 7-year period had you pretty routinely used drop
21    deck trailers as part of the over-the-haul trucking you did
22    or over-the-road trucking you did?
23 A  Yes, sir.
24 Q  Okay.  Taking April 26th out of it, what's the general
25    protocol that you use when you come to let's call it a site

Page 22

1     where you're dropping off a load; okay?  When you go to a
2     plant someplace and you're dropping off a load, tell me,
3     Miguel, your protocol that you use when you get to that
4     place?
5  A  To drop the load in there?
6  Q  Yes, sir.
7        MR. CONN:  He is not talking about on that date.
8  Q  I'm not talking on that day.
9  A  No; no.  I'm talking about --
10       MR. CONN:  Go ahead.  You can ask him if you don't
11    understand his question.
12 A  Are you asking me, like, dropping on the lot or dropping on
13    the dock?
14 Q  On the dock.
15 A  On the back door?
16 Q  Yeah.
17 A  If I have to drop it on the dock door?
18 Q  Yes, sir.
19       MR. CONN:  Are you talking about a dock that would
20    be similar to the one that was at --
21       MR. CONCANNON:  Yes.
22 Q  Because what I am getting at is I gather you're dropping a
23    trailer to switch trailers; right?
24 A  Yeah, that we --
25 Q  That's not what I mean.

Page 23

1  A  Oh, I'm sorry.
2  Q  As counsel said you had it right.  I'm just looking for
3     when, Miguel, you're making a delivery to the dock and you
4     got to be able to get that back end of the trailer to dock
5     height so they can put the plate on it and take the crap off
6     your -- I'm sorry -- take the load off your truck?
7        MR. CONN:  I'm just going to object to form and
8     foundation.  I think there are more variables than just
9     backing into a dock like TRW.  That being said, if you can
10    answer the question go ahead.
11 A  We don't drop those trailers anywhere than our place.  We
12    don't have no places that we can just drop and leave those
13    trailers unless if we drop this trailer and they going to
14    reload it a lot of times we just stay hooked to that
15    trailers.
16       MR. CONN:  Let's go off the record for just a
17    second.
18       (Off the record)
19       MR. CONCANNON:  Back on.
20 Q  Miguel, I want to make sure I am being clear with you.  From
21    what you told me I get the sense that there are times during
22    the week, or certainly during the month where you'll drop a
23    trailer somewhere and someone else will pick up that trailer
24    and you'll go get a different trailer; is that correct?
25 A  Yes, sir.

Page 24

1  Q  And when I say "drop a trailer" that's what that means?
2  A  Yes, sir.
3  Q  Okay.  I want to contrast that with what I want to really
4     know is how you unload a trailer -- okay? -- so you and I
5     are communicating.  When you are driving for Dillon from,
6     let's say, '04 or '5 up through 2012 with a drop deck
7     trailer attached to your cab and you go to a plant can you
8     just kinda give me the general protocol, Miguel, to what you
9     do in order to allow that plant to unload what's in the back
10    of your truck?
11 A  Yes, sir.
12 Q  Thank you.
13 A  First of all, when I arrive to the place I go check in with
14    the customer and give my paperwork and then they tell me
15    which dock is open and they point me to the dock number
16    whatever they have, like two, three docks.  So I go back to
17    the truck and I just line up to drive up to the dock.  And
18    then, of course, I apply my brakes and then go back, you
19    know, to make sure that I just line up to the dock.  I leave
20    about a foot from the dock plate to my -- what do you call
21    it? -- the bumper of my truck so just to make sure I can
22    leave the trailer out so they have a buffer on the side.
23    From there, you know, I go back in to the truck and I just
24    apply my brake light -- I mean, my trailer brakes and then
25    come back, put the knob on and then just stay right on the

Page 25

GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

**Page 26**

1  side just to make sure the trailer is raising up. There is
2  a click. When the trailer goes up there is a click
3  that's -- you can hear the sound go like "Cuh" (indicating)
4  and then the legs -- I call legs and the arms it goes down
5  and I just make sure that the legs are straight and then
6  when the legs straight go down there is a little sound that
7  goes like "Shh" and the air goes "Phhh" and that tells me
8  those arms are locked in place on the axle. And then I
9  look, you know, make sure that things are straight and just
10  go back to the trailer and then easily back to my dock and
11  then when I complete straight on back then I shut them off
12  the truck, apply the brakes and just wait until they got --
13  you know, I get empty.
14  Q   Okay. So if I understand it right, you'll back up with the
15       trailer still in the low position to about a foot away from
16       the edge of the dock plate and you'll apply your brakes;
17       correct?
18  A   Yes, sir.
19  Q   You'll get out of the vehicle to make sure you're about a
20       foot away?
21  A   Yes, sir.
22  Q   And assuming that you are then you will click the actuator
23       on the side of the trailer to begin raising the trailer up?
24  A   I'll go back to the truck because the brakes are locked,
25       then apply my trailer brake.

**Page 27**

1  Q   Okay. So there is two sets of brakes. There is the tractor
2       brakes and the trailer --
3  A   And the trailer brake.
4  Q   -- brakes. Would I be correct, Miguel, that the system
5       won't elevate unless you have already put the trailer brakes
6       on?
7  A   Yes, sir.
8  Q   Okay. All right. So once you get the trailer brakes --
9       once you go -- so you see that it's a foot away, you go back
10       to the front of the cab, engage now the trailer brakes so
11       you have the cab brakes on and the trailers brakes then you
12       can flip the actuator to raise the back end of the trailer?
13  A   Just the trailer brakes is on.
14  Q   Oh, okay.
15  A   Not the tractor.
16  Q   Oh, okay. All right. It's still running in park
17       presumably?
18  A   Well, yeah. Yes, sir.
19  Q   Okay. And then once you have got that raised to your
20       satisfaction you back it up the last foot and then you put
21       it in park, turn it off and you're done until they unload?
22  A   Yeah, when the trailer is up, like say there is a sound.
23       When the trailer goes up there is a sound. It makes a
24       sound. I stand right there.
25  Q   A sound?

**Page 28**

1  A   Yeah.
2  Q   It sounds like you're saying "song" but there is a sound it
3       makes?
4  A   Yeah, that then it goes like -- those legs they click down,
5       goes down just get straight and it goes right on top of the
6       axle and then when it's complete, when the arms are on top
7       of the axle the trailer go, like, "Pssh."
8  Q   Okay.
9  A   And then, of course, I just look, you know, at those arms
10       are straight on there and then go back to the trailer and
11       back up slowly back back there and then when it's complete
12       in there just go back to the truck and turn off everything,
13       you know, apply my brakes.
14  Q   So are the legs on top of the axle, to your knowledge
15       Miguel, what actually provides the support so that the
16       trailer stays up?
17            MR. CONN: Foundation. Go ahead.
18  A   Yes, sir.
19  Q   And it's your testimony that the sound of that kind of last
20       gasp of air coming out is what tells you that the legs have
21       come down?
22            MR. CONN: Foundation. Go ahead.
23  A   Yes, sir.
24  Q   And once those legs come down and that air gets let out
25       you're basically good to go that last foot to back the

**Page 29**

1  trailer up?
2            MR. CONN: Form, foundation. Go ahead.
3  A   Repeat it again.
4  Q   Sure. I'm just trying to get the process. I've seen it.
5       I've heard you describe it. I just want to make sure I get
6       it. Once you hear that sound, that last kind of "Psssh" of
7       air, that sound you told me --
8  A   Uh-huh (affirmative).
9  Q   -- that tells you that the legs have come down; correct?
10  A   No, that tells me that the legs was already locked.
11  Q   The legs are locked?
12  A   Yes, sir.
13  Q   And then once that sound comes you're able to go back in
14       front of the vehicle and back it up the last foot?
15            MR. CONN: Form. Go ahead.
16  Q   Okay.
17            MR. CONN: Did he -- I'm sorry. Did you answer?
18  A   Yes, sir.
19  Q   Okay. I was right, you back it up that last foot after you
20       hear that sound?
21  A   Yes, sir.
22  Q   Okay. Did Dillon Transportation give you any particular
23       training on the drop deck system, how it worked, anything
24       like that?
25  A   When I start with Dillon and that Dillon mechanic they

8  (Pages 26 to 29)



GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

| | |
|---|---|
| 1   showed me how to do it. | 1   do in the course of those eleven hours? |
| 2   Q   Okay. Is there a mechanic -- or how many mechanics are at | 2   A   **Well, we run electronic logs so it's automatically going to** |
| 3   Dillon now, if you know? | 3   **show you how much time are you driving and when do we take** |
| 4   A   **About five.** | 4   **out breaks and when do we go off duty and all of that.** |
| 5   Q   About five. How big is Dillon? Do you know how many the | 5   Q   I thought you used the term "lock" I thought that had to do |
| 6   employees has just generally? | 6   with your engine. You're telling me Dillon maintains within |
| 7   A   **We got about a hundred drivers.** | 7   its vehicle fleet electronic logs? |
| 8   Q   Okay. The driving that you do, Miguel, are you generally | 8   A   **Uh-huh (affirmative).** |
| 9   east of the Mississippi? | 9       MR. CONN: Is that a "yes"? |
| 10   A   **Right now I'm doing, like, -- it's not a dedicated route but** | 10   A   **Yes, sir; yes, sir.** |
| 11   **it's like a regular route so I just go back and forth** | 11   Q   All right. And those electronic logs impact on when and |
| 12   **Carolinas to --** | 12   whether you can continue driving? |
| 13   Q   So you're within the Carolinas generally? | 13   A   **Yes, sir.** |
| 14   A   **Tennessee, Carolinas.** | 14   Q   All right. And those electronic logs do they do anything |
| 15   Q   Tennessee, Carolinas? | 15   other than say the hours in which you're operating? Do they |
| 16   A   **Yes, sir.** | 16   record any other information? |
| 17   Q   Okay. When you're driving -- let's go, since you have been | 17       MR. CONN: Foundation. If you know. |
| 18   driving with Dillon up to today these ten years later do you | 18   A   **No, sir. I don't know, sir.** |
| 19   have a normal checklist that you need to go through on a | 19   Q   Okay. Fair enough; fair enough. Since you have been |
| 20   daily basis when you're driving? | 20   driving for Dillon over the last decade have you ever gotten |
| 21       MR. CONN: Form of the question. "Checklist"? | 21   any citations or writeups, if you will, for improper loads |
| 22   Q   Well, how many hours a day are you permitted under motor | 22   not keeping improper logs, anything like that? |
| 23   carrier standards to drive? | 23       MR. CONN: Just going to object to relevance but |
| 24   A   **11 hours.** | 24   go ahead. |
| 25   Q   Okay. Do you have a typical time that you're generally | 25       MR. CONCANNON: Sure. |
| Page 30 | Page 32 |

| | |
|---|---|
| 1   operating 6:00 to 7:00, you know 5:00 to 6:00? Do you have | 1   A   **No, sir.** |
| 2   a typical time when you operate that you're in? | 2   Q   I want to take you to April 26th of 2012; okay? Do you |
| 3   A   **We run an electronic logs, sir. You don't know what** | 3   remember the day? |
| 4   **electronic logs is?** | 4   A   **No, sir.** |
| 5   Q   Electronic lock? | 5   Q   You don't remember the day? |
| 6   A   **Yes, sir.** | 6   A   **No, sir.** |
| 7   Q   Okay. The ignition won't operate if you try to engage it | 7   Q   Do you know at all what you were carrying in the cab -- or |
| 8   too soon without ample rest? | 8   in the trailer that day, what the load was? |
| 9   A   **They give you times, from time to time and then when your** | 9   A   **I believe it was brake shoes.** |
| 10   **hours lapse you don't have no -- any other choice than shut** | 10   Q   Do you know where you had started that day? |
| 11   **them off.** | 11   A   **I started the night before.** |
| 12   Q   My more specific question is though do you have a general | 12   Q   All right. I'll strike -- |
| 13   typical time frame that you would work those 11 hours? | 13   A   **I pick up in Fletcher, North Carolina.** |
| 14   A   **Well, the route that I'm --** | 14   Q   Okay. So you had picked up in North Carolina and taken the |
| 15       MR. CONN: Object to form of the question. You | 15   load up to Saginaw? |
| 16   can answer. | 16   A   **Yes, sir.** |
| 17   A   **The route that I'm doing now is I usually work at nighttime** | 17   Q   Okay. When you would have gotten to the plant -- I think |
| 18   **because where I pick up my loads the loads would come off** | 18   the records tell us it was a late morning incident, 10:30, |
| 19   **later, or like, 6:00 o'clock so I would start around -- I'd** | 19   11:00 a.m. would you have had any stops that day or would |
| 20   **say around 4:00 o'clock in the afternoon and then I drive to** | 20   you have come straight to Saginaw, if you know? |
| 21   **about 3:00 o'clock in the morning.** | 21   A   **I usually pick up in Fletcher and that time we wasn't** |
| 22   Q   Okay; okay. And then you have to shut off and rest no | 22   **running electronic logs so we were running paper logs so** |
| 23   matter where you're at? | 23   **what I usually pick up is on Fletcher, and then come up to** |
| 24   A   **Yes, sir.** | 24   **about -- there is a rest area back there before you get to** |
| 25   Q   Okay. Are you obliged to make any logs of the driving you | 25   **Saginaw about two hours from there and I used to go to bed** |
| Page 31 | Page 33 |

NetworkReporting
— STATEWIDE COURT REPORTERS —
800-632-2720

GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

**Page 34**

1    on there, and then wake up because I had -- I think -- I had
2    about a 10:00 o'clock appointment time so then drove from
3    that place to Saginaw.
4  Q  Okay.  So you would have picked up the load in Fletcher,
5    North Carolina on the afternoon of April 25th?
6  A  Yes.
7  Q  And your approximate delivery time to Saginaw would have
8    been 10:00 on April 26th to the best of your memory?
9  A  Yes, sir.
10  Q  And you're telling me that since you started in the
11    afternoon and would, otherwise, not be able to drive til
12    probably 2:00 or 3:00 in the morning you would get as far as
13    you could and then take a nap or you would rest for a period
14    of time?
15  A  Yes, sir.
16  Q  And your best memory is you would have made it from Fletcher
17    to somewhere in southern Michigan before you needed to stop?
18  A  Yes, sir.
19  Q  Okay.  And then you would stopped whatever required amount
20    of time you needed to before you could begin to take off
21    again up to Saginaw?
22  A  Yes, sir.
23  Q  All right.  After the events of April 26th with Mr. Goodman
24    happened did you leave Saginaw and go all the way back to
25    North Carolina or did you have to pull over again?

**Page 35**

1  A  No, sir.  We had to -- after that incident I had to take
2    this trailer to a mechanic to be inspected.  And after that
3    I had to stay over because there was another trailer --
4    another trucks coming in with drop decks and since that
5    incident happens to me the boss lady or, you know, the TWA
6    (sic) that was running they don't want this trailers anymore
7    back there so I had to stay over here in Michigan.
8        MR. CONN:  When you said TWA, do you mean TRW?
9        THE WITNESS:  Yeah, the company.  I'm sorry.
10        MR. CONN:  That's okay.
11  Q  The boss lady.  I know what you mean.  I want to back up a
12    little bit.  I know you don't remember the specifics.  So on
13    the 26th whenever you do get there -- and I'm not alleging,
14    Miguel, just to ease your mind I'm not alleging you operated
15    outside of the permissible.  I'm not alleging that; okay?
16  A  Uh-huh (affirmative).
17  Q  So if you rode the 11 hours I don't care.  I'm not asking.
18    Once you do get there whenever it is, it looks like it was
19    around 10:00ish; okay?
20  A  Uh-huh (affirmative).
21  Q  You don't really remember that particular day when you
22    backed the rig up?
23  A  You mean the date?
24  Q  That day.
25        MR. CONN:  I'm going to object to the form of the

**Page 36**

1    question.  Are you asking him does he remember the date the
2    incident occurred or --
3        (Off the record interruption)
4  Q  Miguel, so the record is clear the incident happened on
5    April 26th, 2012.  Okay.
6  A  Yes, sir.
7  Q  You don't remember the particulars of dropping off that
8    particular load that day; correct?
9  A  You mean what day was it, sir?
10  Q  No.  I don't care if it was a Tuesday or a Wednesday.  I'm
11    asking specifically you don't remember backing that truck
12    into that particular loading dock on that particular day?
13  A  Oh, yeah, I remember, sir.
14  Q  You don't remember?
15  A  I remember, yes.
16  Q  Okay.  Do you remember what the weather conditions were that
17    day?
18  A  A little bit cold.  It wasn't too bad.
19  Q  Okay.  Now, when you are backing up a trailer you've given
20    me the kind of procedure that you use.  Where did you learn
21    to do it that way?  Did someone from Dillon teach you to do
22    it that way?  Did you take a class?  How did you learn how
23    to do that?
24  A  Dillon they showed me how to do it.
25  Q  Okay.  They showed you how to do that in 2005 or '04

**Page 37**

1    whenever it was you hired in?
2  A  2004.
3  Q  Did you ever have any additional training beyond that?
4  A  No, sir.
5  Q  Okay.  Have you ever gone under the truck as it's being
6    raised or -- strike that.  Have you ever gone below the
7    trailer to have someone show you exactly how it works when
8    it's engaged, when the elevation system is engaged?
9  A  No, sir.
10  Q  Okay.  Do you know is there a particular name that you call
11    the -- I think you called them "legs" or something.  Is
12    there any particular name that they're called that you're
13    aware of?
14  A  Like, say I call legs or arms.
15  Q  Legs or arms.  Okay.  Now, is part of your job
16    responsibilities at Dillon in 2012 do you have any
17    maintenance responsibilities with regard to either your
18    tractor-trailer or the -- strike that.  Either the tractor
19    or the trailer as you're driving it?
20        MR. CONN:  Form of the question.  Go ahead.
21  A  Am I responsible for that?
22  Q  I'm asking if you are?
23  A  No, sir.
24  Q  The mechanics are responsible for that?
25  A  Yes, sir.

10  (Pages 34 to 37)

GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

| | | |
|---|---|---|
| 1 | Q | So you don't know the working order of the elevation system |
| 2 | | on April 26th specifically from a mechanical standpoint, do |
| 3 | | you? |
| 4 | A | No, sir. |
| 5 | Q | To the extent that -- do you have any knowledge -- just as |
| 6 | | the driver of such a trailer from time to time -- do you |
| 7 | | have any knowledge of how often the fittings on the |
| 8 | | elevation system are greased? |
| 9 | A | No, sir. |
| 10 | Q | Are you made aware, Miguel, of any service history to those |
| 11 | | low deck trailers at any given point in time? |
| 12 | A | No, sir. |
| 13 | Q | Okay. You don't know if they're serviced on a quarterly |
| 14 | | basis, or on a weekly basis, do you? |
| 15 | A | All I know they service trucks every time -- the trailers. |
| 16 | Q | They service the trailers? |
| 17 | A | Yeah. |
| 18 | Q | You don't know what that service consists of; correct? |
| 19 | A | No, sir. |
| 20 | Q | Okay. On April 26th you would have gotten to that site |
| 21 | | around 10:00. Tell me what you remember doing when you got |
| 22 | | there. Describe what you did. |
| 23 | A | When I get to Saginaw? |
| 24 | Q | Yes, sir. |
| 25 | A | When I get to Saginaw, check in with that young lady, the |

Page 38

| | | |
|---|---|---|
| 1 | | trailer and we push it in to lower. |
| 2 | Q | Okay. It looks as though the elevation having seen it now |
| 3 | | around a minute-ish to be elevated? |
| 4 | A | Yeah, it takes about a minute and a half or two minutes. |
| 5 | Q | Okay. And I don't remember the deflation. The deflation |
| 6 | | goes a little faster maybe or is it about the same time? |
| 7 | A | Same time. |
| 8 | Q | Same time. You're aware that it's alleged in this case that |
| 9 | | the trailer dropped suddenly about a foot and a half, are |
| 10 | | you aware of that? |
| 11 | A | About a foot. |
| 12 | Q | You would call it a foot, but it dropped some distance |
| 13 | | abruptly; correct? |
| 14 | A | Yes, sir. |
| 15 | Q | We'll get to that in a second, but has that ever happened to |
| 16 | | you before? |
| 17 | A | No, sir. |
| 18 | Q | Has it ever happened to you since? |
| 19 | A | No, sir. |
| 20 | Q | Okay. So on the 26th of April you would have gotten it to a |
| 21 | | foot away and then you would have turned on the -- or pulled |
| 22 | | the knob out to elevate the system, then what would you have |
| 23 | | done after you pulled the knob out? |
| 24 | A | When I pulled the knob out? |
| 25 | Q | Yup. |

Page 40

| | | |
|---|---|---|
| 1 | | receiver, and when she point me -- you know, she told me to |
| 2 | | go to the dock, just get it into the dock and to back up. |
| 3 | Q | Okay. Do you know that lady's name, by the way? |
| 4 | A | I think it was Ashley, young lady. |
| 5 | Q | Okay. Had you met her before? You had seen her there |
| 6 | | before? |
| 7 | A | Yes, sir. |
| 8 | Q | Okay. And she directed you to a given dock number, "Go to |
| 9 | | that dock"? |
| 10 | A | Uh-huh (affirmative). Yes, sir. |
| 11 | Q | Okay. Once you got back into the cab what did you do next? |
| 12 | A | When I went back to -- I get back to the cab, I look at that |
| 13 | | dock where I was supposed to go in so I look around and I |
| 14 | | line up the trailer to the dock. Back into the dock. I |
| 15 | | left about a foot (indicating) of distance from the dock |
| 16 | | plate. Then when I get out of the -- I applied the brakes, |
| 17 | | of course, and then I get out of the truck, go back, look at |
| 18 | | how far I am from the dock plate. Say, if I'm from about a |
| 19 | | foot away from there I'm fine. So go back to the truck -- |
| 20 | | to my cab and then I just apply my trailer brake. |
| 21 | Q | Trailer brake. Okay. |
| 22 | A | And then I go back and pull the knob up. |
| 23 | Q | Okay. Does the knob go from side to side or does it go get |
| 24 | | pulled back? I didn't operate -- |
| 25 | A | They just pull up or pull in. So we pull up to raise the |

Page 39

| | | |
|---|---|---|
| 1 | A | I stay there by the knob. You can see from there, the axle |
| 2 | | is right there. I just stay right there and just stay right |
| 3 | | there. That's my job to do is stay right there until the |
| 4 | | trailer goes up. And then when the trailer goes up, like I |
| 5 | | said, there is a sound on the trailer. First of all, you |
| 6 | | know, like, the legs goes down. You can hear it click in |
| 7 | | there. And then when the legs start straightening out they |
| 8 | | get on top of the axles and then when those legs are on top |
| 9 | | of the axles there is a air sound that goes "Chhh." And |
| 10 | | that shows me there is complete. I just look at the legs on |
| 11 | | there. And then after that I go back to the cab and back to |
| 12 | | the dock and then, you know, shut off the truck and apply |
| 13 | | the brakes. |
| 14 | Q | Okay. You're able to look at -- it sounds like you're doing |
| 15 | | a couple things there. You're listening to the sounds? |
| 16 | A | Uh-huh (affirmative). |
| 17 | | MR. CONN: "Yes"? |
| 18 | Q | "Yes"? |
| 19 | A | Yes, sir. |
| 20 | Q | And you're looking underneath the trailer? |
| 21 | A | Yes, sir. |
| 22 | Q | All right. And you're doing that when you're standing at |
| 23 | | the area where you engaged the knob, wherever that is on the |
| 24 | | trailer. You can see a few feet away -- under the |
| 25 | | trailer -- you can see the locking mechanism; is that |

Page 41

11 (Pages 38 to 41)

GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

**Page 42**

1  correct?
2  A  Yes, sir.
3  Q  And so when you're making that inspection, I'll call it,
4     you're making that inspection from the location of the knob;
5     correct?
6  A  Yes, sir.
7  Q  So that's the visual inspection you do; correct?
8  A  Yes, sir.
9  Q  And that's the entirety of the visual inspection you do;
10    correct?
11 A  Yes, sir.
12 Q  And then you also have secondary means of inspection which
13    is listening; correct?
14 A  Yes, sir.
15 Q  And if I understand it right you're listening for two
16    things, at least at the end, one is what you say was -- is a
17    click of the legs locking into place?  "Yes"?
18 A  Yes, sir.
19 Q  And then the last thing will be that last gasp -- I'll call
20    it that, you pick what you like, but the last gasp of air
21    coming out that tells you you're finally done?
22 A  Yes, sir.
23 Q  And do I have it right?  Is that all?
24 A  Yes, sir.
25 Q  And once you hear all that and once you see that you have

**Page 43**

1  seen then you're good to go to back up that last foot and
2  then you're done until you drive away?
3  A  Yes, sir.
4  Q  All right.  So let's get to the incident in this case.  Did
5     you know Paul Goodman from Adam?
6  A  No, sir.
7  Q  Do you know the weight of the load that you were driving in
8     terms of tons?  Before the first pallet was removed did you
9     have 32,000, 50,000, if you know?
10 A  About 38,000.  I'm not sure.
11    MR. CONN:  Are you guessing?
12    THE WITNESS:  Yes.
13    MR. CONN:  Don't guess.
14    THE WITNESS:  Oh, I'm sorry.
15 Q  He's right.  That doesn't help anybody.
16 A  I'm sorry.  38,000, yes, sir.
17 Q  Before your deposition today -- and I don't want to know
18    anything you discussed with Mr. Conn or Mr. Yates, that's
19    privileged; okay?  But did you review any documentation
20    before your deposition today?
21 A  No, sir.
22 Q  You didn't review any depositions of Paul Goodman or Ashley
23    Osterhof (phonetic) in this case?
24 A  No, sir.
25 Q  Have you reviewed a copy of the Complaint in this case

**Page 44**

1  against Dillon?
2  A  No, sir.
3  Q  Okay.  So the extent to which you're testifying today about
4     the events of April 26th it's really based upon what you
5     remember?
6  A  Yes, sir.
7  Q  And to some extent is it fair to say you're basing some of
8     your testimony on your normal custom and habit of how you do
9     things?  Are you basing your testimony about what you did on
10    the 26th because you remember it specifically or because
11    that's how you always do things?
12 A  Because I remember it, sir.
13 Q  All right.  Did you ever speak to Paul Goodman at the --
14    strike that.  Around 10:45, Miguel, that seems to be an
15    approximate time frame for when the trailer drops; okay?
16    First of all, did you hear anything when you were at the
17    dock that day when something happened?
18    MR. CONN:  I'm just going to object to the form of
19    the question.  At what point in time are you referring?
20 A  Okay.  The testimony from Ms. Osterhof and Mr. Goodman is
21    that she says around til 10:45, I think, the trailer dropped
22    precipitously and made a sound.  Did you hear anything that
23    sounded like the trailer dropping?
24 A  Yes, sir.
25 Q  Okay.  Can you tell me, Miguel, where you were when you

**Page 45**

1  heard that sound?
2  A  I was in the cab.  I was in the back of my -- in my bunk.
3  Q  Okay.  So when you were at TRW was it the normal custom and
4     practice that you would actually be out of your truck when
5     that happens?  In other words, when they're unloading your
6     trailer you're supposed to be in a room somewhere by the
7     office; correct?
8  A  Yes, sir.
9  Q  Okay.  But on this particular date you happened to be back
10    in your cab for some reason; is that correct?
11 A  Yes, sir.
12 Q  Why?
13 A  I had to make a phone call.
14 Q  Okay.  Do you have any idea from the time that you parked
15    the vehicle and they put the dock plate on how much time
16    elapsed between the time that you parked it and they put the
17    dock plate on?
18 A  No, sir.
19 Q  A minute?  Two minutes?
20 A  No, sir.
21 Q  Longer than that?
22 A  I can't remember.
23 Q  Okay.  When you got out of your cab -- strike that.  After
24    you backed up the cab, the trailer the last time and they
25    put the dock plate on did you get out of the cab again?

GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

**Page 46**

1  A   When I heard the sound?
2  Q   No; no. You already told me one-- once you got the
3      trailer elevated then you would have gotten back in to back
4      it up the last foot or so; correct?
5  A   Yes, sir.
6  Q   Okay. That's where I'm getting. Once you got backed up now
7      and they're ready to put the dock plate on and load or
8      unload that trailer did you get out at that point or were
9      you still in the cab the whole time?
10 A   I was still in the cab.
11 Q   Okay. So you never did see Paul Goodman get into the back
12     of the trailer with his forklift?
13 A   No, sir.
14 Q   Could you feel him coming and going?
15 A   Yes, sir.
16 Q   Okay. You could feel some jostling?
17 A   Bouncing around.
18 Q   "Bouncing around." Okay. Do you know since -- from the
19     time you first felt him being in there -- okay? -- until the
20     trailer being dropped do you know was it two minutes, was it
21     20 minutes, if you know?
22         MR. CONCANNON: Don't guess.
23 A   No, I don't remember, sir.
24 Q   Who were you on the phone with?
25 A   My wife.

**Page 47**

1  Q   Okay. Now, the phone that you called from was that your
2      personal cell phone?
3  A   Yes.
4  Q   What's that cell phone number?
5  A   XXX- --
6  Q   XXX.
7  A   XXX-X- --
8  Q   XXX.
9  A   6451.
10 Q   6451.
11         MR. CONN: Do you mind if he just puts the last
12     four on the record?
13         MR. CONCANNON: I don't mind that.
14         MR. CONN: Okay.
15 Q   Miguel, who is the cell carrier for your cell account as of
16     April 26th, 2012?
17 A   The phone company?
18 Q   Yes, sir.
19 A   Verizon.
20 Q   Okay. If I wanted to subpoena Verizon Wireless to see the
21     time that you were on the phone around 12:- -- or 10:45 or
22     whatever and saw the duration of that phone call would you
23     have any objection to me see that phone record?
24         MR. CONN: I mean, I'm just going to object to the
25     form of the question.

**Page 48**

1          MR. CONCANNON: That's fine.
2          MR. CONN: I mean, you can submit a subpoena. It
3      calls for a legal conclusion as to whether or not --
4          MR. CONCANNON: That's fine.
5          MR. CONN: -- you're entitled to it.
6          MR. CONCANNON: That's fine. I just thought I
7      would ask. If there was an issue great. If not great.
8  Q   So you're on the phone with your wife for however long it
9      was and once this incident happened, Miguel, would it be
10     fair to say that you terminated your call?
11 A   Yes, sir.
12 Q   Okay. So if I saw a phone record that showed you placed the
13     call at a certain time and it terminated four minutes later
14     we could conclude that it happened after Paul got in?
15         MR. CONN: Just going to object to the form of the
16     question because as you have already --
17         MR. CONCANNON: I'll rephrase it. You're right,
18     Eric.
19 Q   Miguel, I just want to get a time frame here and it may or
20     may not prove to be very vital. But I don't know. Once you
21     were in the cab can you tell me was it five minutes before
22     Paul started his deliveries -- strike that. When you got in
23     the cab did you get on the phone with your wife basically
24     right away, or once you parked it?
25 A   I don't remember, sir, to tell you the truth.

**Page 49**

1  Q   Okay. That's fine.
2  A   I don't remember. It's been four years.
3  Q   Okay. But you remembered what you did in terms of elevating
4      the --
5  A   That's my job. I do that every -- every week, sir.
6  Q   And in part the reason you remember it is because you do it
7      the same way every time; correct?
8  A   Yes, sir.
9  Q   So you might not remember doing it exactly that way that day
10     but that's the way you normally do it; fair?
11         MR. CONN: Objection; form of the question, asked
12     and answered.
13 Q   You can answer. Is that a "yes"?
14         MR. CONN: You can answer the question.
15 A   Yes, sir.
16 Q   Now, so you're on with your wife, whatever, Paul is on the
17     back of the trailer on a hi-lo for however many minutes, or
18     crane, or whatever device you choose to say, and there was a
19     drop in the trailer whenever it was you terminated your
20     phone call; correct?
21 A   Yes, sir.
22 Q   All right. When you were in the cab for however long where
23     is the trailer brake in relation to your seat behind the
24     wheel, trailer brake?
25         MR. CONN: With regard to the driver seat or the

13 (Pages 46 to 49)

GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

**Page 50**

1      cab or the sleeper area where he was?
2          MR. CONN:  Well, we don't know that yet.
3    Q   Well, ask it this way:  When you were placing the phone call
4      where were you?
5    **A**   **On the back, all the way in the back.**
6    Q   Okay.  Where is the trailer brake located in the cab?
7    **A**   **Here (indicating) is my steering wheel and the brake is**
8      **right here (indicating).  It's right on the front where I**
9      **have to sit.**
10   Q   So if you're sitting facing your steering wheel in the
11      driver's seat is the brake to your left or to your right?
12   **A**   **To my right.**
13   Q   Okay.  And what kind of a brake is it?  Is it a pedal?  Is
14      it a lever?  Is it a button?
15   **A**   **It's a button.**
16   Q   "It's a button."  Okay.  Is that a pneumatic brake system?
17   **A**   **(No verbal response)**
18   Q   Is it a pneumatic brake system?
19          MR. CONN:  Just --
20   **A**   **What do you mean?**
21   Q   Is it an air brake?
22   **A**   **It's an air brake, yes, sir.**
23   Q   Okay.  When you got out of the vehicle, out of the cab after
24      the trailer dropped did you go back to look inside to see
25      what had happened?

**Page 51**

1    **A**   **Yes, sir.**
2    Q   Okay.  Did you see my client on the hi-lo at that point?
3    **A**   **Yes, sir.**
4    Q   Okay.  What was he doing?
5    **A**   **He was just sitting on the lift, the forklift.**
6    Q   Okay.  Was the forklift, to your vision, on all four of its'
7      wheels or was it tilted on its' side at all?
8    **A**   **It was off.**
9    Q   It was what?
10   **A**   **The trailer dropping this way (indicating); right?**
11   Q   I'm sorry.  The trailer is what?
12   **A**   **The trailer is, like, this way (indicating).  It was**
13      **dropping off.  He was sitting right there (indicating).  He**
14      **was sitting on the forklift.**
15   Q   Okay.  Do you know how far his trailer or his hi-lo was from
16      the back of the trailer in terms of feet?
17          MR. CONN:  You said from the back?
18          MR. CONCANNON:  Yes, sir.
19   **A**   **I don't.  He took about four pallets out, that's how far**
20      **with it.**
21   Q   Four rows or four pallets?
22   **A**   **Four pallets.**
23   Q   So my understanding from testimony thus far in the case is
24      there is three pallets per row; is that correct?  If we look
25      across from left to right.

**Page 52**

1    **A**   **No, two pallets.**
2    Q   Two pallets per row?
3    **A**   **Uh-huh (affirmative).**
4    Q   So he would have gotten two rows essentially out of there?
5    **A**   **(Nodding head in affirmative)**
6    Q   "Yes"?
7    **A**   **Yes, sir.**
8    Q   Okay.  And that might put him 8, 10 feet inside the back of
9      the vehicle to get the next group of pallets?
10   **A**   **Yes, sir.**
11   Q   Once you saw him in the back of the trailer did you say
12      anything to Paul, say anything to him?
13   **A**   **No, sir.**
14   Q   Okay.  Would it be fair the rest of that morning, Miguel,
15      that you never talked to Paul Goodman yourself?
16   **A**   **No, sir.**
17   Q   Correct, you didn't talk to him?
18   **A**   **Correct.**
19   Q   Okay.  Did you talk to -- well, when you saw him did you
20      talk to anybody?
21   **A**   **That accident?**
22   Q   Yes, sir.
23   **A**   **I went back there as soon as I knew the trailer went down.**
24      **I talked to a gentleman right there, I don't know what's his**
25      **name, and I asked him if he was okay.  He didn't tell me he**

**Page 53**

1      was okay.  He didn't tell me he was okay.  He said "Seems
2      like he was okay."  So then after that I went back time cab
3      and make a phone call.  I called my boss.
4    Q   Okay.  Who is your boss?
5    **A**   **Used to be Ross.  I don't remember his last name.**
6    Q   Is he still at Dillon?
7    **A**   **No.**
8    Q   Who is your boss now?
9    **A**   **Stephanie Hill.**
10   Q   Stephanie Hill.  Okay.  Is Ross still with Dillon?
11   **A**   **No; no, sir.**
12   Q   Do you know where he is?
13   **A**   **No, sir.  I don't know, sir.**
14   Q   Okay.  So once you got out of the cab and went back and
15      talked to whoever you talked to from TRW how long were you
16      behind the back of the trailer before you went back in the
17      cab and called Ross?
18   **A**   **About three minutes.**
19   Q   Really?
20   **A**   **Yeah.**
21   Q   And then you called Ross.  What did Ross -- what did you
22      tell Ross happened?
23   **A**   **Well, I told him exactly what happened, the trailer drop off**
24      **on me, and he just told me to just stay there and see what**
25      **happened.**

14 (Pages 50 to 53)

GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

1   Q   Okay. Did you do any -- did he instruct you to do any
2       investigation yourself as to try to figure why it happened?
3   A   No, sir.
4   Q   Okay. At the time that you're there and once you hang up
5       the phone with Ross probably 15 minutes after the incident,
6       maybe 20 minutes after the incident, tops; right?
7   A   Yes, sir.
8   Q   Okay. Did you have any understanding at that time as to why
9       it happened?
10  A   No, sir.
11  Q   You mentioned a moment ago that you thought it dropped about
12      a foot or so. What are you basing that on?
13          MR. CONN: You can answer.
14  A   I'm basing because how high we -- you know, the trailer goes
15      up.
16  Q   Okay. So your understanding is that the amount of elevation
17      that would have been required to get to the required dock
18      height at TRW in Saginaw was about 12 inches?
19  A   Yes, sir.
20  Q   Therefore that's the amount that it probably would have
21      dropped, am I following your logic?
22  A   Yes, sir.
23  Q   All right. If it turns out that the actual height was 18 or
24      20 inches then would that be the same -- that would tell you
25      it dropped 18 to 20 inches? Same logic; correct?

Page 54

1           MR. CONN: Do you understand his question?
2   A   I don't know, sir.
3   Q   Well, your testimony appears, at least to me to mean, that
4       however high up you raised it it dropped the full distance
5       back down; correct?
6   A   Yes, sir.
7   Q   So you think it's 12 inches. I'm simply asking you if it
8       turns out that's it's 18 inches when then it simply -- it
9       dropped 18 inches; correct?
10  A   Well, I don't know how tall is that, sir?
11          MR. CONN: And that's why he told you at the
12      beginning and I keep telling you don't guess. So if you
13      know it was a 12-inch drop tell him it was a 12-inch drop.
14      If you know it was something more or less than that or
15      you're guessing you have to tell him you're making a guess
16      otherwise he is going to assume, as he has just done, that
17      you believe it was 12 inches.
18  A   I don't know, sir.
19  Q   Okay. And just so we're clear, however the span was in
20      distance that it took to get the back of the trailer up to
21      the dock plate whatever that number is "X" you would agree
22      with me that it dropped "X" whatever that amount is? "Yes"?
23  A   Yes, sir.
24  Q   We're on the same page, Miguel. Okay. So once it had
25      dropped and you talked to Ross he said, "Stick around"?

Page 55

1   A   Yes, sir.
2   Q   Okay. It looks as though somebody from TRW would have
3       talked to you in preparation of an incident report. It
4       looks to us it was a gentlemen named Craig Kitchen, perhaps.
5       It was a male that spoke to you?
6   A   No, sir.
7   Q   Was it a female that spoke to you?
8   A   Only female told me there -- there was a lady and she come
9       up and ask him who I was, and she told me -- and I told her
10      who I was, that I'm the driver and she just told me that
11      after we get the trailer, the forklifters out just don't
12      bring no more trailers like that over here.
13  Q   Okay. That's the boss lady?
14  A   That was the end of it.
15  Q   Okay. That was not Ashley. It was some other lady?
16  A   No, sir, that was some other lady.
17  Q   So the scene at Dillon before you leave -- well, you had
18      talked to Ashley when you got there. After the incident
19      happens with my client you talked to this boss lady, and
20      those are the only two people at TRW you remember speaking
21      with; is that correct?
22          MR. CONN: Just a mischaracterization. He talked
23      to another gentleman whether or not he was okay.
24          MR. CONCANNON: Oh, okay. I apologize.
25  Q   You talked to somebody and asked if he was okay and he said

Page 56

1       "Yeah, it looks like he is okay." So than three people from
2       TRW; yes?
3   A   Yes, sir.
4   Q   Anyone else?
5   A   That's it.
6   Q   And so from the time that your trailer drops until you pull
7       that trailer away from -- let me back up. Once they get
8       Paul Goodman out of the trailer did someone empty the
9       remainder of that trailer?
10  A   No, sir.
11  Q   It wasn't emptied anymore?
12  A   No, sir.
13  Q   Okay. So whenever they got him out however many minutes go
14      by did they just tell you to go?
15  A   Yes, sir.
16  Q   And you go?
17  A   I pull out.
18  Q   Okay. Where did you take the trailer at that point?
19  A   First of all, they call a mechanic.
20  Q   "They," who is they?
21  A   Us.
22          MR. CONN: Just make sure you're answering the
23      question that he is -- what he has asked you, so go ahead.
24  A   I don't remember, sir.
25  Q   Somebody from Dillon called a mechanic?

Page 57

15 (Pages 54 to 57)



GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

| | |
|---|---|
| 1   A   I don't know, sir. | 1   A   One inspector. |
| 2   Q   You didn't call a mechanic? | 2   Q   Was it a male or a female inspector? |
| 3   A   No, sir. | 3   A   Male. |
| 4   Q   Do you have any reason to believe anybody from TRW called a | 4   Q   Did the male inspector give you a card? |
| 5       mechanic? | 5   A   No, sir. |
| 6   A   No, sir. | 6   Q   Did the male inspector eventually send a bill to Dillon, if |
| 7   Q   Can you think of a reason why anybody other than somebody at | 7       you know? |
| 8       Dillon would call a mechanic? | 8   A   I don't know, sir. |
| 9           MR. CONN: Foundation, calls for speculation.  You | 9   Q   Did he hand you an invoice to take with you when you left? |
| 10      can answer if you know. | 10  A   No, sir. |
| 11  Q   Am I to understand there was a phone call to a mechanic to | 11  Q   So the person that you don't remember inspected the vehicle |
| 12      look at this Dillon trailer and you're telling me you don't | 12      in your presence and didn't give you a single piece of paper |
| 13      think it was from somebody at Dillon who called? | 13      to take with you; is that correct? |
| 14  A   Yes, sir. | 14  A   Correct, sir. |
| 15  Q   It was somebody at Dillon that called? | 15  Q   All right.  And you don't have any knowledge of whether that |
| 16  A   Yes, sir; yes, sir. | 16      person sent some paperwork to Dillon? |
| 17  Q   You just don't know who that somebody is? | 17  A   I don't have no knowledge.  They probably sent it. |
| 18  A   (Nodding head in affirmative) | 18  Q   Since you had a manual log at that point would you have made |
| 19  Q   Is that a "yes"? | 19      a log entry of that? |
| 20  A   Yes, sir. | 20  A   I don't remember, sir. |
| 21  Q   Okay.  Somebody from Dillon calls to have this looked at. | 21  Q   Well, this never happened to you in the ten years -- strike |
| 22      Where did you take it?  Where did you take the trailer?  Was | 22      that.  In the seven or so years at the time that you have |
| 23      it somewhere in Saginaw? | 23      been driving for Dillon would you have expected that you had |
| 24  A   Yeah, they were somewhere back there.  I don't remember, | 24      been obliged to log that incident some place? |
| 25      sir, the name of the place. | 25  A   Never happened. |
| Page 58 | Page 60 |
| 1   Q   Okay.  But was it Saginaw or local, Bay City, Saginaw, | 1   Q   Okay.  I know it never happened before but would you expect |
| 2       Midland? | 2       that you would have logged it in on the day that it happened |
| 3           MR. CONN:  If you know. | 3       in this case? |
| 4   A   I don't remember, sir.  I know it was somewhere and it was | 4           MR. CONN:  I just want to clarify what you're |
| 5       about 20 miles from there or maybe a little bit more than | 5       referring to as if the incident involving the trailer |
| 6       that but that's about it. | 6       falling or the inspection of it thereafter? |
| 7   Q   Okay.  So you would have taken the trailer somewhere nearby. | 7           MR. CONCANNON:  I mean, the incident of the |
| 8       Do you know was it a particular truck repair place?  Was it | 8       trailer falling. |
| 9       a truck stop with a repair facility added? | 9           MR. CONN:  Okay. |
| 10  A   It was, like, a trailer repair place. | 10  Q   Okay.  I'll be clear so the record is clear.  You never had |
| 11  Q   Trailer repair.  Okay.  Do you know was it off I-75? | 11      a trailer fall like this before? |
| 12  A   I don't remember, sir. | 12  A   No, sir. |
| 13  Q   Was it north of Saginaw or south of Saginaw if you know? | 13  Q   Did you -- |
| 14  A   No, sir.  I don't remember that. | 14          MR. CONN:  Is that correct? |
| 15  Q   Okay.  When you took it to the repair site wherever it was | 15          THE WITNESS:  Correct. |
| 16      did you drop the trailer and then leave? | 16  Q   Did you log the incident with Mr. Goodman and the trailer |
| 17  A   No, sir. | 17      falling in your log book?  "Yes" or "no"? |
| 18  Q   Did you stay while the trailer was inspected? | 18  A   No, sir. |
| 19  A   Yes, sir. | 19  Q   Why? |
| 20  Q   Okay.  Was the trailer inspected in your presence or just | 20  A   When I was at the plant I was off duty. |
| 21      while you were waiting in a lobby somewhere? | 21  Q   Wait.  When you were at TRW you were technically off duty? |
| 22  A   I was in the -- that was in my presence, yes, sir. | 22  A   Yes, sir. |
| 23  Q   So you were there when they inspected it? | 23  Q   Okay.  Were you out -- |
| 24  A   Yes, sir. | 24          MR. CONN:  I just need a -- I need to go to the |
| 25  Q   Was it one inspector or more than one inspector? | 25      bathroom so whenever you have a break. |
| Page 59 | Page 61 |

16  (Pages 58 to 61)

GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

| | |
|---|---|
| 1    MR. CONCANNON: I can take a break now. | 1    Q   About 30 minutes. And I keep saying '04 or '05, you don't |
| 2    MR. CONN: You sure? | 2    have any specific date that you got there. You think it's |
| 3    MR. CONCANNON: That's fine. | 3    ten years ago around from now so that puts us in '05, but it |
| 4    MR. CONN: I don't want to -- | 4    could be '04? |
| 5    MR. CONCANNON: That's fine. | 5    A   Correct. |
| 6    (Off the record) | 6    Q   Okay. When did the mechanic who trained you leave the |
| 7    MR. CONCANNON: We just took a break. I want to | 7    company if you know? |
| 8    follow up on something we were leading with. | 8    A   I don't remember, sir. |
| 9    Q   You had taken it to some facility and near within 20 minutes | 9    Q   Did the training -- I'm sorry -- the trainer give you any |
| 10    or so of Saginaw to have the vehicle looked at. Have you | 10    documentation on the drop deck trailer and how to operate |
| 11    seen any documentation since April 26th from someone other | 11    it? |
| 12    than your attorneys about that evaluation of the trailer? | 12    A   No, sir. |
| 13    A   No, sir. | 13    Q   Were you given any test, Miguel, on how to operate one of |
| 14    MR. CONN: Just want to clarify. You said 20 | 14    these drop deck trailers? |
| 15    minutes. I think he said 20 miles. | 15    A   No, sir. |
| 16    MR. CONCANNON: My mistake. | 16    Q   Since that 30 minutes of training ten years ago have you had |
| 17    MR. CONN: It's neither here nor there. | 17    any other training by Dillon on how to operate the drop deck |
| 18    MR. CONCANNON: You're right. 20 miles. | 18    trailer? |
| 19    Q   Did the person who inspected the trailer on April 26th tell | 19    A   No, sir. |
| 20    you anything that you can remember? | 20    Q   Have you had any training by anybody other than Dillon on |
| 21    A   I can't remember, sir. | 21    how to operate a drop deck trailer? |
| 22    Q   Okay. Do you know how long you were there with the trailer | 22    A   No, sir. |
| 23    at his place? | 23    Q   And to my understanding, you have never been underneath the |
| 24    A   No, sir. I can't remember. | 24    drop deck trailer to see how it works operationally; |
| 25    Q   You don't know whether this person made a repair or didn't | 25    correct? |
| Page 62 | Page 64 |

| | |
|---|---|
| 1    make a repair, do you? | 1    A   No, sir. |
| 2    MR. CONN: You can answer. | 2    Q   "Yes" I'm correct? |
| 3    A   He didn't do nothing. | 3    A   Correct. |
| 4    Q   Okay. So he inspected it and as far as you remember he made | 4    Q   Okay. In terms of inspecting the -- when you go out on a |
| 5    no repair? | 5    Sunday night with a truck, with a tractor and a trailer do |
| 6    A   Nope; no, sir. | 6    you have to do any inspection of either the trailer or the |
| 7    MR. CONN: Is that correct? | 7    cab before you take to the road? |
| 8    THE WITNESS: Correct. | 8    A   Yes, sir. |
| 9    Q   I want to ask you a little bit about the trailer itself. I | 9    Q   Okay. What kind of inspection do you have to do? |
| 10    understand the drop deck -- when you first drove for Dillon | 10    A   Lights, marking lights. |
| 11    in '04 or '05 they had drop deck trailers back then and they | 11    Q   What lights? |
| 12    still have them today; correct? | 12    A   The marking lights that we have, you know, if it's missing |
| 13    A   Correct. | 13    or not. |
| 14    Q   And the training you got who would have given you the | 14    Q   Okay. |
| 15    training from Dillon on the drop deck? | 15    A   We lift the trailer up to make sure it's working. |
| 16    A   It was a mechanic. He is not there no more. | 16    Q   You engage the elevation system? |
| 17    Q   What was his name? | 17    A   Yes, sir. |
| 18    A   I can't remember, sir. | 18    Q   Okay. |
| 19    Q   Okay. So the mechanic who you don't remember did he take | 19    A   Then go down then after that then we -- |
| 20    ten minutes to show you how? | 20    Q   Then you're good to go? |
| 21    MR. CONN: Objection; form. | 21    A   -- we're all right. |
| 22    Q   Do you remember how long he trained you? It was a few | 22    Q   Does that inspection make its way -- in 2012 when you were |
| 23    minutes to use the button? | 23    manually having a log book did that inspection make its way |
| 24    MR. CONN: Form. | 24    into your log book? |
| 25    A   About a half an hour. | 25    A   Yes, sir. |
| Page 63 | Page 65 |

2:14-cv-11473-AJT-RSW  Doc # 22-1  Filed 10/15/15  Pg 20 of 23  Pg ID 139

GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

| | |
|---|---|
| 1  Q  Okay. When you arrive at a destination for a delivery in | 1        MR. CONCANNON: Back on. |
| 2     2012 with a manual log would you log in when you arrive at | 2   Q  Miguel, I understand there are full time and part time but |
| 3     the destination? | 3     is there one mechanic who you know who has been there the |
| 4  A  Yes, sir. | 4     whole time that you have been there? |
| 5  Q  What else would you log in -- like, when you got to TRW on | 5   A  No, sir. |
| 6     April 26th what are the things that you would have logged | 6   Q  Can you name any mechanic at Dillon by name? |
| 7     into your book? | 7   A  Gene, Kevin. |
| 8        MR. CONN: Are you asking him what things | 8   Q  Anyone else other than Gene and Kevin? |
| 9     typically would be in his log book or are you asking him on | 9   A  There is more but I don't remember their name. |
| 10    that specific day what would have been -- or what was in his | 10  Q  That's fine. Do you know the components, Miguel, of what |
| 11    log book? | 11    makes up the elevation system in the trailer? |
| 12       MR. CONCANNON: I'm asking what was in his log | 12  A  What does that mean? |
| 13    book on the 26th. | 13  Q  What are the parts that make it work, if you know? |
| 14       MR. CONN: Okay. | 14       MR. CONN: Foundation. You can answer if you |
| 15  Q  If you remember. | 15    know. |
| 16  A  I don't remember that. | 16  A  No, sir. |
| 17  Q  Okay. Typically on the normal day, not April 26th but on | 17  Q  Okay. Would I be correct that whenever you -- the North |
| 18    the normal day are there certain things that you will | 18    Carolina part pickup started your day on April 25th, 2012; |
| 19    typically log in your log book? | 19    correct? |
| 20  A  Off duty time, break time and go to sleep. | 20  A  Correct. |
| 21  Q  So if you have -- and if I understand your testimony, the 11 | 21  Q  You would have tested the elevation system before you took |
| 22    hours that you can operate is within a 24 hour period of | 22    to the road that day; correct? |
| 23    time; is that correct? | 23  A  Correct. |
| 24  A  Correct. | 24  Q  Is it your testimony that on the 26th before you continued |
| 25  Q  So if you were to get stopped on the road your log book | 25    on with the delivery to Saginaw would you have checked the |
| Page 66 | Page 68 |

| | |
|---|---|
| 1     could tell the person stopping that says "I operated here | 1     elevation system that day before you took to the road? |
| 2     but I took the map here (indicating) or I took a break here, | 2   A  Before? Yes, sir. |
| 3     or I took a break here." Is that part of what the purpose | 3   Q  And you would have checked it in way that you have told |
| 4     of the log book is? | 4     us where you look and you listen; correct? |
| 5  A  Correct. | 5   A  Yes, sir. |
| 6  Q  For your log book, Miguel, was there any other purpose that | 6   Q  And that's the way you were taught to do it by the person |
| 7     you used the log book for? | 7     whoever it was that trained you at Dillon; correct? |
| 8  A  No, sir. | 8   A  Yes, sir. Correct. |
| 9  Q  Would I be correct that any repairs on this trailer -- and | 9   Q  And you have been doing it that way the last ten years? |
| 10    by "this trailer" I mean the one we saw yesterday -- | 10  A  Correct, sir. |
| 11    okay? -- that's got its' own license number, I take it you | 11  Q  When the trailer dropped what sensation did you feel in the |
| 12    would not be aware of the repair history of that trailer; | 12    back of the cab? |
| 13    correct? | 13  A  Just was bump (indicating). |
| 14  A  Correct, sir. | 14  Q  Did the cab really drop very far or did the cab not drop at |
| 15  Q  Who would I ask at Dillon today for those repair records, if | 15    all? |
| 16    there are any? | 16  A  Not at all. |
| 17  A  Dillon mechanics. | 17  Q  And, Miguel, do you need to clarify your testimony about |
| 18  Q  Any Dillon mechanic will do or is there, like, a head | 18    what you were doing in the cab? |
| 19    mechanic that was there in 2012 that's still there? | 19  A  Yes, sir. |
| 20       MR. CONN: I'm going to turn it off, but answer | 20  Q  What would you like to clarify? |
| 21    the question and then I'll go off the record. | 21  A  That I was in the cab just laid back and relaxed. |
| 22  A  We have mechanics that works all day and, I believe, they | 22  Q  So you may have been laying down or watching TV or something |
| 23    have mechanic there on call in case if we need him. | 23    like that? |
| 24       MR. CONCANNON: Okay. Off the record. | 24  A  Well, there was a show -- I don't know if it's funny but |
| 25       (Off the record interruption) | 25    there is a show. I don't even want to mention the name of |
| Page 67 | Page 69 |

NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

| | Page 70 | | Page 72 |
|---|---|---|---|
| 1 | the show and I just watching. I just came down there and I | 1 A | I don't know, sir. |
| 2 | was laying back and watching Jerry Springer. | 2 Q | All right. That's fine. Did anyone at Dillon, not your |
| 3 Q | I figure there is a lot of TV like that at 10:30. That's | 3 | lawyers but did anyone at Dillon say anything to you when |
| 4 | okay. You probably saw a lot of Sam Bernstein commercials | 4 | you got back about what they thought happened? |
| 5 | too. | 5 A | No, sir. |
| 6 A | Yes. | 6 Q | Did anyone ask you, say "Hey, Miguel, how did this happen?" |
| 7 Q | Counsel will know what I mean. Ashley testified hearing a | 7 A | Talked to my boss, Ross, and explain to him what happened. |
| 8 | sound that she heard when this dropped, like a whoosh of | 8 Q | Did Ross do any investigation on his own? |
| 9 | air. Do you recall hearing any sound when this drop | 9 | MR. CONN: Objection. If you know. |
| 10 | happened? | 10 A | I don't know, sir. |
| 11 A | No, sir. | 11 Q | Did you know if any mechanic back at Dillon be it people you |
| 12 Q | That's fine. If I asked you this, I apologize, but you | 12 | named or not, Gene or Kevin, do you know if anybody at |
| 13 | talked to Ross at Dillon when you were still onsite at the | 13 | Dillon look at the trailer once you brought it back? |
| 14 | TRW warehouse; correct? | 14 | MR. CONN: Foundation. Go ahead. |
| 15 A | Yes, sir. | 15 A | I don't know, sir. |
| 16 Q | Once you went to the repair shop did you make any other | 16 Q | Once you left the mechanic on the probably early afternoon |
| 17 | communication with anyone at Dillon about the trailer and | 17 | of the 26th after you had been to Dillon -- or after you had |
| 18 | whatever evaluation of the trailer that took place with | 18 | been to TRW and left did you go straight home, at least as |
| 19 | somebody other than Ross? | 19 | far as you could get home before you had to pull over and |
| 20 A | No, sir. | 20 | rest? |
| 21 Q | So the extent to which there is a person at Dillon that | 21 A | Don't remember. I don't remember, sir. |
| 22 | could tell me what you had said other than you at the time | 22 Q | Okay. Do you remember were you able to pick up another load |
| 23 | of the incident and a little while later it would be Ross? | 23 | before you went back home? |
| 24 A | Yes, sir. | 24 A | I remember I had to pick up -- no. Don't remember, sir. |
| 25 Q | And does Ross work in Tennessee? | 25 Q | But as far as you were aware it was capable of carrying |

| | Page 71 | | Page 73 |
|---|---|---|---|
| 1 A | I don't know where he is at but he is not with us anymore. | 1 | another load if you were able to pick one up on the 26th as |
| 2 Q | Oh, that's right. He is not with the company? | 2 | you were heading back home? |
| 3 A | No; unh-unh. | 3 A | (Nodding head in affirmative) |
| 4 Q | You are not a mechanic; correct? | 4 Q | "Yes"? |
| 5 A | No, sir. | 5 A | Yes. |
| 6 Q | And I don't want to know anything that you know from Mr. | 6 Q | Okay. And whether or not you actually picked up a load on |
| 7 | Conn or Mr. Yates but do you have any understanding or | 7 | the way back home you don't know? |
| 8 | opinion as to what happened, why it fell or dropped on the | 8 A | I don't remember. |
| 9 | 26th? | 9 Q | How would I find out? Would it be in your log or would |
| 10 A | No, sir. | 10 | Dillon otherwise have records of that? |
| 11 Q | Would it be fair that if we went to a trial, Miguel, you | 11 A | They would probably got records of that. |
| 12 | would not be in a position to say that my client, Mr. | 12 Q | Would your log also probably say "I stopped at X Y Z |
| 13 | Goodman, did anything wrong that caused this, would you? | 13 | Warehouse in Livonia, Michigan and picked up a load"? Would |
| 14 | MR. CONN: Foundation. | 14 | your own log tell me that? |
| 15 Q | You can't really cast any blame against Mr. Goodman, can | 15 A | Yes, sir. |
| 16 | you? | 16 Q | Who keeps your log -- strike that. I'll be more clear. You |
| 17 | MR. CONN: Same objection. You can answer. | 17 | keep the log while you're making it; correct? |
| 18 A | (No verbal response) | 18 A | (Sigh) |
| 19 | MR. CONN: Also calls for a legal conclusion. | 19 Q | Are you obliged -- is that a "yes"? |
| 20 | MR. CONCANNON: That's fine. | 20 A | Yes. Oh, yes. I'm sorry. |
| 21 Q | You can answer. | 21 Q | Once you maintain -- strike that. Once you keep that log on |
| 22 A | The only thing I can say is, you know, the bouncing because | 22 | the day or the week in question do you turn that log in to |
| 23 | it was, like, fast, and that's the only thing. | 23 | anybody? |
| 24 Q | So you're saying depending on how fast he was operating the | 24 A | Yes, sir. |
| 25 | hi-lo he could have contributed to it? | 25 Q | Who do you turn it into at Dillon? |

19 (Pages 70 to 73)

GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

| | | |
|---|---|---|
| 1 | A | Dillon Transportation. |
| 2 | Q | Any one person? |
| 3 | A | No, sir. |
| 4 | Q | So if I ask Stephanie Hill would you expect that she can |
| 5 | | tell me where your log for April 26th and April 27th would |
| 6 | | be? |
| 7 | A | I don't know, sir. |
| 8 | Q | Okay. Other than your attorney have you given any written |
| 9 | | statement about the incident of April 26th to anybody? |
| 10 | A | You mean writing? |
| 11 | Q | Yes, sir. |
| 12 | A | We did once at Dillon Transportation. |
| 13 | Q | So Dillon had an incident report for this? |
| 14 | A | It's not a report but, you know, I talked to a lady named |
| 15 | | Pam. She type it up a little thing explaining what |
| 16 | | happened. |
| 17 | Q | Okay. Pam works at Dillon? |
| 18 | A | Yes, sir. |
| 19 | Q | Do you know Pam's last name? |
| 20 | A | No, sir. |
| 21 | Q | Does she work in Tennessee at Dillon? |
| 22 | A | Yes, sir. |
| 23 | Q | And did you give a statement to her by phone or did you go |
| 24 | | to Tennessee to give her a statement? |
| 25 | A | I went to the yard she works at. |

Page 74

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | And then did it lower satisfactorily? |
| 3 | A | Yes, sir. |
| 4 | Q | Okay. Do you know how long you had the elevation system up |
| 5 | | in terms of minutes? |
| 6 | A | No, sir. |
| 7 | Q | Did the person get under the back of the trailer or did they |
| 8 | | just look at it from the side kinda as you have done? |
| 9 | A | Well, he look at it and since the trailer was going up and |
| 10 | | down we did about four or five times so, I guess, -- |
| 11 | Q | He didn't get under the trailer? |
| 12 | A | No, sir. |
| 13 | | MR. CONCANNON: Miguel, thanks very much for your |
| 14 | | time. It's been a pleasure meeting you. I have no further |
| 15 | | questions for the record. |
| 16 | | EXAMINATION |
| 17 | BY MR. CONN: | |
| 18 | Q | You were asked a couple of questions again training and I |
| 19 | | just went to followup on that briefly. You said you had 30 |
| 20 | | minutes of training by a mechanic at Dillon; is that |
| 21 | | correct? |
| 22 | A | Yes, sir. |
| 23 | Q | And then you had no other formal training that was provided |
| 24 | | to you by a mechanic after that point; is that correct? |
| 25 | A | No, sir. Yes, sir. |

Page 76

| | | |
|---|---|---|
| 1 | Q | And you gave her a statement and she typed it up? |
| 2 | A | Yes, sir. |
| 3 | Q | Did you sign it? |
| 4 | A | I don't remember, sir. |
| 5 | Q | Okay. Were you disciplined in any way by Dillon |
| 6 | | Transportation for this incident? |
| 7 | A | What do you mean? |
| 8 | Q | Did they suspend you? Did they -- |
| 9 | A | No, sir. |
| 10 | Q | Did they reprimand you in any way? |
| 11 | A | No, sir. |
| 12 | Q | As far as Dillon is concerned you did nothing wrong that |
| 13 | | day, to your knowledge? |
| 14 | | MR. CONN: Foundation. |
| 15 | A | I don't know, sir. |
| 16 | | MR. CONCANNON: Okay. Off the record. |
| 17 | | (Off the record) |
| 18 | Q | When the trailer was inspected by the mechanic in Michigan |
| 19 | | near Saginaw, within 20 miles or so, wherever you were did |
| 20 | | that mechanic operate the elevation system in your presence |
| 21 | | or did you do it? |
| 22 | A | We both did. |
| 23 | Q | You both did? |
| 24 | A | Yes, sir. |
| 25 | Q | And did it raise? |

Page 75

| | | |
|---|---|---|
| 1 | Q | Okay. But from the time that you received that training up |
| 2 | | to 2012 you had operated these types of trailers correctly; |
| 3 | | is that true? |
| 4 | A | Yes, sir. |
| 5 | Q | And you had no other prior problems with a trailer losing |
| 6 | | elevation suddenly; is that correct? |
| 7 | A | Yes, sir. |
| 8 | Q | Based upon your prior experience operating these trailers, |
| 9 | | on the day this incident occurred did it appear to you that |
| 10 | | the trailer had functioned properly? |
| 11 | | MR. CONCANNON: Foundation. |
| 12 | A | Yes, sir. |
| 13 | Q | When you performed your visual inspection did you see the |
| 14 | | arms or the legs, as you called them on the axle? |
| 15 | A | Yes, sir. |
| 16 | | MR. CONCANNON: For clarity, at what time? During |
| 17 | | the inspection before he drove or in Saginaw? |
| 18 | | MR. CONN: I'm talking about at TRW when he |
| 19 | | arrived. |
| 20 | | MR. CONCANNON: All right. |
| 21 | A | Yes, sir. |
| 22 | | MR. CONN: I have nothing further. |
| 23 | | EXAMINATION |
| 24 | BY MR. CONCANNON: | |
| 25 | Q | And you inspected that from the position that you normally |

Page 77

20  (Pages 74 to 77)

GOODMAN v. DILLON TRANSPORTATION, LLC.                    DEPOSITION OF MIGUEL URJILES

```
 1      inspect it from as you told me; correct?
 2   A  Yes, sir.
 3   Q  And am I correct that the training you got from this
 4      mechanic for 30 minutes was the only training Dillon gave
 5      you; correct?
 6           MR. CONN:  I object.  It's a mischaracterization.
 7      He also had on-the-job training.  To the extent that you can
 8      answer go ahead.
 9   A  Yes, sir.
10   Q  All right.  So in other words other than a mechanic there is
11      not some other person at Dillon who gave you training in
12      addition to the mechanic; right?
13           MR. CONN:  You can answer.
14   A  No, sir.
15   Q  "Yes" I am correct, noone else can?
16   A  You're correct.
17   Q  Just the mechanic; correct?
18   A  Just the mechanic.
19           MR. CONCANNON:  Nothing further.  Thanks, Miguel.
20           MR. CONN:  All right.
21           (Deposition concluded at 12:55 p.m.)
22                     -0-0-0-
23
24
25
```

Page 78

Network Reporting
— STATEWIDE COURT REPORTERS —
800-632-2720